

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| DAWN CURRY PAGE, an individual; GLORIA PERSONHUBALLAH, an individual; JAMES FARKAS, an individual, <br><br>Plaintiffs, <br><br>v. <br><br>VIRGINIA STATE BOARD OF ELECTIONS; CHARLIE JUDD, in his capacity as Chairman of the Virginia State Board of Elections; KIMBERLY BOWERS, in her capacity as Vice-Chair of the Virginia State Board of Elections; DON PALMER, in his capacity as Secretary of the Virginia State Board of Elections; KENNETH CUCCINELLI II, in his capacity as Attorney General of Virginia, <br><br>Defendants. | Civil Action No. 3:13 CV 678 <br><br>Three-Judge Court Requested |

## COMPLAINT

1. Plaintiffs bring this action to challenge the constitutionality of Virginia's Congressional District 3 as a racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment.

2. Until recently, Virginia was deemed a covered jurisdiction under the Voting Rights Act of 1965. Accordingly, its congressional maps were subject to preclearance by the federal government.

3. In the name of avoiding retrogression, Virginia has used Section 5 as a justification to racially gerrymander congressional districts, specifically by packing African-

COMPLAINT – 1

American voters into Congressional District 3 and thereby diminishing their influence in surrounding districts.

4. On June 25, 2013, in *Shelby County v. Holder*, 570 U.S. ___, 2013 WL 3184629 (U.S. June 25, 2013), the United States Supreme Court held that the coverage formula provided in Section 4(b) of the Voting Rights Act is unconstitutional. As a result, Virginia is no longer a covered jurisdiction for purposes of Section 5.

5. Virginia can no longer seek refuge in Section 5 as an excuse to racially gerrymander Congressional District 3. Drawn with race as its predominant purpose, this district cannot pass constitutional muster.

6. Plaintiffs seek a declaration that Virginia's Congressional District 3 is invalid and an injunction prohibiting the Defendants from calling, holding, supervising, or taking any action with respect to Congressional elections based on Congressional District 3 as it currently stands.

## PARTIES

7. Plaintiff Dawn Curry Page is a United States citizen and registered voter in the Commonwealth of Virginia. She currently resides in Congressional District 3.

8. Plaintiff Gloria Personhuballah is a United States citizen and registered voter in the Commonwealth of Virginia. She currently resides in Congressional District 3.

9. Plaintiff James Farkas is a United States citizen and registered voter in the Commonwealth of Virginia. He currently resides in Congressional District 3.

10. Defendant Virginia State Board of Elections is responsible for administering Virginia election laws, supervising and coordinating the work of local election officials to ensure legality and purity in all elections, and issuing rules and regulations for the conduct

COMPLAINT – 2

of all elections in the Commonwealth, including elections for the United States House of Representatives.

11. Defendants Charlie Judd, Kimberly Bowers, and Don Palmer are sued in their respective official capacities as Chairman, Vice-Chair, and Secretary of the Virginia State Board of Elections.

12. Defendant Kenneth T. Cuccinelli, II is sued in his official capacity as Attorney General of Virginia. Defendant Cuccinelli is the chief legal officer of the Commonwealth of Virginia.

## JURISDICTION AND VENUE

13. This Court has jurisdiction to hear Plaintiffs' claim pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331, 1343(a)(3), and 1357. This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

14. A three-judge district court is requested pursuant to 28 U.S.C. § 2284(a), as Plaintiffs' action "challeng[es] the constitutionality of the apportionment of congressional districts" in Virginia.

15. Venue is proper under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

16. On January 20, 2012, the Virginia General Assembly passed Virginia's eleven Congressional districts, set forth at Va. Code Ann. § 24.2-302.2 [hereinafter "2012 Congressional Plan"].

17. Virginia received the 2010 decennial census redistricting data from the Census Bureau on February 3, 2011, during the General Assembly's regular 2011 session. The session expired on February 27, 2011, before the General Assembly had adopted a new

COMPLAINT – 3

Perkins Coie LLP
700 Thirteenth St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: 202.654.6200
Fax: 202.654.6211

congressional district plan. That day, the Governor of Virginia called for a special session to address redistricting.

18. During the special session, the Senate Committee on Privileges and Elections established various guidelines to govern the congressional redistricting process.

19. Those guidelines provided, *inter alia*, that "[d]istricts shall be drawn in accordance with the laws of the United States and the Commonwealth of Virginia including compliance with protections against the unwarranted retrogression or dilution of racial or ethnic minority voting strength."

20. The guidelines further provided that "population equality among districts and compliance with federal and state constitutional requirements and the Voting Rights Act of 1965 shall be given priority in the event of conflict among the [redistricting] criteria."

21. The Virginia General Assembly failed to adopt a new congressional redistricting plan in the General Assembly's 2011 Special Session.

22. On November 8, 2011, Virginia held elections for its General Assembly. Republicans maintained their majority in the Virginia House of Delegates. Democrats lost their majority in the Virginia Senate when 20 Democrats and 20 Republicans were elected. Virginia's Republican Lieutenant Governor Bill Bolling would provide an additional vote in the event of a tie.

23. On January 12, 2012--one day after the General Assembly's 2012 Session began--the Virginia House of Delegates passed HB 251, which proposed new congressional districts for Virginia. The General Assembly had originally considered the redistricting plan in HB 251 during the 2011 Special Session, but the Virginia Senate's Democratic majority at the time would not approve it. On January 20, 2012, the Virginia Senate approved HB 251 by a one-vote margin.

COMPLAINT – 4

24. Virginia Governor Bob McDonnell signed HB 251 into law on January 25, 2012.

25. HB 251 was codified as Va. Code Ann. § 24.2-302.2, which defines the 2012 Congressional Plan, including Congressional District 3.



26. Congressional District 3 is located in southeastern Virginia. It includes portions of Richmond, Petersburg, Newport News, and Norfolk. It is not contiguous, with parts of the district disconnected by the James River and Chesapeake Bay.

27. A similar version of Congressional District 3 has existed since 1991, when the Virginia General Assembly adopted new congressional districts in light of the 1990 census.

COMPLAINT – 5

28. In 1997, a three-judge panel concluded that the version of Congressional District 3 drawn in 1991 was the result of unconstitutional racial gerrymandering. *See Moon v. Meadows*, 952 F. Supp. 1141, 1150 (E.D. Va. 1997), *aff'd*, 521 U.S. 1113 (1997).

29. On July 10, 2001, the Virginia General Assembly enacted a new congressional plan based on the 2000 census. Under the congressional redistricting plan adopted in 2001, Congressional District 3 was similar to its unconstitutional predecessor.

30. The current Congressional District 3 contains only slight variations from Congressional District 3 drawn in 1991 and 2001 and found to be an unconstitutional gerrymander in 1997.

31. At the time of the 2010 census, the 2001 version of Congressional District 3 had an African-American voting age population of 53.1%. In the 2012 Congressional Plan, the African-American voting age population in Congressional District 3 was increased to 56.3%.

32. The Virginia General Assembly increased the African-American population of Congressional District 3 by moving the African-American population from neighboring districts into Congressional District 3. Congressional District 3 is surrounded by Congressional Districts 1, 2, 4, and 7. At the time of the 2010 census, former Congressional District 1 had an African-American voting age population of 19.6%. In the 2012 Congressional Plan, the African-American voting age population decreased to 16.9%. Former Congressional District 2 had an African-American voting age population of 21.4%, which decreased to 21.3% under the current plan. Similarly, the African-American voting age population in Congressional District 4 decreased from 33.5% to 31.3%, and the African-American voting age population in Congressional District 7 decreased from 17% to 14.6%. The fact that the African-American population in each of these districts decreased while the

COMPLAINT – 6

Perkins Coie LLP
700 Thirteenth St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: 202.654.6200
Fax: 202.654.6211

African-American population in Congressional District 3 increased is evidence that the 2012 Congressional Plan's packing of African-American voters in Congressional District 3 was a decision driven primarily by race.

33. Congressional District 3 is not compact. Congressional District 3 also disregards key political subdivisions and geographical boundaries and subordinates other traditional districting principles.

34. Congressional District 3 is bizarre on its face. The northwest corner of the district includes parts of Richmond and the north shore of the James River. It then crosses the James River for the first time and juts west to capture parts of Petersburg. The district again crosses to the north shore of the James River to include part of Newport News, though this portion of the district is not contiguous with any other part of the district. The district then hops over part of Congressional District 2 to include part of Hampton and crosses the James River and Chesapeake Bay to capture part of Norfolk, which is not contiguous with any other part of Congressional District 3.

35. As of the date of the enactment of the 2012 Congressional Plan, Virginia was considered a covered jurisdiction under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. Accordingly, the 2012 Congressional Plan was subject to preclearance by either the United States Department of Justice or the United States District Court for the District of Columbia before it could take effect.

36. On February 2, 2012, the Commonwealth of Virginia submitted its submission under Section 5 to the United States Department of Justice. Excerpts of those documents are attached as Exhibit A.

37. In its Statement of Anticipated Minority Impact, the Commonwealth asserted that the 2012 Congressional Plan "complies with the requirements of Section 5 of the United

COMPLAINT – 7

States Voting Rights Act by retaining minority strength in the redrawn Third District comparable to the minority strength of the [previous] Third District under the 2010 Census." Ex. A at 27.

38. In its Section 5 submission, the Commonwealth further explained that the City of Petersburg, as well as additional population from the Cities of Hampton, Norfolk, and Richmond and the County of Henrico were shifted into Congressional District 3 "so as to meet equal population requirements and the non-retrogression requirements of Section 5."

39. On June 25, 2013, the United States Supreme Court issued its opinion in *Shelby County v. Holder*, 570 U.S. \_\_\_, 2013 WL 3184629 (U.S. June 25, 2013), holding that the coverage formula provided in Section 4(b) of the Voting Rights Act is unconstitutional. As a result, the Commonwealth of Virginia is no longer a covered jurisdiction and need not meet preclearance requirements under Section 5.

40. Upon information and belief, Section 5 preclearance requirements were used as a justification to pack African-American voters into the bizarrely-shaped Congressional District 3.

41. Race was the predominant consideration in the creation of Congressional District 3. No other factor explains the tortured shape of this district, its failure to comply with traditional districting principles, or the high concentration of African-American voters in the district.

42. The predominant consideration of race with respect to Congressional District 3 is not justified by a compelling state interest.

43. In particular, in the wake of *Shelby County*, Section 5 cannot justify the use of race as a predominant factor in drawing congressional district lines.

COMPLAINT – 8

44. Nor can Section 2 of the Voting Rights Act justify the use of race as a predominant factor in drawing Congressional District 3. African-American voters in this district are able to elect candidates of their choice without constituting 56.3% of the District's voting age population.

45. Even if there were a compelling state interest to create and maintain Congressional District 3 with race as the predominant factor, Congressional District 3 is not narrowly tailored to achieve that interest. There are other viable and constitutionally permissible alternatives to Congressional District 3.

## CAUSE OF ACTION

### Violation of the Equal Protection Clause of the United States Constitution

46. Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations in paragraphs 1-45 above.

47. The Fourteenth Amendment of Section 1 of the United States Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

48. Race was the predominant factor in the creation of Congressional District 3.

49. The use of race as the predominant factor with respect to Congressional District 3 is not narrowly tailored to serve a compelling state interest.

50. Accordingly, Congressional District 3 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

51. Plaintiffs have no adequate remedy at law other than the judicial relief sought here. The failure to temporarily and permanently enjoin the conduct of elections based on

COMPLAINT – 9

Congressional District 3 will irreparably harm Plaintiffs by violating their constitutional rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.    Convene a court of three judges pursuant to 28 U.S.C. § 2284(a);

B.    Declare that Congressional District 3 under the 2012 Congressional Plan is a racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment;

C.    Issue a permanent injunction enjoining Defendants from enforcing or giving any effect to the boundaries of Congressional District 3 as drawn in the 2012 Congressional Plan, including an injunction barring Defendants from conducting any elections for the United States House of Representatives based on Congressional District 3;

D.    Hold hearings, consider briefing and evidence, and otherwise take actions necessary to determine and order a valid plan for new congressional districts in the Commonwealth of Virginia; and

E.    Grant such other or further relief the Court deems to be appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

Perkins Coie LLP
700 Thirteenth St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: 202.654.6200
Fax: 202.654.6211

Dated: October 2, 2013

Respectfully submitted,

By _____
John K. Roche (VSB# 68594)
Marc Erik Elias (*pro hac vice* to be filed)
John Devaney (*pro hac vice* to be filed)
Perkins Coie, LLP
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 434-1627
Fax: (202) 654-9106
Email: JRoche@perkinscoie.com
Email: MElias@perkinscoie.com
Email: JDevaney@perkinscoie.com

Kevin J. Hamilton (*pro hac vice* to be filed)
Perkins Coie, LLP
1201 Third Avenue, Ste. 4800
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000
Email: KHamilton@perkinscoie.com

*Attorneys for Plaintiffs*

COMPLAINT – 11