IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| **DAWN CURRY PAGE, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | **Civil Action No.: 3:13-cv-678** |
| **VIRGINIA STATE BOARD OF** ) | |
| **ELECTIONS, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## TRIAL BRIEF OF INTERVENOR-DEFENDANTS AND DEFENDANTS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 4

ARGUMENT ............................................................................................................ 7

I.  PLAINTIFFS HAVE CONCEDED THAT THEY CANNOT SHOW THAT
    RACE RATHER THAN POLITICS PREDOMINATED IN THE ENACTED
    PLAN ............................................................................................................... 7

    A.  Dr. McDonald's Concessions End This Case ....................................... 7

    B.  Dr. McDonald's Cursory VTD Analysis Is Less Supportable Than A
        Similar Analysis Rejected In Easley .................................................... 9

II. PLAINTIFFS HAVE ADDUCED NO PROOF THAT RACE PREDOMINATED
    IN THE ENACTED PLAN ............................................................................... 13

    A.  Plaintiffs' Admission That Race Predominates In The Alternative Plan
        Dooms Their Claim ............................................................................. 14

    B.  The Alternative Plan Fails To Prove A Racial Gerrymander ............... 16

        1.  The Alternative Plan Does Not Achieve The General Assembly's
            Political Objectives ..................................................................... 17

        2.  The Alternative Plan Is Not As Consistent With Traditional
            Redistricting Principles As The Enacted Plan ........................... 17

        3.  Plaintiffs Have Not Shown That The Alternative Plan Would Bring
            About Significantly Greater Racial Balance Than The Enacted
            Plan ............................................................................................. 22

    C.  Plaintiffs Have No Other Evidence To Support Their Shaw Claim ..... 23

III. THE ALTERNATIVE PLAN IS NOT MORE NARROWLY TAILORED TO
     ACHIEVE SECTION 5 COMPLIANCE THAN THE ENACTED PLAN .............. 23

    A.  The Enacted Plan Is Narrowly Tailored To Achieve Section 5 Compliance ...... 24

    B.  Plaintiffs Have Not Shown That The Alternative Plan Could Have
        Received Preclearance ....................................................................... 28

CONCLUSION ....................................................................................................... 30

CERTIFICATE OF SERVICE ..................................................................................

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abrams v. Johnson*,
   521 U.S. 74 (1997)..........................................................................................30

*Ala. Leg. Black Caucus v. State of Ala.*,
   No. 2:12-cv-691, at 162–72 (N.D. Ala. Dec. 20, 2013)..........................................27

*Backus v. State*,
   857 F. Supp. 2d 553 (D.S.C. 2012), *summ. aff'd*, 133 S. Ct. 156 (2012) ....................19, 23, 24

*Bush v. Vera*,
   517 U.S. 952 (1996)...............................................................................3, 14, 24, 26

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).........................................................................................4

*Colleton County Council v. McConnell*,
   201 F. Supp. 2d 618 (D.S.C. 2002)........................................................................24

*Easley v. Cromartie*,
   532 U.S. 234 (2001)................................................................................ passim

*Fletcher v. Lamone*,
   831 F. Supp. 2d 887 (D. Md. 2011), *summ. aff'd* 133 S. Ct. 29 (2012) ..............................7, 8

*Georgia v. Ashcroft*,
   539 U.S. 461 (2003).......................................................................................24

*Hunt v. Cromartie*,
   526 U.S. 541 (1991)........................................................................................7

*Karcher v. Daggett*,
   462 U.S. 725 (1983)....................................................................................14, 21

*Miller v. Johnson*,
   515 U.S. 900 (1995)................................................................................ passim

*Moon v. Meadows*,
   952 F. Supp. 1141 (E.D. Va. 1997), *summ. aff'd*, 521 U.S. 1113 (1997)...................... passim

*Shaw v. Hunt*,
   517 U.S. 899 (1996)................................................................................ passim

*Shaw v. Reno*,
509 U.S. 630 (1993)..........................................................................................1, 3

*Shelby County v. Holder*,
133 S. Ct. 2612 (June 25, 2013)........................................................................3, 4

*Wilkins v. West*,
264 Va. 447 (2002) ........................................................................................ passim

*Wilson v. Kasich*,
981 N.E.2d 814 (2012)..........................................................................................23

**STATUTES**

42 U.S.C. § 1973c ........................................................................................4, 5, 24

42 U.S.C. § 1973c(b) ..........................................................................3, 25, 28, 29

42 U.S.C. § 1973c(c)..............................................................................................26

Va. Stat. § 24.2-305 ..............................................................................................20

Va. Stat. § 24-302 (1998 Version) ........................................................................5

Va. Stat. § 24-302.1 (2001 Version) ......................................................................5

**OTHER AUTHORITIES**

28 C.F.R. § 51.54(c)(1)..........................................................................................30

Dep't of Justice Guidance Concerning Redistricting Under Section 5,
76 Fed. Reg. 7470 (2011) ................................................................................27

Micah Altman & Michael McDonald, *A Half Century of Virginia Redistricting*,
47 U. Rich. L. Rev. 771, 816 (Mar. 2013)..........................................1, 7, 8, 17, 20

Va. Const. Article II, § 6..........................................................................................18

INTRODUCTION

Plaintiffs' *Shaw v. Reno* claim fails at the threshold because Plaintiffs *admit* that the General Assembly had dispositive reasons for creating the alleged deficiencies in Enacted District 3 wholly apart from any racial considerations.  Specifically, Plaintiffs' expert, Dr. Michael McDonald—who is the *only* substantive witness Plaintiffs intend to call at trial—has conceded that it would have made "perfect sense" for the General Assembly to adopt Enacted District 3 for *political* reasons even if every affected voter "was *white*."  McDonald Dep. at 139 (emphasis added) (Ex. A).  Thus, Plaintiffs cannot prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without" District 3.  *Miller v. Johnson*, 515 U.S. 900, 916 (1995).  In fact, before he was retained as Plaintiffs' expert, Dr. McDonald described the Enacted Plan *not* as a racial gerrymander, but instead as "a 8-3 partisan division of the state" in favor of Republicans "that also protected all incumbents."  Micah Altman & Michael McDonald, *A Half Century of Virginia Redistricting*, 47 U. Rich. L. Rev. 771, 816 (Mar. 2013).  These concessions foreclose Plaintiffs from showing that "race *rather than* politics" explains the shape and composition of District 3, and their *Shaw* claim fails.  *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (emphasis in original).

Plaintiffs' failure of proof does not end there.  Incredibly, unlike plaintiffs in every other *Shaw* case, Plaintiffs have not even *attempted* to propose a *race-neutral* alternative that does *not* subordinate traditional redistricting principles to race (and thereby illustrates how racial considerations infected Enacted District 3).  Rather, Plaintiffs *concede* that race "predominates" in *their* Alternative Plan because that Plan was intentionally drawn with a "50% quota" for District 3's black voting-age population ("BVAP").  McDonald Dep. at 104, 118, 151.  Thus, fully accepting *all* of Plaintiffs' allegations and characterizations, they are asking this Court to require, in order to fulfill the Fourteenth Amendment's *racial neutrality* mandate, a district that

1

concededly subordinates traditional principles to race for the avowed purpose of achieving a "50% quota" (to replace an Enacted District 3 that allegedly does so to achieve a "55% quota"). *See id.* at 150–51. But, of course, one cannot *expose* the Legislature's purportedly illegitimate use of race by proposing an alternative that illegitimately uses race, and the Court cannot *remedy* an illegitimately racial district by replacing it with *another* such district.

As this reflects, Plaintiffs' "racial gerrymander" claim has nothing to do with eliminating race from Virginia's congressional redistricting, but is simply an obvious effort to *use* race to advance Democratic *political* interests, by redeploying heavily Democratic black voters. The *only* difference between the Enacted Plan and the Alternative Plan is the placement of the boundary between Districts 2 and 3, and Plaintiffs' political purpose for moving that boundary is obvious. By consciously reducing District 3's BVAP to a razor-thin majority, the Alternative Plan shifts a large number of (predominately black) Democratic voters to District 2. This shift would transform evenly-divided District 2, which is currently represented by Republican Scott Rigell, into a heavily Democratic district, in direct violation of the General Assembly's legitimate political, incumbency-protection, and core-preservation goals.

Plaintiffs thus advocate a 6% reduction in District 3's BVAP not to cure an alleged predominant use of race in District 3—indeed, they *concede* that "race still predominates" in the Alternative Plan and its 50% quota, *see id.* at 104, 118, 151—but instead to swing District 2 nearly 6% in the Democratic Party's political favor. Plaintiffs' own allegations and evidence thus demonstrate that they have not *attempted* to prove what *Shaw* plaintiffs must "at least" show: that "the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles" and that bring about "significantly greater racial balance." *Easley*, 532 U.S. at 258. The Alternative Plan does not

2

attempt to significantly alter the racial balance, but seeks to trade one majority-black district for another, and is indisputably at odds with both the General Assembly's political objectives and the traditional districting principles of core preservation and incumbency protection.

Because compliance with Section 5 of the Voting Rights Act is an affirmative defense under *Shaw*, Plaintiffs' failure to prove a predominant use of race dooms their claim without any need to inquire whether the use of race was justified by Section 5. *See Shaw v. Hunt*, 517 U.S. 899, 918 (1996) (*Shaw II*). In any event, Plaintiffs' claim concerning a Section 5 defense also fails. Plaintiffs concede that the Legislature had a compelling government interest to comply with Section 5. Thus, the only question is whether the Alternative Plan is more "narrowly tailored" to achieve Section 5 compliance than the Enacted Plan. *See id.*[1]

Yet contrary to Plaintiffs' apparent belief, the narrow tailoring inquiry does not open the door to "endless 'beauty contests'" among competing districting plans with slightly different BVAPs. *Bush v. Vera*, 517 U.S. 952, 977 (1996) (plurality op.). Rather, narrow tailoring is shown here because the General Assembly had a "strong basis in evidence" to believe that the Enacted Plan "substantially addresses" Section 5, *id.*: (i) Congress amended Section 5 in 2006 to prohibit *any* "dimin[ution]" in minority voters' "ability to elect" their candidates of choice, including by making a safe black district any less safe, 42 U.S.C. § 1973c(b); (ii) independent proposals from a bipartisan commission to which Dr. McDonald served as an advisor called for at least maintaining District 3's BVAP; and (iii) in 2011, black delegates in areas covered by

---

[1] Intervenor-Defendants and Defendants understand Plaintiffs to have abandoned the central premise of their Complaint: that the Supreme Court's 2013 decision in *Shelby County v. Holder* retroactively invalidated the Enacted Plan that the General Assembly constitutionally adopted in 2012. *See* Compl. ¶¶ 1–6 (DE 1). Plaintiffs have conceded that *Shelby County* did not "change[] or even inform[] the General Assembly's actual motivation . . . in 2012," Pls.' Opp. to Summ. J. at 19 (DE 42), so that post hoc judicial decision inherently sheds no light on whether the General Assembly intentionally discriminated on the basis of race, as Plaintiffs' *Shaw* claim requires them to show, *Shaw v. Reno*, 509 U.S. 630, 639–44 (1993) (*Shaw I*).

3

District 3 advocated 55% BVAP for majority-black districts in the House of Delegates.

In any event, even if a Section 5 beauty contest were the standard for narrow tailoring, Plaintiffs' Alternative Plan would plainly lose because it complies neither with Section 5 nor with Plaintiffs' conception of Section 5.  Plaintiffs apparently believe that a plan is not narrowly tailored if the majority-black district has a BVAP *any* greater (even 1%) than the minimum required to obtain preclearance.  *See, e.g.*, Compl. ¶ 45.  Plaintiffs thus believe that, in the absence of a racial bloc voting analysis, a redistricting plan should preserve the benchmark BVAP.  *See* McDonald Dep. at 230.  Plaintiffs further believe that where a racial bloc voting analysis has been conducted, a redistricting plan must calibrate the district's BVAP to the lowest level at which minority voters can elect their candidate of choice.  *See id.* at 207–11.  According to Dr. McDonald's own racial bloc voting analysis, that level is *25%* BVAP in District 3.  Yet the Alternative Plan *neither* preserves District 3's benchmark BVAP *nor* reduces it to the lowest permissible level—so it does not comply even with Plaintiffs' (erroneous) construction of Section 5.[2]

## STATEMENT OF FACTS

Virginia was a covered jurisdiction under Section 5 from 1965 until the Supreme Court's decision in *Shelby County v. Holder*, 133 S. Ct. 2612 (June 25, 2013).  Section 5 required Virginia to submit any changes to its election or voting laws to federal preclearance.  *See* 42

---

[2] Fact discovery has now closed, all expert reports have been completed, and Dr. McDonald is Plaintiffs' only substantive witness, *see* Pls.' Witness List (Ex. B)—yet there is no dispute as to any material fact.  The Court therefore can grant summary judgment to Defendants without any fact-finding or a trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Miller*, 515 U.S. at 916–17 (federal courts "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race," and courts must "recognize these principles, and the intrusive potential of judicial intervention into the legislative realm, when assessing under the Federal Rules of Civil Procedure the adequacy of a plaintiff's showing at the various stages of litigation and determining whether to permit discovery or trial to proceed").

U.S.C. § 1973c.  Congress amended Section 5 in 2006 to prohibit any covered jurisdiction from enacting any change to such laws with "any discriminatory purpose" or the effect of "diminishing the ability" of minorities to elect their "candidates of choice."  *Id.* §§ 1973c(b), (c).

District 3 is currently the only congressional district in Virginia where black voters have the ability to elect their candidate of choice.  *See* Statement Of Anticipated Minority Impact (Ex. C).  District 3 is represented by Democrat Bobby Scott and is surrounded by Districts 1, 2, 4, and 7, all of which are represented by Republicans.  *See* Enacted Plan Map (Ex. D).

District 3 was created as a majority-black district in 1991.  In 1997, a three-judge court invalidated the 1991 version of District 3 as a racial gerrymander.  *Moon v. Meadows*, 952 F. Supp. 1141, 1144 (E.D. Va. 1997) (three-judge court), *summ. aff'd*, 521 U.S. 1113 (1997).  In 1998, the General Assembly enacted a new districting plan with 50.5% BVAP in District 3.  *See* Va. Stat. § 24-302 (1998 Version) (Ex. E).  The General Assembly enacted the Benchmark Plan in 2001, and that plan received Section 5 preclearance.  *See* Va. Stat. § 24-302.1 (2001 Version) (Ex. F).  The BVAP in Benchmark District 3 was 53.2% at the time of enactment and 53.1% in 2010.  *See* Statement Of Anticipated Minority Impact at 5.  Neither Plaintiffs nor any other party challenged the 1998 or Benchmark versions of District 3 as a racial gerrymander.

Following the release of the 2010 Census data in 2011, the Virginia Senate approved a set of criteria for drawing the new congressional districting plan.  Sen. Comm. On Privileges & Elections Res. No. 2 (Mar. 25, 2011) (Ex. G) ("Sen. Criteria").  The Senate Criteria "identify the standards applied" by the General Assembly "in drawing new congressional districts" in 2012. Statement Of Change at 8  (Ex. H).

The Enacted Plan adopted in 2012 preserves 83.1% of the core of Benchmark District 3. *See* Morgan Rep. at 24 (Ex. I).  The Enacted Plan moved the City of Petersburg from District 4

to District 3; New Kent County from District 3 to District 7; precincts in Richmond from District 7 to District 3; and precincts in Henrico from District 3 to District 7. *See id.* The net effect of these and other shifts was to increase District 3's BVAP to 56.3%. *See* Statement of Anticipated Minority Impact at 5. The Justice Department granted preclearance of the Enacted Plan. *See* Mar. 14, 2012 Preclearance Letter (Ex. J).

The Enacted Plan made 2 of the 3 Democratic districts—including District 3—more Democratic, and 7 of the 8 Republican districts—including the four districts surrounding District 3—more Republican. *See* Morgan Rep. at 12. Dr. McDonald agrees that the Enacted Plan's changes to District 3 were politically beneficial to the Republican incumbents surrounding District 3, and that a politically-motivated General Assembly would have made those changes even if every affected voter "was white." McDonald Dep. at 137.

Plaintiffs did not produce their Alternative Plan until February 4, 2014 (DE 53), after the Court directed Plaintiffs to produce it (DE 50) and four months after filing suit. Plaintiffs admit that race "predominates" in the Alternative Plan because it was drawn with a "50% quota" for District 3's BVAP. *See* McDonald Dep. at 104, 118, 151. Dr. McDonald also admits that the Alternative Plan replicates the Enacted Plan's moves between Districts 3, 4, and 7 and, thus, that his criticisms of those moves in the Enacted Plan "apply equally" to the Alternative Plan. *Id.* at 87–88. And even though the only difference between the Alternative Plan and the Enacted Plan is the boundary between Districts 2 and 3, the Alternative Plan preserves only 69.2% of the core of District 3. *See id.* at 81; Morgan Rep. at 24.

The net effect of the Alternative Plan is to reduce District 3's BVAP from 53.1% in the Benchmark Plan to 50.2%. *See* McDonald Analysis at 8 (Ex. K). The Alternative Plan also makes District 2 heavily Democratic, increasing the Democratic vote share from 49.5% (2008

Presidential election) and 50.3% (2012 Presidential election) to 54.9% (2008 Presidential election) and 55.1% (2012 Presidential election).  *See* Morgan Rep. at 10–13.

## ARGUMENT

### I.   PLAINTIFFS HAVE CONCEDED THAT THEY CANNOT SHOW THAT RACE RATHER THAN POLITICS PREDOMINATED IN THE ENACTED PLAN

#### A.   Dr. McDonald's Concessions End This Case

Dr. McDonald—Plaintiffs' *only* substantive witness—has conceded that it would have made "perfect sense" for the Republican-controlled General Assembly to adopt the Enacted Plan even if every affected voter in and around District 3 "was white."  McDonald Dep. at 139.  In fact, before he was retained in this case, Dr. McDonald described the Enacted Plan *not* as a racial gerrymander, but instead as "a 8-3 partisan division of the state" in favor of Republicans "that also protected all incumbents."  Altman & McDonald, 47 U. Rich. L. Rev. at 816.

These concessions end this case.  Because "race and political affiliation" are often "highly correlated," Plaintiffs must decouple the two and show that "race *rather than* politics" predominates in Enacted District 3.  *Easley*, 532 U.S. at 242.  Indeed, because a political purpose does not violate *Shaw*, a legislature may subordinate traditional principles to gerrymander (or support) Democrats "even if it so happens that the most loyal Democrats happen to be African-American Democrats and even if the State were conscious of that fact."  *Hunt v. Cromartie*, 526 U.S. 541, 551 (1991).  Thus, in *Easley*, the Supreme Court overturned as *clearly erroneous* a three-judge court's finding of a *Shaw* violation because the evidence was equally consistent with a political and a racial purpose, and therefore failed to prove that "race *rather than* politics *predominantly* explain[ed]" the plan.  532 U.S. at 243, 257–58 (emphases in original).

Another three-judge court in the Fourth Circuit recently applied this rule to grant summary judgment to the defendants in a *Shaw* case.  *See Fletcher v. Lamone*, 831 F. Supp. 2d

887 (D. Md. 2011) (three-judge court), *summ. aff'd* 133 S. Ct. 29 (2012).  The *Fletcher* court

rejected a racial gerrymander claim against Maryland's 2011 congressional redistricting plan

because "[m]oving Democrats for partisan purposes does not . . . violat[e] the Fourteenth

Amendment," and "the plaintiffs have not shown that the State moved African-American voters

from one district to another because they were African-American and not simply because they

were Democrats."  *Id.* at 901.  The Supreme Court summarily affirmed.  *See* 133 S. Ct. 29.

Plaintiffs cannot meet that high burden.  Plaintiffs' concession that the General Assembly

would have adopted Enacted District 3 for political reasons even if every affected voter "was

white," McDonald Dep. at 139, forecloses any showing that it "moved African-American voters

from one district to another because they were African-American and not simply because they

were Democrats," *Fletcher*, 831 F. Supp. 2d at 901.  In other words, that the General Assembly

implemented "a 8-3 partisan division of the state" in favor of Republicans "that also protected all

incumbents," Altman & McDonald, 47 U. Rich. L. Rev. at 816, *irrespective* of race, means that it

did not adopt a *racial* gerrymander, *Easley*, 532 U.S. at 242.

Plaintiffs' concessions are unsurprising: as Dr. McDonald acknowledges, the Enacted

Plan's changes to Benchmark District 3 were politically beneficial to the Republican incumbents

in the four surrounding districts.  *See* McDonald Dep. at 125–40.  As measured by the 2008 and

2012 Presidential election results, the Enacted Plan made 2 of the 3 Democratic districts more

Democratic, and 7 of the 8 Republican Districts more Republican.  *See* Morgan Rep. at 10–13.

This effect extended to District 2, which is represented by Republican Scott Rigell.  *See id.*

District 2 "was the most closely divided of all the districts, with Democrat Barack Obama and

Republican John McCain each capturing 49.5% of the vote" in 2008.  *Id.* at 12.  That District

voted out a Republican incumbent Member of Congress in 2008 and a Democratic incumbent in

2010, when Congressman Rigell first won election.  *Id.* at 12–13.  District 2's "evenly divided political composition and election history would have provided the Republican-controlled General Assembly with a reason to strengthen one-term Republican incumbent Congressman Scott Rigell," which it did by moving more heavily Republican areas into District 2 and more heavily Democratic areas out of District 2.  *See id.* at 13.

The same pattern adhered in District 1 represented by Republican Robert Wittman; District 4 represented by Republican Randy Forbes; and District 7 represented by Republican Eric Cantor.  *See id.* at 10–13.  All of these districts became more Republican under the Enacted Plan than they were under the Benchmark Plan.  *See id.*; *see also* McDonald Dep. at 125–38.

In short, "the trades that Dr. McDonald concludes are racially-motivated are just as readily, and perhaps more readily, explained by politics than by race."  Morgan Rep. at 13–14. Most relevant here, Dr. McDonald states that the Enacted Plan moved an 18.3% BVAP area from District 3 to District 2 and a 36.7% BVAP area from District 2 to District 3.  *See* McDonald Analysis at 9.  But the 18.3% BVAP area moved into Republican District 2 was also only 47% (2008 election) and 48% (2012 election) Democratic, while the 36.7% BVAP area moved into Democratic District 3 was 64% (2008 election) or 69% (2012 election) Democratic.  *See* Morgan Report at 13.  This is true of *all* of moves between District 3 and surrounding districts that Dr. McDonald criticizes as predominantly racial in the Enacted Plan: as even he concedes, they *all* strengthened the Republican incumbents in the surrounding districts.  *See id.* at 125–39.  This fact only underscores that it made "perfect sense," wholly apart from race, for the General Assembly to make these moves.   McDonald Dep. at 139.

### B.   Dr. McDonald's Cursory VTD Analysis Is Less Supportable Than A Similar Analysis Rejected In *Easley*

Notwithstanding his concessions, Dr. McDonald suggests that he has conducted an

analysis to show that race rather than politics predominates in the Enacted Plan—but the Supreme Court rejected, as a matter of law, a more defensible analysis in *Easley*.  At issue in *Easley* was whether race had predominated in the North Carolina General Assembly's creation of a 47% black district.  *See* 532 U.S. at 246.  To support that claim, the plaintiffs' expert reviewed all precincts in the six counties whose portions made up the challenged district.  *See id.* at 247.  The expert observed that the challenged district contained "between 39% and 56% of the precincts (depending on the county) that are more-than-40% reliably Democratic," but "almost every precinct with more-than-40% African-American voters."  *Id.*  He then inferred that race must have predominated because precincts that were Democratic and black were included in the challenged district, but precincts that were Democratic and white were excluded.  *See id.*

The Supreme Court concluded that this analysis "offer[ed] little insight into the legislature's true motive" and overturned as clearly erroneous the three-judge court's judgment that relied upon it.  *Id.* at 248.  In the first place, the expert had not shown whether "the excluded white-reliably-Democratic precincts were located near enough to [the challenged district's] boundaries or each other for the legislature as a practical matter to have included them, without sacrificing other political goals."  *Id.*  Moreover, while all of the examined precincts "were at least 40% reliably Democratic[,] . . . virtually all of the African-American precincts included in [the district] were more than 40% reliably Democratic."  *Id.*  Because the legislature's objective was to make the challenged district "as safe as possible" politically, it "sought precincts that were reliably Democratic, not precincts that were 40% reliably Democratic, for obvious political reasons."  *Id.* a 246–47.  Indeed, given the correlation between race and political affiliation, "a legislature may, by placing reliable Democratic precincts within a district without regard to race, end up with a district containing more heavily African-American precincts, but the reasons

10

would be political rather than racial." *Id.* at 245.[3]

Dr. McDonald's cursory analysis of the Enacted Plan suffers the same flaws. Dr. McDonald purports to identify the voting tabulation districts (VTDs) in "the localities that comprise or are adjacent to the [Enacted] Third District" that have a "Democratic performance greater than 55%," which he describes as "heavily Democratic." 1/20/14 McDonald Reply at 7 (Ex. L). He points out that the average BVAP in the 189 such VTDs in District 3 is 59.5% and in the 116 such VTDs in adjacent localities is 43.5%, and then leaps to the conclusion "that race trumped politics" in the decision to include or exclude these VTDs from District 3. *See id.* at 8.

Dr. McDonald, however, has defined the excluded VTDs broadly to encompass any VTDs in "*localities* that . . . are adjacent to" Enacted District 3, regardless of whether the *VTDs* are adjacent to District 3. *Id.* at 7 (emphasis added). He therefore has not shown whether any of the 116 "excluded white-reliably-Democratic precincts were located near enough to [District 3's] boundaries or each other for the legislature as a practical matter to have included them, without sacrificing other political goals." *Easley*, 532 U.S. at 246. At the same time, he includes in his analysis VTDs that are located in the *center* of District 3, *see* McDonald Dep. at 154, and therefore *could not* have been moved to another district.

Moreover, Dr. McDonald treats all 55%-Democratic VTDs as equal, even though some are more Democratic than others—so he has not shown that "the excluded white precincts were as reliably Democratic as the African-American precincts that were included in" District 3. *Easley*, 532 U.S. at 246. In fact, when the *actual* Democratic vote share is considered, the 55%-Democratic VTDs *in* District 3 are both more black *and* more Democratic than the VTDs in

---

[3] Here, of course, the Republican-controlled General Assembly's political goal would not have been to make the already safe Democratic District 3 more Democratic, but to make the surrounding Republican districts more Republican by *removing* heavily Democratic areas.

localities *adjacent* to District 3: the VTDs in District 3 are on average 59.5% black and 80.9%

Democratic, while the VTDs in adjacent localities are on average 43.5% black and 65.4%

Democratic.  *See* VTD Chart (Ex. M).  Thus, while Dr. McDonald inferred racial predominance

from the 16% difference in average BVAP among the two groups of VTDs, he says absolutely

nothing about the virtually identical 15.5% difference in their average Democratic vote share.

*See* 1/20/14 McDonald Reply at 7–8.  He therefore has done nothing to rebut the possibility that

the General Assembly, "by placing reliable Democratic precincts within a district without regard

to race, end[ed] up with a district containing more heavily African-American precincts, but the

reasons w[ere] political rather than racial."  *Easley*, 532 U.S. at 245.

In fact, Dr. McDonald's analysis is significantly *weaker* than the analysis rejected in

*Easley*.  In the first place, Dr. McDonald ignores the baseline racial composition of District 3 and

the surrounding districts.  Because District 3 is a majority-black district but the surrounding

districts are not, the average BVAP in VTDs within District 3 necessarily would be higher than

the average BVAP in VTDs outside of District 3.

Moreover, unlike in *Easley*, the General Assembly was *preserving* an existing majority-

black district in order to comply with Section 5, not creating an identifiable black district in the

first instance.  *See id.* at 237–41.  Thus, 166 of the Dr. McDonald's 189 55%-Democratic VTDs

in District 3 *already* were included in *Benchmark* District 3—and their 81.6% average

Democratic vote share and 60.7% average BVAP are slightly *higher* than the averages in the 189

VTDs Dr. Morgan observes.  *See* VTD Chart.  As discussed below, *see infra* at 13–14, the

General Assembly had ample non-racial reasons to leave these VTDs in District 3, such as

preserving the cores of existing districts and protecting incumbents.  At the same time, the *new*

55% Democratic VTDs that the General Assembly added to District 3 are *less* black (and less

Democratic) than the preexisting VTDs, meaning that the General Assembly made District 3 *whiter* through its addition of 55%-Democratic VTDs.  *See* VTD Chart.

Finally, while the alternative plan in *Easley* purported to fix the alleged racial pattern, *see Easley*, 532 U.S. at 248, the Alternative Plan here *perpetuates* the pattern.  Dr. McDonald admits that he has not bothered to conduct his VTD analysis on the Alternative Plan, and would be "surprise[d]" if it showed a pattern similar to what he described in the Enacted Plan.  *See* McDonald Dep. at 170.  According to Dr. McDonald's own data, however, there are 160 55%-Democratic precincts in Alternative District 3, with an average BVAP of 59.8% and an average Democratic vote share of 80.6%.  *See* VTD Chart.  The Alternative Plan also has 145 55%-Democratic VTDs in adjacent localities, with an average BVAP of 46.4% and an average Democratic vote share of 68.8%.  *See id.*  In other words, the difference in average BVAP between the two sets of VTDs is 13.5%, and the difference in average Democratic vote share is 11.8%.  *See id.*  The disparity of 1.7% between these averages is *larger* than the 0.5% disparity between the average BVAP and Democratic vote share observed in the Enacted Plan.  *See id.*

## II. PLAINTIFFS HAVE ADDUCED NO PROOF THAT RACE PREDOMINATED IN THE ENACTED PLAN

Even if Plaintiffs could survive their lack of evidence that race rather than politics explains Enacted District 3, they still must show more than that race was "*a* motivation for the drawing of" District 3, *Easley*, 532 U.S. at 241 (emphasis in original), but rather that race was the "predominant factor" for why the General Assembly "subordinated traditional race-neutral districting principles."  *Miller*, 515 U.S. at 916.  That burden is particularly daunting here: unlike in the ordinary *Shaw* case, the General Assembly *preserved* an existing majority-black district rather than creating a new one.  *See Shaw I*, 509 U.S. at 635–37.  In fact, no case has ever found a *Shaw* violation where a legislature has preserved an existing majority-minority district.  This is

13

because there are ample non-racial reasons for maintaining the status quo in such districts, such as the traditional principles of "preserving cores" and protecting incumbents. *Karcher v. Daggett*, 462 U.S. 725, 740 (1983); *Wilkins v. West*, 264 Va. 447, 463–64 (2002).

*Shaw* obviously does not discourage—much less *prohibit*—the General Assembly from applying the *same* continuity criteria to District 3 that it applied to other districts. *See Bush*, 517 U.S. at 977 (plurality op.) (*Shaw* does not "limit a State's discretion to apply traditional districting principles in majority-minority, as in other, districts"). Such a rule would *discriminate* on the basis of race by subjecting majority-black districts to separate criteria. Thus, *Shaw* is triggered only when a legislature treats majority-minority districts *differently* because of their racial composition. *Shaw I*, 509 U.S. at 639–49. And since it is undisputed that the General Assembly preserved district cores and protected incumbents across the state, its *similar* treatment of District 3 was not *differential* treatment, much less *race-based* differential treatment. In fact, Plaintiffs' concession that race "predominates" in the Alternative Plan and their failure to propose a viable alternative independently suffice to defeat Plaintiffs' claim.

A.    **Plaintiffs' Admission That Race Predominates In The Alternative Plan Dooms Their Claim**

To prove that race predominated in the Enacted Plan, Plaintiffs were required to offer an alternative under which race did *not* predominate. *Miller*, 515 U.S. at 916. This requirement makes perfect sense: a federal court must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race," and cannot determine whether a redistricting plan "subordinate[s] traditional race-neutral districting principles" to racial considerations—much less *remedy* the predominant use of race—unless it knows what a plan that does *not* so subordinate traditional redistricting principles would look like. *Id.* at 916. This is precisely why *Easley* requires *Shaw* plaintiffs to come forward with an alternative plan that

14

brings about a "significantly greater racial balance" than the enacted plan. 532 U.S. at 258.

Plaintiffs, however, cannot meet this threshold burden because they *admit* that race "predominates" in the Alternative Plan, which was drawn to preserve District 3's BVAP above a "50% quota." McDonald Dep. at 104, 118, 151. Because Plaintiffs have not contended, through submission of the Alternative Plan or elsewhere, that there was a race-neutral alternative that better complies with traditional principles, they have provided no basis to infer that the Enacted Plan subordinates traditional principles to race. *See Miller*, 515 U.S. at 916.

Indeed, the Alternative Plan is identical to the Enacted Plan except for the boundary between Districts 2 and 3. *See* McDonald Dep. at 81. The Alternative Plan thus contains all of the same flaws in District 3 that Plaintiffs allege the Enacted Plan contains, except those along the boundary with District 2. *See id.* at 87–88. And, in the District 2 boundary area, the Alternative Plan "corrects" the Enacted Plan's alleged predominant use of race to *increase* District 3's BVAP with a conceded predominant use of race to *decrease* District 3's BVAP to a "50% quota." *Id.* at 151.

*First*, Dr. McDonald asserts that both the 1998 and Benchmark versions of District 3 are "constitutionally suspect" because, in his view, "[t]here is no reason to believe race was not also the predominant factor in the[ir] creation." 1/20/14 McDonald Reply at 6. The Alternative Plan is equally "constitutionally suspect," *id.*, because it "retains most of Benchmark District 3, including its population, shape and geography," Morgan Rep. at 5–6; McDonald Dep. at 72–73.

*Second*, Dr. McDonald criticized the Enacted Plan because it moved the "African-American community of Petersburg" to District 3 (which he opined made District 3 "similar to the unconstitutional district at issue in *Moon*"), and white voters from District 3 to District 4. 12/6/13 McDonald Rep. at 22–23 (Ex. N). Dr. McDonald also took issue with the Enacted

15

Plan's "shift[ing] lower Black VAP" New Kent County from District 3 to District 7 "in exchange for much higher Black VAP VTDs" in Henrico and Richmond, asserting that these moves showed that "Virginia chose to further racially segregate localities" and to "racially divide" Richmond. *Id.* at 6, 24, 26.  Yet, by Dr. McDonald's own admission, the Alternative Plan *replicates* all of these moves, so these criticisms "apply equally" to the Alternative Plan. McDonald Dep. at 87.

*Third*, the Alternative Plan moves a staggering number of people—287,015, or 39.6% of an ideal district—between Districts 1, 2, and 3 in order to calibrate District 3's BVAP to Plaintiffs' "50% quota." *Id.* at 60, 85, 151.  By retaining much of Benchmark District 3 and replicating moves made in the Enacted Plan, the Alternative Plan increases District 3's BVAP well above 50%.  *See* Morgan Rep. at 8–11.  To offset this increase, the Alternative Plan moves massive numbers of white voters into, and black voters out of, District 3 through its District 1, 2, and 3 swaps.  *See id.*  Thus, while the Enacted Plan's trades between Districts 1, 2, and 3 were largely race-neutral, the Alternative Plan moves a net of more than 23,000 voting-age blacks *out* of District 3.  *See id.*  As even Dr. McDonald recognizes, such a movement of voters to consciously *decrease* a district's BVAP is a racial gerrymander.  McDonald Dep. at 51.  The Alternative Plan thus exacerbates the alleged racial predominance in District 3.

## B.    The Alternative Plan Fails To Prove A Racial Gerrymander

Plaintiffs' claim also fails because the Alternative Plan does not prove "at least that the [General Assembly] could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles," and does not bring about "significantly greater racial balance" than the Enacted Plan.  *Easley*, 532 U.S. at 258.

### 1. The Alternative Plan Does Not Achieve The General Assembly's Political Objectives

The Alternative Plan undermines, rather than achieves, the General Assembly's "legitimate political objectives." *Easley*, 532 U.S. at 258. Instead of maintaining the Enacted Plan's "8-3 partisan division of the state that also protected all incumbents," Altman & McDonald, 47 U. Rich. L. Rev. at 816, the Alternative Plan proposes a 7-4 partisan division that seriously weakens Congressman Rigell. It "would swing the closely-divided District 2 approximately 5.3% more Democratic than Benchmark District 2 and 5.5% more Democratic than Enacted District 2." Morgan Rep. at 14–15. Alternative District 2 would be 54.9% (2008 election) or 55.1% (2012 election) Democratic, *see id.* at 15—right at the 55% level that Dr. McDonald considers to be "highly Democratic," McDonald Dep. at 153.

### 2. The Alternative Plan Is Not As Consistent With Traditional Redistricting Principles As The Enacted Plan

As noted, Plaintiffs agree that the Alternative Plan subordinates traditional principles to race—but contend that it *better* complies with traditional principles than the Enacted Plan. *See* McDonald Dep. at 104, 203–04. Thus, Plaintiffs' claim is that the Alternative Plan somehow subordinates traditional principles *less* than the Enacted Plan, which is not a cognizable basis for finding a *Shaw* violation. *See supra* at 13–16. Anyway, the claim is false. The Alternative Plan concededly performs *worse* than the Enacted Plan on the traditional principles of core preservation and incumbency protection, splits only one fewer locality, and achieves only miniscule differences in *some* compactness measures. Plaintiffs thus are asking the Court to override the General Assembly's judgment that the Enacted Plan's incumbency protection and core preservation benefits outweigh one extra locality split. But it is a bedrock rule that "the General Assembly must balance these competing" principles "when designing electoral districts." *Wilkins*, 264 Va. at 463–64; *see Miller*, 515 U.S. at 915 (legislatures "must have

17

discretion to exercise the political judgment necessary to balance competing interests").

The Virginia Constitution identifies only two traditional principles, compactness and contiguity.  Va. Const. art. II, § 6.  The Virginia Supreme Court has recognized other "traditional redistricting elements," including "preservation of existing districts, incumbency, voting behavior, and communities of interest."  *Wilkins*, 264 Va. at 464.  The Senate Criteria adopted by the Democratic Senate in 2011 are the most recent iteration of Virginia's traditional principles, and recognize "incumbency considerations" and preserving "communities of interest" defined by "governmental jurisdictions," "political beliefs, [and] voting trends."  Sen. Criteria V.

Even Dr. McDonald agrees that the Senate Criteria "look very much like traditional redistricting criteria."  McDonald Dep. at 47.  Moreover, the fact that the Senate Criteria were adopted by a Democratically-controlled Senate in 2011 *enhances* their utility and credibility for assessing the Enacted Plan adopted by a Republican-controlled General Assembly in 2012.  It is simple enough for a legislature to promulgate a set of criteria to *justify* a plan it already intends to enact—but that is not the case with the Senate Criteria, which provide a preexisting "framework" against which to judge the Enacted Plan.  *See id.* at 46.

**Compactness**.  Dr. McDonald concedes that Alternative District 3 "is not compact," McDonald Dep. at 89, so, under his own theory, it *violates* the Virginia Constitution.  *See* Va. Const. art. II, § 6.  Dr. McDonald also agrees that there are "30-plus measures of compactness"—all of which are "inherently manipulable"—and that he is not aware of any objective standard for determining compactness.  McDonald Dep. at 89–92.  Nonetheless, he suggests that Alternative District 3 is "more compact" than Enacted District 3 because of minor differences in their scores on the Reock, Polsby-Popper, and Scwartzberg tests.  12/6/13 McDonald Rep. at 7.  Yet Dr. McDonald concedes that Alternative District 3 is *less* compact

18

than Enacted District 3 on the Ehrenburg and Population Polygon tests, which are no less reliable than the three measures he favors.  McDonald Dep. at 91–92.  This case thus confirms Dr. McDonald's prior view that "I could provide a compactness measure that would look really great for our side, and you can produce a compactness measure that would look really great for your side."  2/10/12 McDonald *Backus* Dep. at 150 (Ex. O).[4]

**Contiguity**.  Virginia's contiguity requirement may be met over water without a connecting bridge.  *Wilkins*, 264 Va. at 463–66; Sen. Criteria III.  Dr. McDonald admits that Alternative District 3, like Enacted District 3, achieves contiguity in this way.  3/24/14 McDonald Reply at 8 (Ex. P).  He contends, however, that the Enacted Plan uses water contiguity "with the express purpose of . . . bypass[ing] White communities"—but he nowhere identifies *who* "express[ed]" this purpose or where.  *Id.*  Moreover, he makes no mention of the *political* composition of the "bypass[ed]" areas, and thus cannot infer that race rather than politics predominated.  *See id.*  Finally, in all events, since water contiguity is not contrary to any Virginia redistricting principle, use of this option for racial purposes would not *subordinate* traditional principles to race.  *See Miller*, 515 U.S. at 916.  *Shaw* does not prohibit considering race, only subordinating traditional districting principles to those racial considerations.  *See id.*

**Locality Splits**.  Even though Dr. McDonald agrees that there is no "established principle" for elevating reduction of locality splits over other traditional principles, McDonald Dep. at 192, he seeks to do precisely that and to attach dispositive weight to the fact that the Alternative Plan has *one* fewer split locality than the Enacted Plan.  But while locality splits are

---

[4] Dr. McDonald stated earlier that the "General Assembly" endorsed his three preferred compactness measures by using them "in determining how well districts met" the compactness requirement.  3/24/14 McDonald Reply at 8.  Dr. McDonald provides no citation for this statement, and, in any event, it is irreconcilable with his repeated assertions that the General Assembly failed to adopt *any* "formally operative" criteria for the Enacted Plan.  *See id.* at 9–10.

not insignificant, they have not been an important traditional principle—much less more important than other principles—for four decades.

In fact, the Virginia Constitution was amended in 1970 to eliminate respect for "political subdivisions" as a traditional principle. *See* Altman & McDonald, 47 U. Rich. L. Rev. at 782. In 2000, the General Assembly identified by statute certain important traditional principles, but respecting political subdivisions was not one of them. *See* Va. Stat. § 24.2-305. *Wilkins* does not mention preserving political boundaries as a traditional districting principle. *See Wilkins*, 264 Va. at 464. Reflecting this consensus view, the Senate Criteria noted that local government lines "may reflect communities of interest to be balanced, but they are entitled to no greater weight as a matter of state policy than any other identifiable communities of interest." Sen. Criteria V. The Criteria thus emphasized that the "discernment, weighting, and balancing of the varied factors that contribute to communities of interest is an intensely political process best carried out by elected representatives of the people." *Id.*

In any event, even focusing exclusively on split localities, "[t]here is no reason to conclude that this marginal difference" of one split locality between the Alternative and Enacted Plans "is significant." Morgan Rep. at 20. The Enacted Plan splits five fewer localities than the Benchmark Plan, *see id.* at 19–20, but Dr. McDonald previously brushed aside this larger improvement because "the fact remains that like the *Moon v. Meadows* Unconstitutional District, the [Enacted] Third District has more splits than any other district," 1/20/14 McDonald Reply at 9. By that logic, the Alternative Plan's smaller improvement over the Enacted Plan is also irrelevant because Alternative District 3 also has more splits than any other district in the Alternative Plan. *See* Morgan Rep. at 20–21.

After these facts were noted, Dr. McDonald suggested that the Alternative Plan's locality

20

splits are superior to the Enacted Plan's splits because they affect a smaller population.  3/24/14 McDonald Reply at 7.  Yet Enacted District 3 *maintained* splits in localities that were split in the Benchmark Plan and, therefore, preserved existing communities of interest along the "governmental jurisdictions" of the Benchmark Districts.  Sen. Criteria V; *see also* Morgan Rep. at 23.  The Alternative Plan, by contrast, creates a new split dividing 1,016 residents of Portsmouth—which was not split in the Benchmark or Enacted Plans—away from the rest of Portsmouth and Benchmark District 3.  Even Dr. McDonald recognizes that it is "very unlikely" that this small number of Portsmouth voters moved to District 2 would "have any influence over [their] congressional representation."  McDonald Dep. at 184.[5]

**Preservation of Cores**.  "[P]reserving the cores of prior districts" is a traditional principle.  *Karcher*, 462 U.S. at 740; *see also Wilkins*, 264 Va. at 463–64; Sen. Criteria V.  The General Assembly faithfully applied this principle across the Enacted Plan and preserved at least 71.2% of the core of each Benchmark District.  *See* Morgan Rep. at 24.  Dr. McDonald concedes that the Alternative Plan performs worse than the Enacted Plan on this principle, and that Alternative District 3 preserves *only 69.2%* of the core of Benchmark District 3, far less than the *83.1%* preserved in Enacted District 3.  McDonald Dep. at 55–56.

**Protection Of Incumbents**.  Incumbency protection is a traditional districting principle. *Karcher*, 462 U.S. at 740; *Wilkins*, 264 Va. at 463–64; Sen. Criteria V.  Dr. McDonald agrees that the Enacted Plan better protects incumbents than the Alternative Plan, as he must since the

---

[5] Dr. McDonald also previously attempted to manufacture a disparity in the number of split VTDs in the Alternative Plan and the Enacted Plan, but he now concedes that the number of split VTDs *affecting population*—the only relevant number—is the *same* in both plans.  *See* McDonald Dep. at 109.  He contends, however, that while the Enacted Plan's split VTDs are not "independently significant," they have a "racial component."  *Id.* at 113.  But, as with Dr. McDonald's contiguity argument, he ignores the political component to the VTD splits and the fact that even racially motivated VTD splits do not subordinate any traditional principle to race.

Alternative Plan harms Congressman Rigell. *See* McDonald Dep. at 179–81.

At his deposition, but nowhere in his *four* expert reports, Dr. McDonald contended that Delegate Janis—the sponsor of the bill in 2011 that eventually became the Enacted Plan—stated that the drafter did *not* consider incumbency protection in the Enacted Plan. *See, e.g.*, *id.* at 119, 179–81. This suggestion is simply baffling and demonstrably false: Plaintiffs themselves have acknowledged that Delegate Janis stated that the drafter considered the "preferences of Members of Congress." Pls.' Opp. to Mot. for Summ. J. at 17 (DE 42). Indeed, it is hard to envision a more forthright acknowledgement of incumbency protection: Delegate Janis repeatedly stated on the floor of the General Assembly that the Enacted Plan was drawn to "preserv[e] the will of the electorate by maintaining current incumbents" and to reflect incumbent preferences. *See, e.g.*, 4/12/11 Floor Hearing at 0:59-5:41, 18:52-21:17, 26:00-30:56, 41-42:30 (Ex. Q).

### 3. Plaintiffs Have Not Shown That The Alternative Plan Would Bring About Significantly Greater Racial Balance Than The Enacted Plan

Finally, the Alternative Plan's 6% BVAP reduction would not bring about "significantly greater racial balance" than the Enacted Plan. *Easley*, 532 U.S. at 258. The evil in *Shaw* was a state's creation of a majority-black district that was racially identifiable and segregated voters on the basis of their race. *See Shaw I*, 509 U.S. at 639–44. The Alternative Plan does *nothing* to undo this alleged evil here because "race still predominates" in Alternative District 3, which was avowedly drawn to precisely achieve a 50% racial quota. McDonald Dep. at 104, 118.[6]

---

[6] Dr. McDonald asserts that "the Alternative Third District has a greater racial balance than the [Enacted] Third District" because the Alternative District's BVAP is "substantially similar to" the 1998 version's BVAP, while the Enacted District's has a BVAP "closer to" the 1997 version struck down in Moon. 3/24/14 McDonald Reply at 1. But *constitutional* majority-black districts do not have a different *racial balance* than unconstitutional majority-black districts and, anyway, McDonald himself asserts that "[t]here is no reason to believe that race was not also a predominant factor in the creation of the" 1998 version of District 3. 1/20/14 McDonald Reply at 6.

C.      **Plaintiffs Have No Other Evidence To Support Their *Shaw* Claim**

Even if Plaintiffs could overcome their lack of a viable, race-neutral alternative plan, they have no other evidence to support their claim.  Before producing the Alternative Plan, Plaintiffs offered two reports in which Dr. McDonald opined that "race" was the General Assembly's "predominant purpose" in shifting areas in and out of District 3.  Dr. McDonald, however, did not consider the Senate Criteria or analyze whether race-neutral criteria explain those shifts.  *See* 12/6/13 McDonald Rep. at 12–26; 1/20/14 McDonald Reply at 8–10.

This analysis is indistinguishable from Dr. McDonald's analysis that another three-judge court recently rejected as "incomplete and unconvincing."  *Backus v. State*, 857 F. Supp. 2d 553, 562 (D.S.C. 2012) (three-judge court), *summ. aff'd*, 133 S. Ct. 156 (2012).  There, as here, Dr. McDonald "identified districts that exchanged population in a manner that resulted in a district experiencing a net [BVAP] increase."  *Id.* at 561.  He then "examined whether traditional districting principles were subordinated" in those districts and, "[i]f they were[,] concluded that race was the predominant factor."  *Id.* at 561–62.  As that court pointed out, Dr. McDonald "relied on incomplete information" because he did not examine preservation of "communities of interest" or "incumbency protection."  *Id.* at 562.  As noted, Dr. McDonald's opinion in this case suffers from similar flaws—so it is likewise "incomplete and unconvincing."  *Id.*[7]

III.    **THE ALTERNATIVE PLAN IS NOT MORE NARROWLY TAILORED TO ACHIEVE SECTION 5 COMPLIANCE THAN THE ENACTED PLAN**

The affirmative defense of narrow tailoring is not even triggered in this case because

---

[7] A lack of diligence and reliability appears to be a hallmark of Dr. McDonald's work as an expert: in yet another redistricting case this cycle, the Ohio Supreme Court noted that his "affidavits are replete with conclusory statements that lack specific factual support" and left it "to wonder about [his] analytical choices and the concomitant viability of his conclusions." *Wilson v. Kasich*, 981 N.E.2d 814, 827 (2012).  The court deemed it "unclear whether Professor McDonald even considered all the applicable criteria," noted that the *Backus* court had found his opinion "unreliable," and rejected his opinion before it as "similarly defective."  *Id.*

23

Plaintiffs have failed to carry their *prima facie Shaw* burden.  *See Shaw II*, 517 U.S. at 908.

Even where narrow tailoring is triggered, the enacted district need not "defeat rival compact

districts designed by plaintiffs' experts in endless 'beauty contests.'"  *Bush*, 517 U.S. at 977

(plurality op.).  Indeed, in this context, the Supreme Court "adhere[s] to [its] longstanding

recognition of the importance in our federal system of each State's sovereign interest in

implementing its redistricting plan."  *Id.*  States thus retain "flexibility" in how they "respect"

traditional principles and undertake "reasonable efforts to avoid" Voting Rights Act liability.  *Id.*

Thus, narrow tailoring does not turn on whether the enacted plan achieves the most

minimal possible compliance with the VRA, or whether Plaintiffs' alternative more minimally

complies.  Rather, narrow tailoring is shown "if the State has a 'strong basis in evidence' for

concluding that creation of a majority-minority district is reasonably necessary to comply with

the [Voting Rights Act], and the districting that is based on race 'substantially addresses the

[Voting Rights Act] violation.'"  *Id.* (quoting *Shaw I*, 509 U.S. at 656; *Shaw II*, 517 U.S. at 918);

*Colleton County Council v. McConnell*, 201 F. Supp. 2d 618, 639 (D.S.C. 2002) (three-judge

court); *Backus*, 857 F. Supp. 2d at 599 (same); *Moon*, 952 F. Supp. at 1149 (same).

Indisputably, the Enacted District 3 "substantially addresses" the conceded need to not

retrogress under Section 5—in fact, the General Assembly's redistricting effort was

indistinguishable from the effort of the independent bipartisan commission to which Dr.

McDonald served as an advisor.  Plaintiffs' Alternative Plan is therefore irrelevant.

### A.     The Enacted Plan Is Narrowly Tailored To Achieve Section 5 Compliance

In 2003, the Supreme Court construed Section 5 to permit conversion of majority-

minority districts into minority-minority districts in certain cases. *Georgia v. Ashcroft*, 539 U.S.

461, 479–80 (2003).  Congress amended Section 5 three years later to overturn *Ashcroft*, which

"misconstrued and narrowed the protections afforded by Section 5."  42 U.S.C. § 1973c note,

Findings (b)(6).  Thus, the 2006 version of Section 5 prohibited any change that would "diminish[]" minority voters' ability to elect their "candidates of choice."  42 U.S.C. § 1973c(b).

This new "ability to elect" standard afforded the General Assembly more than sufficient reason to conclude that Section 5 prohibited *any* reduction in District 3's BVAP, which could diminish minority voters' ability to elect their "candidates of choice" by making a safe black district less safe.  *Id.*  Moreover, the General Assembly opted not to conduct a costly racial bloc voting analysis.  As even Dr. McDonald agrees, maintaining the benchmark BVAP is the "best way to proceed" toward preclearance in the absence of such an analysis.  McDonald Dep. at 230.

The Independent Bipartisan Advisory Commission On Redistricting formed by Governor McDonnell—to which Dr. McDonald served as an advisor—took a similar view.  Because that Commission lacked "the resources to conduct . . . racial voting analyses," it included in its proposed majority-minority districts "a percentage of minority voting-age population within the range accepted by the Department of Justice in 2001."  Comm. Rep. at 18 (Ex. R).  Thus, when it issued its final report in April 2011, the Commission proposed three congressional districting options, all of which had a BVAP in District 3 between 52.5% and 55.1%.  *See id.* at 22–27.

The General Assembly also had evidence that 55% BVAP was a reasonable threshold for obtaining Section 5 preclearance.  *See* Morgan Rep. at 26.  In 2011, the General Assembly considered proposed redistricting plans for the House of Delegates and its 12 majority-black districts.  *See id.* at 25–27.  *See id.*  Some of these proposals, including the Independent Commission's two proposals, had majority-black districts with BVAPs below 55%.  *See id.*

At least one black Delegate from an area covered by District 3—Delegate Dance of Petersburg—advocated a 55% minimum BVAP for majority-black districts in the House plan.  *See* 4/4/11 Privileges And Elections Hearing at 13–14 (Ex. S).  Delegate Dance explained the

view that "*at least 55 percent performing*" was necessary to preserve black voters' ability to

elect in House districts:

> So I know Delegate McClellan was at 50 percent, currently she's at a 50 percent district, as far as an African American district. For Delegate McClellan, that's not an issue. Even though she's an African American, she can win that district. But if Delegate McClellan leaves that and goes on to become . . . a state-wide representative, Congress or whatever, could another African American minority person, if you will, still be able to keep that as one of the 12 minority districts? Not so.

*Id.* at 13–14 (emphasis added).[8]

The General Assembly thus enacted a House plan with a BVAP of 55% or higher in all

12 majority-black districts, including districts within the geography covered by District 3, even

though this "required increasing" the BVAP in some districts. *See* Morgan Rep. at 26. Eight of

the 12 members of the House Black Caucus voted in favor of the plan. *See id.*

On this record, the General Assembly had "a strong basis in evidence" to believe that

Section 5 prohibited reducing District 3's BVAP below the benchmark level, and that 55%

BVAP was a reasonable level for preserving the ability to elect. *Bush*, 517 U.S. at 977 (plurality

op.). The General Assembly acted accordingly when it adopted the Enacted Plan with 56.3%

BVAP in District 3. *See id.* The Justice Department precleared the Enacted Plan, meaning that

Virginia carried its burden to prove that the Plan was enacted without "any discriminatory

purpose," 42 U.S.C. § 1973c(c), even though one of the key factors the Department considers is

"whether minorities are overconcentrated in one or more districts," Dep't of Justice Guidance

---

[8] Black community leaders made similar pleas. *See, e.g.*, 4/4/11 Privileges And Elections Public Hearing at 20 (Petersburg Mayor Moore: "As our community, even though we have a strong voting strength of at least 55 percent, our statistics show that, with the voting percentages of 40 to 42 percent, it is important that we maintain the minority districts."); *id.* at 28 (Rev. Pollard, Chesterfield NAACP: "We're hoping that you will keep us with at least 55 percent of the democratic voting in the district, so we may maintain our minority status.") (Ex. T).

Concerning Redistricting Under Section 5, 76 Fed. Reg. 7470, 7472 (2011).

Plaintiffs offer three arguments in an attempt to defeat this showing, all of which fail. *First*, Plaintiffs suggest that a plan cannot be narrowly tailored if it increases the district's BVAP above the benchmark level. *See, e.g.*, Compl. ¶ 45. As noted, that is irreconcilable with Supreme Court precedent. *See also Ala. Leg. Black Caucus v. State of Ala.*, No. 2:12-cv-691, at 162–72 (N.D. Ala. Dec. 20, 2013) (three-judge court) (rejecting identical argument) (Ex. U). Moreover, Plaintiffs' argument would lead to even *more* race-consciousness in redistricting: *precisely replicating* the benchmark BVAP is a more rigid racial strait-jacket, requiring more precise and offsetting race-conscious adjustments than one granting reasonable flexibility. The Alternative Plan proves this obvious truism because Plaintiffs significantly departed from traditional principles in order to calibrate Alternative District 3's BVAP to their 50% quota. *See supra* Part II.B. In all events, Plaintiffs' notion that narrowly tailoring equals precise benchmark BVAP replication is irrelevant because they have proposed no such alternative—the Alternative Plan is 3% off the Benchmark BVAP (lower).

*Second*, Dr. McDonald points out that the General Assembly received preclearance of a redistricting plan for the Virginia Senate in 2011 that had 5 majority-black districts below 55% BVAP. *See* 3/24/14 McDonald Reply at 2. Dr. McDonald, however, fails to note that the BVAP in each of these districts was *higher* than the BVAP in Alternative District 3. *See, e.g.*, Senate Statement of Anticipated Minority Impact at 6 (Ex. V).

*Finally*, Dr. McDonald makes much of his assertion that District 3's incumbent representative, Bobby Scott, could be reelected with a lower BVAP than is present in Enacted District 3. *See* 3/24/14 McDonald Reply at 3–4. But the question under Section 5 is not whether a long-serving incumbent could be reelected, but whether the plan effects *any* "dimin[ution] of

27

the ability" of minority voters "to elect" *any* "candidates of their choice," 42 U.S.C. § 1973c(b), even first-time minority candidates.

### B.    Plaintiffs Have Not Shown That The Alternative Plan Could Have Received Preclearance

Plaintiffs' claim also fails because they have not proven that the Alternative Plan could have received Section 5 preclearance, much less that it is narrowly tailored to that purpose.  The Alternative Plan reduces District 3's BVAP to a razor-thin majority level from 53.1%.  Therefore, all agree that this diminished BVAP had to be justified by a sophisticated racial bloc voting analysis, to prove to DOJ that the reduced *BVAP* did not reduce black voters' *ability to elect.  See supra* at 25; 42 U.S.C. § 1973c(b).  But such analyses, particularly for the new "ability to elect" standard, are complicated, expensive, and quite debatable.  Therefore, the Legislature, like the Independent Commission, had a powerful reason to adopt the far safer, simpler, and less expensive course of not diminishing BVAP.

Moreover, Dr. McDonald's racial bloc voting analysis, designed to *support* Plaintiffs' Alternative Plan BVAP and *justify* reducing the Benchmark BVAP, does nothing of the sort, and *confirms* the dangers of relying on racial bloc voting analysis to justify reducing the BVAP below the Benchmark.  Analyzing the results in the Obama-McCain 2008 election[9] and the 2009 gubernatorial race, McDonald concludes that the black "candidate of choice would be elected from Alternative District Three."  3/24/14 McDonald Reply at 5–6.  But this fails to prove non-retrogression for two fundamental reasons.  First, it asks the wrong question.  Under Section 5, the question is not whether the black-preferred candidates "would be elected," but whether such candidate's ability to be elected has been "*diminished*" from the Benchmark—which Dr.

---

[9] Dr. McDonald states that the Obama-McCain race is "more probative" than the only other election he examines, the 2009 gubernatorial election, because it is a "black-while contest." McDonald Dep. at 211.

28

McDonald's analysis does not even attempt to address.  42 U.S.C. §1973c(b).

Second, this analysis would not prove to any sensible person, much less the 2012 Justice Department, that reduced BVAP in District 3 would not reduce the ability to elect, because it proves *far too much*.  That is, it not only "shows" that blacks would be able to elect their preferred candidate at *51%* BVAP, but at *25%* BVAP.  But, of course, no Section 5 jurisdiction would engage in the doomed-to-failure effort to reduce a *53.1%* BVAP district to *25%* BVAP and argue that this did not retrogress blacks' ability to elect.  Specifically, Dr. McDonald finds that black voters' candidate of choice receives 100% of the black vote in Alternative District 3 and "in the mid to high 30's crossover vote from non-blacks" (38.6% in the "more probative" Obama race).  *See* 3/24/14 McDonald Reply at 6; McDonald Dep. at 208–18.  Thus, in a 25% BVAP District 3, a black candidate would start with 25% of the total vote (because black voters vote 100% for their preferred candidate).  And because 38.6% of non-black voters vote for black voters' preferred candidate, a 75% non-black voting-age population equals another 28.95% of the total vote (38.6% of the 75% non-black voting-age population).  Thus, at 25% BVAP, the preferred black candidate would receive 53.95% of the vote in Alternative District 3 under Dr. McDonald's analysis.

Notwithstanding these "results," no one seriously believes that a reduction from 53.1% to 25% BVAP is non-retrogressive (which is why Plaintiffs did not propose such an alternative) and no sensible Legislature would produce a plan that is so obviously D.O.A. at the Justice Department's Section 5 unit.  Rather, it reflects only that the votes received by *Barack Obama* (who twice won Virginia—a state with 19.4% BVAP) and the *white* Democratic 2009 gubernatorial candidate say nothing about what a first-time black congressional candidate could expect in District 3—which is the only relevant question.

29

Thus, Dr. McDonald's racial bloc voting analysis does not come close to showing that Alternative District 3 is non-retrogressive and, indeed, confirms the Legislature's wisdom in not reducing the Benchmark BVAP. Conversely, if Dr. McDonald's analysis *is* accepted, it confirms that the Alternative District 3 is *not* "narrowly tailored" because its BVAP is more than 25% higher than the BVAP that satisfies Section 5—*i.e.*, a *25%* BVAP. Either way, Dr. McDonald's analysis confirms the invalidity of the Alternative Plan as a more "narrowly tailored" means of satisfying Section 5.

Finally, Dr. McDonald suggests that because "the Department of Justice approved [the 1998] version of the Third District with a Black VAP of 50.5%," Alternative District 3 "would have been precleared." 3/24/14 McDonald Reply at 1. This is plainly untrue. The question under Section 5 is whether the new plan diminishes minority voters' ability to elect their candidate of choice as compared to the *benchmark* plan, which is the "last legally enforceable" plan. 28 C.F.R. § 51.54(c)(1). For the Enacted Plan and the Alternative Plan, that plan is the 53.1% Benchmark Plan. *See id.* In contrast, because a redistricting plan held unconstitutional under *Shaw* cannot serve as a Section 5 benchmark, *see id.*; *Abrams v. Johnson*, 521 U.S. 74, 95–97 (1997), the benchmark for the 1998 Plan was *not* the 1991 plan struck down in *Moon*, but instead the *prior* 1980's plan that did not have a *majority-black* district. Since 50.5% BVAP was significantly *higher* than the 1980's benchmark, the 1998 Plan was, of course, precleared. But that fact has no bearing on whether, when compared to the Benchmark Plan with a 53.1% BVAP, the Alternative Plan's 50.2% BVAP diminished minority voters' ability to elect.

## CONCLUSION

The Court should grant judgment to Defendants and Intervenor-Defendants.

Dated:   April 16, 2014                                         Respectfully submitted,


/s/ Mike F. Melis                                              /s/ Jonathan A. Berry
Mark R. Herring,                                               Michael A. Carvin (*pro hac vice*)
Attorney General of Virginia                                   John M. Gore (*pro hac vice*)
                                                               Jonathan A. Berry (VSB #81864)
Cynthia E. Hudson,                                             JONES DAY
Chief Deputy Attorney General                                 51 Louisiana Avenue, N.W.
                                                               Washington, DC 20001
Rhodes B. Ritenour                                             Tel: (202) 879-3939
Deputy Attorney General                                        Fax: (202) 626-1700
                                                               Email: macarvin@jonesday.com
*Trevor S. Cox (VSB No. 78396)                                 Email: jmgore@jonesday.com
Deputy Solicitor General                                       Email: jberry@jonesday.com

*Mike F. Melis (VSB No. 43021)                                 *Counsel for Intervenor-Defendants*
Assistant Attorney General                                     *Virginia Representatives*

Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
(804) 786-2071
Fax: (804) 786-1991
tcox@oag.state.va.us
mmelis@oag.state.va.us
*Counsel of Record*

*Attorneys for Defendants Charlie Judd,*
*Kimberly Bowers, and Don Palmer in their*
*official capacities*

## CERTIFICATE OF SERVICE

I certify that on April 16, 2014, a copy of the TRIAL BRIEF OF INTERVENOR-DEFENDANTS AND DEFENDANTS was filed electronically with the Clerk of Court using the ECF system, which will send notification to the following ECF participants:

John K. Roche, Esq.
Mark Erik Elias, Esq.
John Devaney, Esq.
PERKINS COIE, LLP
700 13th Street, N.W., Suite 600
Washington, D.C. 20005-3960
Tel. (202) 434-1627
Fax (202) 654-9106
JRoche@perkinscoie.com
MElias@perkinscoie.com
JDevaney@perkinscoie.com

Kevin J. Hamilton, Esq.
PERKINS COIE, LLP
1201 Third Avenue, Ste. 4800
Seattle, WA 98101-3099
Tel. (202) 359-8000
Fax (202) 359-9000
KHamilton@perkinscoie.com

*Counsel for Plaintiffs*

Mike F. Melis
Office of the Attorney General
900 East Main Street
Richmond, VA 23219
Telephone: (804) 786-2071
Fax: (804) 371-2087
mmelis@oag.state.va.us

*Counsel for Defendants*

Dated: April 16, 2014

/s/ Jonathan A. Berry
Jonathan A. Berry

*Counsel for Intervenor-Defendants Virginia Representatives*