# EXHIBIT I

**Report of John B. Morgan Regarding Plaintiffs' Alternative Plan and the Enacted Plan**

*Page v. State Board of Elections*

**Background Information**

My name is John B. Morgan.  I have been retained by the defendants to offer an expert opinion regarding Plaintiffs' Alternative Plan and the Enacted Plan.  I hold a B.A. in History from the University of Chicago.  As detailed in my CV, attached as Exhibit A, I have extensive experience in the field of redistricting, working on redistricting plans in the redistricting efforts following the 1990 Census, the 2000 Census, and the 2010 Census. I have testified as an expert witness in demographics and redistricting.  I am being compensated at a rate of $250 per hour for my services in this case.

In preparing this analysis, I considered the following:  the legal briefs submitted to the court, reports by Dr. Michael McDonald and Dr. Thomas Brunell, court cases mentioned in the briefs and reports, relevant portions of the Sec. 5 preclearance submissions to the Department of Justice, various maps and datasets from the current and previous congressional districts, the Plaintiffs' Alternative Plan maps and data, the 2010 redistricting PL94-171 data and Census geography data from the Census Bureau, political and redistricting data from the Department of Legislative Services and the Virginia State Board of Elections, and the Maptitude for Redistricting geographic information system (GIS) software and manuals from Caliper Corporation.

The redistricting geographic information system (GIS) software package used for this analysis is Maptitude for Redistricting from Caliper Corporation.  The redistricting software was loaded with the census PL94-171 data from the Census and the Census geography as well as available redistricting and political data from Department of Legislative Services and the Virginia State Board of Elections.  The full suite of census geography was available, including Census Places, Voting Districts, water bodies, and

1

roads, as well as Census Blocks which are the lowest level of geography for which the Census Bureau reports population counts.

The Department of Legislative Services provided political data for 2008 and 2009 for use during the General Assembly redistricting process.  I prepared reports and analysis based on this data for the Benchmark, Enacted and Alternative Plans.  In addition, I was provided data for the 2012 presidential election by counsel and asked to analyze this data for the Benchmark, Enacted, and Alternative Plans.

**Table 1. Benchmark 2001 Congressional Districts Election Data**

| CD | Current Party | Rep. Gov '09 | Dem. Gov '09 | Rep. Lt. Gov '09 | Dem. Lt. Gov '09 | Rep. Att. Gen. '09 | Dem. Att. Gen. '09 | Rep. Pres. '08 | Dem. Pres. '08 | Other Pres. '08 | Rep. U.S. Sen. '08 | Dem. U.S. Sen. '08 | Other U.S. Sen. '08 | Rep. Pres. '12 | Dem. Pres. '12 | Other Pres. '12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | R | 65% | 35% | 62% | 38% | 63% | 37% | 53% | 47% | 1% | 38% | 61% | 1% | 52% | 47% | 1% |
| 2 | R | 62% | 38% | 56% | 44% | 60% | 40% | 50% | 50% | 1% | 34% | 64% | 1% | 48% | 50% | 1% |
| 3 | D | 34% | 66% | 33% | 67% | 35% | 65% | 25% | 75% | 1% | 18% | 81% | 1% | 23% | 75% | 1% |
| 4 | R | 61% | 39% | 59% | 41% | 61% | 39% | 50% | 49% | 1% | 37% | 61% | 1% | 49% | 50% | 1% |
| 5 | R | 61% | 39% | 60% | 40% | 62% | 38% | 52% | 47% | 1% | 35% | 64% | 1% | 52% | 46% | 2% |
| 6 | R | 67% | 33% | 66% | 34% | 67% | 33% | 58% | 41% | 1% | 41% | 58% | 1% | 59% | 40% | 2% |
| 7 | R | 66% | 34% | 63% | 37% | 65% | 35% | 54% | 45% | 1% | 39% | 59% | 1% | 54% | 44% | 1% |
| 8 | D | 39% | 61% | 37% | 63% | 36% | 64% | 32% | 67% | 1% | 25% | 73% | 1% | 30% | 68% | 1% |
| 9 | R | 67% | 33% | 66% | 34% | 66% | 34% | 59% | 39% | 1% | 36% | 63% | 1% | 64% | 34% | 2% |
| 10 | R | 61% | 39% | 58% | 42% | 58% | 42% | 48% | 51% | 1% | 38% | 61% | 1% | 48% | 51% | 1% |
| 11 | D | 55% | 45% | 52% | 48% | 52% | 48% | 44% | 56% | 1% | 35% | 64% | 1% | 42% | 57% | 1% |

**Table 2. Enacted Congressional Districts Election Data**

| CD | Current Party | Rep. Gov '09 | Dem. Gov '09 | Rep. Lt. Gov '09 | Dem. Lt. Gov '09 | Rep. Att. Gen. '09 | Dem. Att. Gen. '09 | Rep. Pres. '08 | Dem. Pres. '08 | Other Pres. '08 | Rep. U.S. Sen. '08 | Dem. U.S. Sen. '08 | Other U.S. Sen. '08 | Rep. Pres. '12 | Dem. Pres. '12 | Other Pres. '12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | R | 66% | 34% | 63% | 37% | 64% | 36% | 53% | 46% | 1% | 39% | 60% | 1% | 53% | 46% | 1% |
| 2 | R | 62% | 38% | 57% | 43% | 60% | 40% | 50% | 49% | 1% | 35% | 64% | 1% | 49% | 50% | 1% |
| 3 | D | 31% | 69% | 29% | 71% | 31% | 69% | 22% | 78% | 1% | 16% | 83% | 1% | 20% | 79% | 1% |
| 4 | R | 63% | 37% | 60% | 40% | 62% | 38% | 51% | 48% | 1% | 39% | 60% | 1% | 50% | 49% | 1% |
| 5 | R | 62% | 38% | 61% | 39% | 62% | 38% | 52% | 47% | 1% | 36% | 63% | 1% | 53% | 46% | 2% |
| 6 | R | 67% | 33% | 67% | 33% | 68% | 32% | 58% | 41% | 1% | 42% | 57% | 1% | 59% | 39% | 2% |
| 7 | R | 68% | 32% | 65% | 35% | 67% | 33% | 56% | 43% | 1% | 41% | 58% | 1% | 57% | 42% | 1% |
| 8 | D | 40% | 60% | 38% | 62% | 38% | 62% | 33% | 66% | 1% | 26% | 73% | 1% | 31% | 68% | 1% |
| 9 | R | 66% | 34% | 66% | 34% | 66% | 34% | 59% | 40% | 1% | 36% | 63% | 1% | 63% | 35% | 2% |
| 10 | R | 63% | 37% | 60% | 40% | 60% | 40% | 50% | 50% | 1% | 39% | 60% | 1% | 50% | 49% | 1% |
| 11 | D | 50% | 50% | 47% | 53% | 47% | 53% | 38% | 61% | 1% | 30% | 68% | 1% | 36% | 62% | 1% |

**Table 3. Plaintiffs' Alternative Congressional Districts Election Data**

| CD | Current Party | Rep. Gov '09 | Dem. Gov '09 | Rep. Lt. Gov '09 | Dem. Lt. Gov '09 | Rep. Att. Gen. '09 | Dem. Att. Gen. '09 | Rep. Pres. '08 | Dem. Pres. '08 | Other Pres. '08 | Rep. U.S. Sen. '08 | Dem. U.S. Sen. '08 | Other U.S. Sen. '08 | Rep. Pres. '12 | Dem. Pres. '12 | Other Pres. '12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | R | 66% | 34% | 63% | 37% | 64% | 36% | 53% | 46% | 1% | 39% | 60% | 1% | 53% | 46% | 1% |
| 2 | R | 57% | 43% | 52% | 48% | 55% | 45% | 44% | 55% | 1% | 31% | 68% | 1% | 44% | 55% | 1% |
| 3 | D | 38% | 62% | 36% | 64% | 37% | 63% | 28% | 71% | 1% | 20% | 78% | 1% | 25% | 73% | 1% |
| 4 | R | 63% | 37% | 60% | 40% | 62% | 38% | 51% | 48% | 1% | 39% | 60% | 1% | 50% | 49% | 1% |
| 5 | R | 62% | 38% | 61% | 39% | 62% | 38% | 52% | 47% | 1% | 36% | 63% | 1% | 53% | 46% | 2% |
| 6 | R | 67% | 33% | 67% | 33% | 68% | 32% | 58% | 41% | 1% | 42% | 57% | 1% | 59% | 39% | 2% |
| 7 | R | 68% | 32% | 65% | 35% | 67% | 33% | 56% | 43% | 1% | 41% | 58% | 1% | 57% | 42% | 1% |
| 8 | D | 40% | 60% | 38% | 62% | 38% | 62% | 33% | 66% | 1% | 26% | 73% | 1% | 31% | 68% | 1% |
| 9 | R | 66% | 34% | 66% | 34% | 66% | 34% | 59% | 40% | 1% | 36% | 63% | 1% | 63% | 35% | 2% |
| 10 | R | 63% | 37% | 60% | 40% | 60% | 40% | 50% | 50% | 1% | 39% | 60% | 1% | 50% | 49% | 1% |
| 11 | D | 50% | 50% | 47% | 53% | 47% | 53% | 38% | 61% | 1% | 30% | 68% | 1% | 36% | 62% | 1% |

**Executive Summary**

In his several reports, Dr. McDonald offers many criticisms of the Enacted Plan and contends that it was drawn as an unconstitutional racial gerrymander.  Based on a review and analysis of the available data, I conclude that the Enacted Plan is not a racial gerrymander, that politics rather than race predominated, and that the Alternative Plan would not be an appropriate substitute for the Enacted Plan.

The Alternative Plan was not before the General Assembly at the time it adopted the Enacted plan, but was instead offered for the first time in connection with this litigation in February 2014.  The Alternative Plan therefore says little, if anything, about the General Assembly's purpose in enacting the Enacted Plan.

The Alternative Plan is at least as race-conscious as, perhaps even more race-conscious than, the Enacted Plan.  The Alternative Plan retains most of the Benchmark District 3 that Dr. McDonald criticized as "constitutionally suspect," and replicates many of the geographic trades between District 3 and surrounding districts that Dr. McDonald previously argued were predominantly racial, including the move of the City of Petersburg into District 3.  In fact, the only difference between the Enacted Plan and the Alternative Plan is the placement of the boundary between Districts 2 and 3.  The Alternative Plan moves that boundary to achieve its avowed racial goal of achieving a barely "majority-minority district." 2/21/14 McDonald, page 9.

Second, Dr. McDonald does not even attempt to suggest that race, rather than politics, was the predominant reason for the Enacted Plan's treatment of the District 2 and 3 population trades.  Such political concerns readily explain the drawing of District 2, where Republican Congressman  Scott Rigell was serving in his first term after defeating a Democratic incumbent in this closely-divided district. District 2 in the Enacted Plan, as enacted by the Republican-controlled General Assembly, provides an

3

obvious political benefit to Republicans by preserving the prospects for the re-election of now-incumbent Congressman Rigell.  This refutes the notion that race was the predominant factor in the population trades in this area.

Third, the Alternative Plan and Dr. McDonald's reports fail to show that the General Assembly could have achieved its political goals through a plan that was comparably consistent with traditional redistricting principles as the Enacted Plan and that brought about "significantly greater racial balance." The Alternative Plan undermines rather than advances the presumed political goals of the General Assembly because it replaces the political strengthening of Congressman Rigell in District 2 with a plan that weakens his electoral prospects relative not only to the Enacted Plan, but even the prior district. While Dr. McDonald argues that the Alternative Plan marginally outperforms the Enacted Plan on certain traditional redistricting principles, he does not even mention other principles where the Alternative Plan performs worse than the Enacted Plan – such as preserving the cores of existing districts, protecting incumbents, and complying with the Voting Rights Act.  Indeed, by lowering District 3's Black VAP to a barely majority level that would also be lower than the Benchmark level, the Alternative Plan would have presented obstacles to preclearance that the Enacted Plan did not present. Finally, since Alternative District 3 maintains a black majority that is 6% different in Black VAP than the Enacted District 3, it does not bring about a "greater racial balance."

**Under Dr. McDonald's Own Analysis, the Alternative Plan is Just as Race-conscious as the Enacted Plan**

Under Dr. McDonald's own approach, the Alternative Plan is at least as race conscious as the Enacted Plan.  First, Dr. McDonald criticizes both the District 3 drawn after the *Moon v. Meadows* case and the Benchmark District 3 as "constitutionally suspect" under *Shaw* and the Supreme Court's racial gerrymandering cases – but the Alternative Plan retains most of the population, shape and geography of Benchmark District 3.  With respect to changes to Benchmark District 3, the Alternative Plan replicates

4

many of the trades between District 3 and surrounding districts - such as the addition of Petersburg to District 3 - that Dr. McDonald concluded in his first report were predominantly racial.  McDonald states that the Virginia General Assembly "strategically traded populations in and out of the Third Congressional District so as to *increase* the Black Voting Age Population of the District."  McDonald 12/6/13 Report, page 1, with emphasis in original.  Applying Dr. McDonald's own analysis, the Alternative Plan strategically trades populations in and out of the Third Congressional District so as to *decrease* the Black Voting Age Population of the District.

**Alternative District 3 Retains Portions of Benchmark District 3 Which Dr. McDonald and Plaintiffs Allege is Unconstitutional.**

In his 1/20/14 report, McDonald states that: "There is no reason to believe that race was not also the predominant factor in the creation of the Remedial and Benchmark Third Districts." 1/20/14 McDonald, page 6.  He concluded that both the Remedial version of District 3 adopted after *Moon v. Meadows* and the Benchmark District 3 adopted in 2001 are "constitutionally suspect" for this reason. McDonald further notes that "the constitutionality of the Benchmark District was never upheld by a court" 1/20/14 McDonald, page 9.  Yet despite these misgivings about the constitutionality of the predecessor districts, Alternative District 3 retains most of Benchmark District 3, including its population, shape and geography.  In his 12/16/13 Report, Dr. McDonald applies the geographically descriptive language of District 3 from the *Moon* case to analyze District 3 of the Enacted Plan.  In that same fashion, much of this geographically descriptive language applies to Alternative District 3.  Just like the Remedial and Benchmark and Enacted District 3, Alternative District 3:

- "is anchored in the tidewater" region of Virginia and encompasses "Suffolk [,] Portsmouth[,] Hampton [and] Newport News,"
- "us[es] only the open water of…the James River" to connect areas of the district,

5

- "crosses the James River into largely rural Surry County, recrossing the James River to take in all of the African-American majority Charles City County,"

- "to the south…runs through Prince George County,"

- "to the east…takes in part of rural southeastern Henrico county before reaching the more built up and heavily black eastern suburbs of Richmond, racially dividing the capital city… before terminating in a small black neighborhood in northern Henrico County."  McDonald 12/6/13 Report, page 6

Thus, on Dr. McDonalds own analysis, Alternative District 3 is "constitutionally suspect" because "[t]here is no reason to believe that race was not also the predominant factor in [its] creation."  1/20/14 McDonald, page 6.

**The Alternative Plan Replicates the Trades between Districts 4 and 7 and District 3 That Dr. McDonald Identified as Predominantly Racial**

With respect to the 2012 changes to Benchmark District 3, Alternative District 3 makes virtually all of the major changes made by Enacted District 3 that Dr. McDonald concluded were predominantly driven by race.

First, Dr. McDonald criticized the Enacted Plan's population trades between District 3 and District 4 because "the primary result of these trades was to move the entirety of the densely African-American community of Petersburg from the Benchmark Fourth to the adopted Third District." 12/6/14 McDonald Report, page 22.  Dr. McDonald concluded that the "assignment of Petersburg to the adopted Third District is similar to the unconstitutional district at issue in *Moon vs. Meadows*." 12/6/13 McDonald Report, page 23.  He also concluded that race explains the General Assembly's movement of whiter populations in Prince George County from Benchmark District 3 to Enacted District 4.

The Alternative Plan precisely replicates these trades between Districts 3 and 4.  The Alternative Plan moves "the entirety of the densely populated African-American community of Petersburg from the Benchmark Fourth to the [Alternative] Third District," and it makes the same trades in Prince George County from the benchmark District 3 to District 4 that Dr. McDonald objected to in his first report. 12/6/13 McDonald Report, page 22.  Thus, according to Dr. McDonald's own analysis, the Alternative Plan's "assignment of Petersburg to the adopted Third District is similar to the unconstitutional district at issue in Moon vs. Meadows." 12/6/13 McDonald Report, page 23.

Second, Dr. McDonald criticizes the Enacted Plan because population trades between District 7 and District 3 involved "shifting lower Black VAP New Kent and one Richmond VTD form the benchmark Third District to the adopted Seventh District in exchange for much higher Black VAP VTDs moved from the benchmark Seventh District to the adopted Third District."  12/6/13 McDonald Report, page 24.  Dr. McDonald concluded that these moves showed that "Virginia chose to further racially segregate localities", including "Richmond." 12/6/13 McDonald Report, page 26.  Dr. McDonald further stated that Enacted District 3 "takes in rural eastern Henrico County before reaching the more built up and heavily black eastern suburbs of Richmond, racially dividing the capital city nearly in half before terminating in a black neighborhood in northern Henrico County." 12/6/13 McDonald Report, page 6.

Again, the Alternative Plan makes exactly these same trades between Districts 3 and 7.  The Alternative Plan moves predominantly white New Kent County from Benchmark 3 to District 7 and the "much higher Black VAP VTDs" in Henrico and Richmond from Benchmark District 7 to District 3. 12/6/13 McDonald Report, page 24.  Thus, in Dr. McDonald's own view the choice of population moves in the Alternative Plan serves "to further racially segregate localities," including "Richmond," 12/6/13 McDonald Report, page 26, such that the Alternative Plan "takes in rural eastern Henrico County before reaching the more built up and heavily black eastern suburbs of Richmond, racially dividing the capital

city nearly in half before terminating in a black neighborhood in northern Henrico County." 12/6/13

McDonald Report, page 6.

**The Alternative Plan's Trades between Districts 1 and 2 and District 3 Strategically Decrease the Black VAP in District 3**

The Enacted Plan's trades between Districts 1, 2 and 3 involve a much smaller population and have a significantly smaller impact on District 3's racial composition than the Alternative Plan's trades between those districts.  The Enacted Plan moves 84,057 total people back and forth between Districts 1, 2 and 3 from the Benchmark Plan.  Given the ideal congressional district size of 727,366, these changes equal 11.6% of a district.  The Alternative Plan moves 287,015 people back and forth between Districts 1, 2 and 3 from the Benchmark Plan, which is almost four times as many people moved as were shifted in these districts in the Enacted Plan.  Given the ideal congressional district size of 727,366, these changes equal 39.5% of a district.

Table 4. Population Affected by Trades in Districts 1, 2 and 3

| Benchmark to Enacted District | Population | VAP | Benchmark to Alternative District | Population | VAP |
|---|---|---|---|---|---|
| 1-to-3 | 23,288 | 17,805 | 1-to-3 | 106,886 | 83,523 |
| 3-to-1 | 7,351 | 5,106 | 3-to-1 | 7,351 | 5,106 |
| **1&3 Subtotal** | **30,639** | **22,911** | **1&3 Subtotal** | **114,237** | **88,629** |
| 2-to-3 | 27,917 | 20,543 | 2-to-3 | 45,798 | 35,556 |
| 3-to-2 | 25,501 | 20,049 | 3-to-2 | 126,980 | 97,432 |
| **2&3 Subtotal** | **53,418** | **40,592** | **2&3 Subtotal** | **172,778** | **132,988** |
| | | | | | |
| **Total Affected** | **84,057** | **63,503** | **Total Affected** | **287,015** | **221,617** |
| **Ideal District size** | **727,366** | | **Ideal District Size** | **727,366** | |
| **% Affected** | **11.6%** | | **% Affected** | **39.5%** | |

8

In the Enacted Plan the net result of these trades between Districts 1, 2, and 3 add 9,399 Black VAP (exclusive) and 9,658 Black VAP (inclusive) to Enacted District 3.  The Enacted Plan's trades between Districts 1 and 3 had a minimal racial impact on District 3 because the Black VAP of the areas moved into and out of district were virtually the same – at approximately 44% Black VAP.  In fact, these trades slightly decreased the overall Black VAP of District 3 as compared to the Benchmark District 3.  Indeed, Dr. McDonald recognizes that "a slightly higher BVAP percentage was transferred into the First District." 12/6/13 McDonald, page 18.  Moreover, the area transferred into District 3 has a lower Black VAP, 43.4% (exclusive) or 44.6% (inclusive), than the Benchmark District 3's Black VAP of 53.1% (exclusive) or 53.9% (inclusive).

The Enacted Plan's trades between Districts 2 and 3 also bring an area into District 3 that has a lower Black VAP – 36.7% (exclusive) and 37.9% (inclusive) – than the rest of Benchmark District 3.  The area transferred out of District 3 has a Black VAP of 18.3% (exclusive) and 18.8% (inclusive), meaning that the difference between these two areas is 18.4% (exclusive) and 19.1% (inclusive).  But the net number of Black VAP moved into District 3 is only 3,887 (exclusive) or 4,011 (inclusive).

**Table 5. Population Trades between Benchmark and Enacted Plan in Districts 1, 2 and 3**

| Benchmark to Enacted District | Population | VAP | Black VAP (exclusive method) | Black VAP (inclusive method) | % Black VAP (exclusive method) | % Black VAP (inclusive method) |
|---|---|---|---|---|---|---|
| 1-to-3 | 23,288 | 17,805 | 7,736 | 7,933 | 43.4% | 44.6% |
| 3-to-1 | 7,351 | 5,106 | 2,224 | 2,286 | 43.6% | 44.8% |
| Net to 3 from 1 | 15,937 | 12,699 | 5,512 | 5,647 | | |
| 2-to-3 | 27,917 | 20,543 | 7,548 | 7,785 | 36.7% | 37.9% |
| 3-to-2 | 25,501 | 20,049 | 3,661 | 3,774 | 18.3% | 18.8% |
| Net to 3 from 2 | 2,416 | 494 | 3,887 | 4,011 | | |
| | | | | | | |
| Net to 3 from 1&2 | 18,353 | 13,193 | 9,399 | 9,658 | | |

By contrast, the Alternative Plan's trades between Districts 1, 2 and 3 are far more sweeping and have a much greater racial effect on the Black VAP of District 3.  The net result of these trades between Districts 1, 2, and 3 serve to *decrease* the Black VAP of Alternative District 3 by 23,293 Black VAP

(exclusive) and 23,232 Black VAP (inclusive).

The Alternative Plan causes this overall decrease by moving higher Black VAP areas out of District 3 and moving much lower Black VAP areas into District 3.  The Alternative Plan's trades between 1 and 3 move a 43.6% (exclusive) or 44.8% (inclusive) Black VAP area out of District 3 and a 29.6% (exclusive) of (30.3%) inclusive Black VAP area into District 3 – a difference of 14.0% (exclusive) or 14.5% (inclusive) Black VAP.  This populous area of more than 106,000 people moved into District 3 has a much lower Black VAP than Benchmark District 3.

The Alternative Plan's trades between District 2 and 3 move a 56.8% (exclusive) and 57.6% (inclusive) Black VAP area out of District 3 and a 27.0% (exclusive) or 27.7% (inclusive) Black VAP area into District 3 – a difference of 29.8% (exclusive) or 29.9% (inclusive) Black VAP.  The populous area of more than 126,000 people moved out of District 3 has a higher Black VAP than the Benchmark District 3.

None of the Alternative Plan's trades between Districts 1, 2 and 3 are explained on non-racial grounds, such as politics and incumbency protection.  Thus, the Alternative Plan is at least as race-conscious, and arguably even more race-conscious, than the Enacted Plan.

**Table 6. Population Trades between Benchmark and Alternative Plan in Districts 1, 2 and 3**

| Benchmark to Alternative District | Population | VAP | Black VAP (exclusive method) | Black VAP (inclusive method) | % Black VAP (exclusive method) | % Black VAP (inclusive method) |
|---|---|---|---|---|---|---|
| 1-to-3 | 106,886 | 83,523 | 24,714 | 25,349 | 29.6% | 30.3% |
| 3-to-1 | 7,351 | 5,106 | 2,224 | 2,286 | 43.6% | 44.8% |
| Net to 3 from 1 | **99,535** | **78,417** | **22,490** | **23,063** | | |
| 2-to-3 | 45,798 | 35,556 | 9,599 | 9,866 | 27.0% | 27.7% |
| 3-to-2 | 126,980 | 97,432 | 55,382 | 56,161 | 56.8% | 57.6% |
| Net to 3 from 2 | **-81,182** | **-61,876** | **-45,783** | **-46,295** | | |
| | | | | | | |
| Net to 3 from 1&2 | **18,353** | **16,541** | **-23,293** | **-23,232** | | |

Looked at another way, the Alternative Plan's trades in Districts 1, 2 and 3 would have reduced

the Black VAP of District 3 to a minority-Black VAP level below 50% from the 53.1% (exclusive) or 53.9%

(inclusive) of the Benchmark District 3.  This strategic decrease in Black VAP caused by the Alternative

Plan's trades in Districts 1, 2 and 3, requires a strategic increase in Black VAP on the northern end of

District 3 in order to achieve the avowed racial goal of preserving District 3 as a barely "majority-

minority district."  These necessary strategic trades to *increase* the Black VAP in the north of Alternative

District 3 caused by the Alternative Plan's trades to *decrease* the Black VAP in Districts 1, 2 and 3 are

exactly the trades Dr. McDonald concluded were predominantly racial:  adding Petersburg into

Alternative District 3 and "shifting lower Black VAP New Kent and one Richmond VTD form the

benchmark Third District to the adopted Seventh District in exchange for much higher Black VAP VTDs

moved from the benchmark Seventh District to the adopted Third District."  12/6/13 McDonald Report,

pages 22-24.

**Dr. McDonald offers No Proof That Race Rather than Politics Predominated in the Enacted Plan**

In the *Easley vs. Cromartie* case, the court discusses that because "race and political affiliation"

often are "highly correlated," Plaintiffs bear the "demanding burden" to show that race rather than

politics predominated in the drawing of the challenged plan and district within the that plan.  *Easley v.*

*Cromartie,* 532 U.S. 234, 258 (2001).  Similarly in this case, it is my understanding Plaintiffs must show

that "race rather than politics" predominated in the drawing of the Enacted Plan and Enacted District 3.

It is my understanding that if changes to District 3 in the Enacted Plan are equally consistent with politics

as they are with race, then the Plaintiffs' efforts would be insufficient to require a change in the Virginia

congressional districts enacted by the General Assembly.  Dr. McDonald does not even mention the

political considerations in the Enacted Plan, much less separate those considerations from race and

show that race predominated in the Enacted Plan.

The Enacted Plan, when viewed as a whole, preserves the cores of the Benchmark districts while

11

achieving the necessary population equality and politically strengthening incumbents of both parties. This bears out especially in the key metric of the 2008 Presidential race, which was available to the Republican-controlled General Assembly at the time of the redistricting, as well as in the metric of the later 2012 race, which essentially validates the conclusion that politics explain the Enacted Plan.  On these metrics, 2 of the 3 Democratic districts, including District 3, became more Democratic while 7 of the 8 Republican districts, including Districts 1, 2, 4 and 7 that surround District 3, became more Republican.  (This number includes heavily Republican District 6, which becomes more Republican on the 2012 metric and no more Democratic on the 2008 metric.)  The exceptions are heavily Democratic District 8 and heavily Republican District 9, but the changes there not significant in light of the overall political composition of those districts.

**Table 7. Benchmark and Enacted Districts with 2008, 2012 Presidential Data**

| CD | Current Party | Benchmark | | Enacted | | Difference | | | Benchmark | | Enacted | | Difference | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Rep. Pres. '08 | Dem. Pres. '08 | Rep. Pres. '08 | Dem. Pres. '08 | DIFF Rep. Pres. '08 | DIFF Dem. Pres. '08 | Change | Rep. Pres. '12 | Dem. Pres. '12 | Rep. Pres. '12 | Dem. Pres. '12 | DIFF Rep. Pres. '12 | DIFF Dem. Pres. '12 | Change |
| 1 | R | 52.5% | 46.6% | 53.3% | 45.8% | 0.8% | -0.8% | More R | 52.0% | 46.6% | 52.9% | 45.7% | 1.0% | -1.0% | More R |
| 2 | R | 49.5% | 49.5% | 49.7% | 49.3% | 0.2% | -0.2% | More R | 48.2% | 50.3% | 48.6% | 50.0% | 0.3% | -0.3% | More R |
| 3 | D | 24.7% | 74.6% | 21.8% | 77.6% | -3.0% | 3.0% | More D | 23.3% | 75.5% | 20.0% | 78.8% | -3.3% | 3.3% | More D |
| 4 | R | 49.9% | 49.3% | 51.3% | 48.0% | 1.4% | -1.4% | More R | 48.6% | 50.3% | 50.1% | 48.7% | 1.5% | -1.6% | More R |
| 5 | R | 51.8% | 47.3% | 52.2% | 46.8% | 0.4% | -0.4% | More R | 52.0% | 46.4% | 52.5% | 45.9% | 0.6% | -0.5% | More R |
| 6 | R | 57.8% | 41.2% | 57.7% | 41.2% | 0.0% | 0.0% | Neither | 58.7% | 39.5% | 58.8% | 39.4% | 0.1% | -0.1% | More R |
| 7 | R | 54.0% | 45.2% | 56.3% | 42.8% | 2.4% | -2.4% | More R | 54.5% | 44.1% | 56.9% | 41.7% | 2.4% | -2.5% | More R |
| 8 | D | 31.9% | 67.2% | 32.8% | 66.3% | 0.9% | -0.9% | More R | 30.5% | 68.2% | 31.0% | 67.8% | 0.5% | -0.5% | More R |
| 9 | R | 59.3% | 39.2% | 58.9% | 39.7% | -0.5% | 0.5% | More D | 63.9% | 34.1% | 63.0% | 34.9% | -0.8% | 0.8% | More D |
| 10 | R | 47.7% | 51.5% | 49.6% | 49.6% | 1.9% | -1.9% | More R | 48.0% | 50.6% | 49.9% | 48.7% | 1.9% | -1.8% | More R |
| 11 | D | 43.6% | 55.6% | 38.5% | 60.7% | -5.2% | 5.1% | More D | 41.5% | 57.2% | 36.4% | 62.3% | -5.2% | 5.1% | More D |

The changes to District 3 in the Enacted Plan had the effect of not only slightly increasing the Black VAP of District 3, while increasing the Democratic strength of District 3, but also of making the surrounding districts stronger for the incumbent congressmen.   This was true in District 2, where the evenly divided political composition and election history would have provided a Republican-controlled General Assembly with a reason to strengthen one-term incumbent Republican Congressman Scott Rigell.  According to the 2008 Presidential results, District 2 was the most closely divided of all the

districts, with Democrat Barack Obama and Republican John McCain each capturing 49.5% of the vote. That same year Democrat Glenn Nye defeated a two-term Republican incumbent Congresswoman Thelma Drake to win election to Congress from Benchmark District 2.  Scott Rigell first won election from District 2 in 2010 when he defeated then incumbent Congressman Nye.

Thus, when the General Assembly considered the Enacted Plan in 2011 and 2012, Congressman Rigell was a freshman Member of Congress from a closely-divided district that had voted out the incumbents in two consecutive elections.  The General Assembly made trades between adjacent Districts 1 and 3 that improved the re-election prospects of Congressman Rigell.  This is clear not only from the fact that District 2 became slightly more Republican in the enacted plan, but also from the political composition of the Enacted Plan's trades between Districts 2 and 3.  The Enacted Plan trades a 64% (2008) or 69% (2012) Democratic area for a nearly identically-sized 52% (2008) or 50% (2012) Republican area, which has the effect of making District 2 more Republican.  Even with the need to gain over 11% population in Benchmark District 2, the changes resulting in Enacted District 2 serve to improve the electoral prospects of incumbent Congressman Scott Rigell and result in a district that is essentially evenly divided politically on the 2008 presidential political data.

**Table 8. Population Movement Between Benchmark and Enacted Districts with 2008, 2012 Presidential Data**

| Benchmark to Enacted District | Population | Rep. Pres. '08 % | Dem. Pres. '08 % | Oth. Pres. '08 % | | Rep. Pres. '12 % | Dem. Pres. '12 % | Oth. Pres. '12 % |
|---|---|---|---|---|---|---|---|---|
| 1-to-3 | 23,288 | 39% | 60% | 1% | | 33% | 66% | 1% |
| 3-to-1 | 7,351 | 24% | 75% | 0% | | 23% | 76% | 1% |
| 2-to-3 | 27,917 | 35% | 64% | 1% | | 30% | 69% | 1% |
| 3-to-2 | 25,501 | 52% | 47% | 1% | | 50% | 48% | 1% |
| 4-to-3 | 35,447 | 13% | 86% | 1% | | 11% | 88% | 1% |
| 3-to-4 | 5,713 | 46% | 53% | 1% | | 44% | 55% | 1% |
| 3-to-7 | 20,217 | 63% | 36% | 1% | | 64% | 34% | 1% |
| 7-to-3 | 36,106 | 14% | 85% | 1% | | 13% | 86% | 1% |

Indeed, the trades involving District 3 that Dr. McDonald concludes are racially-motivated are just as readily, and perhaps more readily, explained by politics than by race because they make District 3

13

more Democratic and surrounding Districts more Republican.  Dr. McDonald, however, does not discuss the political effects of these trades, much less refute this non-racial explanation for them.

**The Alternative Plan Does not Prove That The Enacted Plan Was A Racial Gerrymander**

I understand that "in a case such as this one where majority-minority districts (or the approximate equivalent) are at issue and where racial identification correlates highly with political affiliation, the party attacking the legislatively drawn boundaries must show at least that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with the traditional districting principles.  That party must also show that those districting alternatives would have brought about significantly greater racial balance." *Easley*, 532 U.S. at 258.

I have been asked to analyze whether the Alternative Plan achieves the General Assembly's political goals in the Enacted Plan, is as consistent with traditional redistricting principles as the Enacted Plan, and brings about a "significantly greater racial balance" than the Enacted Plan.  I conclude that the Alternative Plan does not achieve any of these results.

**The Alternative Plan Undermines, Rather Than Achieves, The General Assembly's Political Goals, Including the Goal to Strengthen the Incumbent in District 2.**

The Alternative Plan fails rather than serves the General Assembly's political goals, especially to strengthen Congressman Rigell in District 2.  The Alternative Plan not only fails to strengthen Congressman Rigell politically, it weakens him politically, and appears to be drawn to turn District 2 into a Democratic district.  While Republican presidential candidate John McCain captured 49.5% of the vote in Benchmark District 2 in 2008 and he would have captured 49.7% of the vote in the area covered by the Enacted District 2, he would have received only 44.3% of the vote in the area covered by Alternative District 2.  In other words, the Alternative Plan would swing the closely-divided District 2 approximately

14

5.3% more Democratic than Benchmark District 2 and 5.5% more Democratic than Enacted District 2, to the obvious disadvantage of Congressman Rigell and the obvious advantage of Democrats.  The Republican-controlled General Assembly would have had ample political reason not to adopt the Alternative Plan, and instead to adopt the Enacted Plan that strengthened Congressman Rigell and did not advance the electoral prospects of his next Democratic challenger.

Indeed, the change in the presidential 2008 political performance in Alternative Plan District 2 from the Benchmark District 2 stands out as the greatest change of any district in the Alternative Plan and it is *against* the political party of the incumbent.  The second-most changed district is District 11, which shows a change of 5.2% in the 2008 presidential vote, and this change is *in favor of* incumbent Democrat Congressman Gerry Connolly, who had just won a close re-election in 2010.

Table 9. Benchmark and Alternative Districts with 2008, 2012 Presidential Data

| | | Benchmark | | Plaintiffs' Alt. | | Difference | | | Benchmark | | Plaintiffs' Alt. | | Difference | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CD | Current Party | Rep. Pres. '08 | Dem. Pres. '08 | Rep. Pres. '08 | Dem. Pres. '08 | DIFF Rep. Pres. '08 | DIFF Dem. Pres. '08 | Change | Rep. Pres. '12 | Dem. Pres. '12 | Rep. Pres. '12 | Dem. Pres. '12 | DIFF Rep. Pres. '12 | DIFF Dem. Pres. '12 | Change |
| 1 | R | 52.5% | 46.6% | 53.3% | 45.8% | 0.8% | -0.8% | More R | 52.0% | 46.6% | 52.9% | 45.7% | 1.0% | -1.0% | More R |
| 2 | R | 49.5% | 49.5% | 44.3% | 54.9% | -5.3% | 5.3% | More D | 48.2% | 50.3% | 43.6% | 55.1% | -4.7% | 4.7% | More D |
| 3 | D | 24.7% | 74.6% | 27.8% | 71.5% | 3.1% | -3.2% | More R | 23.3% | 75.5% | 25.4% | 73.3% | 2.1% | -2.2% | More R |
| 4 | R | 49.9% | 49.3% | 51.3% | 48.0% | 1.4% | -1.4% | More R | 48.6% | 50.3% | 50.1% | 48.7% | 1.5% | -1.6% | More R |
| 5 | R | 51.8% | 47.3% | 52.2% | 46.8% | 0.4% | -0.4% | More R | 52.0% | 46.4% | 52.5% | 45.9% | 0.6% | -0.5% | More R |
| 6 | R | 57.8% | 41.2% | 57.7% | 41.2% | 0.0% | 0.0% | Neither | 58.7% | 39.5% | 58.8% | 39.4% | 0.1% | -0.1% | More R |
| 7 | R | 54.0% | 45.2% | 56.3% | 42.8% | 2.4% | -2.4% | More R | 54.5% | 44.1% | 56.9% | 41.7% | 2.4% | -2.5% | More R |
| 8 | D | 31.9% | 67.2% | 32.8% | 66.3% | 0.9% | -0.9% | More R | 30.5% | 68.2% | 31.0% | 67.8% | 0.5% | -0.5% | More R |
| 9 | R | 59.3% | 39.2% | 58.9% | 39.7% | -0.5% | 0.5% | More D | 63.9% | 34.1% | 63.0% | 34.9% | -0.8% | 0.8% | More D |
| 10 | R | 47.7% | 51.5% | 49.6% | 49.6% | 1.9% | -1.9% | More R | 48.0% | 50.6% | 49.9% | 48.7% | 1.9% | -1.8% | More R |
| 11 | D | 43.6% | 55.6% | 38.5% | 60.7% | -5.2% | 5.1% | More D | 41.5% | 57.2% | 36.4% | 62.3% | -5.2% | 5.1% | More D |

The Alternative Plan's trades in Districts 1, 2 and 3 undermine the political goals of the General Assembly to unify the districts politically and to strengthen incumbents of both parties.  The trades that the Alternative Plan makes involving District 3 that Dr. McDonald claims are necessary to remedy an alleged racial gerrymander in fact turn closely-divided District 2 into a Democratic district.  This is exactly contrary to the effect of the Enacted Plan passed by the General Assembly.  The Alternative Plan caused

this result by moving an 81% (2008) or 81% (2012) Democratic area of more than 126,000 people in to

District 2, and a much smaller, relatively more Republican area which is 50% (2008) or 55% (2012)

Democratic out of District 2 and into District 3.

In addition, the Alternative Plan takes populous territory from Benchmark District 1 which could

have strengthened Congressman Rigell in District 2 (and indeed was moved to District 2 in the Enacted

Plan) and moves it to District 3.  This also has the effect of undermining Congressman Rigell and making

District 3 less Democratic.

**Table 10. Population Movement Between Benchmark and Alternative Districts with 2008, 2012 Presidential Data**

| Benchmark to Alternative District | Population | Rep. Pres. '08 % | Dem. Pres. '08 % | Oth. Pres. '08 % | | Rep. Pres. '12 % | Dem. Pres. '12 % | Oth. Pres. '12 % |
|---|---|---|---|---|---|---|---|---|
| 1-to-3 | 106,886 | 45% | 54% | 1% | | 41% | 57% | 1% |
| 3-to-1 | 7,351 | 24% | 75% | 0% | | 23% | 76% | 1% |
| 2-to-3 | 45,798 | 49% | 50% | 1% | | 43% | 55% | 2% |
| 3-to-2 | 126,980 | 19% | 81% | 1% | | 18% | 81% | 1% |
| 4-to-3 | 35,447 | 13% | 86% | 1% | | 11% | 88% | 1% |
| 3-to-4 | 5,713 | 46% | 53% | 1% | | 44% | 55% | 1% |
| 7-to-3 | 36,106 | 14% | 85% | 1% | | 13% | 86% | 1% |
| 3-to-7 | 20,217 | 63% | 36% | 1% | | 64% | 34% | 1% |

**The Alternative Plan is Not as Consistent with Traditional Redistricting Principles as the Enacted Plan**

When compared to the Enacted Plan, the Alternative Plan is not as consistent with traditional

redistricting principles.  While the Alternative Plan may have a marginal effect on two principles, it is

significantly worse with respect to a number of others including preservation of cores and communities

of interest, protection of incumbents, and compliance with the Voting Rights Act.

**Compactness**

Dr. McDonald asserted in his 12/6/13 report that Enacted District 3 "is an extreme district" and

the least compact of the Virginia congressional districts on three measures, the Reock test, the Polsby-

Popper test, and the Schwartzberg test.  12/6/13 McDonald, page 7.  Dr. McDonald, however, provides

no standard for determining when a district is acceptably compact or unacceptably non-compact. McDonald identifies only marginal differences in District 3's compactness scores in the Enacted and Alternative Plans. Enacted District 3 scores a 0.19 on the Reock test, 0.08 on the Polsby-Popper test and 3.07 on the Schwartzberg test. 12/6/13 McDonald, page 7. Alternative District 3 scores 0.22 on the Reock test, only 0.03 points better than Enacted District 3; 0.11 on the Polsby-Popper test, again only 0.03 points better than the Enacted District 3; and 2.61 on the Schwartzberg test. (In the 2/21/14 McDonald Report Table 4, Dr. McDonald lists the value for District 3 as 2.04, while the compactness reports I ran for the Schwartzberg Test show it to be 2.61.) Dr. McDonald does not suggest that these small numerical differences have real-world significance, or are meaningful under some professionally accepted standard. He does not suggest that Alternative District 3 meets a professionally accepted standard for minimally acceptable compactness, which Enacted District 3 does not satisfy and Alternative District 3 does. I am not aware of any such standard.

In his reports, Dr. McDonald fails to mention at least two other compactness measures under which Enacted District 3 is *more* compact than Alternative District 3. On the Ehrenburg test – which computes the ratio of the largest inscribed circle divided by the area of the district and treats higher numbers as more compact than lower numbers – Enacted District 3 scores 0.25, or better than Alternative District 3's score of 0.23. Likewise, on the Population Polygon test – which computes the ratio of the district population to the approximate population of the convex hull of the district and treats higher numbers as more compact than lower numbers – Enacted District 3 scores 0.54, or better than Alternative District 3's score of 0.53.

**Table 11. Compactness of Enacted and Alternative Congressional Districts**

| District | Enacted Plan | | Alternative Plan | |
|---|---|---|---|---|
| | Population Polygon | Ehrenburg | Population Polygon | Ehrenburg |
| 1 | 0.63 | 0.28 | 0.63 | 0.28 |
| 2 | 0.57 | 0.31 | 0.84 | 0.32 |
| 3 | 0.54 | 0.25 | 0.53 | 0.23 |
| 4 | 0.62 | 0.29 | 0.62 | 0.29 |
| 5 | 0.50 | 0.30 | 0.50 | 0.30 |
| 6 | 0.81 | 0.23 | 0.81 | 0.23 |
| 7 | 0.59 | 0.30 | 0.59 | 0.30 |
| 8 | 0.88 | 0.34 | 0.88 | 0.34 |
| 9 | 0.73 | 0.24 | 0.73 | 0.24 |
| 10 | 0.50 | 0.22 | 0.50 | 0.22 |
| 11 | 0.68 | 0.15 | 0.68 | 0.15 |

Dr. McDonald also suggests that whereas Enacted District 3 was the least compact under all three of his preferred measures, Alternative District 3 is the "second least compact" district on the Reock and Polsby-Popper tests and the "third least compact" district on the Schwartzberg test.  2/21/14 McDonald, pages 6-7.  This means little because compactness scores are often at odds with each other.  For example, District 9 is the least compact district and is slightly less compact then Alternative District 3, on the Reock test, but District 9 is more compact than Alternative District 3 on the Polsby-Popper test.  Likewise, compactness scores show that District 11 is the least compact on the Polsby-Popper test, but is more compact than Alternative District 3 on the Reock test.

**Locality and VTD splits**

One traditional redistricting criterion is the respect for municipal boundaries.  The Virginia Senate in its redistricting criteria also suggested that VTDs should be preserved, but for both boundaries, the Virginia Senate treated them on par with the criterion of preserving other communities of interest.  The Senate Criteria V. Communities of Interest state that:

> "Districts shall be based on legislative consideration of the varied factors that can create or contribute to communities of interest.  These factors may include, among others, economic

factors, social factors, cultural factors, geographic features, *governmental jurisdictions* and service delivery areas, *political beliefs*, voting trends and *incumbency considerations*.  It is inevitable that some interests will be advanced more than others by the choice of particular district configurations.   Public comment has been invited, has been and continues to be received, and will be considered.   The discernment, weighing, and balancing of the varied factors that contribute to communities of interest is an intensely political process best carried out by elected representatives of the people.   Local government jurisdiction and precinct lines may reflect communities of interest to be balanced, but they are entitled to no greater weight as a matter of state policy than other identifiable communities of interest." Senate Criteria V. (emphasis added).

Dr. McDonald criticized the Enacted Plan in his first report because it splits "17 localities" into different districts across the state. 12/6/13 McDonald, page 9.  But 3 of the localities are only "technically split" because all of the population "is in one district while one or more water blocks without population are in another district."  Section 5 Submission, Statement of Change, page11.

Dr. McDonald, moreover, has used two different methods for counting "splits" in localities. Whereas Dr. McDonald criticized the number of *split* localities in the Enacted Plan in his first report, his latest report does not mention that number, but instead counts the number of *times* localities are *split.* Thus, Dr. McDonald's first report counted a locality split into two districts as one "split locality," his latest report counts it as two "locality splits."  Dr. McDonald's preference for "locality splits" masks the fact that the Alternative Plan splits *only one fewer locality* than the Enacted Plan.

**Table 12. Split Localities in Enacted Plan and Alternative Plan**

| Split Localities affecting population | Enacted Plan (Districts) | Plaintiffs Alternative Plan (Districts) |
|---|---|---|
| Bedford | (5, 6) | (5, 6) |
| Chesterfield | (4, 7) | (4, 7) |
| Fairfax | (8,10,11) | (8,10,11) |
| Fauquier | (1,5) | (1,5) |
| Hampton | (2,3) | |
| Henrico | (3,7) | (3,7) |
| Henry | (5,9) | (5,9) |
| Newport News | (1,2,3) | (1,3) |
| Norfolk | (2,3) | |
| Prince George | (3,4) | (3,4) |
| Prince William | (1,10,11) | (1,10,11) |
| Richmond | (3,7) | (3,7) |
| Roanoke | (6,9) | (6,9) |
| Spotsylvania | (1,7) | (1,7) |
| Portsmouth | | (2,3) |
| **Total** | **14** | **13** |

| Split Localities affecting no population | Enacted Plan (Districts) | Plaintiffs Alternative Plan (Districts) |
|---|---|---|
| Isle of Wight | (3,4) | (3,4) |
| James City | (1,3) | (1,3) |
| Suffolk | (3,4) | (3,4) |
| **Total** | **3** | **3** |

There is no reason to conclude that this marginal difference in split localities is significant. The Enacted Plan fares much better than the Benchmark Plan on split localities because the Benchmark Plan split 19 localities affecting population as described in Section 5 Submission, Statement of Change, page 11. Dr. McDonald previously brushed aside this improvement because "the constitutionality of the Benchmark district was never upheld by a court" and in his view, "[n]or does the constitutionality of the [Enacted] Third District hinge on how it compares to the Benchmark District." 1/20/14 McDonald, page 9. Thus, Dr. McDonald suggested that "[e]ven if it improves to some degree upon aspects of the Benchmark District, the fact remains that like the *Moon v. Meadows* Unconstitutional District, the [Enacted] Third District has more splits than any other district." 1/20/14 McDonald, page 9.   By the

same analysis, the Alternative Plan's marginal improvement over the Enacted Plan on split localities –

which are smaller than the Enacted Plan's improvement over the Benchmark Plan's splits – are

irrelevant because the Alternative Plan's District 3 also creates more splits than any other district.

Moreover, contrary to Dr. McDonald's report, the Alternative Plan does not improve on the

number of split VTDs – or even the number of VTD splits – when only splits affecting population are

considered as was done in the Section 5 Submission.  Dr. McDonald criticized the Enacted Plan in his first

report because it splits "20 VTDs" into different districts across the state. 12/6/13 McDonald, page 10.

However, "[The Enacted Plan] splits 10 precincts across the state to meet the criteria adopted by the

Committee, a significant reduction from the 26 split precincts in the current plan.  (As in the case of split

localities, these numbers exclude technically split precincts where all of the precinct's population is in

one district and there is no population in the other district)." Section 5 Submission, Statement of

Change, page 11.   Once again, Dr. McDonald has used two counting methods.  Dr. McDonald criticized

the number of *split* VTDs in the Enacted Plan in his first report, but his latest report does not mention

that number and instead counts the number of *times* VTDs are *split.*  Thus, Dr. McDonald's first report

counted a VTD split into two districts as one "split VTD," his latest report counts it as two "VTD splits."

**Table 13. Split VTDs in Enacted Plan and Alternative Plan**

| Split VTDs affecting population [Locality] | Enacted Plan (Districts) | Plaintiffs Alternative Plan (Districts) |
|---|---|---|
| Remington [Fauquier] | (1, 5) | (1, 5) |
| Lee Hill [Spotsylvania] | (1, 7) | (1, 7) |
| Buckland Mills [Prince William] | (1, 10) | (1, 10) |
| Machen [Hampton] | (2, 3) | |
| Rives [Prince George] | (3, 4) | (3, 4) |
| 404 [Richmond City] | (3, 7) | (3, 7) |
| New London Academy [Bedford] | (5, 6) | (5, 6) |
| Mount Olivet [Henry] | (5, 9) | (5, 9) |
| Saint Albans [Fairfax County] | (8, 11) | (8, 11) |
| Old Mill [Fairfax County] | (10, 11) | (10, 11) |
| One [Portsmouth] | | (2, 3) |
| **Total** | **10** | **10** |

| Split VTDs affecting no population [Locality] | Enacted Plan (Districts) | Plaintiffs Alternative Plan (Districts) |
|---|---|---|
| Roberts B [James City] | (1, 3) | (1, 3) |
| Riverside [Newport News] | (2, 3) | |
| Warwick [Newport News] | (2, 3) | |
| Hilton [Newport News] | (2, 3) | |
| Deep Creek [Newport News] | (2, 3) | |
| Bartlett [Isle of Wight] | (3, 4) | (3, 4) |
| Carrollton [Isle of Wight] | (3, 4) | (3, 4) |
| Rushmere [Isle of Wight] | (3, 4) | (3, 4) |
| Ebenezer [Suffolk] | (3, 4) | (3, 4) |
| Bennetts Creek [Suffolk] | (3, 4) | (3, 4) |
| Harbour View [Suffolk] | (3, 4) | (3, 4) |
| Magarity [Fairfax County] | (8, 11) | (8, 11) |
| Five [Portsmouth] | | (2, 3) |
| **Total** | **12** | **9** |

Even using Dr. McDonald's preferred measure of VTD splits, the Alternative Plan does not improve on the Enacted Plan.  Dr. McDonald counts 44 VTD splits in the Enacted Plan and 38 VTD splits in the Alternative Plan.  He hails this purported difference of 6 such splits as a significant factor in claiming that "these Alternative Districts better conform to traditional redistricting principles." 2/21/14 McDonald, page 5.  In fact, however, a net of 6 such splits that Dr. McDonald identifies as different

between the plans are in the "technically split" precincts involving no population.  Where population is concerned, the numbers of split VTDs and VTD splits in the Enacted Plan *are the same as* the numbers of split VTDs and VTD splits in the Alternative Plan.

Even if the numbers supported Dr. McDonald's conclusion that the Alternative Plan meaningfully improves on the Enacted Plan with respect to splits, Dr. McDonald elevates localities and VTDs above other communities of interest that the Senate criteria directed should be treated on par with localities and VTDs.  Under the Senate Criteria, the Benchmark Districts are "governmental jurisdictions" just like the localities and VTDs and communities of interest formed around congressional districts and communities of interest are entitled to the same "weight" as localities and VTDs.  Senate Criteria V.

Dr. McDonald also disregards that the vast majority of the split localities in the Enacted Plan merely preserve preexisting split localities from the Benchmark Plan.  The Enacted Plan's splits, therefore, respect communities of interest formed around the Benchmark Districts.  By contrast, the Alternative Plan creates a new split dividing a portion of Portsmouth – which was not split in the Benchmark Plan – away from both the rest of Portsmouth and the rest of Benchmark District 3, where it formed part of a community of interest.

**Contiguity**

There is no dispute that the Enacted Plan satisfied the traditional redistricting criterion that the districts be contiguous.  In drawing the Enacted Plan, the General Assembly decided that "contiguity by water" even without a connecting bridge "is sufficient" to satisfy the contiguity requirement.  Senate Criteria III.  Dr. McDonald indicated in his first report that contiguity by water without a connecting bridge was not sufficient, but instead indicative of a racial gerrymander.  12/6/13 McDonald, page 8.  Alternative District 3 is contiguous across the James River without a connection in two places." 2/21/14

McDonald, page 7.  The Alternative Plan thus achieves contiguity in District 3 exactly the same way as the Enacted Plan.

### The Alternative Plan is Less Consistent with Certain Traditional Redistricting Principles Than the Enacted Plan

Dr. McDonald does not mention several traditional redistricting criteria identified by the Virginia Senate - including preservation of cores of districts, incumbency protection and compliance with the Voting Rights Act – under which the Alternative Plan performs worse than the Enacted Plan.

### Preservation of Cores and Uniting of Political Communities of Interest

Preserving the cores of benchmark districts maintains communities of interest, facilitates better communication between citizens and their elected representatives, and protects incumbent representatives.  Preservation of cores can be measured as a percentage of voters in a benchmark district who remain in the enacted district.

**Table 14. Preservation of Cores of the Benchmark Districts**

| Enacted Plan | | Plaintiffs Alternative Plan | |
|---|---|---|---|
| District | Percent Retained | District | Percent Retained |
| 1 | 76.5 | 1 | 76.5 |
| 2 | 85.0 | 2 | 82.5 |
| 3 | 83.1 | 3 | 69.2 |
| 4 | 96.2 | 4 | 96.2 |
| 5 | 89.8 | 5 | 89.8 |
| 6 | 91.5 | 6 | 91.5 |
| 7 | 88.1 | 7 | 88.1 |
| 8 | 85.4 | 8 | 85.4 |
| 9 | 90.2 | 9 | 90.2 |
| 10 | 89.2 | 10 | 89.2 |
| 11 | 71.2 | 11 | 71.2 |
| Average | 86.0 | Average | 84.5 |

The Enacted Plan preserves between 71% and 96% of the cores of the Benchmark districts, and preserves 83% or more of the cores of 9 of the 11 districts, including District 3.  The Enacted Plan preserves 85% of the core of District 2 and 83% of the core of District 3.

The Alternative Plan performs significantly worse than the Enacted Plan on this criterion.  The Alternative Plan preserves only 69.2% of the core of District 3, down from 83% in the Enacted Plan.  In other words, Alternative District 3 would be the *worst performing* district in terms of preservation of cores in either the Enacted or the Alternative Plan.  Dr. McDonald offers no explanation as to why the only majority-minority district in Virginia should be entitled to less continuity and respect for incumbency protection than every other district.

**Protection of Incumbents**

The Senate Criteria included the factor of "incumbency considerations."  Senate Criteria V.  This factor encompasses not just preserving the cores of districts but also strengthening incumbents politically.  As explained, the Enacted Plan respects this factor significantly, while the Alternative Plan undermines it, particularly in District 2, where Congressman Rigell would be gravely weakened in his re-election prospects.

**Compliance with the Voting Rights Act**

The Senate Criteria treated compliance with the Voting Rights Act, "including compliance with protections against unwarranted retrogression or dilution of racial or ethnic minority voting strength," as the highest priority for the Enacted Plan after compliance with the Constitutional equal-population requirement.  Senate Criteria II.  I understand that a redistricting plan complies with Section 5 only if it does not diminish the ability of minority voters to elect their candidates of choice.

The Enacted Plan increased District 3's Black VAP on both of Dr. McDonalds' preferred measures

25

3.2% (exclusive) and 3.3% (inclusive).  2/21/14 McDonald, page 8.  The Enacted Plan thus did not

diminish the ability of black voters to elect their candidates of choice.  The Enacted Plan received

preclearance from the Department of Justice.

In 2011, Virginia was one of the first states to complete its statewide legislative redistricting and

seek Section 5 preclearance from the Department of Justice.  The General Assembly passed a

redistricting plan for the House of Delegates which required preclearance for the 2011 elections.  The

benchmark House of Delegates plan had 12 districts in which African-Americans formed a majority of

the total and voting age populations.   Many of those districts were located in the geography covered by

Congressional District 3.  During the redistricting process, the House of Delegates considered a number

of proposed plans that preserved the 12 majority-black districts.  Some of these alternative plans had

Black VAP below 55%. House of Delegates Section 5 Submission, Statement of Minority Impact, page 5.

But the House of Delegates plan that the General Assembly enacted had a Black VAP of above

55% in all 12 majority-black districts – including the districts within Congressional District 3.  This

required increasing the Black VAP in some of the 12 majority-black benchmark districts from the Black

VAP level at the time of the 2010 census.  Eight of the 12 members of the House of Delegates Black

Caucus voted in favor of the Enacted House of Delegates plan.  House of Delegates Section 5

Submission, Statement of Minority Impact, page 5.

Thus, the General Assembly enacted, with strong support of bipartisan and black legislators, a

House of Delegates redistricting plan with a 55% Black VAP as the floor for black-majority districts

subject to Justice Department preclearance under Section 5, including districts within the geography

covered by Congressional District 3.  The General Assembly therefore had ample reason to believe that

legislators of both parties, including black legislators, viewed the 55% black VAP for the House of

Delegates districts as appropriate to obtain Section 5 preclearance, even if it meant raising the Black

26

VAP above the levels in the benchmark plan.  The General Assembly acted in accordance with that view

for the congressional districts and adopted the Enacted Plan with the District 3 Black VAP at 56.3%

The Alternative Plan, by contrast, decreases District 3's Black VAP by 2.9% and drops it to a

razor-thin majority of 50.2% (exclusive) and 51% (inclusive).  These levels are below the 55% that the

General Assembly found appropriate to comply with Section 5 for House Districts.

Dr. McDonald states that "a racial bloc voting analysis" is required to prove what Black VAP is

necessary to comply the Voting Rights Act. 1/20/14 McDonald, page 11.  Dr. McDonald provides no such

analysis of the Alternative Plan.  Thus Dr. McDonald cannot – and does not – opine that the Alternative

Plan could or would have received preclearance under Section 5.

Therefore the Alternative Plan would have presented obstacles to obtaining Section 5

preclearance that the Enacted Plan did not present.   The Alternative Plan drops District 3's Black VAP

well below the 55% that the General Assembly believed was appropriate to obtain preclearance for

House Districts and decreases District 3's Black VAP to a razor-thin majority below the Benchmark Black

VAP level.  Had the Alternative Plan been before it, the General Assembly had ample reason to prefer

the Enacted Plan, which increased District 3's Black VAP above 55% and faced none of these hurdles to

achieving Section 5 preclearance.

**The Alternative Plan Does Not Bring About Significantly Greater Racial Balance Than the
Enacted Plan**

I have been asked to analyze whether the Alternative plan brings about "significantly greater

racial balance" than the Enacted Plan.  As I understand it, the purpose of this requirement is to cure the

alleged racial gerrymander and turn the gerrymandered district into one that is not racially identifiable.

The Alternative Plan fails that purpose because it preserves District 3 as a racially identifiable majority-

black district on both of Dr. McDonald's Black VAP measurements.  The Alternative Plan District 3 replaces a black-majority district with a black-majority district and in doing so would not seem to cure the alleged racial predominance that Dr. McDonald criticizes in the Enacted Plan, including the changes to the Benchmark District 3 that the Alternative Plan replicates.

**The Enacted Plan is not a Racial Gerrymander**

Based on my review and analysis of the available data discussed throughout this report, I also conclude that the Enacted Plan is not a racial gerrymander.  In my opinion, politics rather than race predominated and the Enacted Plan is consistent with traditional redistricting principles, including the criteria identified by the Virginia Senate and followed by the General Assembly.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed on March 14, 2014 in Fairfax, Virginia.

John B. Morgan