IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| Dawn Curry Page, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 3:13-cv-678-REP-LO-AKD |
| Virginia State Board of Elections, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PLAINTIFFS' TRIAL BRIEF

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................................... 1

II. EXPECTED EVIDENCE AT TRIAL ..................................................................... 2

  A.  Delegate Janis Admits that Racial Considerations Motivated the 2012 Plan ................................................................................................. 3

  B.  The General Assembly Used a Racial Quota to Draw CD3 ................................ 5

  C.  CD3 Reflects the General Assembly's Racial Purpose ........................................ 6

  D.  The General Assembly's Focus on Race Caused CD3 to Have a Bizarre Shape ................................................................................................. 7

  E.  The General Assembly's Method for Drawing CD3 Relied Predominantly on Race ................................................................................. 9

  F.  CD3 Under the 2012 Plan Is Similar to the District Held Unconstitutional in *Moon v. Meadows* ................................................. 11

  G.  Plaintiffs' Alternative Map Confirms that the General Assembly Could Have Achieved Its Goals Without Packing Black Residents into CD3 .......................................................................................................... 12

III. ARGUMENT .......................................................................................................... 15

  A.  Racial Gerrymandering Is Unconstitutional ...................................................... 15

  B.  Race Was the Predominant Factor Behind the Shape of CD3 ........................... 16

    1.  Statements by the 2012 Plan's Author Show that Race Was the Predominant Factor Behind The Shape of CD3 ............................... 16

    2.  The Shape and Composition of CD3 Show that Race Was the Predominant Purpose Behind the 2012 Plan ..................................... 18

    3.  Defendants Fail to Show that Other Purposes Motivated the 2012 Plan .......................................................................................... 20

  C.  Defendants Cannot Show that CD3 Passes Strict Scrutiny ................................ 20

    1.  Defendants Cannot Show that CD3 Serves a Compelling State Interest ........................................................................................ 21

    2.  Defendants Cannot Show that CD3 Is Narrowly Tailored ...................... 24

  D.  The Court Should Impose an Immediate and Effective Remedy ........................ 27

  E.  Plaintiffs Are Entitled to Their Reasonable Attorneys' Fees and Costs ................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abrams v. Johnson*,
521 U.S. 74 (1997)................................................................29

*Adamson v. Clayton Cnty. Elections & Registration Bd.*,
876 F. Supp. 2d 1347 (N.D. Ga. 2012) ................................28

*Beer v. United States*,
425 U.S. 130 (1976)..............................................................25

*Bush v. Vera*,
517 U.S. 952 (1996) ....................................................... passim

*Citizens United v. FEC*,
558 U.S. 310 (2010)........................................................ 22, 23

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989)........................................................17, 27

*Clark v. Putnam Cnty.*,
293 F.3d 1261 (11th Cir. 2002) ............................................17

*Easley v. Cromartie*,
532 U.S. 234 (2001)..............................................................19

*Grutter v. Bollinger*,
539 U.S. 306 (2003)....................................................17, 26, 27

*Hastert v. State Bd. of Elections*,
777 F. Supp. 634 (N.D. Ill. 1991) ........................................28

*Hensley v. Eckerhart*,
461 U.S. 424 (1983)..............................................................30

*In re Legislative Districting of State*,
805 A.2d 292 (Md. 2002) ....................................................29

*Larios v. Cox*,
305 F. Supp. 2d 1335 (N.D. Ga.), *aff'd*, 542 U.S. 947 (2004)................29

*League of United Latin Am. Citizens v. Perry*,
548 U.S. 399 (2006)..............................................................28

*Long Beach Area Chamber of Commerce v. City of Long Beach*,
603 F.3d 684 (9th Cir. 2010) ................................................23

*McDaniels v. Mehfoud*,
702 F. Supp. 588 (E.D. Va. 1988) ........................................27

# TABLE OF AUTHORITIES
(continued)

**Page**

*Miller v. Johnson*,
515 U.S. 900 (1995) ......................................................................................... passim

*Moon v. Meadows*,
952 F. Supp. 1141 (E.D. Va.), *aff'd*, 521 U.S. 1113 (1997) .......................................11, 19, 26

*Parents Involved in Cmty Schs. v. Seattle Sch. Dist. No. 1*,
551 U.S. 701 (2007) ...........................................................................................................21

*Perez v. Perry*,
Case No. 5:11-CV-00360-OLG-JES-XR, Order (ECF No. 685) (W.D. Tex.
Mar. 1, 2012) ......................................................................................................................30

*Prejean v. Foster*,
227 F.3d 504 (5th Cir. 2000) .....................................................................................25, 26, 27

*Regents of Univ. of California v. Bakke*,
438 U.S. 265 (1978) ...........................................................................................................17

*Scott v. Germano*,
381 U.S. 407 (1965) ...........................................................................................................27

*Shaw v. Hunt*,
517 U.S. 899 (1996) ......................................................................................................... passim

*Shaw v. Reno*,
509 U.S. 630 (1993) ......................................................................................................... passim

*Shelby County, Alabama v. Holder*,
570 U.S. ___, 133 S. Ct. 2612 (2013) .....................................................................21, 22, 24

*Sixty-Seventh Minn. State Senate v. Beens*,
406 U.S. 187 (1972) ...........................................................................................................29

*Smith v. Beasley*,
946 F. Supp. 1174 (D.S.C. 1996) .............................................................................17, 18, 27

*SpeechNow.org v. FEC*,
599 F.3d 686 (D.C. Cir. 2010) ...........................................................................................23

*Stephenson v. Bartlett*,
582 S.E.2d 247 (N.C. 2003) ...............................................................................................29

*Upham v. Seamon*,
456 U.S. 37 (1982) .............................................................................................................29

*Whitcomb v. Chavis*,
403 U.S. 124 (1971) ...........................................................................................................22

**TABLE OF AUTHORITIES**
(continued)

**Page**

*White v. Weiser*,
   412 U.S. 783 (1973) ................................................................29

*Wise v. Lipscomb*,
   437 U.S. 535 (1978) ................................................................28

**STATUTES**

42 U.S.C. § 1973*l*(e) ....................................................................30

42 U.S.C. § 1983 .............................................................................30

Federal Election Campaign Act, 2 U.S.C. § 431 et seq. ............................ 23

MOVE Act, 42 U.S.C. § 1973ff *et seq.* ....................................................28

Va. Code Ann. § 24.2-302.2 ............................................................2

Voting Rights Act, 42 U.S.C. §§ 1973 et seq. .................................. passim

**OTHER AUTHORITIES**

Nathaniel Persily, *When Judges Carve Democracies: A Primer on Court-Drawn
   Redistricting Plans*, 73 Geo. Wash. L. Rev. 1131 (2005) ........................27

U.S. Const. amend. IVX ....................................................1, 3, 11, 15

U.S. Const. amend. I ....................................................................22

## I.    INTRODUCTION

This action arises from the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, which indisputably forbids race-based redistricting, absent a compelling state interest and, even then, only when narrowly tailored to meet that state interest. As the evidence at trial will show, in its 2012 congressional redistricting plan, the Virginia General Assembly manipulated Virginia's Third Congressional District by moving White voters out of the district and packing Black voters into the district, all with the admitted goal of achieving a pre-set quota, or minimum of Black voters.  The author of the redistricting plan, Delegate Bill Janis, contended that this effort to pack Black voters into the Third Congressional District was somehow required by the Voting Rights Act, Plaintiffs' Proposed Trial Exhibit ("Pl. Ex.") 47 at 16, and admitted that this was his "paramount concern," a "primary focus," and that he was "especially focused" on such purported compliance.  *Id*. at 10, 14, 25.  But this vague incantation hardly shields such explicit race-based decision making from constitutional scrutiny; indeed, it vividly demonstrates the General Assembly's predominant focus on the racial composition of the district.  Plaintiffs' burden is, accordingly, easily met.

Defendants and Intervenors, by contrast, cannot possibly satisfy the exacting strict scrutiny standard to justify race-based decionmaking.  Though they will try to hide behind purported compliance with the Voting Rights Act, they can point to no legal basis or record evidence that either Section 2 or Section 5 required them to *increase* the minority population in a long-performing minority district.  Indeed, the map-drawers failed to conduct any Voting Rights Act analysis whatsoever, choosing instead to pack more Black voters into the Third Congressional District in direct violation of constitutional equal protection guarantees.  Plaintiffs

respectfully request that the Court invalidate the 2012 Plan and ensure that a constitutional plan is adopted for the 2014 congressional elections.

## II.   EXPECTED EVIDENCE AT TRIAL

Virginia received the results of the 2010 federal census on February 3, 2011.  Pl. Ex. 8 at 5.  As a result of that census, Virginia was required to redraw its congressional districts in order to balance population totals within each district.  Pl. Ex. 4.  Delegate Bill Janis, a member of the Virginia House of Delegates, used that data to draw a new plan for Virginia's congressional districts.[1]  Pl. Ex. 8 at 7.  Del. Janis presented his plan (HB 5004) to the House of Delegates on April 6, 2011, and the House of Delegates adopted it six days later.  *Id*.  The Virginia Senate, however, rejected Del. Janis's plan and replaced it (keeping the HB 5004 name) with a plan sponsored by Sen. Mamie Locke.  *Id*. at 8; *see also* Pl. Ex. 14 at 13.  The House and Senate were unable to reconcile the competing plans and the redistricting effort thus stalled.  Pl. Ex. 8 at 8.

The November 2011 elections, however, changed the composition of the Virginia Senate, and the newly-seated House and Senate promptly adopted Del. Janis's plan (renamed HB 251) without any changes in January 2012.  Pl. Ex. 8 at 8; *see also* Pl. Ex. 15.  Governor Bob McDonell signed the plan into law on January 25, 2012.[2]  Pl. Ex. 8 at 9.  The congressional plan created and sponsored by Del. Janis (the "2012 Plan") is codified as Va. Code Ann. § 24.2-302.2.

The 2012 Plan includes eleven congressional districts, the same number as the congressional plan adopted in 2001 ("Benchmark Plan").  Pl. Exs. 16, 17.  A majority of the

---

[1] When Del. Janis presented his plan to the House of Delegates on April 11, 2011, he explained that he was the "chief patron" of the congressional plan, and that the plan "is my legislation.  I looked at this legislation.  I looked at the data."  Pl. Exs. 46, 47 at 14.

[2] In 2012, Virginia was a covered jurisdiction under Section 5 of the Voting Rights Act, requiring any such redistricting plans to receive "preclearance" by the Department of Justice ("DOJ") prior to implementation.  Virginia, accordingly, submitted the plan for review and, on March 14, 2012, DOJ precleared the plan.  Defendants Proposed Trial Exhibit ("Def. Ex.") 14.

voting age population in the Third Congressional District ("CD3") in the 2012 Plan (like the Benchmark Plan) is Black.  Pl. Exs. 16, 17.  The district stretches along the James River from Richmond to Norfolk, and 59.5% of its total residents and 57.2% of its voting age residents are Black.[3]  Pl. Ex. 6 at 5, Pl. Ex. 27 at 3-6.

## A.      Delegate Janis Admits that Racial Considerations Motivated the 2012 Plan

When the 2012 Plan came up for its first vote in the House of Delegates on April 12, 2011, Del. Janis candidly explained its purpose on the House floor.  Pl. Exs. 46, 47.  He announced that the two most important criteria for the 2012 Plan were adhering to the one-person, one-vote mandate of the U.S. Constitution and ensuring that CD3 has a certain racial composition, specifically that "there be no retrogression in minority voter influence" in the district.  Pl. Exs. 46, 47 at 3.  He clarified that after these criteria, the 2012 Plan took into account other factors, such as preserving district cores, not locating incumbents in the same district, and putting localities and communities of interest in the same district.[4]  Pl. Exs. 46, 47 at 4-6.

Del. Janis emphasized the predominant role of race in his decision making.  He stated that "I was *most especially focused* on making sure that the Third Congressional District did not

---

[3] As explained by Plaintiffs' expert Dr. Michael McDonald, there are two ways to calculate racial demographic data, which he calls the "inclusive" method and the "exclusive" method.  Pl. Ex. 27 at 12-13.  The "inclusive" method counts any individual as Black who reports his race as Black, alone or in combination with other races, while the "exclusive" method counts only those who report their race as Black alone or Black and White.  Consistent with the guidance provided by the Department of Justice, Plaintiffs use the "inclusive" method where the data is available.

[4] Del. Janis's presentation before the House of Delegates was consistent with his remarks to the House and Senate Committees on Privileges and Elections.  Del. Janis explained to the House Committee that his first two considerations when creating the 2012 Plan were compliance with the one-person, one-vote rule and the "mandate that there be no retrogression in minority voters in the Third Congressional District."  Pl. Ex. 13 at 2-5.  Similarly, in his appearance before the Senate Committee, Del. Janis repeated that the 2012 Plan first and foremost had to comply with the one-person, one-vote rule and had to avoid "retrogression of a minority voter influence . . . most specifically vis-à-vis the lines for the 3rd Congressional District."  Pl. Ex. 14 at 4-6.  He described these as "the most important criteria" for the 2012 Plan.  *Id*. at 9.

retrogress in its minority voting influence." Pl. Exs. 46, 47 at 14 (emphasis added).  He

confirmed that "the *primary focus* of how the lines in HB5004 were drawn, was to ensure that

there be no retrogression [of Black voters] in the Third Congressional District." Pl. Exs. 46, 47 at

25 (emphasis added).  He further emphasized the importance of race when he stated that "one of

the *paramount concerns* in the drafting of the Bill was the constitutional and federal law mandate

under the Voting Rights Act that we not retrogress minority voting influence in the Third

Congressional District." Pl. Exs. 46, 47 at 25 (emphasis added).[5]

      During this discussion, Del. Janis explained his particular method for drawing CD3.  Del.

Ward Armstrong asked whether Del. Janis or anyone else had conducted a voting performance

analysis—that is, an analysis of voting patterns among racial groups to determine what might be

required to prevent "retrogression." Pl. Exs. 46, 47 at 10.  Specifically, Del. Armstrong asked

"what voting performance analysis [was] conducted of the various congressional districts,

particularly with regard to minority participation . . . ." Pl. Exs 46, 47 at 10; *see also id*. at 12-13

(asking what "analysis was done to determine . . . what percentage it would take for [the]

minority population [of CD3] to elect its candidate of choice."). Del. Janis did not answer

whether any such analysis had ever been conducted, instead explaining that he simply

> looked at the census data as to the current percentage of Voting
> Age African American Population in the Third Congressional
> District and what that percentage would be in the proposed lines to

---

[5] Del. Janis's presentation to the House Committee on Privileges and Elections similarly emphasized that race was the predominant factor behind the shape of CD3. Del. Janis explained that he wanted "to have no less than percentages [of Black voters] that we have under the existing lines with the existing census data." Pl. Ex. 13 at 8. After he provided the BVAP percentages for CD3 under the Benchmark Plan and 2012 Plan, Del. Janis received a number of questions about why the BVAP percentage for CD3 *increased* in the 2012 Plan. *Id*. at 9-11. Del. Janis did not answer the question directly, but simply asserted that he "looked at the voting age African American population," compared the BVAP under the 2012 Plan and the Benchmark Plan, and created districts with equal population. *Id*. at 9-12.

> ensure that the new lines that were drawn for the Third
> Congressional District would not retrogress in the sense that they
> would not have less percentage of Voting Age African American
> population under the proposed lines in 5004 that exist under the
> current lines under the current Congressional district.

Pl. Exs. 46, 47 at 10.  Del. Janis later admitted that he did not know whether a voting

performance analysis like the one described by Del. Armstrong had been conducted by any

outside consultants.[6]  Pl. Exs. 46, 47 at 15.

While Del. Janis emphasized the importance of race in his decision making, he explicitly

denied that he took partisan concerns into account when drawing the 2012 Plan.  In a

presentation to the Senate Committee on Privileges and Elections, Del. Janis stated without

qualification that "I haven't looked at the partisan performance.  *It was not one of the factors that*

*I considered in the drawing of the district*."  Intervenor-Defendants Proposed Trial Exhibits

("Int-Defs. Exs.") 18 at 14 (emphasis added).  Indeed, at no point in his presentations before the

General Assembly or its committees did Del. Janis ever mention partisan or political motivations

behind the 2012 Plan.  Instead, Del. Janis repeated that the most important factors were

compliance with the one-person, one-vote mandate and "that there be no retrogression in the

minority voter influence in the Third Congressional District."  Pl. Exs. 46, 47 at 25.

**B.      The General Assembly Used a Racial Quota to Draw CD3**

Rather than using traditional redistricting criteria or analyzing actual voter performance

as required for VRA compliance, discovery has revealed that the General Assembly instead

adopted a floor, or quota, of 55% BVAP for CD3, and then manipulated the boundaries of the

district to achieve (or exceed) that quota.  In a remarkable admission, Defendants' own expert,

---

[6] Del. Janis' claim that his singular focus on race was merely an attempt to comply with the
Voting Rights Act is belied by this failure to conduct a racial block voting analysis, the use of a
predetermined racial quota for CD3, and the addition to the Black population in the district rather
than merely seeking to preserve Black voting strength within the district.

John Morgan, who was involved in the redistricting process, has explained that the supporters of the 2012 Plan "viewed the 55% black VAP . . . as appropriate to obtain Section 5 preclearance, even if it meant raising the Black VAP above the levels in the benchmark plan." Pl. Ex. 34 at 26-27.  They apparently set this quota because the majority-minority districts in the approved House of Delegates redistricting plan each had at least 55% BVAP and had been precleared by DOJ.  *Id.* at 26.  Thus, rather than actually analyze the voting performance of the district, they simply adopted this "floor" as shorthand for compliance and swapped population to excise White voters from and pack Black voters into the district until they achieved or exceeded this target percentage.  As Del. Janis made clear in his remarks before the House, no voting performance analysis was conducted to determine whether the 55% BVAP quota was required to avoid retrogressing Black voters' ability to elect candidates of their choice.  Pl. Ex. 46, 47 at 10, 15.

Moreover, contrary to Mr. Morgan's explanation, the General Assembly could not have reasonably believed that a 55% BVAP quota was required by either DOJ or the substantive requirements of Section 5.  In 2011, the General Assembly adopted a redistricting plan for the Senate of Virginia that maintained five Black majority-minority districts, none of which met the 55% BVAP quota.  Pl. Ex. 30 at 2.  DOJ precleared the Senate redistricting plan shortly after it was enacted, and well in advance of the General Assembly's enactment of the 2012 Plan.  *Id.*[7]

## C.    CD3 Reflects the General Assembly's Racial Purpose

The General Assembly's use of a quota to increase CD3's Black population is evident in the ultimate composition of the district.  Consistent with its targeted goal, the 2012 Plan

---

[7] It is also worth noting that the BVAP in all of the 2011 majority-minority Senate districts decreased from the benchmark Senate districts.  Int-Def. Ex. 48 at 28.  Senate District 2's BVAP went from 58.9% to 51.2%.  *Id.*  Senate District 5's BVAP went from 56.1% to 53.6%.  *Id.* Senate District 9's BVAP went from 54.9% to 50.8%.  *Id.*  Senate District 16's BVAP went from 54.5% to 53.1%.  *Id.*  Senate District 18's BVAP went from 58.3% to 53.5%.  *Id.*

significantly increased the total number of Black residents in CD3.  In 2011, 275,499 Black

voting age residents lived in Benchmark CD3.  Pl. Ex. 27 at 14.  Under the 2012 Plan, 320,210

Black voting age residents lived in the district—an increase of 44,711 individuals.  *Id.*

These changes also increased the percentage of Black voting age residents in CD3.  In

2011, Benchmark CD3 had a BVAP of 53.9%.  *Id.*  Under the 2012 Plan, that percentage

*increased* to 57.2%.  *Id.*  Remarkably, Black voters accounted for over 90% of the voting age

residents added to CD3 under the 2012 Plan.  *Id.*

The General Assembly packed Black voters into CD3 even though the district had

performed as a safe majority-minority district for twenty years.  Pl. Ex. 27 at 11.  Congressman

Bobby Scott has represented CD3 since 1991.  Pl. Ex. 21 at 33.  In the six elections from 2002 to

2012, he ran unopposed in three.  Pl. Ex. 27 at 11.  He was opposed in the general election in

2010 and 2012 but reelected in both.  *Id.*  In 2010, he won 70% of the vote, and in 2012—under

the 2012 Plan—he won by an even larger margin, with no less than 81.3% of the vote.  *Id.*  The

authors of the 2012 Plan did not conduct any voter performance studies to evaluate whether

increasing the BVAP in CD3 was needed to avoid retrogressing the ability of Black voters to

elect their candidate of choice.  The actual voter performance of the district reveals why:  it

would have been plainly apparent that packing additional Black voters was unnecessary and,

indeed, one could have *lowered* the BVAP without retrogressing at all.  *See* Pl. Ex. 30 at 4-5.

**D.      The General Assembly's Focus on Race Caused CD3 to Have a Bizarre Shape**

The General Assembly's convoluted efforts to pack Black voters into CD3 resulted in a

bizarrely shaped district that reveals the lengths to which the drafters went to achieve their racial

goal.  CD3 looks like a series of islands connected over land by other districts and over water by

the broad James River.  Pl. Ex. 52.  The district starts north of Richmond and slides down the

northern shore of the James River, ending abruptly at the border of James City.  It then jumps

over James City, which is part of CD1, and lands in a horseshoe shape in Newport News.  It then

leaps over southern and eastern Newport News in CD2 and stops in Hampton.  The second half

of CD3 starts anew on the southern shore of the James River, first darting west to swallow

Petersburg and then sliding east through Surry.  It then hops over Isle of Wight, which is in CD4,

grabs Portsmouth, and runs up into Norfolk, tearing CD2 into areas on either side of Norfolk.

Virginia legislators confirmed that the shape of CD3 is bizarre.  In a public hearing in

2010, a speaker described Benchmark CD3 to a panel of state legislators.  Pl. Ex. 12 at 48-50.

Although Benchmark CD3 is different than CD3 under the 2012 Plan, the two districts closely

resemble one another, as both connect almost all of the same communities along the James

River.  *See* Pl. Ex. 52.  The speaker described CD3 as "a monstrosity because it's been

gerrymandered by . . . 90 miles of James River bottom to connect wide areas of Norfolk with the

City of Richmond."  Pl. Ex. 12 at 49.  He further described CD 3 as "packing pretty much every

black community up and down the James River into one" district.  *Id*.  Stephen Martin, a member

of the Senate of Virginia and the Senate's Committee on Privileges and Elections, responded that

he "would agree with that and did not care for the 3rd, the way the 3rd was done."  *Id*. at 50.

The shape of CD3 plainly reveals that the General Assembly subordinated traditional

redistricting criteria to its consideration of race.  Traditional redistricting criteria include

compactness, contiguity, and respect for local political subdivisions.  But the evidence will show

that none of these interests were protected here.  First, as to compactness, Del. Janis explained to

the Senate Committee on Privileges and Elections that he paid no attention to compactness when

drawing the 2012 Plan.  Pl. Ex. 14 at 8.  He admitted that he "didn't examine compactness

scores" and was "not competent to offer an opinion about the relative compactness" of districts

or plans.  *Id.*  The shape of CD3 reflects the General Assembly's disregard for compactness, as the compactness tests used by Virginia in its Section 5 Submission (the Reock, Polsby-Popper, and Schwartzberg tests) show that CD3 is Virginia's least compact congressional district.  *See* Pl. Ex. 4 at 10-11, Pl. Ex. 27 at 7.

Second, CD3 is not contiguous over land.  The 2012 Plan uses the James River to connect portions of CD3 that could be contiguous by land.  *See* Pl. Ex. 52.  It also includes areas on opposite sides of the James River that are not connected by bridges.  *Id.*  The General Assembly's lack of concern for contiguity is evident in its decision to separate portions of CD3 in Newport News and Hampton even though the cities share a municipal border, a decision remedied in the Plaintiffs' Alternative Plan.  *Id.*

Finally, CD3 splits more counties and cities than any other congressional district in Virginia and contributes to most of the locality splits of its neighboring districts.  Pl. Ex. 27 at 8-9.  CD3 splits local counties and cities nine times.  *Id.*  The district with the second highest number of splits is CD1, with only 5 splits, two of which are due to CD1's boundary with CD3.  *Id.*  CD3 also splits more voting precincts than any of Virginia's other congressional districts.  *Id.* at 10.  The 2012 Plan splits 20 voting precincts in all; CD3 participates in 14 of them.  *Id.*

**E.      The General Assembly's Method for Drawing CD3 Relied Predominantly on Race**

The 2010 census showed that Benchmark CD3 was underpopulated.  In 2011, Benchmark CD3 had 663,390 residents.  Pl. Ex. 27 at 13.  The ideal number needed to ensure that all eleven Virginia congressional districts had an equal population was 727,366 residents.  *Id.*  The General Assembly thus had to add 63,976 residents to CD3 to comply with the zero variance rule.  *Id.*

Even though population had to be *added* to CD3, the General Assembly began by *removing* residents from the district.  It did so in order to achieve its primary purpose: to pack

more Black residents into CD3.  Merely adding Black voters to reach the 727,366 ideal would have been insufficient to reach or exceed the predetermined 55% quota, so the plan instead withdrew White voters to allow additional Black voters to be added to the district.  For example, the General Assembly removed from Benchmark CD3 25,501 people—18.8% of whom were Black voting age residents—and relocated them into CD2 under the 2012 Plan.  Pl. Ex. 27 at 15, 19-21.  The General Assembly then moved from Benchmark CD2 into the new CD3 a different set of 27,917 people—37.9% of whom were Black voting age residents.  *Id.*  This swap relocated 53,418 people to increase the population in CD3 by only 2,416, a substantial disruption for a modest increase in population.  The swap, however, achieved its real purpose:  transferring 4,011 Black voting age residents from CD2 to CD3.

The General Assembly undertook a similar swap between CD3 and CD7.  It took 20,217 people—14.5% of whom were Black voting age residents—from Benchmark CD3 and relocated them in the new CD7.  Pl. Ex. 27 at 15, 24-25.  It simultaneously took 36,101 people—65% of whom were Black voting age residents—from Benchmark CD7 and moved them to the new CD3.  *Id.*  Over 56,318 people were relocated to increase the population of CD3 by only 15,884 people, but the real effect was to move 15,721 Black voting age residents into CD3.

The General Assembly's packing of additional Black voting age residents into CD3 also decreased the number of Black residents in surrounding districts.  Compared to the Benchmark Plan, the 2012 Plan decreased the BVAP percentage in CD1 by 2.6 points, in CD2 by .2 points, in CD4 by 2.2 points, and in CD7 by 2.4 points.  Pl. Ex. 27 at 15.

These swaps underscore that the General Assembly subordinated other districting criteria to race.  In his comments to the House of Delegates, Del. Janis contended that one of his criteria was to preserve existing districts out of respect for the voters' perceived preference for those

districts.  Pl. Exs. 46, 47 at 4.  But Del. Janis's decision to *remove* a substantial number of voters from CD3—which was underpopulated to begin with—to increase the BVAP of the district belies that rationalization and demonstrates that race was the predominant factor behind his plan.

**F.   CD3 Under the 2012 Plan Is Similar to the District Held Unconstitutional in *Moon v. Meadows***

Less than twenty years ago, the predecessor to the current CD3 was found to be an unconstitutional racial gerrymander, and CD3 under the 2012 Plan has inherited many of its defects.  Virginia made CD3 its first majority-Black congressional district in 1991.  The district had a total Black population of 63.98% and BVAP of 61.17%.  Pl. Ex. 24.  In 1995, voters challenged CD3 as an unconstitutional racial gerrymander.  Pl. Ex. 21 at 23.  In 1997, the court held that CD3 violated the Equal Protection Clause.  *Moon v. Meadows*, 952 F. Supp. 1141 (E.D. Va.), *aff'd*, 521 U.S. 1113 (1997).  The Supreme Court summarily affirmed.

CD3 under the 2012 Plan has a similar composition to the version of CD3 found unconstitutional in *Moon*.  Both versions of CD3 connect the disparate communities of Richmond, Petersburg, Newport News, Hampton, Portsmouth, and Norfolk.  Pl. Ex. 27 at 6. Both rely on the James River to connect these areas, many of which could be contiguous by land. *Id*.; *see also* Pl. Ex. 52.  Both are also the result of swaps that shifted areas with low concentrations of Black voting age residents out of the district and moved areas with high concentrations of Black voting age residents into the district.  Pl. Ex. 27 at 12, 14-16.

CD3 under the 2012 Plan is also more similar to the unconstitutional district than it is to the intervening versions of CD3.  After the court found the 1991 version of CD3 unconstitutional, the General Assembly redrew CD3.  Pl. Ex. 21 at 18.  The version of CD3 drawn in 1998 had a total Black population of 53.59% and a BVAP of 50.47%.  Pl. Ex. 22 at 2.

It lowered the percentage of Black residents in CD3 by returning Portsmouth, Suffolk, Hopewell, and Petersburg to CD 4.  Pl. Ex. 21 at 19.  The General Assembly adopted Benchmark CD3 in 2001 after the 2000 federal census.  Pl. Ex. 20 at 37-39.  When enacted, it had a total Black population of 56.8% and a BVAP of 53.2%.  *Id*. at 37.

CD3 under the 2012 Plan, however, has percentages of total Black population and BVAP that are closer to those figures for the unconstitutional CD3 than for the 1998 remedial district. The following table shows that, over time, the General Assembly has concentrated more and more Black voters into CD3, approaching the levels of the unconstitutional district:[8]

|  |  | **1991** | **1998** | **2001** | **2012** |
|---|---|---|---|---|---|
| **CD3** | Total Black Population | 63.98% | 53.59% | 56.8% | 59.5% |
|  | BVAP | 61.17% | 50.47% | 53.2% | 56.3% |
| **CD4** | Total Black Population | 32.09% | 38.59% | 33.6% | 32.4% |
|  | BVAP | 30.66% | 36.75% | 32.3% | 31.3% |

**G.    Plaintiffs' Alternative Map Confirms that the General Assembly Could Have Achieved Its Goals Without Packing Black Residents into CD3**

None of this was necessary.  Plaintiffs have submitted an alternative map for CD3 ("Alternative Map") that shows Virginia could have achieved its districting goals without packing Black voters into CD3.  *See* Plaintiffs' Notice of Filing of Alternative Congressional Redistricting Plan, Dkt. No. 53.  The map makes modest changes by affecting only two districts: CD2 and CD3.  Pl. Ex. 29 at 1.  And it changes their boundary in only two ways, adding an area

---

[8] The table includes only "exclusive" statistics found in Pl. Exs. 6, 20, 22, 24.

currently in CD2 to CD3 in order to unite Newport News and Hampton in one district, and unifying Norfolk in one district by moving it entirely into CD2.  *Id*. at 1-2.

The Alternative Plan better serves the criteria Del. Janis described as the basis for the 2012 Plan.  Del. Janis explained that the 2012 Plan sought to (1) apportion population equally among all congressional districts, (2) avoid retrogressing the ability of Black voters to elect candidates of their choice, (3) preserve the core of existing districts, (4) avoid placing incumbents in the same district, and (5) respect local political boundaries.  Pl. Exs. 46, 47 at 2-6.

Under the Alternative Plan, all congressional districts have equal population, and CD3 preserves Black voters' ability to elect candidates of their choice, as shown in the racial block voting analysis provided by Plaintiffs' expert, Dr. Michael McDonald.  Pl. Exs. 29 at 5, Pl. Ex. 30 at 4-6.  The Alternative CD3 also avoids packing additional Black voting age residents into the district.  Pl. Ex. 30 at 1.

In addition, the Alternative Plan gives preserving district cores the same weight that the 2012 Plan did.  As shown above, the 2012 Plan compromised core districts to accomplish other goals, and the Alternative Plan does the same.  The key difference is that the 2012 Plan moved voters out of their districts to pack Black voters into CD3 while the Alternative Plan moved them to make Newport News and Hampton contiguous, reduce the number and impact of locality splits, and increase compactness.  *See* Pl. Ex. 29 at 1-2.  Overall, the two plans preserve approximately 85% of each district, as measured by the number of voters who stayed in the same district under the Benchmark Plan and either the 2012 Plan or Alternative Plan.  Pl. Ex. 34 at 24. Many of the Alternative Plan's changes, moreover, simply move residents who were also moved under the 2012 Plan.  Pl. Ex. 29 at 3.  Thus, the Alternative Plan and 2012 Plan approach preserving core districts in much the same way.

-13-

Like the 2012 Plan, the Alternative Plan does not put incumbents in the same district, and it respects local political boundaries better than the 2012 Plan.  Pl. Ex. 29 at 3.  The Alternative Plan splits fewer localities than the 2012 Plan, and it decreases the number of residents affected by the splits by 240,080.  Pl. Ex. 29 at 3-5.

The Alternative Plan respects the traditional redistricting criteria of compactness and contiguity better than the 2012 Plan.  CD3 is more compact under the Alternative Plan as measured by the compactness tests used by Virginia in its Section 5 submission, and it makes the portion of CD3 that includes Newport News and Hampton contiguous by land when it was previously only contiguous by water.  Pl. Ex. 29 at 6, 7.  Thus, judged by the criteria that Del. Janis used to shape CD3, the Alternative Plan performs as well or better than the 2012 Plan.

Defendant's expert, Mr. Morgan, attempts in his expert report to retroactively add a new criteria by contending that the 2012 Plan was motivated by partisan interests and that the Alternative Plan does not sufficiently reflect that priority.  Pl. Ex. 34 at 14-16.  This after-the-fact rationalization is directly contradicted by the record:  Del. Janis explicitly and unequivocally denied that partisan politics were one of the criteria behind the 2012 Plan.  Int-Defs. Ex. 18 at 14. Instead, he was careful to explain that he sought the input of congressmen from both major parties and that the goal of protecting incumbents simply involved not putting them in the same district.  Pl. Exs. 46, 47 at 4-5.  Thus, Mr. Morgan's analysis is completely at odd with the testimony and positions of the 2012 Plan's author.

Furthermore, even if, notwithstanding Del. Janis's assertions to the contrary, partisan motivations played a role in the 2012 Plan, any such political interests were subordinated to the racial purposes involved in the General Assembly's purported compliance with the Voting Rights

-14-

Act, which Del. Janis repeatedly stated was the most important concern next to equal population across districts.  *See* Pl. Ex. 14 at 9.

### III.    ARGUMENT

**A.    Racial Gerrymandering Is Unconstitutional**

The Equal Protection Clause of the Fourteenth Amendment prohibits racial gerrymandering.  *Shaw v. Reno* ("*Shaw I*"), 509 U.S. 630, 644 (1993).  "The right to vote freely for the candidate of one's choice is the essence of a democratic society," and states cannot use "subtle . . . instruments" to deny this right on the basis of race.  *Id*. at 639 (internal quotation marks and citation omitted).  Packing members of a minority group into one district to stifle their influence in other districts, is one method of race-based redistricting.  *Id*. at 640, 647.  Such a "racially gerrymandered districting scheme, like all laws that classify citizens on the basis of race, is constitutionally suspect."  *Shaw v. Hunt* ("*Shaw II*"), 517 U.S. 899, 904 (1996).

Plaintiffs challenging the constitutionality of a plan as a racial gerrymander bear the burden of proving that race was the predominant purpose behind the districting decision.  *Miller v. Johnson*, 515 U.S. 900, 916 (1995).  Once plaintiffs have made this showing, the burden shifts to defendants to satisfy strict scrutiny by proving that: (1) the state had a compelling governmental interest in making the race-based districting decision; and (2) the decision was narrowly tailored to achieve that interest.  *Bush v. Vera*, 517 U.S. 952, 976 (1996).

Here, the evidence plainly shows that race was the predominant factor behind CD3, and Defendants and Intervenors cannot satisfy their burden to show that the plan served a compelling interest and was narrowly tailored.

**B.    Race Was the Predominant Factor Behind the Shape of CD3**

To show that race was the predominant purpose behind a districting plan, a plaintiff must demonstrate that "the legislature subordinated traditional race-neutral districting principles . . . to racial considerations." *Miller*, 515 U.S. at 916.  Such an unconstitutional purpose exists when a state packs or "concentrate[s] a dispersed minority population in a single district by disregarding traditional districting principles," such as "compactness, contiguity, and respect for political subdivisions." *Shaw I*, 509 U.S. at 647.  A plaintiff can meet this burden "either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose." *Miller*, 515 U.S. at 916.

The direct and circumstantial evidence here easily demonstrates that race was the predominant factor in the General Assembly's adoption of CD3.

**1.    Statements by the 2012 Plan's Author Show that Race Was the Predominant Factor Behind The Shape of CD3**

First, and most importantly, Del. Janis, the author of the plan candidly admitted that race was the predominant factor in the creation of the 2012 Plan and CD3.  His statements that maintaining a certain number of Black residents  in CD3 was the "primary focus," "most especial[] focus[]," and "paramount concern" behind the district leave no doubt that race was the predominant factor in his districting decision.  Pl. Exs. 46, 47 at 10, 14, 25; *see also Shaw II*, 517 U.S. at 906 (statements that compliance with Voting Rights Act and creation of districts with specific racial composition were "overriding purpose" and "principal reason" for districts showed race predominated) (emphasis omitted); *Miller*, 515 U.S. at 918 (statements that districts would have been different "but for" race and that racial considerations were the "substantial reason" for a district's shape showed that race was a predominant factor).

-16-

Virginia's use of a racial quota to draw CD3 is similarly strong evidence that race was the predominant factor behind the 2012 Plan. The Supreme Court has time and again treated "rigid racial quota[s]" with the highest skepticism. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 499 (1989); *see also Grutter v. Bollinger*, 539 U.S. 306, 335 (2003); *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 315 (1978) (Powell, J.). Racial quotas in the districting context are no different. As Justice Kennedy has confirmed, "we would no doubt apply strict scrutiny if a State decreed that certain districts had to be at least 50 percent white, and our analysis should be no different if the State so favors minority races." *Bush*, 517 U.S. at 996 (Kennedy, J., concurring).

In *Shaw II*, the Supreme Court held that applying such fixed racial criteria to a districting decision shows that race predominated. There, the Supreme Court affirmed the district court's conclusion that race was the predominant purpose behind North Carolina's attempt to redraw a district. 517 U.S. at 905-7. The Court acknowledged that North Carolina considered other criteria in addition to race, but it concluded that race was the predominant factor because "[r]ace was the criterion that, in the State's view, could not be compromised; respecting communities of interest and protecting Democratic incumbents came into play only after the race-based decision had been made." *Id.* at 907. Thus, use of a rigid race-based criterion such as a quota is strong evidence that race was the predominant factor in a districting decision. *See Clark v. Putnam Cnty.*, 293 F.3d 1261, 1267 (11th Cir. 2002) (statement by map drawer that "her predominant consideration . . . was to maintain the core of the existing majority minority districts and strive toward a 60% black VAP" was evidence that race predominated).

A three-judge panel in South Carolina came to a similar conclusion on remarkably similar facts. In *Smith v. Beasley*, 946 F. Supp. 1174, 1207 (D.S.C. 1996), the court found that South

Carolina's state legislative redistricting plan was an unconstitutional racial gerrymander.  In reaching this decision, the court paid particular attention to the legislature's use of a 55% BVAP quota, characterizing the legislature as having the attitude that "[i]f a district needed more black citizens to reach the goal of 55% BVAP, it mattered little where they came from."  *Id.* at 1207.  As the court concluded "[t]his is the very evil condemned in *Shaw*, *Miller*, and *Bush*."  *Id.*

Virginia's General Assembly used just this kind of unconstitutional quota to determine the composition of CD3.  Pl. Ex. 34 at 25-27.  The General Assembly based the 55% BVAP quota on an incorrect and outdated assumption about Section 5 requirements, and it conducted no voting analysis to determine if 55% BVAP was needed to avoid retrogressing Black voters' ability to elect candidates of their choice in CD3.  The General Assembly simply picked a number of Black residents for CD3 that was higher than the number in the benchmark district and proceeded, not only to meet that quota, but exceed it.  This is not permissible and such efforts have been routinely rejected as impermissible racial gerrymandering.  On this record, strict scrutiny is required.

## 2.  The Shape and Composition of CD3 Show that Race Was the Predominant Purpose Behind the 2012 Plan

Even in the absence of Del. Janis' candid admissions, the very shape of CD3 is telling.  "[R]eapportionment is one area in which appearances do matter," *Shaw I*, 509 U.S. at 647, and a district's "bizarre" or "irregular" shape shows that racial considerations predominated.  *See Miller*, 515 U.S. at 914.  In particular, districts that attempt to connect disparate communities by narrowly complying with contiguity requirements are often considered "bizarre" and probative of an improper racial purpose.  *See Shaw II*, 517 U.S. at 903, 905-6 (district that snaked along freeway collecting areas with Black residents was evidence of improper racial purpose); *Miller*,

515 U.S. at 917 (narrow land bridges that connected areas with high concentrations of Black residents showed that race was the predominant purpose); *Moon*, 952 F. Supp. at 1147 (CD3 that connected communities along the James River similar to the 2012 Plan had bizarre shape indicating unconstitutional racial purpose).

The existence of an alternative districting plan that meets a state's goals while providing greater racial equity shows that a plan "is unexplainable on grounds other than race" and should receive strict scrutiny. *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (internal quotation marks and citation omitted). In *Easley*, the Supreme Court found vague assertions about possible alternative maps unconvincing, but it acknowledged that a "hypothetical alternative district[] [that] would have better satisfied the legislature's other nonracial political goals as well as traditional nonracial districting principles" would show an "improper legislative motive." *Id*. at 249. Plaintiffs here have submitted a plan that shows Virginia could have achieved the goals motivating the 2012 Plan without packing Black voters into CD3, further demonstrating that the Court should apply strict scrutiny to the 2012 Plan.

The strategy of swapping areas with a low concentration of minority voters out of a district while bringing areas with a high concentration of minority voters into the district also shows that race was a predominant factor in drawing a district. In *Moon v. Meadows*, Virginia amended CD3 to add "Richmond County whose population was roughly 69.8% white and 30.2% Black . . . [and removed ] the entire population of James City County which was approximately 80% white and 20% black." 952 F. Supp. at 1146. The court concluded that this was "evidence that race played the predominant role in the development of the new Congressional district." *Id*. The 2012 Plan pursued precisely this same strategy. Pl. Ex. 27 at 15.

### 3. Defendants Fail to Show that Other Purposes Motivated the 2012 Plan

Defendants contend that race was not Virginia's predominant purpose because it simply tried to comply with the Voting Rights Act. Courts, however, regularly find that where the primary goal is compliance with the Voting Rights Act, race is the predominant purpose. In *Miller*, Georgia attempted to comply with DOJ's interpretation of the Voting Rights Act, and the Supreme Court concluded that race was the predominant purpose behind its districting plan precisely because of its attempt at compliance. 515 U.S. at 917. Similarly, in *Shaw II*, North Carolina's attempt to satisfy DOJ's preclearance requirements resulted in the Supreme Court's conclusion that race predominated. 517 U.S. at 906; *see also Bush*, 517 U.S. at 957, 962 (race predominated when Texas adopted new majority-minority districts "with a view to complying with the Voting Rights Act"); *Shaw I*, 509 U.S. at 642-43 (recognizing that redistricting decisions based on race are subject to strict scrutiny standard, even if made for purportedly "benign" or "remedial" reasons). Similarly here, Virginia's attempt to comply with the Voting Rights Act does not inoculate the 2012 Plan from review; indeed, race was a predominant factor behind the 2012 Plan precisely *because* it was used to "comply" with the Voting Rights Act.

Defendants' expert remarkably contends that politics, not race, shaped the 2012 Plan-- despite the fact that the plan's author explicitly disavowed partisan interests, and despite that same expert's assertion that CD3 was drawn pursuant to a 55% BVAP quota. To be clear, this was not a quota for Democratic voters or Republican voters; it was a quota for Black voters.

### C. Defendants Cannot Show that CD3 Passes Strict Scrutiny

Because race was a predominant factor in the General Assembly's creation of CD3, Defendants "must demonstrate that [Virginia's] districting legislation is narrowly tailored to achieve a compelling interest." *Miller*, 515 U.S. at 920. "[R]acial classifications are simply too

-20-

pernicious to permit any but the most exact connection between justification and classification." *Parents Involved in Cmty Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (internal quotation marks and citation omitted).  Defendants cannot begin to meet this exacting standard.

### 1.    Defendants Cannot Show that CD3 Serves a Compelling State Interest

Defendants contend that the General Assembly's alleged goal of complying with Section 5 justified its use of race when drawing CD3.  Section 5 compliance, however, ceased to be a compelling interest after the Supreme Court's decision in *Shelby County, Alabama v. Holder*, 570 U.S. ___, 133 S. Ct. 2612 (2013).  *Shelby County* held that the coverage formula of the Voting Rights Act was unconstitutional, and accordingly Section 5 no longer applied to certain jurisdictions, including Virginia.  133 S. Ct. at 2631.  Because Virginia is no longer subject to Section 5, Section 5 compliance obviously cannot serve as a compelling interest that justifies Virginia's race-based redistricting.

*Shelby County* itself confirms that a constitutionally suspect law must be justified by current circumstances.  In describing Section 5, the Supreme Court held that "the Act imposes current burdens and must be justified by current needs."  *Id*. at 2619.  Similarly, the General Assembly's attempt to comply with Section 5 imposes current burdens on Virginia's voters and must be justified by current needs.  Because Virginia no longer needs to comply with Section 5, Section 5 compliance no longer justifies the 2012 Plan.

Defendants' contention that the General Assembly's intent to comply with Section 5 in 2012 justifies a race-based regime in effect in 2014 fails to account for a crucial distinction between the purpose analysis and compelling interest analysis required in an Equal Protection case.  *See Miller*, 515 U.S. at  917, 920 (examining separately the districting plan's purpose and alleged compelling interest).  There is no dispute that the purpose behind a districting decision is

-21-

set when the decision was made.  Similarly, the interest served by the decision may be fixed at

the time the state acts.  But whether that interest is compelling changes over time.   Here,

Virginia's alleged interest in Section 5 compliance ceased to be compelling after *Shelby County*.

      In the districting context in particular, a change in the law can invalidate a plan that may

have been justified at the time it was adopted.  In *Whitcomb v. Chavis*, the Supreme Court

affirmed the District Court's order requiring reapportionment of the Indiana General Assembly

on the basis of substantial population inequalities across districts.  403 U.S. 124, 163 (1971).

The Court flatly rejected the argument that the districting plan was constitutional because a

federal court had approved it a few years earlier under a different standard.  It concluded:

> Here, the District Court did not order reapportionment as a result
> of population shifts since the 1965 Stout decision, but only because
> the disparities among districts which were thought to be
> permissible at the time of that decision had been shown by
> intervening decisions of this Court to be excessive.

*Id.*  While population shifts alone do not permit a court to order mid-decennial redistricting, a

change in the applicable law does: a court may order statewide redistricting where "intervening

decisions of [the Supreme] Court" establish that a redistricting scheme violates equal protection

principles.  *Id.*  Here, too, the *Shelby County* decision is a change in the applicable law, and the

justification for the 2012 Plan must be examined under the law that applies now.

      The requirement that a defendant's compelling interest be judged in light of current

circumstances is further supported by the Supreme Court's application of strict scrutiny in the

First Amendment context.  Like districting decisions predominantly based on race, laws that

burden pure speech must satisfy strict scrutiny.  *See Citizens United v. FEC*, 558 U.S. 310, 340

(2010).  In *Citizens United*, the Supreme Court struck down a provision of the Federal Election

Campaign Act ("FECA") that barred corporations and unions from making independent

expenditures for certain political ads. *See id.* at 365-66. The Court held that the ban was not justified by the government's asserted interest in, among others, preventing certain kinds of political inculence, *id.* at 359, or preventing aggregations of wealth from drowning out the speech of others (the "antidistortion" interest). This holding overruled two prior decisions that had recognized these interests as compelling, *id.* at 365, and two circuits quickly found that *Citizens United* vitiated these two interests as possible compelling interests. In *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010), the D.C. Circuit sitting en banc unanimously invalidated certain FECA contribution limits, reasoning in part that "[g]iven this precedent [of *Citizens United*], the only interest we may evaluate to determine whether the government can justify contribution limits . . . is the government's anticorruption interest." *Id.* at 692. Likewise, in *Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684 (9th Cir. 2010), the Ninth Circuit invalidated a city ordinance limiting certain contributions after rejecting the city's asserted anti-distortion interest, noting that "the Supreme Court has overruled *Austin* and explicitly rejected the 'anti-distortion rationale' upon which it rested." *Id.* at 693. *Citizens United* and its aftermath illustrate the dynamic quality of strict scrutiny: Even where earlier government actions may have been justified at the time, courts routinely strike down measures that, based on intervening Supreme Court authority, no longer advance compelling interests.

But even if the Court were to disregard the implications of *Shelby County*, before compliance with Section 5 could possibly be a compelling interest, a defendant must show that such compliance was its "actual purpose" and that it had "a strong basis in evidence . . . for believing" that the districting decision was "'reasonably necessary under a constitutional reading and application of'" the Act. *Shaw II*, 517 U.S. at 908 n.4; *Miller*, 515 U.S. at 921. Certainly, Defendants can point to no authority that Section 5's non-retrogression principles require an

*increase* in minority population in a district that has consistently performed for the minority candidate of choice. *See Miller*, 515 U.S. at 921 (no compelling interest where "the congressional plan challenged . . . was not required by the Act under a correct reading of the statute"). Further, Virginia performed no analysis that showed such an increase even might be necessary. Virginia's decision to increase the number of Black voting age residents in CD3 was not "reasonably necessary" to comply with Section 5, and Defendants cannot credibly contend that complying with Section 5 was the compelling interest behind its adoption of CD3.

### 2. Defendants Cannot Show that CD3 Is Narrowly Tailored

Even if Defendants could satisfy their burden to show that the 2012 Plan served a compelling interest, they cannot meet their burden to prove that CD3 was narrowly tailored to achieve that interest. *Shaw II*, 517 U.S. at 908; *Bush*, 517 U.S. at 976; *Miller*, 515 U.S. at 920.

Defendants have attempted to justify their race-based redistricting by simply averring to the need for Voting Rights Act compliance, but the Supreme Court has rejected this approach, holding that:

> When a state governmental entity seeks to justify race-based remedies to cure the effects of past discrimination, we do not accept the government's mere assertion that the remedial action is required. Rather, we insist on a strong basis in evidence of the harm being remedied.

*Miller*, 515 U.S. at 922. Nor does Voting Rights Act compliance necessarily shield a plan from challenge. *Shaw I*, 509 U.S. at 654 ("[T]he Voting Rights Act and our case law make clear that a reapportionment plan that satisfies § 5 still may be enjoined as unconstitutional."). To the contrary, a districting decision must be "required under a correct reading of § 5" to be narrowly tailored, *Shaw II*, 517 U.S. at 911, and "[a] reapportionment plan would not be narrowly tailored to the goal of avoiding retrogression if the State went beyond what was reasonably necessary to

-24-

avoid retrogression." *Shaw I*, 509 U.S. at 655.  In fact, the Supreme Court has consistently struck down plans that were not narrowly tailored to achieve Voting Rights Act compliance.  *See, e.g.*, *Bush*, 517 U.S. at 983 (finding Texas "went beyond what was reasonably necessary to avoid retrogression") (internal quotation marks and citation omitted); *Shaw II*, 517 U.S. at 910-18 (concluding that districts were not narrowly tailored to comply with the VRA); *see also Miller*, 515 U.S. at 921 (rejecting districts as unconstitutional where not required under a correct reading of the VRA).  "[C]overed jurisdictions [do not have] *carte blanche* to engage in racial gerrymandering in the name of nonretrogression."  *Shaw I*, 509 U.S. at 655.

Thus, even if Defendants could show that CD3 was drawn to comply with Section 5— and this Court determined that was and remains a valid compelling interest for subjugating traditional redistricting criteria to considerations of race—Defendants must show that the General Assembly did not go "beyond what was reasonably necessary" to achieve that compliance to defeat Plaintiffs' racial gerrymandering claim.  *Bush*, 517 U.S. at 983.

Defendants cannot begin to make such a showing.  They offer no expert testimony to demonstrate that any BVAP less than 56.3% would have led to "retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."  *Beer v. United States*, 425 U.S. 130, 141 (1976).  There is no evidence that shows the General Assembly even analyzed (let alone retained an expert to analyze) how high the BVAP of CD3 must be to provide minorities an ability to elect their candidates of choice.  Indeed, Defendants make no effort to explain why they believe Section 5 required the General Assembly to *increase* the BVAP in CD3 by more than three full percentage points.  *See Moon*, 952 F. Supp. at 1150 ("There is simply no evidence that the Legislature took any steps to narrowly tailor [CD 3], nor has it produced enough evidence of a compelling government interest.").  *Cf. Prejean v. Foster*,

227 F.3d 504, 518 (5th Cir. 2000) ("Narrow tailoring demands an explanation that the district chosen entails the least race-conscious measure needed to remedy a violation.").  Nor do Defendants make any effort to defend CD3 as justified by compliance with Section 2, much less demonstrate that the General Assembly had a "strong basis in evidence" for concluding that race-based redistricting was necessary and that CD3 did not "subordinate traditional districting principles to race substantially more than is 'reasonably necessary' to avoid" liability, as required by the case law.  *Bush*, 517 U.S. at 979.  *See also Miller*, 515 U.S. at 921-22.

*Bush v. Vera* is particularly important here because it specifically held that increasing the percentage of minority residents in a district—as Virginia did—was not narrowly tailored to comply with Section 5.  In *Bush*, Texas had increased the number of Black residents in a district from 35.1% to 50.9%.  Texas claimed that it made this change to comply with Section 5.  517 U.S. at 983.  The plurality explained that "[t]he problem with the State's argument is that it seeks to justify not maintenance, but substantial augmentation, of the African-American population percentage in District 18."  *Id*.  This increase, according to the plurality, was not narrowly tailored to the goal of complying with Section 5 because "[t]he State has shown no basis for concluding that the *increase* . . . was necessary to ensure nonretrogression."  *Id*.  The Court warned that "[n]onretrogression is not a license for the State to do whatever it deems necessary to ensure continued electoral *success*; it merely mandates that the minority's *opportunity* to elect representatives of its choice not be diminished."  *Id*.  A majority of the justices agreed that the district was not narrowly tailored.  *See id*. at 1003 (Thomas, J., joined by Scalia, J., concurring).

Defendants' explanation that Virginia used a quota only further shows that the 2012 Plan was not narrowly tailored.  The Supreme Court has held in other equal protection cases that use of racial quotas is not narrowly tailored.  *See Grutter v. Bollinger*, 539 U.S. 306, 334 (2003) ("To

-26-

be narrowly tailored, a race-conscious admissions program cannot use a quota system . . . .");

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 507-08 (1989) ("the 30% quota cannot be

said to be narrowly tailored to any goal").  Because "[n]arrow tailoring [in the districting context]

demands . . . that the district chosen entails the least race-conscious measure needed to remedy a

violation," the use of a quota that considers only race cannot possibly be narrowly tailored.

*Prejean*, 227 F.3d at 518.  The General Assembly conducted no study to determine how many

Black voting age residents were needed in CD3 to maintain their voting strength and used the

55% BVAP quota even though they knew it was not required for Section 5 compliance.  The

General Assembly's quota considered only race and is not narrowly tailored.  This is improper as

a matter of well settled law.  *See Beasley*, 946 F. Supp. at 1210 ("Districts in which most

minority citizens register and vote will not need 55% BVAP to elect a candidate of choice.  To be

narrowly tailored, such facts should be considered when district lines are drawn.  This was not

done in the present cases because of the insistence that all majority-minority districts have at

least 55% BVAP with no evidence as to registration or voter turnout.").

**D.    The Court Should Impose an Immediate and Effective Remedy**

Courts regularly exercise the "power . . . [either] to require valid reapportionment or to

formulate a valid redistricting plan."  *Scott v. Germano*, 381 U.S. 407, 409 (1965).  If time

allows, a court should give the appropriate legislative body an opportunity to enact a new plan

that avoids the constitutional infirmities in the invalidated plan.  *See McDaniels v. Mehfoud*, 702

F. Supp. 588, 596 (E.D. Va. 1988); Nathaniel Persily, *When Judges Carve Democracies: A

Primer on Court-Drawn Redistricting Plans*, 73 Geo. Wash. L. Rev. 1131, 1133 (2005).  But, as

the Supreme Court has explained, "[a]lthough the legislative branch plays the primary role in

congressional redistricting, our precedents recognize an important role for the courts when a

districting plan violates the Constitution."  *League of United Latin Am. Citizens v. Perry*, 548

U.S. 399, 415 (2006).  In particular, where it is clear that the appropriate legislative body will not

or cannot enact a valid plan in time, as when the "imminence of . . . [an] election makes [referral

to the legislative branch] impractical . . . it becomes the 'unwelcome obligation' of the federal

court to devise and impose a reapportionment plan pending later legislative action."  *Wise v.

Lipscomb*, 437 U.S. 535, 540 (1978) (principal opinion) (internal citation omitted).

The Virginia congressional primary election is scheduled for June 10, 2014, and if

delayed, it must occur in the next few months to comply with the MOVE Act, 42 U.S.C. § 1973ff

*et seq*.  This imminent election makes it impractical to refer adoption of a new plan to the

General Assembly and allow it to perform the task at its leisure.  Accordingly, the General

Assembly should be afforded no more than two weeks to adopt a remedial plan, and if it cannot,

the Court should take on the "unwelcome obligation" to adopt a reapportionment plan.

The Court plainly has the authority to adopt a remedial plan if the General Assembly is

unable to do so in the time allotted.  *See*, *e.g.*, *Adamson v. Clayton Cnty. Elections &

Registration Bd.*, 876 F. Supp. 2d 1347, 1352-53 (N.D. Ga. 2012) (utilizing independent

technical advisor to aid in creating new map in time for looming qualifying deadlines and

election); *Hastert v. State Bd. of Elections*, 777 F. Supp. 634, 661-62 (N.D. Ill. 1991) (comparing

and ultimately adopting one of competing congressional redistricting plans submitted by

plaintiffs where legislature failed to enact new districting scheme following census);

*Stephenson v. Bartlett*, 582 S.E.2d 247, 248-49 (N.C. 2003) (finding legislature's remedial plan

unconstitutional and adopting court's own plan over the course of 11 days); *In re Legislative

Districting of State*, 805 A.2d 292, 298 (Md. 2002) (court adopted plan because "legislative

elections are imminent, [and] there is simply no time to return the matter to the political

-28-

branches").  In exercising that power, the Court could choose to draw an interim remedial plan
(with or without the aid of a Special Master), or adopt (in whole or in part) Plaintiffs' Alternative
Plan.  While Plaintiffs' Alternative Plan provides evidence of liability on the merits, it also
serves as a viable remedial plan.  It satisfies the standards for court-adopted districting plans
established in *Abrams v. Johnson*, 521 U.S. 74 (1997), and *Upham v. Seamon*, 456 U.S. 37
(1982), because it does not "'intrude upon state policy any more than necessary,'" *id*. at 42
(quoting *White v. Weiser*, 412 U.S. 783, 795 (1973)).  The Alternative Plan affects only two
districts, CD2 and CD3.  It also respects traditional redistricting criteria because it is more
compact, more contiguous by land, and preserves more local jurisdictions than the 2012 Plan.  It
also respects and, in many instances, furthers the goals of the 2012 Plan.  For all of these reasons,
Plaintiffs' Alternative Plan provides the Court with a viable option as it proceeds to adopt interim
congressional district lines.

Regardless of who adopts the remedial plan, the Court also must change the deadlines for
Virginia's 2014 congressional election cycle.  Because candidates must be given the opportunity
to register their candidacy under a constitutional remedial plan, the Court should reopen the
candidate filing period that closed on March 27, 2014.  It is well within the Court's authority to
change election deadlines in this manner.  *See, e.g.*, *Sixty-Seventh Minn. State Senate v. Beens*,
406 U.S. 187, 201 n.11 (1972) ("If time presses too seriously, the District Court has the power
appropriately to extend the time limitations imposed by state law."); *Larios v. Cox*, 305 F. Supp.
2d 1335, 1342-43 (N.D. Ga.) (noting that the "court has broad equitable power to delay certain
aspects of the electoral process if necessary" and finding "no reason why the court could not
extend [the candidate qualifying] period if this proves to be necessary to ensure constitutional
elections"), *aff'd,* 542 U.S. 947 (2004).  Indeed, a three-judge panel in Texas recently ordered

-29-

adjustments to the election schedule and other provisions in the Texas Election Code for the 2012 congressional elections in light of outstanding redistricting issues still under review. *See Perez v. Perry*, Case No. 5:11-CV-00360-OLG-JES-XR, Order (ECF No. 685) (W.D. Tex. Mar. 1, 2012). That courts inherently possess the authority to modify election deadlines when necessary follows from their power to review apportionment plans for constitutional compliance.

In fact, Virginia has recently delayed statewide elections, demonstrating that such a delay is possible. Pl. Ex. 8 at 5. In 2011, Virginia delayed its primary elections to allow the General Assembly to draw new legislative districts. *Id*. The primary elections were scheduled for June 14, 2011, and the General Assembly voted unanimously to delay the election until August 23, 2011. *Id*. Similar accommodations should be made in 2014 to ensure that congressional elections proceed under a plan that complies with the U.S. Constitution.

**E.    Plaintiffs Are Entitled to Their Reasonable Attorneys' Fees and Costs**

Plaintiffs brought this lawsuit under 42 U.S.C. § 1983, and prevailing parties in § 1983 actions "should ordinarily recover an attorney's fee . . . ." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (internal quotation marks and citation omitted). Prevailing parties are also entitled to recover their expert fees. *See* 42 U.S.C. § 1973*l*(e). Plaintiffs request the opportunity—should they prevail—to demonstrate their attorneys' fees, expert fees, and costs by post-trial motion.

-30-

Dated:  April 16, 2014                          Respectfully submitted,


By /s/_____
    John K. Roche (VSB# 68594)
    Marc Erik Elias (admitted *pro hac vice*)
    John Devaney (admitted *pro hac vice*)
    Perkins Coie, LLP
    700 13th St. N.W., Suite 600
    Washington, D.C. 20005-3960
    Phone:  (202) 434-1627
    Fax:  (202) 654-9106
    Email: JRoche@perkinscoie.com
    Email: MElias@perkinscoie.com
    Email: JDevaney@perkinscoie.com

    Kevin J. Hamilton (admitted *pro hac vice*)
    Perkins Coie, LLP
    1201 Third Avenue, Ste. 4800
    Seattle, WA 98101-3099
    Phone:  (206) 359-8000
    Fax:  (206) 359-9000
    Email: KHamilton@perkinscoie.com

    *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of April, 2014, I caused the foregoing to be electronically filed with the Clerk of this Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Mike Melis
Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
(804) 786-2071
Fax: (804) 786-1991
mmelis@oag.state.va.us

*Attorneys for Defendants Charlie Judd, Kimberly Bowers, and Don Palmer in their official capacities*

Frederick W. Chockley , III
Baker & Hostetler LLP
1050 Connecticut Ave NW
Suite 1100
Washington, DC 20036
(202) 861-1500
fchockley@bakerlaw.com

Jennifer Marie Walrath
Baker & Hostetler LLP (DC)
1050 Connecticut Ave NW
Suite 1100
Washington, DC 20036
202-861-1702
Fax: 202-861-1783
jwalrath@bakerlaw.com

*Attorneys for Movants Robert B. Bell, Christopher Marston, and William Janis*

Jonathan Andrew Berry
Jones Day
51 Louisiana Ave NW
Washington, DC 20001
202-879-3939
Fax: 202-626-1700
jberry@jonesday.com

John Matthew Gore
Jones Day
51 Louisiana Ave NW
Washington, DC 20001
(202) 879-3930
Fax: (202) 626-1700
jmgore@jonesday.com

Michael Anthony Carvin
Jones Day
51 Louisiana Ave NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com

*Attorneys for Intervenor-Defendant Virginia Representatives*

Cullen Dennis Seltzer
Sands Anderson PC
1111 E Main Street
24th Floor
P O Box 1998
Richmond, VA 23218-1998
804-648-1636
Fax: 804-783-7291
cseltzer@sandsanderson.com

*Attorneys for Interested Parties Clerk of the Virginia Senate, Clerk of the Virginia House, and Division of Legislative Services*

-32-

Respectfully submitted,

By_____/s/_____
    John K. Roche (VA Bar No. 68594)
    Perkins Coie, LLP
    700 13th St., N.W., Suite 600
    Washington, D.C. 20005-3960
    Phone:  (202) 434-1627
    Fax:  (202) 654-9106
    JRoche@perkinscoie.com

    *Attorneys for Plaintiffs*