# APPENDIX OF EXCERPTS
# FROM CITED TRIAL EXHIBITS

# PLAINTIFFS' TRIAL EXHIBIT NO. 8

## 2012 Submission Attachment 17 - Legislative History of 2012 Virginia Congressional District Plan

Attachment 17

## LEGISLATIVE HISTORY OF
## 2012 VIRGINIA CONGRESSIONAL DISTRICT PLAN

This Attachment provides a chronology that identifies the events, legislative actions, and proposals resulting in the enactment of House Bill 251 as Chapter 1 of the 2012 Acts of Assembly, signed by Governor Robert F. McDonnell on January 25. 2012, (hereafter Chapter 1). Chapter 1 contains the redistricting plan for the 11 congressional seats apportioned to Virginia under the 2010 Census results.

In 2005, the General Assembly began preparing for the decennial congressional and legislative reapportionment (commonly referred to as legislative redistricting) required by the Virginia Constitution, Article II, Section 6, with the Commonwealth's participation in Phases I and II of the Census Bureau's redistricting data program. The Division of Legislative Services was designated as the agency to coordinate with the Census Bureau and carry out the program. The Division operates under the general supervision of the Joint Reapportionment Committee. This bi-partisan committee represents the House of Delegates and Senate (Virginia Code §§ 30-263 through 30-265) and oversees preparations for redistricting. Participation in Phases I and II involved the review of census geography, the incorporation of Virginia's voting precincts in the Bureau's census geography, and the provision of 2010 Census redistricting data at the voting precinct level.

The second major step in preparing for redistricting was to build a geographic information system and acquire software to enhance the system used in 2001. A key component of the computer-based redistricting system was the website maintained by the Division of Legislative Services. The Division's redistricting website was begun in 2000 and maintained throughout the decade. This website,

1

Attachment 17

http://redistricting.dls.virginia.gov/2010/ was expanded for the 2011-2012 redistricting process to include more sophisticated mapping options and a mechanism for the public to comment on plans as they were introduced and made public. The objective of the expanded website was to provide for the broadest and promptest dissemination of redistricting information, population and election history data, interactive maps, and redistricting proposals as they were made public. Copies of public comments made on the website were routinely distributed to the Privileges and Elections Committees.

Information available through the website to legislators and the public includes data on the current and proposed districts; interactive maps; statistical reports; block, precinct, locality, and district-level population data; and shape and block-assignment files. Notices of redistricting public hearings and transcripts of the hearings and Committee meetings are published on the redistricting website. The House and Senate Privileges and Elections Committees Redistricting Criteria resolutions and *Drawing the Line*, a publication created by the Division of Legislative Services about redistricting in Virginia, are also found on the website. In addition, there is a webpage that contains 2010 Census data, an explanation of file formats, and free data downloads.

The Division's website was updated regularly. The events described in the following chronology were routinely posted on the website and available through the General Assembly's Legislative Information System (http://lis.virginia.gov/). The statistical reports for the congressional redistricting legislation considered by the General Assembly in its 2011 Special Session I and its 2012 Regular Session, were generated using 2010 Census population data and the precinct boundaries that were included in the 2010 Census reports.

Attachment 17

## CHRONOLOGY

### 2005 through 2009

The Division of Legislative Services, subject to oversight from the Joint Reapportionment Committee, participated in Phases I and II of the Census Bureau's redistricting program and began constructing the new computer redistricting system with funds appropriated in the state's biennial budgets.

### April 1, 2010

Census Day.

### August through December 2010

Delegate Mark L. Cole of Fredericksburg announced on **August 23, 2010,** that the redistricting subcommittee of the House of Delegates Committee on Privileges and Elections was scheduling a series of six public hearings throughout the Commonwealth in preparation for the 2011 redistricting process with a goal of encouraging broad public input into the redistricting process. The six different public hearings took place in September, October, and December in Roanoke, Norfolk, Fairfax, Danville, Stafford, and Richmond.   Transcripts of the hearings were made available on the Division's redistricting website and may be viewed in Attachment 15.

In **August 2010,** the Division published the first issue of its redistricting newsletter, *Drawing the Line 2011,* with population estimates for the current districts and background information on the redistricting process.   The newsletter was mailed to members of the Virginia General Assembly and posted on the Division's website. In

3

Attachment 17

addition, all interested parties were provided notification by email with a link to the website.

On **September 16, 2010,** Senator Janet Howell, Chair of the Senate Committee on Privileges and Elections announced a schedule of four public hearings in Roanoke, Herndon, Portsmouth, and Richmond in October, November, and December. Transcripts of the hearings were made available on the Division's redistricting website and may be viewed in Attachment 15.

In the late fall of 2010, Christopher Newport University and the Public Mapping Project announced a 2011 Virginia College and University Legislative Redistricting Competition with a **December 15, 2010,** deadline to register. The Competition website was: http://www.varedistrictingcompetition.org/. Twelve colleges participated and 55 plans were submitted by mid-March 2011 for state legislative and congressional districts. SB 5003 is one of the competition plans and was a first place winner in the Governor's Commission Division. It is a congressional redistricting plan and created by a William and Mary Law School team. It was introduced on April 7, 2011, by request by Senator J. C. Miller.

On **December 17, 2010,** the Joint Reapportionment Committee met in Richmond and received an update from the Division of Legislative Services on its work with the Census Bureau and its preparations for the redistricting process. The Committee adopted a resolution directing staff to continue preparations for redistricting in 2011 and authorizing the Division to proceed with necessary steps to enter into contracts for a redistricting software application and the development of a website to provide public access to the process and allow public comments on proposed redistricting plans.

Attachment 17

## January and February 2011

The General Assembly met for the 2011 Regular Session from **January 12 to February 27, 2011**, and adopted House Bill 1507 (Ch. 3, 2011 Acts of Assembly) to move the usual June 14 primary date to August 23, 2011, and allow time for enactment and Section 5 Voting Rights Act review of the redistricting plans for the House of Delegates and Senate before the November 2011 elections for those bodies.  The bill passed unanimously and took effect immediately upon passage on February 17, 2011, subject to Department of Justice review that was initiated February 24, 2011.  DOJ sent their preclearance notification on March 22, 2011.

On **February 3, 2011,** Virginia received the Public Law 94-171 redistricting data from the Census Bureau, and the Division posted the data on its website along with explanatory information.  The Joint Reapportionment Committee met **February 7 and 23, 2011,** for staff reports on its readiness to draw redistricting plans and provide for public access to and comments on plans.

On **February 25, 2011,** Delegate M.K. Cox introduced House Joint Resolution No. 986 applying to the Governor to call a redistricting special session to begin immediately upon adjournment of the 2011 Regular Session. Both houses agreed and the resolution took effect **February 26, 2011**. The 2011 Regular Session adjourned on Sunday, **February 27, 2011,** and on that day the Governor issued his proclamation calling for the special session. The 2011 Special Session I convened February 27 and agreed to House Joint Resolution 5002 setting the ground rules for the Special Session. The Special Session then recessed until April 4, 2011, allowing time for public hearings and the drawing of plans.

5

Attachment 17

### March and April 2011

The House and Senate Privileges and Elections Committees announced on **March 18, 2011,** that the committees would hold a series of eight joint public hearings around the Commonwealth on March 31, April 2, and April 4, 2011. Information on the public hearings and the 2010 populations of the then current House of Delegates, Senate, and congressional plans were posted on the redistricting website and covered in the issue Number 2 of *Drawing the Line 2011*. Transcripts for the hearings are available on the website and in Attachment 15.

On **March 25, 2011,** the House and Senate Committees on Privileges and Elections met separately in Richmond and each adopted a committee resolution setting out the criteria that the committee would follow in reviewing redistricting plans for the House of Delegates and Senate. The Senate Committee also adopted a resolution for criteria in reviewing congressional district plans. See attachment 4. This resolution was identical to the resolution adopted July 9, 2001, by both the House and Senate Committees on Privileges and Elections with one updated reference to court cases. The House Committee held extensive discussions on the criteria for redrawing House of Delegates districts and adjourned without taking up congressional redistricting criteria.

The General Assembly placed its primary emphasis during April on the passage of redistricting plans for the House of Delegates and Senate in advance of the November 2011 election. However, beginning **April 6, 2011,** members of the General Assembly began introducing bills to redraw congressional districts and releasing congressional district plans on the Division's redistricting website.

Attachment 17

Here is the chronology for the plans made public and for the various legislative actions taken on the congressional district plans.  The parenthetical notes show the name of the plan as shown on the Division website.

**April 6, 2011**   Delegate Bill Janis introduced **HB 5004**  and it was referred to the House Committee on Privileges and Elections.  (HB 5004 - B. Janis); posted on website April 6, 2011.

**April 7, 2011**   Senator J.C. Miller introduced **SB 5003,** by request, and it was referred to the Senate Committee on Privileges and Elections.  (SB 5003 - J.Miller (William & Mary Plan)); posted April 8, 2011.  No further action was taken on SB 5003.

**April 11, 2011**        Senator Locke introduced **SB 5004** and it was referred to the Senate Committee on Privileges and Elections.  (SB 5004 - M. Locke); posted April 11, 2011.  No further action was taken on SB 5004.  However, a later version of this plan was made public and subsequently placed in HB 5004 by a Senate Committee on Privileges and Elections substitute amendment for HB 5004.  See, June 6 and 7, 2011, below.

**April 12, 2011**        The House Committee on Privileges and Elections met, adopted one technical amendment to correct a Fairfax County precinct name, and reported HB 5004 with one amendment (17 - 2, Delegates Alexander and Howell, A.T. voting nay).  The House voted 71-23 later on April 12 to report HB 5004 with the Committee amendment and two amendments offered by Delegate Janis to reunite the Taylor Elementary School Precinct (213) of the City of Norfolk in the Third Congressional District. The House communicated the engrossed HB 5004 to the Senate where it was referred to the Senate Committee on Privileges and Elections.  The Senate Committee reported (9-6) a substitute for HB 5004.

Attachment 17

**April 25 and 27, 2011**      The Senate met and recommitted HB 5004 to the Senate Committee on Privileges and Elections.

## May through December 2011

**June 6 through 9, 2011**      Senator Locke released a substitute for her SB 5004 (SB 5004 - M.Locke Substitute); posted June 6, 2011.  On June 9, 2011, the Committee on Privileges and Elections adopted and reported (9-4) an identical substitute for HB 5004 (HB 5004 Senate Committee Substitute (6/9/11)), posted June 7, 2011.  On June 9, the Senate passed the HB 5004 Committee Substitute (22-15), the House rejected the Senate substitute amendment, and HB 5004 was put into conference.

The conference committee deadlocked.  There was no further action taken on HB 5004 in 2011.

## January 2012

**January 10, 2012**      Delegate Robert B. Bell prefiled HB 251, an exact duplicate of the 2011 engrossed HB 5004 as it had passed the House of Delegates (2012 HB251 - Robert B. Bell); posted January 11, 2012.

**January 11, 2012**      The 2011 Special Session adjourned sine die, and the General Assembly convened the 2012 Regular Session. The House Committee on Privileges and Elections met and Delegate Bell explained that HB 251 was the same as HB 5004 (2011 Special Session I) as it had passed the House in 2011.  The Committee reported HB 251 by a vote of 19 - 3 (Delegates Scott, Sickles, and Spruill voting no).

Senator Jill Vogel introduced SB 455, which was the same as HB 5004 as it had been introduced and was referred to the Senate Committee on Privileges and Elections.

**January 13, 2012**      The House passed HB 251 by a vote of 74-21.

8

Attachment 17

**January 16, 2012**    HB 251 was referred to the Senate Committee on Privileges and Elections.

**January 17, 2012**    The Senate Committee on Privileges and Elections reported HB 251 by a vote of 8-7 and reported a substitute for SB 455 also by a vote of 8-7 that conformed it to HB 251.

**January 20, 2012**    The Senate passed HB 251 by a vote of 20-19 and engrossed the substitute for SB 455.

**January 25, 2012**    **Governor McDonnell signed HB 251.**

See attachments 3 and 5 for analyses of Chapter 1 of the 2012 Acts of Assembly and SB 5004 (Special Session I, 2011).

Draft DLS/mrs

1/26/12

sprojects/redist/2012/submission ch 0 attachment 17

# PLAINTIFFS' TRIAL EXHIBIT NO. 12

# Senate Committee on Privileges and Elections Subcommittee on Redistricting Public Hearing Transcript

Attachment 15

V I R G I N I A

SENATE COMMITTEE

On PRIVILEGES And ELECTIONS

SUBCOMMITTEE ON REDISTRICTING

PUBLIC HEARING

Thursday, November 4, 7:00 P.M.

Herndon Town Council Chambers
765 Lynn Street
Herndon, Virginia

- - - - - - - - - -

McCOY COURT REPORTING ASSOCIATES
8120 Little River Turnpike
Annandale, Virginia 22003
(703) 280-4422

Attachment 15

(Laughter ensues.)

THE CHAIRPERSON:  I expect to get pressure from just about every elected official in this state that will be enacted.

It will be a bill.  It will be just like we do our own, but they will come forward with proposals.  They will come from anybody who wants to send them to us, including the congressmen themselves.

And, as I said in my probably too-long opening statement, with the congressional districts the numbers have to be almost precisely identical in every single district.

The Supreme Court is being very rigid about that.  I read about a case in another state where there was a 13-vote difference between some districts and the courts disallowed that plan.  So that will be a severe restraint.  There can be exceptions, but it will be tight.

Yes?

MR. JERRY WELCH:  It's kind of a -- someone brought up a fairly good point about the

Attachment 15

49

2nd, 4th, 5th and 9th Congressional Districts, but you totally bypassed the 3rd, which is kind of a monstrosity because it's been gerrymandered by, what, 90 miles of James River bottom to connect wide areas of Norfolk with the City of Richmond.

THE CHAIRPERSON:  Are you talking the 3rd Senate District?

SENATOR MARTIN:  The 3rd congressional.

THE CHAIRPERSON:  The 3rd congressional, okay.

SENATOR MARTIN:  Of which I agree completely.

MR. WELCH:  Yeah, I mean, that's what -- you know, everybody's sort of spoken about bipartisanship and making it fair, but packing pretty much every black community up and down the James River into one is -- I don't know how they made it past the Department of Justice review in 2001.

But that's what we're talking about there. Don't slam every Democratic area in Fairfax and Arlington and Alexandria into Jim's district and

Attachment 15

then everything else downstate.

SENATOR MARTIN:  I would agree with that and did not care for the 3rd, the way the 3rd was done.

MR. WELCH:  Thank you.

THE CHAIRPERSON:  Yes.

MR. ALEX BLAKEMORE:  This is just a -- I guess is a question.  The handout you all handed out said there's a constitutional, I guess a Virginia constitutional mandate that the districts be compact and contiguous, but doesn't the 10th Congressional District, isn't that completely discontiguous in two parts, or is that not true?

The 8th is really gerrymandered, but.

THE CHAIRPERSON:  Let me ask Mr. Cotter, who's our legal expert.

MR. COTTER:  Where is it disconnected?

MR. BLAKEMORE:  The 11th cuts through a big -- there's like a northern part and a southern part of the 10th and then the 11th.

MR. SPIKE WILLIAMS:  It wraps around the 11th.

# PLAINTIFFS' TRIAL EXHIBIT NO. 13

## House of Delegates Committee on Privileges and Elections Public Meeting Transcript

1      THE COMMITTEE ON PRIVILEGES AND ELECTIONS

2                    PUBLIC MEETING

3

4    _____

5

6

7    BEFORE:        MARK COLE, CHAIRMAN

8

9

10   PLACE:         COMMONWEALTH OF VIRGINIA

11                  GENERAL ASSEMBLY BUILDING

12                  HOUSE ROOM C

13                  RICHMOND, VIRGINIA 23218

14

15   DATE:          APRIL 11, 2011

16

17

18

19

20

21

22

23

24

25

CRANE-SNEAD & ASSOCIATES, INC.
4914 Fitzhugh Avenue, Suite 203
Richmond, Virginia 23230
Tel. No. (804) 355-4335

1      DELEGATE JONES:  Just some housekeeping real

2   quickly.  I want to point out to all the members that you have in your

3   package a comment report distributed to all the members and it includes up

4   until a few days ago all the comments concerning redistricting that have

5   been submitted to the website for you all's review.  And I know some of you

6   at least have been reviewing the comments online and so I just wanted to

7   make sure that that was available to everyone.  Okay, the purpose of today's

8   meeting is to take up, consider bills dealing with Congressional redistricting

9   and we do have at least one plan that's been submitted that's on the docket

10  today.  And that's I believe it's House Bill 5004 and the patron is Delegate

11  Janis.  And I'll ask Delegate Janis if you would please present yourself.

12      DELEGATE JANIS:  Thank you, Mr. Jones.  House Bill

13  5004 is a bill to redraw the boundary lines for each of the eleven Virginia

14  Congressional Districts, the ones that are ten-year constitutionally mandated

15  reapportionment.  The boundary lines reflected in House Bill 5004, the

16  legislation here in front of you were drawn based on several criteria.  First,

17  the districts were drawn to conform with all mandates from the United

18  States Constitution and the Constitution of Virginia and specifically to

19  comply with the requirement that there be one person, one vote.  This was a

20  significant challenge given the dramatic and non-uniform shifts in

21  population across the Commonwealth over the past ten years, most

22  specifically the dramatic population growth in parts of Northern Virginia

23  with corresponding population loss of parts of Southside, Southwest and

24  even parts of the state that might grow but don't grow at the same rate.  The

25  second criteria were districts were drawn to conform with all mandates from

CRANE-SNEAD & ASSOCIATES, INC.

1    all applicable federal law, most notably the Urban Rights Act mandate that

2    there be no retrogression in minority voters in the Third Congressional

3    District and also the Zero Variance Rule that mandates that each of these

4    eleven Congressional Districts must be drawn so that they encompass a

5    population no fewer than 727,365 residents but no more than 727,366.  So

6    the Zero Variance means down to a one person difference in each of these

7    eleven districts and each have more than 700,000 residents.  Third, the

8    districts are drawn with respect to the greatest degree possible the will of the

9    Virginia electorate as it was expressed in the November 2010 Congressional

10   elections.  They're based on the core of the existing Congressional Districts

11   with a minimal amount of change or disruption necessary consistent with

12   the need to either expand or contract the territory of the districts based on

13   whether they've lost population, gained population or gained population at a

14   rate that was less than they needed in order to meet the 727,365 benchmark.

15    The plan respects the will of the electorate by not cutting currently elected

16   Congressmen out of the districts nor do we presume to throw currently

17   elected Congressmen together in the districts.  We try to respect the fact that

18   November 2010, the voters spoke in each of these districts, they elected the

19   current representatives and what we tried to do was to be respectful of

20   where they lived and not try to lump them together or cut them out of the

21   districts.  You'll also note that the plan attempts where possible to keep

22   jurisdictional localities intact and to reunite where possible localities and

23   jurisdictions which are currently fractured or splintered because of previous

24   redistricting plans.  In fact, if you look at this plan, it's [unintelligible]

25   jurisdictions of the current Congressional District lines, three counties, the

CRANE-SNEAD & ASSOCIATES, INC.

1    County of Allegheny, the County of Brunswick and the County of Caroline

2    are reunited in a single Congressional District under this plan.  One city,

3    Covington, has been reunited.  And I believe Martinsville and Salem are

4    now intact as well.  Wherever possible, this plan also preserves, seeks to

5    preserve existing local communities of interest.  They're smaller than a

6    jurisdiction but are considered to be a sort of a community of interest and to

7    reunite such communities that may have been fractured in the course of

8    redistrict [unintelligible].  One example that comes to mind is Reston up in

9    Northern Virginia.  District boundary lines were drawn based in part on

10   specific and detailed recommendations provided by each of the eleven

11   currently elected Congressmen, both the Republican members and the

12   Democrat members.  And they each gave significant, specific and detailed

13   recommendations about how they could draw the lines or the boundaries or

14   what would make sense for their particular district in order to preserve the

15   local communities of interest and the need to either expand or contract their

16   district to meet the 727,365 person benchmark.  I personally spoke with

17   each member of the Virginia Congressional Delegation, both the Republican

18   members and the Democrat members and they have each confirmed with me

19   that the lines for their district as they are reflected in House Bill 5004

20   conform to the recommendations that were provided and the information

21   that was provided by them.  And each member of the delegation, both

22   Republican and Democrat, has confirmed for me that they support the way

23   the lines for their specific district are drawn in House Bill 5004.  And so,

24   that's basically the legislation, I'm going to answer questions.  There is one,

25   for taking questions of the Committee, I have to make one technical

1   amendment.  And if you look at page four of the bill, in the Tenth

2   Congressional District if you look at line 206, there is a precinct in Fairfax

3   called Lee's Corner, number 920, and you'll see right next to it is Lee's

4   Corner West, which is 927.  There seems to be some discrepancy between

5   State Board of Elections and the local registrar but I do have something here

6   from the Fairfax County, Virginia Electoral Board and General Register's

7   website.  They identified precinct 920 in Fairfax on their website as Lee's

8   Corner East and then there's a 927, which is Lee's Corner West.  We have

9   identified 920 in this legislation as Lee's Corner and I think probably out of

10   an abundance of caution that is a technical amendment that I probably

11   would like to move at this time.

12                   UNIDENTIFIED MALE:  Second.

13                    CHAIRMAN:  Okay, there's a motion.  There's a motion

14   and a second for a technical amendment renaming or correcting the name of

15   one of the precincts of Fairfax.  Any discussion on this amendment?  All

16   those in favor of adopting the amendment say "Aye."  (Ayes.)  Opposed?

17   (no response)  All right, the amendment now is in force.

18                   DELEGATE JANIS:  And with that, Mr. Chairman, I

19   stand ready to answer any questions anyone might have of me.

20                   CHAIRMAN:  Are there any questions of Delegate

21   Janis?

22                   UNIDENTIFIED FEMALE:  Delegate Janis, you

23   referenced that you had talked with all eleven Congressional members and

24   they all complied or were all saying the lines, they were in agreement of

25   these lines as drawn?

1   Covington is reunited.  Martinsville, I believe, is reunited as well and the

2   City of Salem is reunited.  So there are fewer split counties, cities or towns

3   under this proposal than there are under the existing plan.

4            CHAIRMAN:  Further questions [unintelligible].

5            UNIDENTIFIED MALE:  There have been some rumors

6   around about the consideration of a minority influence district.  Can you

7   give me any feedback on that?  What's the status and can you give some

8   consideration to that?

9            DELEGATE JANIS:  I'm not an election lawyer.  I had

10  not heard, what we, what one of the criteria applied was today we've got

11  Congressman Scott in the Third Congressional District.  That is the only

12  minority majority district in the delegation.  Under the current

13  Congressional lines, the Third Congressional District has a total African

14  American population of about a 55.33%.  Under these proposed lines,

15  there's a 3.17% change.  There's a 58.50% African American total

16  population.  If you want to get voting age population, there is about a 4.3%

17  change.  It goes from being 52.62% voting age to 57% voting age.  So

18  mindful that the voting rights act requires us not to retrogress that district,

19  what these lines reflect is under the new proposed lines, we can have no less

20  than percentages that we have under the existing lines with the existing

21  census data from 2011, the updated census data.  So we drew the majority

22  minority district, the Third in accordance with the Voting Rights Act.  And

23  that was basically what we did.  I didn't look at drawing the other districts

24  because one of the other criteria which I used was try not to disrupt the lines

25  of the current districts any more than you have to given population shifts, et

1   cetera.  If you actually look at the map and then you did an overlay, I can get

2   a graphic that would work very well.  I've got one here, it's not a very good

3   graphic and I can send some up to you but the brown line is going to be the

4   delta or change, if you look at this, the district boundaries don't change very

5   much under this plan and that was deliberate.  So, I've heard there's some

6   proposals about other ways you could have drawn the line.  I can't speak to

7   why it wasn't drawn that way.  I can only speak to why it was drawn this

8   way.

9                CHAIRMAN:  All right, Delegate Spruill.

10               DELEGATE SPRUILL:  I had talked with Congressman

11  Scott and he has always indicated to me that he could live with a less

12  number of [unintelligible] and I was talking about, took Petersburg, which is

13  majority black, and put them into the Third, and made Bobby's precinct

14  even more black than what it is.  So my first question is what is the

15  percentage of minority in Petersburg now and what is proposed?

16               DELEGATE JANIS:  I didn't get down on a jurisdiction

17  by jurisdiction basis.  What I have are the numbers for the total African

18  American population in the Third District under the current lines and the

19  total African American percentage under the proposed lines.

20               DELEGATE SPRUILL:  That's what I want to know

21  about, give me the Fourth first.

22               DELEGATE JANIS:  The total African American

23  population of the Fourth or the Third?

24               DELEGATE SPRUILL:  The Fourth, please sir.

25               DELEGATE JANIS:  The Fourth District.  Today in the

1    Fourth Congressional District, the total African American population is

2    33.66%.

3                        DELEGATE SPRUILL:  All right.

4                        DELEGATE JANIS:  Under the proposed lines, the total

5    African American population would be 31.60%.

6                        DELEGATE SPRUILL:  Thirty one point?

7                        DELEGATE JANIS:  31.6.  So it's just about, it's 2.06%

8    change.

9                        DELEGATE SPRUILL:  Can you give me the Third now

10   please?

11                       DELEGATE JANIS:  The Third District goes from

12   55.33% under the current lines to 58.50% under the proposed line.  That's

13   3.17%.

14                       DELEGATE SPRUILL:  The next question then, why

15   would you increase, why would you increase the number of the Third

16   Congressional District to more approximately 55 to 58, when already

17   [unintelligible] tradition it will be hard for a black not to win it unless

18   there's a lot of candidates [unintelligible] couldn't win it.  Why would you

19   increase it from 55 to 58 and drop to 30 and drop the Fourth down?

20                       DELEGATE JANIS:  If you take the numbers I just told

21   you, those are the total African American population.

22                       DELEGATE SPRUILL:  Yes, sir.

23                       DELEGATE JANIS:  And I've looked at the voting age

24   African American population.  There's a significant difference in the Third

25   over the Fourth.  So, for example, in the Third Congressional District, the

CRANE-SNEAD & ASSOCIATES, INC.

1  voting age African American population under the current lines is 52.62%.

2  Under the proposed, it becomes 57%, okay?  Now, if you look at the Fourth

3  Congressional District, the Fourth Congressional District, the current voting

4  age African American population is 32.00% but the voting age proposed is

5  31.7.  So, when you look at all those numbers together, there's a significant

6  difference between, there's a much greater difference between total African

7  American population versus the voting age African American population in

8  the Third District compared to the Fourth District.  The Fourth District

9  numbers, the total African American population tracks very closely with

10  voting age there.  There's a bigger delta in the Third.  Given all the

11  information I received from Congressman Scott, Congressman Forbes and

12  every other one, those are the two that gave recommendations on those

13  lines.  The way those two lines come up against each other are based on the

14  recommendations that they provided to us.

15      DELEGATE SPRUILL:  So you do think that's the

16  problem to prove that though.  I'm just looking at, that's why I was harping

17  on the question to you about talking to Congressman Scott, who said that he

18  doesn't need going from 55 to 58.  He doesn't need that.  He said it would

19  be more feasible if it would stay, I'm trying to figure out why you would

20  take Petersburg out of the Fourth.  Moving from Third from 33.66 to 31.6,

21  I'm saying how what [unintelligible] taking a group of blacks out of one

22  area put them into another block that really don't need them.  We already

23  had [unintelligible] in the Third already.  And because Petersburg is south

24  [unintelligible] votes and a lot of people trying to put tax money by moving

25  them over a black district that is already heavy black.

CRANE-SNEAD & ASSOCIATES, INC.

1    DELEGATE JANIS:  What I'm saying also is this is not

2    the only criteria that we had to apply using the Third District or the Fourth

3    District.  After you did this, you also had to make sure or before and after

4    this you had to make sure the final number in both districts was no less than

5    727,365 no more than 727,366.  So this isn't the only criteria that we had to

6    apply.  The other criteria that had to be applied was every one of the districts

7    has to be in that Zero Variance whether it was a minority majority district or

8    whether it was not.  So, that's why looking at that criteria which is

9    paramount to count one person one vote Zero Variance, those are, one

10   person one vote is a Constitutional requirement, Zero Variance is under

11   federal law and the other main legislation from the federal government and

12   the Voting Rights Act.  Given the three, this was the way we drew the lines.

13   I can't speak to, I'm sure there are other ways the line could be drawn.  All I

14   can speak to is that we drew it this way because we had a recommendation

15   from both Congressmen, we had the data from the census, we had the

16   requirement under the Constitution that it has to be one person one vote and

17   we had the requirement under federal law that they had to be drawn with

18   Zero Variance.

19              DELEGATE SPRUILL:  So you're saying to me that this

20   was not drawn to take Petersburg out just to take blacks out of the district

21   that were now [unintelligible] it will be hard for a black person to run in the

22   Fourth now because you're taking a group of strength voters out, it'll be

23   hard for a black to even run in the Fourth now.

24              DELEGATE JANIS:  I would say, I don't want to offer

25   an opinion on whether or not an African American candidate could be

CRANE-SNEAD & ASSOCIATES, INC.

1  successful in the Fourth or not.  All I can tell you is that the numbers before

2  and after the change in the voting age African American population in the

3  Fourth Congressional district was 1.3%.

4             DELEGATE SPRUILL:  Thank you, Chairman.

5             CHAIRMAN:  And just to kind of follow up on that, the

6  current, this is currently drawn, this is your Third District under population

7  or over population?

8             DELEGATE JANIS:  Well, as the Third District is

9  currently drawn, the ideal Congressional District being 727,365, the Third

10  Congressional District needed to gain 63,975 residents in order to meet the

11  727,365 number.  So, it was one of the districts that needed to grow by

12  about sixty thousand in order to meet the Zero Variance requirement.  That's

13  why I said, you know, and one criteria applied was that we don't retrogress

14  African American [unintelligible] in the Third.  But we're also under the

15  requirement that each one has to meet the 727,365.  The Third District

16  started out short 63,975 residents under the current census.  So it narrowed

17  it, with our variance being 1% on some of our plans and 2% on the others,

18  we've got a significant amount of flexibility here.  You have to basically be

19  within one person.  So, the error range of options that were available to us.

20             CHAIRMAN:  All right, Delegate Alexander.

21             DELEGATE ALEXANDER:  Good afternoon, Mr.

22  Chairman.  I have a question for Delegate Janis.  Could you tell me whether

23  or not the Taylor precinct in the City of Norfolk is currently split?

24             DELEGATE JANIS:  Old one or new one?

25             DELEGATE ALEXANDER:  This one here.

CRANE-SNEAD & ASSOCIATES, INC.

# PLAINTIFFS' TRIAL EXHIBIT NO. 27

## Expert Report of
## Dr. Michael McDonald

# Expert Report of Dr. Michael P. McDonald

## *Page v. State Board of Elections*

## 1. Biographical Information

I am Associate Professor of Government and Politics at George Mason University and a non-resident Senior Fellow at the Brookings Institution.

I have been involved in redistricting since the late 1980s when I prepared racial bloc voting analyses for the Department of Justice in *Garza* v *Los Angeles Board of Supervisors*. Since then I have been involved as a consultant to redistricting authorities or parties in litigation in fourteen states. I have also provided court testimony at trial or by deposition in a number of redistricting cases. Finally, I have produced numerous scholarly writings on the American electoral system. Please see my attached vita for more information regarding my academic publications and professional experience.

I have a specific interest in Geographic Information System applications to enable greater public participation in redistricting. I co-led a team with Dr. Micah Altman that developed award-winning open-source redistricting software called DistrictBuilder that allows users to draw districts through web-browsers. We deployed this software to support advocacy efforts and actual redistricting efforts by government officials in several jurisdictions within the United States and Mexico.

Among the government bodies that used our software was Virginia Governor Bob McDonnell's Independent Bipartisan Advisory Redistricting Commission, to which I also served as a mapping consultant. The software was also deployed to support a Virginia college student redistricting competition that occurred concurrently with the Commission's and the General Assembly's redistricting deliberations.

I have been retained by Perkins Coie LLP on behalf of Plaintiffs in *Page v. Virginia State Board of Elections* to provide expert witness testimony regarding their challenge to Virginia's Third Congressional District as the product of an unlawful racial gerrymander. I am being compensated at a rate of $300/hr.

## 2. Executive Summary

This expert report presents evidence that the adopted Third Congressional District was the product of an unlawful racial gerrymander. First, it examines the geography of the district, specifically demonstrating how the district is not compact, not contiguous, and splits multiple counties, independent cities, and precincts. Second, it demonstrates that, notwithstanding the fact that the minority candidate of choice had consistently won landslide victories, the Virginia General Assembly strategically traded populations in and out of the Third Congressional District so as to *increase* the Black Voting Age Population of the District. Finally, the analysis compares

1

the adopted Third District to the Third District deemed unconstitutional by a federal three-judge panel in 1997, demonstrating the striking similarities between both the goals and the results of the two districts.

In sum, the boundaries and composition of Virginia's Third Congressional District demonstrate that race predominated in the drawing of the District.

## 3.  Background and Data Sources

### A.  Background

Following the 1990 census, the Commonwealth of Virginia created an African-American majority Third Congressional District that was further amended in 1993.

In 1997, this Third District became the subject of federal litigation in *Moon v. Meadows*. The Eastern District of Virginia three-judge panel found the Third District to be the product of an unlawful racial gerrymander and enjoined the conduct of any elections based on that District.

Following the 2010 redistricting, the General Assembly adopted a congressional redistricting plan in HB 251, that was approved by the Governor. The adopted Third District and surrounding Districts are the subjects of my expert report.

### B.  Population and Geographic Data Sources

I obtained from the Census Bureau Virginia's 2010 census population and geographic data produced in support of redistricting.[1] Virginia's congressional districts prior to the last redistricting are described in the Census Bureau's geographic data. I refer to these as "benchmark" districts.

In 2012, the General Assembly adopted new congressional districts in HB 251. I obtained the census block assignment file for HB 251, which describes the adopted districts in the census geography, from the General Assembly's redistricting website.[2]

## 4.    Geographical Description

In Figure 1, I provide a map of the adopted Third Congressional District. In Figures 2 through 5, I provide detailed maps of portions of the district. Figure 2 is a detailed map of Norfolk and Portsmouth. Figure 3 is a detailed map of Newport News and Hampton. Figure 4 is a detailed map of Petersburg, Prince George, and Surry. Figure 5 is a detailed map of Henrico and Richmond.

---

[1] These data were modified from the original Census Bureau release due to the incorrect location of the Norfolk Naval Base in the census geography. *See* http://www2.census.gov/census_2010/01-Redistricting_File--PL_94-171/Virginia/VA_errata%5B1%5D.pdf.
[2] *See:* http://redistricting.dls.virginia.gov/2010/RedistrictingPlans.aspx#31

The adopted Third District is colored red. The adopted First District is yellow. The adopted Second District is Green. The adopted Fourth District is lavender. The adopted Seventh District is olive green.

Water is colored blue. To demonstrate where districts cross water, districts are overlaid onto the water such that the water has slightly different coloring depending on which district the water is assigned to. Water assigned to the adopted Third District appears with a purplish hue.

Virginia's counties and independent cities — what I refer to as "localities" — are labeled and outlined by a dark solid line.

Within localities are voting precincts, which I refer to as VTDs. VTD is short for "Voting Tabulation District," which is the Census Bureau's generic name for precincts, wards, and election districts. VTDs are outlined by a faint dotted line.

I identify significant connecting bridges in the Third District and adjacent districts as outlined yellow line segments.



**Figure 1. The Adopted Third Congressional District**

3



**Figure 2. The Adopted Third Congressional District, Norfolk and Portsmouth Detail**



**Figure 3. The Adopted Third Congressional District, Newport News and Hampton Detail**



**Figure 4. The Adopted Third Congressional District, Petersburg, Prince George, and Surry Detail**



**Figure 5. Adopted Third Congressional District, Henrico and Richmond Detail**

The *Moon* Court described the physical geography of the unconstitutional Third District in these terms:

"The District has been aptly described as follows:

The Third Congressional District, as presently configured, is an amalgamation principally of African-American citizens contained within the legislatively determined boundaries for the obvious purpose of establishing a safe black district. The district is anchored in the tidewater cities of Norfolk, Suffolk, and Portsmouth. It crosses the Chesapeake Bay to include portions of the cities of Hampton and Newport News where the African-American population is the majority, using only the open water of the Chesapeake Bay and the James River to connect the disparate and non-contiguous portions of these two small cities. The District then crosses the James River into the largely rural Surry County, recrossing the James River to take in all of the African-American majority Charles City County. In Charles City County the district splits in three directions. To the south the District runs through Prince George County and slices through the City of Hopewell, including only those areas where blacks predominate, before terminating some 30 miles away in the City of Petersburg, which it also divides racially. To the east, the District takes in part of rural southeastern Henrico County before reaching the more built up and heavily black eastern suburbs of Richmond, racially dividing the capital city nearly in half before terminating in a small black neighborhood in northern Henrico County. To the north, the district widens out to take all of the rural and agricultural counties of New Kent, King William, King and Queen, and ends its roughly 225 mile trek in Essex County along the banks of the Rappahannock River. (Pl.'s Complaint)."

The adopted Third District can be described in strikingly similar terms to the unconstitutional Third District.

The Third Congressional District, as presently configured, is an amalgamation principally of African-American citizens contained within the legislatively determined boundaries for the obvious purpose of establishing a safe black district. The district is anchored in the tidewater cities of Norfolk, Suffolk, and Portsmouth. It crosses the Chesapeake Bay to include portions of the cities of Hampton and Newport News where the African-American population is the majority, using only the open water of the Chesapeake Bay and the James River to connect the disparate and non-contiguous portions of these two small cities. The District then crosses the James River into the largely rural Surry County and dividing Prince George County. In Prince George County, the District splits in two directions. To the south the District takes in all of the African-American majority City of Petersburg. To the north the District recrosses the James River to take in all of the African-American majority Charles City County. The District then takes in rural eastern Henrico County before reaching the more built up and heavily black eastern suburbs of Richmond, racially dividing the capital city nearly in half before terminating in a black neighborhood in northern Henrico County.

I examine below in greater detail the Third District's (1) compactness, (2) contiguity, (3) locality splits, and (4) Voting Tabulation District splits.

*A.     Compactness*

In Table 1, I report the compactness of the adopted congressional districts. I report three commonly used compactness measures called the Reock Test, Polsby-Popper Test, and the Schwartzberg Test.

The Reock Test compares a district to a circle, considered by many to be the most compact shape. The test involves calculating the ratio of the area of a district to the area of the smallest circle that can be drawn around it. This ratio ranges between zero and one, with one being the most compact shape (in this case, the district is a circle). Thus, lower values of the Reock Test correspond with less compact districts.

The Polsby-Popper Test also compares a district to a circle. This test involves calculating the ratio of the area of a district to a circle with the same perimeter as the district. As with the Reock Test, a lower value indicate a less compact district.

The Schwartzberg Test also compares a district to a circle. This test involves calculating the ratio of the perimeter of the district to the perimeter of a circle with the same area. Unlike the two other compactness measures, higher values indicate less compact districts.

| District | Reock | Polsby-Popper | Schwartzberg |
|---|---|---|---|
| 1 | 0.28 | 0.18 | 2.09 |
| 2 | 0.27 | 0.20 | 2.09 |
| 3 | 0.19 | 0.08 | 3.07 |
| 4 | 0.32 | 0.20 | 2.04 |
| 5 | 0.30 | 0.15 | 2.30 |
| 6 | 0.26 | 0.16 | 2.17 |
| 7 | 0.30 | 0.13 | 2.34 |
| 8 | 0.37 | 0.26 | 1.76 |
| 9 | 0.20 | 0.18 | 2.13 |
| 10 | 0.29 | 0.12 | 2.60 |
| 11 | 0.23 | 0.09 | 3.06 |

**Table 1. Compactness of Adopted Congressional Districts**

Table 1 illustrates the adopted Third District is an extreme district on all three compactness measures. By any of these measures, the adopted Third Congressional District is the least compact of any adopted district, with a Reock Test score of 0.19, a Polsby-Popper Test score of .08 and a Schwartzberg Test score of 3.07.

## B.    Contiguity

Contiguity means that all parts of a district are connected.  Specifically, a district is contiguous if any part of the district can be reached from any other part without crossing the district boundary — in other words, if the district is not divided into two or more discrete pieces.

Figure 1 demonstrates that the adopted Third District is contiguous at points only by virtue of being connected via water, particularly the James River, without a connecting bridge. Furthermore, the adopted Second District's contiguity is affected by the shape of adopted Third District.

As Figure 2 illustrates, the adopted Second District wraps around the north end of the Norfolk portion of the adopted Third District, crossing Willoughby Bay without a connecting bridge. As the Second District continues to wrap around the Third District, it crosses the Lafayette River without a connecting bridge.

As Figure 3 illustrates, the Second District then crosses the James River to Hampton. Although there is a connecting bridge and tunnel, the northern terminus of the bridge is in the Third District. The Second Congressional District then wraps around the Third District on the northern portion of Hampton crossing the Southwest Branch Back River, this time connected by a bridge.

The Third District is connected from Portsmouth by bridges across intervening water to Norfolk and Hampton. However, further along the west of the James River, only water connects the Hampton and Newport News portions of the Third District. Likewise, only water connects the Newport News and Surry portions of the Third District.

Figure 4 shows that the Third District again crosses the James River just to the east to Hopewell. It is not clear from the Census Bureau's geographical data if the Third Congressional District is connected across the James River between Prince George and Charles City. The Third District's boundary stops at a bridge, but there is insufficient geospatial information to determine if the eastern portion of the bridge is indeed contained in the Third District.

## C.    Locality Splits

I refer to Virginia's Counties and Independent Cities as "localities," which are defined in the Census Bureau's geography. If a district does not entirely contain a geography, in this case a locality, within its borders, the geography is considered to be "split" by the district.

Seventeen (17) localities are split by all adopted Districts.

In Table 2, I calculate the number of times each adopted District splits a Virginia locality and the number of locality splits that involve the Third Congressional District.

| District | Number of Locality Splits by District | Number of Locality Splits Involving CD3 |
|---|---|---|
| 1 | 5 | 2 |
| 2 | 3 | 3 |
| 3 | 9 | 9 |
| 4 | 4 | 3 |
| 5 | 3 | |
| 6 | 2 | |
| 7 | 4 | 2 |
| 8 | 1 | |
| 9 | 2 | |
| 10 | 2 | |
| 11 | 2 | |

**Table 2. Localities Split by Adopted Congressional Districts**

The adopted Third District splits nine localities, the most of any adopted district. The next largest number of locality splits are by the First Congressional District, with five, then the Fourth and Seventh Congressional Districts, with four apiece. The adopted Second Congressional district splits three localities.

The adopted Third District contributes to the higher number of locality splits with its surrounding districts. All three of the adopted Second District's locality splits involve the Third District. Three of four of the adopted Fourth District's locality splits involve the Third District. Two of four of the adopted Seventh District's locality splits involve the Third District. Two of five of the adopted First District's locality splits involve the Third District.

The statistics presented in Table 2 illustrate that a typical adopted Virginia Congressional District splits at most three localities. The adopted Third District is an anomaly. The Third District splits nine localities, the most of any district. Since another district must be involved in a split, the districts adjacent to the Third Congressional District have a higher number of locality splits due to the unusually large number of locality splits involving the Third Congressional District.

In determining that race was the predominant factor in the creation of the unconstitutional Third District, the *Moon* Court noted that "[a]s of 1993, the Congressional district plan splits some 21 independent cities and counties, with more than half of those county and city splits (11) in the Third District." 952 F. Supp. at 1148. Similarly here, the adopted Third District splits 17 independent cities and counties, with more than half of those locality splits in the adopted Third District.

9

| District | Number of VTD Splits by District | Number of VTD Splits Involving CD3 |
|---|---|---|
| 1 | 4 | 1 |
| 2 | 5 | 5 |
| 3 | 14 | 14 |
| 4 | 7 | 7 |
| 5 | 3 | |
| 6 | 1 | |
| 7 | 2 | 1 |
| 8 | 2 | |
| 9 | 1 | |
| 10 | 2 | |
| 11 | 3 | |

**Table 3. Voting Tabulation District Splits by Adopted Congressional Districts**

### D.      Voting Tabulation District Splits

In Table 3, I calculate the number of times Virginia Voting Tabulation Districts (VTDs) are split by the adopted districts and the number of VTD splits that involve the Third District.

Twenty (20) VTDs are split by all adopted Districts.

The adopted Third District splits fourteen VTDs, the most of any adopted district. The next largest number of VTD splits are in the Fourth District, with seven, then the Second District, with five, and the First District, with four. The adopted Seventh District splits two VTDs.

The Third District contributes to the higher number of VTD splits in its surrounding districts. All seven of the Fourth District's VTD splits involve the Third Congressional District, as do all five of the VTD splits of the Second District. One of four of the First District's VTD splits involves the Third Congressional District. One of two of the Seventh District's locality splits involves the Third Congressional District.

The statistics presented in Table 3 illustrate that, without factoring in the Third District, a typical adopted Virginia Congressional District splits, at most, three VTDs. The adopted Third District is again an extreme outlier, as it is with locality splits presented in Table 2. The Third Congressional District splits 14 VTDs, twice as many as any other district. Since another district must be involved in a split, the districts adjacent to the Third District — particularly the Second and Fourth Districts — have a higher number of locality splits due to the unusually large number of locality splits involving the Third District.

In its determination that race was the predominant factor in the creation of the unconstitutional Third District, the *Moon* Court noted that "the entire State's redistricting had only 54 split precincts, but 37 of them were in the Third District." 952 F. Supp. at 1148. Similarly here, the

10

adopted Congressional District plan has only 20 VTD splits, but 14 of them are within the Third District.

*E.     Summary*

The adopted Third Congressional District is bizarrely shaped. It is the least compact of all the adopted congressional districts. At least at two points, perhaps three, it is contiguous only across water without a connecting bridge. The adopted Third District is involved in a majority of the locality and VTD splits across all adopted Districts.

These are all factors that the *Moon* Court considered when determining that Virginia used race as the predominant factor when adopting the Third District in 1993.

Furthermore, the bizarrely shaped Third Congressional District negatively affects the Second Congressional District's contiguity. At three points the Second Congressional District wraps around the Third Congressional District in a manner that traverses water without a connecting bridge.

## 5.     Historical Performance of Candidates to the Third District

| Candidate | 2002 | 2004 | 2006 | 2008 | 2010 | 2012 |
|---|---|---|---|---|---|---|
| *Rep. Bobby Scott* | 96.1% | 69.3% | 96.1% | 97.0% | 70.0% | 81.3% |
| *Republican Opponent* | | 30.5% | | | 27.2% | 18.5% |
| *Other Candidates* | 3.9% | 0.1% | 3.9% | 3.0% | 2.8% | 0.3% |

**Table 4. Election Results for the Third Congressional District, 2002-2012**

As reported in Table 4, the African-American candidate in the Third District, and presumably African-American candidate of choice, Rep. Bobby Scott was reelected to the district from 2002 to 2012 with an average vote share of 85.0%. In the 2010 election, a historically good election for Republican candidates nationwide, Rep. Scott received 70.0% of the vote. In the subsequent election, following the increase of the Black voting-age population of the Third District, Rep. Scott received 81.3% of the vote.

Rep. Scott has won overwhelmingly lopsided election victories in the benchmark and adopted Third District before the recent redistricting. The increase of the Black voting-age population of the Third District is thus at face value not needed to continue to elect the African-American candidate of choice.

The Commonwealth of Virginia did not include in its Section 5 submission to the Department of Justice an analysis to determine if the Black voting-age population of the benchmark Third District needed to be increased in order for the African-American community to continue to elect a candidate of choice. Other jurisdictions in the United States have performed such analyses. In South Carolina, for example, a "to elect" analysis of State Senate District 10 found that a Black

voting-age population of 33.3% was effective for the African-American community to have the ability to elect candidates of its choice, and the Department of Justice approved the district.[3]

As analyses in other states demonstrate, the Black voting-age population of the Third District needed to elect an African-American candidate of choice may be substantially lower than the adopted or even benchmark Third District's Black voting-age population.

## 6.   The Black Voting-Age Population of the Third District Was Strategically Increased

In addition to an examination of the shape of the Third District, the Court's analysis in *Moon v. Meadows* examined how "[t]hroughout the redistricting process, the Legislature sought to protect and indeed enhance this initial ratio [of Black population]." 952 F. Supp. at 1146. The Court examined changes to the District adopted by the General Assembly through amendments by the Governor — Virginia's Governor has amendatory veto power — and through subsequent amendments to the district in 1993. The Court found these moves were further evidence of "Virginia's predominant attention to the principal goal of creating a safe black district" *Id*.

I perform a similar analysis as the *Moon v. Meadows* Court, using the benchmark Third District as the baseline for comparison. I begin by describing important aspects of the data and proceed with analyzing trades made between the Third District and surrounding Districts.

Notwithstanding the historical performance of the African-American candidate of choice in the Third District, the General Assembly increased the Black voting-age population of the District.

In my opinion, similar to the process observed by the *Moon v. Meadows* Court, Virginia traded population among the Third and surrounding Districts with the purpose of increasing the Black voting-age population of the adopted Third District.

### A.  *Defining the Black Voting-Age Population*

Prior to the 2000 census individuals could identify themselves as one – and only one – of five racial populations: American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, or White.

Beginning with the 2000 census, individuals may identify themselves as belonging to one or more of the five racial populations. With some frequency, individuals identify themselves as belonging to more than one of these racial groups.

To address the potential non-comparability of race statistics, the Office of Management and Budget (OMB) issued Bulletin No. 00-02, which provides guidance on the allocation of multiple-race responses for use in civil rights monitoring and enforcement. The Bulletin directs

---

[3] Exhibit 14 of South Carolina's Section 5 submission, "Retrogression Analysis for the South Carolina Senate Districting Plan Adopted in 2001" by Richard L. Engstrom, July 27, 2011.

federal agencies to treat an individual who lists more than one race as belonging to the minority group that is the subject of the complaint or enforcement action under consideration.

The Department of Justice also has published a statement regarding allocation of multiple-race categories in the Federal Register Notice "Guidance Concerning Redistricting and Retrogression Under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c". The Department of Justice describes a process to evaluate Section 5 retrogression whereby a minority race population is calculated in two steps. First, the minority population is calculated as consisting of those persons who identify themselves as belonging to (1) the minority race alone and (2) the minority race and the White population. Second, other combinations of minority races will be considered if it appears there are significant numbers of responses among the other racial combinations. This Guidance was written prior to the release of the census population data in 2000. The Guidance language is couched in terms of what Department of Justice expected – that the number of responses to multiple-race categories would be small.

Plaintiffs allege racial gerrymandering with respect to Black or African-American voters. Virginia congressional districts are drawn to equalize total population. Voting rights questions involve voters, and thus minority voting rights analyses primarily examine the voting-age population (VAP) of the minority group at issue.

Consistent with the OMB Bulletin and Department of Justice Guidance, I calculate two statistics for the Black VAP. First, I calculate Black VAP as a combination of census responses identifying a person as Black or Black and White. I call this the "exclusive" method since it excludes some multi-race individuals who identified themselves to the Census Bureau as African-American. Second, I calculate Black VAP as any response where Black is chosen alone or in combination with one or more other races. I call this the "inclusive" method since it includes all individuals who identified themselves to the Census Bureau as African American.

It is my opinion that the inclusive method is the valid calculation consistent with the OMB Bulletin and DOJ Guidance for the voting rights allegations raised by Plaintiffs. I report these statistics alongside the exclusive method calculations, as the Virginia General Assembly reports only the exclusive method calculations in their redistricting statistical reports.

### B. Population of Adopted and Benchmark Third District

In Table 5, I report population statistics for the benchmark and adopted Third Congressional District.

The ideal population for each Virginia congressional district following the 2010 census is 727,366 persons. Prior to the last redistricting, the benchmark Third District had 663,390 persons according to the 2010 census. The benchmark Third District needed to add 63,976 persons to achieve population equality with other Virginia congressional districts.

| | Total Pop. | Ideal Pop. | Deviation | VAP | Black VAP (Exclusive Method) | Black VAP (Inclusive Method) | %Black VAP (Exclusive Method) | %Black VAP (Inclusive Method) |
|---|---|---|---|---|---|---|---|---|
| *Benchmark* | 663,390 | 727,366 | -63,976 | 511,559 | 271,419 | 275,499 | 53.1% | 53.9% |
| *Adopted* | 727,366 | 727,366 | 0 | 560,158 | 315,604 | 320,210 | 56.3% | 57.2% |
| *Change from Benchmark to Adopted* | 63,976 | | | 48,599 | 44,185 | 44,711 | 3.3% | 3.3% |
| *%Black VAP of Net VAP Added to Benchmark District* | | | | | 90.9% | 92.0% | | |

**Table 5. Selected Population Statistics for the Benchmark and Adopted Third Congressional District**

Prior to the redistricting, the benchmark Third District had a total voting-age population of 511,559 persons. As calculated using the exclusive method, 271,419 of those persons were Black, or 53.1% of the VAP. As calculated using the inclusive method, 275,499 of those persons were Black, or 53.9% of the VAP. The inclusive method counts 4,080 additional voting-age persons over the exclusive method as identifying themselves as Black or African-American in the benchmark Third District.

The adopted Third District's total population is 727,366 persons, exactly equal to the ideal population for a Virginia congressional district, and represents an increase of 63,976 persons over the Benchmark Third District.

Following the redistricting, the adopted Third District had a voting-age population of 560,158 persons. This represents an increase of 48,599 persons of voting-age over the benchmark Third District. As calculated using the exclusive method, 315,604 of those persons were Black, or 56.3% of the VAP. This represents an increase 3.3 percentage points over the benchmark Third District (the apparent discrepancy is due to rounding). As calculated using the inclusive method, 320,210 of those voting-age persons were Black, or 57.2% of the VAP. This also represents an increase of 3.3 percentage points over the benchmark district. The inclusive method counts 4,606 additional voting-age persons over the exclusive method as identifying themselves as Black in the adopted Third District.

## C. Detailed Changes to the Third District

For Virginia to increase the Black VAP from the Benchmark to the Adopted Third District, given that the benchmark Third District required additional population, areas with substantially higher Black VAP than the benchmark Third District were added to the benchmark district. During the redistricting process, either a net of 44,185 (exclusive method) or 44,711 (inclusive method) Blacks of voting-age were added to the district. In other words, among the net voting-age population added from the surrounding benchmark districts to the adopted Third District, 90.9% (exclusive method) or 92.0% (inclusive method) were Black.

Four congressional districts are adjacent to the benchmark Third District: the First, Second, Fourth, and Seventh. While the Black voting-age population of the adopted Third District was

14

increased relative to the benchmark district, all four of these adjacent districts saw a decrease in Black voting-age population percentages. The Black VAP of the First District decreased 2.6 percentage points (either method), the Second District decreased 0.2 percentage points (either method), the Fourth District decreased 2.2 percentage points (either method), and the Seventh District decreased 2.4 percentage points (either method).

Table 6 presents population statistics for the population that was removed from the benchmark Third District into the surrounding adopted congressional districts and the population that was removed from the surrounding benchmark districts into the adopted Third Congressional District.

| Benchmark to Adopted District | Total Pop | VAP | Black VAP (exclusive method) | Black VAP (inclusive method) | % Black VAP (exclusive method) | % Black VAP (inclusive method) |
|---|---|---|---|---|---|---|
| 1 → 3 | 23,288 | 17,805 | 7,736 | 7,933 | 43.4% | 44.6% |
| 3 → 1 | 7,351 | 5,106 | 2,224 | 2,286 | 43.6% | 44.8% |
| 2 → 3 | 27,917 | 20,543 | 7,548 | 7,785 | 36.7% | 37.9% |
| 3 → 2 | 25,501 | 20,049 | 3,661 | 3,774 | 18.3% | 18.8% |
| 4 → 3 | 35,447 | 27,835 | 20,917 | 21,089 | 75.1% | 75.8% |
| 3 → 4 | 5,713 | 4,176 | 1,729 | 1,757 | 41.4% | 42.1% |
| 7 → 3 | 36,106 | 27,743 | 17,853 | 18,035 | 64.4% | 65.0% |
| 3 → 7 | 20,217 | 15,996 | 2,255 | 2,314 | 14.1% | 14.5% |
| Net Change to Third District | 63,976 | 48,599 | 44,185 | 44,711 | 90.9% | 92.0% |

**Table 6. Population Movement Between Benchmark and Adopted Congressional Districts**

Although the benchmark Third District needed to gain population, population was not only added to the adopted Third District from surrounding benchmark districts, population was also moved *from* the benchmark Third Congressional District into the surrounding adopted districts. Since the Third District needed to add population to reach population equality, the population moved from the benchmark Third District made the redistricting more complex, as even more population needed to be added to the Third District to compensate for the population removed from the District.

A simple strategy to increase the Black VAP of the adopted Third District might involve moving high density African-American communities into the district from the surrounding benchmark districts. A sophisticated strategy to increase the Black VAP of the adopted Third District further involves removing lower density Black VAP communities from the benchmark Third District and replacing them with higher density Black VAP communities from surrounding benchmark districts.

The sophisticated strategy of trading lower density Black VAP communities in the benchmark Third District with higher density Black VAP communities in the surrounding benchmark districts is evident in Table 6.

15

In the trades between the Third District and the Second, Fourth, and Seventh Districts, lower density Black VAP communities were removed from the benchmark Third Congressional District and higher density Black VAP communities were added to the adopted Third District from these surrounding benchmark districts. The communities traded between the benchmark Third and First Districts appear to have substantially similar Black VAP, however these trades were part of a complex three-way trade that involved the Second District.

I discuss below trades of population and geography between the (1) First and Third Districts, (2) Second and Third Districts, (3) Fourth and Third Districts, and (4) Seventh and Third Districts.

Figures 6 through 10 illustrate changes to the benchmark and surrounding Districts. The adopted congressional districts are presented in the same color scheme as before. Benchmark congressional district boundaries are presented as red lines. Locality boundaries are presented as black lines and VTD boundaries are presented as gray lines. Water is colored blue and shaded according to adopted district colors. Bridges are presented as yellow.



**Figure 6. Geography Trades between the First and Third Districts**

*(1) Trades between the First and Third Districts*

Trades between the First and Third Districts primarily involved a complex trade between the First and Second Districts. Race predominated in these trades in how Hampton and Newport News population formerly assigned to the benchmark First District was segregated along racial lines, with predominantly White population given to the Second District and predominantly Black population given to the Third District.

16

Prior to the redistricting, the benchmark First and Third Districts shared common borders in Hampton and Newport News. The adopted First District's southern border was removed entirely from Hampton and almost entirely from Newport News.

Much of the Newport News territory surrendered by the First District is predominantly White according to the 2010 census. Giving this population to the adopted Third District would have avoided the necessity of linking the Hampton and Newport News portions of the Third District via the James River with no connecting bridge. Instead, the General Assembly chose to wrap the adopted Second District around the Hampton portion of the adopted Third District, at one point creating a narrow neck less than a mile wide. This neck then enabled the General Assembly to segregate Newport News along racial lines between the Second and Third Districts.

Fifteen of sixteen whole Newport News VTDs formerly in the benchmark First District were assigned to the adopted Second District, plus parts of three more VTDs formerly split between the benchmark First and Third Districts. One whole VTD formerly in the benchmark First District was assigned to the adopted Third District.

The single Newport News VTD formerly located in the benchmark First District assigned to the adopted Third District — South Morrison — has the highest Black voting-age population of any of the whole VTDs formerly located in the benchmark First District. South Morrison has a total population of 4,473 persons, a VAP of 3,267 persons, and a Black VAP of 46.9% (exclusive method) or 48.1% (inclusive method).

The total of all other Newport News population formerly located in the benchmark First District and assigned to the Second District has a total population of 70,701 persons, a VAP of 55,944 persons, and a Black VAP of 22.6% (exclusive method) or 23.1% (inclusive method).

Three of six whole Hampton VTDs formerly in the benchmark First District were assigned to the Second District and the remaining three whole VTDs were assigned to the Third District. A part of one VTD in Hampton was split between the Second and Third.

The four Hampton VTDs formerly located in the benchmark First District and assigned to the adopted Second District (three wholly and one in part) have a total population of 12,897 persons, a VAP of 9,774 persons, and a Black VAP 44.6% (exclusive method) or 45.7% (inclusive method).

The four Hampton VTDs formerly located in the benchmark First District and assigned to the adopted Third District (three wholly and one in part) have a total population of 18,815 persons, a VAP of 14,538 persons, and a Black VAP 42.7% (exclusive method) or 43.8% (inclusive method).

The Hampton population assigned from the benchmark First District to the adopted Third District has a slightly lower Black VAP percentage than the population assigned to the adopted

Second District — 2.0 percentage points lower by either calculation method. At the same time, however, the geography assigned to the adopted Second District is less densely populated, such that although both the adopted Second and Third Districts were each assigned three VTDs formerly in the benchmark First District and one was split between them, 5,918 fewer Hampton residents formerly in the benchmark First District were assigned to the Second District compared to the Third District. The lower total population gain realized in the Second District's connection through Hampton meant a larger number of Newport News Whites could be added to the Second District, thereby more than offsetting the slightly higher Hampton Black VAP percentage formerly in the First District assigned to the Second District.

One whole Newport News VTD formerly assigned to the benchmark Third District was assigned to the First District. Additionally, a portion of Greenwood was assigned to the adopted First District (a very small portion of this VTD was formerly split between the benchmark First and Third Districts). A small portion of one York County VTD — Magruder — formerly located in the benchmark Third District was also assigned to the adopted First District. (It is appropriate to mention this York VTD here since it is contiguous to the Newport News VTDs.)

The total of these three assignments of VTD portions from the benchmark Third District to the adopted First District are reported in Table 6 and have a total population of 7,351 persons, a VAP of 5,106 persons, and a Black VAP of 43.6% (exclusive method) or 44.8% (inclusive method).

The population moved from the benchmark First District to the adopted Third District have a total population of 23,288 persons, a VAP of 17,805 persons, and a Black VAP of 43.4% (exclusive method) or 44.6% (inclusive method).

There may appear to be no racial component to the trades between the First and Third Districts from the Table 6 statistics since a slightly higher BVAP percentage was transferred into the First District. However, race played a role. Predominantly White Newport News VTDs could have been given to the adopted Third District when the benchmark First District was removed from these localities. This population was instead given to the adopted Second District. The Newport News population that was given to the adopted Third District had the highest Black VAP of any VTD in the benchmark First District.

Furthermore, the adopted Second District was made contiguous to Newport News by way of a low-population mile-wide finger wrapping around the Hampton portion of the adopted Third District. Indeed, as described in the next section, even further segregation of Newport News was enabled by this configuration since the adopted Second District was now able to take additional predominately White Newport News population from the benchmark Third District.

18



**Figure 7. Geography Trades between the Second and Third Districts**

*(2) Trades between the Second and Third Districts*

As reported in Table 6, population trades between the Second and Third Districts further segregated these districts' populations along race by moving higher Black VAP areas from the benchmark Second District into the adopted Third District in exchange for lower Black VAP territory moved from the benchmark Third District to the adopted Second District. Furthermore, these trades reduced the compactness of the Second and Third Districts and resulted in three instances where the Second District is contiguous by water with no connecting bridge.

The population moved from the benchmark Second District to the adopted Third District had a total population of 27,917 persons, a VAP of 20,543 persons, and a Black VAP of 36.7% (exclusive method) or 37.9% (inclusive method).

The population moved from the benchmark Third District to the adopted Second District had a total population of 25,501 persons, a VAP of 20,049 persons, and a Black VAP of 18.3% (exclusive method) or 18.8% (inclusive method).

I review below trades between the Second and Third Districts, which occurred in the localities of (a) Newport News, (b) Norfolk, and (c) Hampton.

   *a.   Newport News*

In Newport News, all trades between the Second and Third Districts involved moving predominantly White population from the benchmark Third District to the adopted Second

19

District. Four whole VTDs and parts of two others were assigned from the benchmark Third District to the adopted Second District.

Furthermore, these trades resulted in a less compact alignment of the Second and Third Districts as an arm of the adopted Second District was extended along the James River shore. While it may appear from visual inspection that a sizable VTD connects the Newport News portion of the adopted Third District to the James River, all but a small sliver on the northern end of the shore has zero-population.

These trades from the benchmark Third District to the adopted Second District resulted in moving a total population of 17,745 persons, a VAP of 13,592 persons, and a Black VAP of 19.1% (exclusive method) or 19.7% (inclusive method).

As described in the section above regarding trades between the First and Third Districts, none of these trades between the Second and Third Districts would have been possible if the Second District had not been connected to Newport News through a complex series of trades with the benchmark First District. Thus, trades between the First and Third Districts should not be viewed in isolation since they enabled the adopted Second District to take predominantly White Newport News population from the benchmark Third District.

  b. *Norfolk*

In Norfolk, trades between the Second and Third District involved moving higher density Black VAP areas from the benchmark Second to adopted Third District in exchange for lower density Black VAP areas from the benchmark Third to the adopted Second District. Furthermore, these trades negatively affected the compactness of both districts and created three portions of the adopted Second District to be connected by water with no connecting bridge.

Three whole VTDs and a part of one were assigned from the benchmark Second District to the adopted Third District. At the same time, three whole VTDs were assigned from the benchmark Third District to the adopted Second District.

In sum, the Norfolk population shifts from the benchmark Second District to the adopted Third District resulted in moving a total population of 13,791 persons, a VAP of 9,694 persons, and a Black VAP of 35.0% (exclusive method) or 36.0% (inclusive method).

In sum, the Norfolk population shifts from the benchmark Third District to the adopted Second District resulted in moving a total population of 8,026 persons, a VAP of 64,57 persons, and a Black VAP of 16.6% (exclusive method) or 16.9% (inclusive method).

Reassignment of four Norfolk VTDs exemplify how the reconfiguration had a negative effect on the traditional redistricting principles of compactness and contiguity.  One VTD, Titustown Center, was moved from the benchmark Second District to the adopted Third District. Three

VTDs with roughly similar population — Suburban Park, Willard, and Lafayette — were moved from the benchmark Third District to the adopted Second District.

Titustown Center has 7,528 persons, of whom 4,990 are of voting-age, and among the voting-age population 1,649 (exclusive method) or 1,700 (inclusive method) persons are African-American or Black. The Black percentage of the voting-age population is 33.0% (exclusive method) or 34.1% (inclusive method).

Suburban Park, Willard, and Lafayette combined have a total population of 8,026 persons, of whom 6,467 are of voting-age, and among the voting-age population 1,070 (exclusive method) or 1,093 (inclusive method) persons are African-American or Black. The Black percentage of the voting-age population is 16.6% (exclusive method) or 16.9% (inclusive method).

The reconfiguration of these four VTDs caused two portions of the adopted Second District to be connected across water, with no connecting bridge. Following the assignment of Titustown Center from the benchmark Second District to the adopted Third District, the western Norfolk portion of the adopted Second District is contiguous to the remainder of the district only across Willoughby Bay, with no connecting bridge. Following the assignment of Suburban Park, Willard, and Lafayette from the benchmark Third District to the adopted Second District, these three precincts are contiguous to the Second District only across the Lafayette River, with no connecting bridge.

A simple visual inspection reveals that the benchmark Second District divided Norfolk with the benchmark Third District in a more compact manner than the adopted districts. Following the redistricting, the adopted Second District wraps around four VTDs assigned to the adopted Third District so that Suburban Park, Willard, and Lafayette may be assigned to the adopted Second District.

In sum, traditional redistricting principles were subsumed to race to accomplish this move, which results in visually less compact districts and an adopted Second District that must twice traverse water without a bridge.

### c. Hampton

In Hampton, all trades between the Second and Third Districts involved moving population from the benchmark Second District to the adopted Third District. Four whole VTDs and a portion of one VTD were assigned from the benchmark Second District to the adopted Third District.

These trades from the benchmark Second District to the adopted Third District resulted in moving a total population of 14,126 persons, a VAP of 10,849 persons, and a Black VAP 38.3% (exclusive method) or 40.0% (inclusive method).

The reassignment of these VTDs simultaneously improved and degraded the connectedness of the adopted Second and Third Districts over water. A portion of the benchmark Second District

formerly connected only via the James River was assigned to the adopted Third District. However, the assignment of the whole VTD at the northern terminus of the Hampton Roads Bridge-Tunnel — Pheobus — from the benchmark Second District to the adopted Third District resulted in all of the Hampton and Newport News portions of the adopted Second District to be connected by water without a connecting bridge to the remainder of the Second District.



**Figure 8. Geography Trades between the Third and Fourth Districts**

*(3) Trades between the Fourth and Third Districts*

Trades between the Fourth and Third Districts are located in Prince George and Petersburg. The primary result of these trades was to move the entirety of the densely African-American community of Petersburg from the benchmark Fourth District to the adopted Third District.

The population moved from the benchmark Fourth District to the adopted Third District had a total population of 35,447 persons, a VAP of 27,835 persons, and a Black VAP of 75.1% (exclusive method) or 75.8% (inclusive method).

The population moved from the benchmark Third District to the adopted Fourth District had a total population of 5,713 persons, a VAP of 4,176 persons, and a Black VAP of 41.4% (exclusive method) or 42.1% (inclusive method).

In Prince George, the whole of one VTD and a portion of another were assigned from the benchmark Third District to the adopted Fourth District. A portion of one VTD was assigned from the benchmark Fourth District to the Third District. Although the net of the Prince George

changes alone is largely a wash,[4] the assignment of this latter portion enabled the whole of densely-Black Petersburg to be assigned from the benchmark Fourth District to the adopted Third District.



**Figure 9. Geography Trades between the Third and Fourth Districts, Unconstitutional 1990s District Boundary in Green.**

The Petersburg population shifts from the benchmark Fourth District to the adopted Third District resulted in moving a total population of 32,420 persons, a VAP of 25,713 persons, and a Black VAP of 78.0% (exclusive method) or 78.6% (inclusive method).

The assignment of Petersburg to the adopted Third District is similar to the unconstitutional District at issue in *Moon v. Meadows*. To demonstrate, I overlay in Figure 11 the unconstitutional Districts, identified by a dark green line, onto the adopted Districts, colored as before.

The unconstitutional Third District extended from Charles City through portions of Prince George to connect to then-predominantly Black portions of Petersburg. The adopted Third District similarly extends through portions of Prince George to connect all of Petersburg.

---

[4] The Prince George population shifts from the benchmark Third District to the adopted Fourth District resulted in moving a total population of 5,713 persons, a VAP of 4,176 persons, and a Black VAP of 41.4% (exclusive method) or 42.1% (inclusive method).  The Prince George population shifts from the benchmark Fourth District to the adopted Third District resulted in moving a total population of 3,027 persons, a VAP of 2,122 persons, and a Black VAP of 40.3% (exclusive method) or 41.2% (inclusive method).

The unconstitutional Third District split Petersburg, while the adopted Third District does not. Because Petersburg has become more densely Black since the 1990s census, the end result is still the same: adding densely-Black Petersburg population to the Third District.

1990 census statistics for Petersburg were provided by Plaintiffs' counsel to me in a document with the file name "1998 - Book 1.pdf," provided by the Division of Legislative Services. In 1990, the lowest Black voting-age percentage of any Petersburg VTD was Ward Three, Precinct Two, with 22.1% BVAP. Four of 14 VTDs had BVAP below fifty percent.

As of the 2010 census, the Petersburg VTD with the smallest Black voting-age population is the Third Ward, First Precinct, with a Black VAP of 67.3% (exclusive method) or 67.6% (inclusive method).

With Petersburg now so heavily African-American, there is less need to divide the locality if one has the intent to concentrate African-Americans into a district.



**Figure 10. Geography Trades between the Third and Seventh Districts**

*(4) Trades between the Seventh and Third Districts*

Trades between the Seventh and Third Districts primarily involved shifting lower Black VAP New Kent and one Richmond VTD from the benchmark Third District to the adopted Seventh District in exchange for much higher Black VAP VTDs moved from the benchmark Seventh District to the adopted Third District in Henrico and Richmond.

24

The population moved from the benchmark Seventh District to the adopted Third District had a total population of 36,101 persons, a VAP of 27,743 persons, and a Black VAP of 64.4% (exclusive method) or 65.0% (inclusive method).

The population moved from the benchmark Third District to the adopted Seventh District had a total population of 20,217 persons, a VAP of 15,996 persons, and a Black VAP of 14.1% (exclusive method) or 14.5% (inclusive method).

The whole of New Kent was moved from the benchmark Third District to the adopted Seventh District. These New Kent population shifts from the benchmark Third District to the adopted Seventh District resulted in moving a total population of 18,429 persons, a VAP of 14,328 persons, and a Black VAP of 14.0% (exclusive method) or 14.4% (inclusive method).

In Henrico, all trades between the Seventh and Third Districts involved moving population from the benchmark Seventh District to the adopted Third District. Four whole VTDs were assigned from the benchmark Seventh District to the adopted Third District.

These Henrico population shifts from the benchmark Seventh District to the adopted Third District resulted in moving a total population of 14,550 persons, a VAP of 10,526 persons, and a Black VAP of 77.0% (exclusive method) or 77.8% (inclusive method).

In Richmond, seven whole VTDs and a part of one were moved from the benchmark Seventh District to the adopted Third District. One VTD was moved from the benchmark Third District to the adopted Seventh District.

The Richmond population shifts from the benchmark Seventh District to the adopted Third District resulted in moving a total population of 21,556 persons, a VAP of 17,217 persons, and a Black VAP of 56.6% (exclusive method) or 57.2% (inclusive method).

The single Richmond VTD moved from the benchmark Third District to the adopted Seventh District resulted in moving a total population of 1,788 persons, a VAP of 1,688 persons, and a Black VAP of 14.9% (exclusive method) or 15.1% (inclusive method).

*Summary*

The net effect of these trades among the Third District and surrounding Districts is reported in Table 6. Predominantly greater Black VAP was moved into the adopted Third District and predominantly lesser Black VAP was moved out of the benchmark Third District. The net result is that 63,976 persons were added to the adopted Third District, 48,599 of whom were persons of voting age; 90.9% (exclusive method) or 92.0% (inclusive method) of this voting-age population is Black.

The overall racial composition of these trades are reflected in the trades made within localities as well. In Norfolk and Richmond, 45,161 persons were traded between the Third District and

25

surrounding Districts, and in both localities substantially higher Black VAP formerly in surrounding benchmark Districts were swapped for substantially lower Black VAP in the benchmark Third District. The Hampton and Prince George trades between districts were essentially a wash, whereby slightly lower Black VAP in surrounding benchmark districts were swapped for slightly higher Black VAP in the benchmark Third District. Importantly, however, these trades created contiguous geography that enabled one-way trades between Districts, thereby adding substantially higher Black VAP to the adopted Third District in Petersburg and Henrico, and removing substantially lower Black VAP from the benchmark Third District in Newport News.

As a result of similar changes in *Moon v. Meadows*, the Court found the direction of increasing the Black VAP of the unconstitutional District a "...deliberate and integral part of Virginia's predominant intention to the principal goal of creating a safe black district." 952 F. Supp. at 1146.  In my opinion, the same holds true for the adopted Third District. Virginia chose to further racially segregate localities from Norfolk to Richmond. Virginia did so through trades that involved removing predominantly White population from the Third District — even though the Third District needed to add population to reach population balance — in exchange for predominantly Black population. This provides further evidence that race was the predominant factor in the creation of the adopted Third District.

## 7.    Conclusions

In my opinion, race predominated in the construction of the adopted Third Congressional District. The bizarre shape of the adopted Third District serves the purpose of segregating localities along racial lines in order to create a majority Black district.

Furthermore, in my opinion changes made to the adopted Third District only intensified racial segregation among the Third and surrounding Districts. The Commonwealth's Section 5 submission to the Department of Justice confirms this. The Commonwealth describes how the changes to the benchmark Third Congressional District resulted in "...an increase in the total and voting-age African-American populations by 3.3 percent and 3.2 percent, respectively, and both total and voting-age populations are increased to over 55 percent." (These percentages are calculated using the exclusive method.)[5]

In my opinion, the fact that the African-American candidate of choice, Rep. Bobby Scott, successfully won reelection by landslide margins throughout the last decade indicates that not only was it unnecessary to increase the Black voting-age population of the Third District, the African-American community would have the ability to elect its candidate of choice with substantially less percentage of the voting-age population.

---

[5] *See:* http://redistricting.dls.virginia.gov/2010/Data/Ref/DOJSubmission2012/Attachment_5_cong.pdf, at 2.

The Department of Justice found similarly that the Black VAP of the Third District can be safely reduced. In the wake of the *Moon v. Meadows* decision Virginia adopted a remedial Third District that reduced the Black VAP of the Third District from 61.6% to 50.5%.[6] The Department of Justice approved the remedial Third District under the non-retrogression standard.

---

[6] See page 2 of a letter from then-Virginia Attorney General Mark Early to the Chief of the Department of Justice Voting Section with the heading "Submission under Section 5 of the Voting Rights Act: Ch. 1, 1998 Va. Acts Redistricting U.S. Congressional Seats." This letter was provided to me by Plaintiff's counsel as part of a FOIA request from the General Assembly's Division of Legislative Services.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed on December 6, 2013, in Fairfax, Virginia.

Michael P. McDonald

# PLAINTIFFS' TRIAL EXHIBIT NO. 29

# Analysis by Dr. Michael McDonald of Plaintiffs' Proposed Alternative Congressional Plan

# Analysis by Dr. Michael McDonald

# of Plaintiffs' Proposed Alternative Congressional Plan

### *Page v. State Board of Elections*

Plaintiffs in *Page v. State Board of Elections* have produced an alternative redistricting plan to address constitutional deficiencies in the Third Congressional District adopted by the Commonwealth of Virginia. Plaintiffs have produced an Alternative Third Congressional District narrowly tailored to maintain a majority-minority district and to minimize changes to the Adopted Map. The alternative plan makes changes only to two Adopted Congressional Districts, the Second and the Third. These changes have the effect of producing a Third District that, in comparison to the Adopted Third District, (1) is narrowly tailored to create a district with a Black Voting-Age Population of 50.2% (exclusive method) or 51.0% (inclusive method), (2) better respects existing locality and VTD boundaries, (3) is more compact, and (4) does not cross water without a connector with the effect of bypassing White communities. As a by-product of these changes, the Adopted Second District is also improved in terms of respecting locality boundaries, compactness, and crossing water without a connector.

## Description of Plaintiffs' Alternative Third District

Plaintiffs' Alternative Districts are different from the Adopted Districts only in the shared boundary between the Adopted Second and Third Districts. Figure 1 demonstrates by overlaying the Alternative Third District on the Adopted Districts. The Adopted Districts use the same coloring scheme as in my original report (McDonald pp.2-5), with the Adopted Second District shaded green and the Adopted Third shaded pink. Plaintiffs' Alternative Districts are outlined in dark green.

Figure 2 provides a detail of the difference between Plaintiffs' Alternative Districts and the Adopted Districts in the only affected localities of Hampton, Newport News, Norfolk, and Portsmouth. Since it may not be apparent, Figure 3 provides another closer view of a small split that occurs in Portsmouth to balance the populations between the Alternative Second and Third Districts.

There are two primary differences between the Alternative and Adopted Districts. First, VTDs located in Hampton and Newport News formerly in the Benchmark First District are assigned to the Alternative Third District instead of the Second District, thereby minimizing splits of these localities, their VTDs, improving the compactness of the district, and rectifying the use of the James River to by-pass non-Black areas of Hampton and Newport News. Second, the locality of Norfolk is entirely assigned to the Alternative Second District, thereby eliminating

1

splits of this locality, improving the compactness of the district, and eliminating the use of water without connecting bridges to keep the Second District contiguous. A small slice of Portsmouth is split to balance the Alternative Second and Third Districts' total populations.



**Figure 1. Plaintiffs' Alternative Districts Overlaid on Adopted Districts**



**Figure 2. Plaintiffs' Alternative Districts Overlaid on Adopted Districts: Hampton, Newport News, Norfolk, and Portsmouth Detail**

2



**Figure 3. Plaintiffs' Alternative Districts Overlaid on Adopted Districts: Portsmouth Detail**

## Locality and VTD Splits

The Alternative Districts more closely adhere to locality boundaries than the Adopted Districts. While the Adopted Second and Third Districts split between them the localities of Hampton,  Newport News, and Norfolk,  the Alternative Districts reunite these localities. Hampton and Newport News geography formerly in the Benchmark First District that was assigned to the Adopted Second District is now assigned to the Alternative Third District. Norfolk geography assigned to the Adopted Third district is assigned to the Alternative Second District.

Table 1 reports the number of times districts in the Adopted and  Alternative Plans split localities. Districts in Plaintiffs' Alternative Plan split a total of 34 localities, compared with the Adopted Plan's 37 locality splits. The Alternative District Two splits two fewer localities than the Adopted District Two. The Alternative District Three splits one fewer locality than the Adopted District Three.

Table 2 reports the number of times districts in the Adopted and  Alternative Plans split VTDs. Districts in Plaintiffs' Alternative Plan split a total of 38 VTDs, 6 fewer than the 44 in the adopted plan. The Alternative Third District splits a net of 3 fewer VTDs; there are 4 fewer VTD splits in Newport News, 1 fewer split in Hampton, and 2 more splits in Portsmouth. The

Alternative Second District has a net of 2 fewer VTD splits; there are 3 fewer VTD splits in Newport News, 1 fewer split in Hampton, and 2 more splits in Portsmouth.

| District | Adopted Plan | | Alternative Plan | |
|---|---|---|---|---|
| | Number of Locality Splits by a District | Number of Locality Splits Involving CD3 | Number of Locality Splits by a District | Number of Locality Splits Involving CD3 |
| 1 | 5 | 2 | 5 | 2 |
| 2 | 3 | 3 | 1 | 1 |
| 3 | 9 | 9 | 8 | 8 |
| 4 | 4 | 3 | 4 | 3 |
| 5 | 3 | | 3 | |
| 6 | 2 | | 2 | |
| 7 | 4 | 2 | 4 | 2 |
| 8 | 1 | | 1 | |
| 9 | 2 | | 2 | |
| 10 | 2 | | 2 | |
| 11 | 2 | | 2 | |
| Total | 37 | 19 | 34 | 16 |

**Table 1. Comparison of Locality Splits in Adopted Plan and Alternative Plan**

| District | Adopted Plan | | Alternative Plan | |
|---|---|---|---|---|
| | Number of VTD Splits by a District | Number of Locality Splits Involving CD3 | Number of VTD Splits by a District | Number of Locality Splits Involving CD3 |
| 1 | 4 | 1 | 4 | 1 |
| 2 | 5 | 5 | 2 | 2 |
| 3 | 14 | 14 | 11 | 11 |
| 4 | 7 | 7 | 7 | 7 |
| 5 | 3 | | 3 | |
| 6 | 1 | | 1 | |
| 7 | 2 | 1 | 2 | 1 |
| 8 | 2 | | 2 | |
| 9 | 1 | | 1 | |
| 10 | 2 | | 2 | |
| 11 | 3 | | 3 | |
| Total | 44 | 28 | 38 | 22 |

**Table 2. Comparison of VTD Splits in Adopted Plan and Alternative Plan**

Plaintiffs' Alternative Plan has two locality splits among the localities of Hampton, Newport News, Norfolk, and Hampton: (1) A split of Newport News between the Adopted First and Third Districts is preserved in Plaintiffs' Alternative Plan in order to prevent any change to the Adopted First District, and (2) A split of Portsmouth shown in Figure 3 is created to balance

4

the population of the Alternative and Second Districts, so that both Alternative districts have the exact equal total population of 727,366 persons.

Table 3 reports that the split of Portsmouth affects 1,016 total persons, or 0.14% of the total population of these districts.[1] This contrasts with the Adopted Plan, in which a total of 241,096 persons, or 33.1% of the total population, are affected by the splits of these districts.

| | Adopted Plan | | Alternative Plan | |
|---|---|---|---|---|
| | 3rd District | 2nd District | 3rd District | 2nd District |
| Hampton | 92,867 | 44,569 | 137,436 | 0 |
| Newport News | 85,453 | 88,176 | 173,629 | 0 |
| Norfolk | 131,729 | 111,074 | 0 | 242,803 |
| Portsmouth | 95,535 | 0 | 94,519 | 1,016 |
| **Net (Sum of smaller population split in a locality)** | 241,096 | | 1,016 | |

**Table 3. Total Population Split Between Districts Two and Three in Adopted and Alternative Plans.**

Not only do these Alternative Districts better conform to traditional redistricting principles, they also conform more closely to the public's preferences expressed to the General Assembly. The Commonwealth of Virginia included in Attachment 15 of their Section 5 submission regarding the Adopted congressional districts a transcript of a redistricting forum held in Norfolk, Virginia on September 22, 2010. At the forum members of the public repeatedly appealed to representatives of the General Assembly to respect the region's localities, and no speaker expressed a preference for spitting localities. For example:

- "[T]o remain true to the values of a representative democracy, the redistricting plan should be drawn in [a] manner in which elected representation is determined on the basis of shared common interests of the localities and their citizens." - Paul Fraim, Mayor, City of Norfolk, Public Hearing of the Redistricting Subcommittee of the Privileges and Elections Committee of the Virginia House of Delegates, Norfolk, VA, Sept. 22, 2010 (hereafter "Meeting Transcript"), p. 14.

- "[I]t would not serve the city of Norfolk of the folks in Ocean View area and the vibrant community that we have very well if you chop it up..." - Pam Brown, Chair, Republican Party of Norfolk, Meeting Transcript at p.21.

---

[1] It is my opinion that since the affected population is sufficiently small, if the court determines there is a rational objective of preserving the integrity of political subdivision lines the entirety of Portsmouth can be assigned to Alternative District Three. For example, in *Abrams v. Johnson* 521 U.S. 74 (1997), the U.S. Supreme Court upheld a Georgia congressional redistricting plan drawn by a court with an *overall* deviation of 0.35 percent; a modified Alternative plan here would have an overall deviation between the largest and smallest district of 0.28 percent. This small change meets the rational goals of reducing election administration costs and reducing voter confusion for the affected Portsmouth population.

- "[P]lease do it [redistricting] in a way that was intended over 200 years ago, where it was done by areas..." - Richard Fisher, private citizen, Meeting Transcript at pp. 22-23.

- "We know that the mathematics of the process may require some sharing of representation, but this should be minimized. Certainly the 4th Congressional District must contain all of Chesapeake." - Pete Burkhimer, Chair, Chesapeake City Committee of the Republican Party of Virginia, Meeting Transcript at p.25.

- "Chesapeake wants to be together, but so does everyone else. Norfolk wants to be. So does everyone else. So please get that at the top of a priority..." Eileen Huey, private citizen, Meeting Transcript at p.31.

- "Don't split cities and towns. Real simple. You've heard it. You've heard it echoed over and over again." - Thom Ayres, Director of Operations for the Hampton Roads Tea Party, Meeting Transcript at p.33.

- "Hampton, to my knowledge, is the only jurisdiction in the Commonwealth of Virginia that is split into three congressional districts, and it makes it real difficult to find out which voter goes where." - Carl Anderson, Tea Party Patriot and Chairman of the Republican Party of Hampton, Meeting Transcript at p.34.

- "We'd like to keep the integrity of each of the cities intact when redistricting. It's difficult for the city of Norfolk -- we're divided by both the 2nd and 3rd." - Alexander Palmer, Second Vice-Chair Norfolk Democratic Committee, Meeting Transcript at p.45.

## Compactness

In Table 4, I report the compactness of the Adopted and Alternative congressional districts. I report three commonly used compactness measures called the Reock Test, Polsby-Popper Test, and the Schwartzberg Test, the mechanics of which are described in my initial report (McDonald, p.7).

Plaintiffs' Alternative District Three is more compact than Adopted District Three on all three compactness measures.

- By the Reock measure, where *larger* values indicate a more compact district, Adopted District Three has a score of 0.19 and Alternative District Three has a score of 0.22. Furthermore, whereas Adopted District Three ranks as the least compact district by the Reock measure, Alternative District Three ranks as the second least compact district.

- By the Polsby-Popper measure, where *larger* values indicate a more compact district, Adopted District Three has a score of 0.08 and Alternative District Three has a score of 0.11. Furthermore, whereas Adopted District Three ranks as the least compact district by the Polsby-Popper measure, Alternative District Three ranks as the second least compact district.

- By the Schwartzberg measure, where *smaller* values indicate a more compact district, Adopted District Three has a score of 3.07 and Alternative District Three has a score of 2.04. Furthermore, whereas Adopted District Three ranks as the least compact district by the Schwartzberg measure, Alternative District Three ranks as the third least compact district (tied with District Four).

| District | Adopted Plan | | | Alternative Plan | | |
|---|---|---|---|---|---|---|
| | Reock | Polsby-Popper | Schwartzberg | Reock | Polsby-Popper | Schwartzberg |
| 1 | 0.28 | 0.18 | 2.09 | 0.28 | 0.18 | 2.09 |
| 2 | 0.27 | 0.20 | 2.09 | 0.26 | 0.33 | 1.65 |
| 3 | 0.19 | 0.08 | 3.07 | 0.22 | 0.11 | 2.04 |
| 4 | 0.32 | 0.20 | 2.04 | 0.32 | 0.20 | 2.04 |
| 5 | 0.30 | 0.15 | 2.30 | 0.30 | 0.15 | 2.30 |
| 6 | 0.26 | 0.16 | 2.17 | 0.26 | 0.16 | 2.17 |
| 7 | 0.30 | 0.13 | 2.34 | 0.30 | 0.13 | 2.34 |
| 8 | 0.37 | 0.26 | 1.76 | 0.37 | 0.26 | 1.76 |
| 9 | 0.20 | 0.18 | 2.13 | 0.20 | 0.18 | 2.13 |
| 10 | 0.29 | 0.12 | 2.60 | 0.29 | 0.12 | 2.60 |
| 11 | 0.23 | 0.09 | 3.06 | 0.23 | 0.09 | 3.06 |

**Table 4. Compactness of Adopted and Alternative Congressional Districts**

## Contiguity

As noted in my Reply to Defendants' Expert, "... [T]he *Moon v. Meadows* court found water contiguity without a connecting bridge to be a factor weighed in its determination that race predominated in the creation of the Unconstitutional Third District." (McDonald, p.10).

Plaintiffs' Alternative District is contiguous across the James River without a connection in two places, (1) between the localities of Portsmouth and Hampton and (2) between Newport News and Surry. These uses of water contiguity have the effect of respecting locality boundaries. By contrast, the Adopted Districts, as I describe in my initial expert report (McDonald p.8), use water contiguity without a connection in multiple locations, which in the cases of Hampton and Newport News (McDonald, p.17) and Norfolk (McDonald, p.21) has the effect of bypassing White communities.

## Black Voting-Age Population

7

The Benchmark Third District had a Black VAP of 53.1% (inclusive method) or 53.9% (exclusive method). The Adopted Third District increased the number and percentage of Black voters, with a Black VAP of 56.3% (exclusive) or 57.2% (inclusive). Plaintiffs' Alternative Third District has a Black Voting-Age Population of 50.2% (exclusive) or 51.0% (inclusive). This figure is not dissimilar to the Remedial District drawn in response to *Moon v Meadows*, which had a Black VAP of 50.5%.

In my initial expert report I describe how trades among the Benchmark Third District and surrounding districts consistently had the effect of increasing the Black VAP of the Adopted Third District (McDonald, pp.13-15). This analysis is restated in Table 4.

| Benchmark to Adopted District | Total Pop | VAP | Black VAP (exclusive method) | Black VAP (inclusive method) | % Black VAP (exclusive method) | % Black VAP (inclusive method) |
|---|---|---|---|---|---|---|
| 1 to 3 | 23,288 | 17,805 | 7,736 | 7,933 | 43.4% | 44.6% |
| 3 to 1 | 7,351 | 5,106 | 2,224 | 2,286 | 43.6% | 44.8% |
| 2 to 3 | 27,917 | 20,543 | 7,548 | 7,785 | 36.7% | 37.9% |
| 3 to 2 | 25,501 | 20,049 | 3,661 | 3,774 | 18.3% | 18.8% |
| 4 to 3 | 35,447 | 27,835 | 20,917 | 21,089 | 75.1% | 75.8% |
| 3 to 4 | 5,713 | 4,176 | 1,729 | 1,757 | 41.4% | 42.1% |
| 7 to 3 | 36,106 | 27,743 | 17,853 | 18,035 | 64.4% | 65.0% |
| 3 to 7 | 20,217 | 15,996 | 2,255 | 2,314 | 14.1% | 14.5% |
| Net Change to Third District | 63,976 | 48,599 | 44,185 | 44,711 | 90.9% | 92.0% |

**Table 4. Population Movement Between Benchmark and Adopted Congressional Districts (Table 6 in McDonald, p.15)**

In Table 5, I produce a similar analysis. I have shaded rows for trades of areas of the Alternative Third District that are identical to the Adopted Third District.

Table 4 shows that the Black VAP of the net population moved into the Adopted Third District is 90.9% (exclusive) or 92.0% ( inclusive). In contrast, the Black VAP of the net population moved into the Alternative Third District is 22.1% (exclusive) or 22.8% (inclusive). This is expected, as Plaintiffs' Alternative District lowers the Black VAP compared to the Benchmark district by 2.2 percentage points (either method) while the Adopted district raises it by 3.2 (exclusive) or 3.3 (exclusive) percentage points.

The trades of population between the Benchmark Third District and the surrounding Alternative Districts no longer consistently point in the direction of swapping lower Black VAP formerly in the Benchmark Third District with higher Black VAP from the surrounding Benchmark districts. Trades between the First and Third Districts and Second and Third Districts swap higher Black VAP formerly in the Benchmark Third District with lower Black VAP from the surrounding Benchmark districts.

8

| Benchmark to Alternative District | Total Pop | VAP | Black VAP (exclusive method) | Black VAP (inclusive method) | % Black VAP (exclusive method) | % Black VAP (inclusive method) |
|---|---|---|---|---|---|---|
| 1 to 3 | 106,886 | 83,523 | 24,714 | 25,349 | 29.6% | 30.3% |
| 3 to 1 | 7,351 | 5,106 | 2,224 | 2,286 | 43.6% | 44.8% |
| 2 to 3 | 45,798 | 35,556 | 9,599 | 9,866 | 27.0% | 27.7% |
| 3 to 2 | 126,980 | 97,432 | 55,382 | 56,161 | 56.8% | 57.6% |
| 4 to 3 | 35,447 | 27,835 | 20,917 | 21,089 | 75.1% | 75.8% |
| 3 to 4 | 5,713 | 4,176 | 1,729 | 1,757 | 41.4% | 42.1% |
| 7 to 3 | 36,106 | 27,743 | 17,853 | 18,035 | 64.4% | 65.0% |
| 3 to 7 | 20,217 | 15,996 | 2,255 | 2,314 | 14.1% | 14.5% |
| Net Change to Third District | 63,976 | 51,947 | 11,493 | 11,821 | 22.1% | 22.8% |

**Table 5. Population Movement Between Benchmark and Alternative Congressional Districts**

## Narrowly Tailored Use of Race

The Alternative Third District does not cure all the problems identified in the Adopted Third District, but, in my opinion, the use of race is narrowly tailored to maintain a majority-minority district without unnecessarily compromising traditional redistricting criteria. Additionally, Plaintiffs' attempt to minimize the changes to the Adopted Map contributes in large part to the fact that the Alternative Map does not cure all of the issues identified in my first report.

While the Alternative Third District continues to split more localities than any other district, it splits fewer localities than the Adopted Third District. Similarly, while it continues to split more VTDs than any other district, it splits fewer VTDs than the Adopted Third District. It is not compact, but it is no longer the least compact district. It crosses the James River without a connection, but the use of water contiguity no longer has the effect of bypassing White populations.  It continues to be a majority Black Voting-Age Population district.

While in my opinion race continues to be a factor in the creation of the Alternative Third District, the district is narrowly tailored to produce the goal of a majority-minority district without unnecessarily compromising traditional redistricting criteria. The Alternative Third District has a Black VAP of 50.2% (exclusive) or 51.0% (inclusive) method. As I have noted previously in my expert report (McDonald, p.27) and my Reply to Defendants' Expert (McDonald p. 5), the Remedial Third District adopted in response to *Moon v. Meadows* had a Black VAP of 50.5%. By any metric, the Alternative Third District hews much more closely to the Black VAP of the Remedial Third District than the Adopted Third District does.

**Conclusion**

Plaintiffs' Alternative Third District narrowly tailors the district to maintain a majority Black VAP Alternative Third District by only affecting the boundaries of the Adopted Second and Third Districts, thereby minimizing disruption to the impending 2014 congressional elections. It does so by minimizing locality splits in Hampton, Newport News, Norfolk and Portsmouth, which is also the expressed wishes of the citizens of these localities.

I declare that under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on February 21, 2014 in Fairfax, Virginia.


Michael P. McDonald

# PLAINTIFFS' TRIAL EXHIBIT NO. 30

## Dr. Michael McDonald
## Reply Report to Mr. Morgan

# Dr. Michael P. McDonald

## Reply Report to Mr. Morgan

### Overview

Defendants retained Dr. Brunell as an expert to address the Adopted Plan. Dr. Brunell had the opportunity to respond to my original report, and I responded to his analysis in my reply report. Defendants have now retained Mr. Morgan, whose report ostensibly replies to my Analysis of Plaintiffs' Proposed Alternative Congressional Plan (Feb. 21, 2014). However, Mr. Morgan also critiques my two previous reports on the Adopted Plan. In this way, Mr. Morgan attempts to bolster Dr. Brunell's analysis on topics already addressed in the previous exchange of expert reports.

More surprisingly, even while Mr. Morgan takes liberties in responding to my previous reports, he completely ignores entire portions of the analysis provided in all my reports. As discussed further below, Mr. Morgan's analysis is based on a misunderstanding of the Voting Rights Act, a misapprehension about the operating criteria guiding the redistricting process, and a misrepresentation of my previous reports.

### Preclearance and "Greater Racial Balance"

Mr. Morgan suggests that the racial composition of the Adopted Third District was necessary to ensure preclearance under Section 5 of the Voting Rights Act, and further suggests that I "cannot - and [do] not - opine that the Alternative Plan could or would have received preclearance under Section 5" (Morgan p. 27). Mr. Morgan's analysis is plainly incorrect.

As an initial matter, Mr. Morgan ignores my observation that "the Alternative Third District hews much more closely to the Black VAP of the Remedial Third District [in light of *Moon v. Meadows*] than the Adopted Third District does" (McDonald Analysis of Alternative p.9), and that the Remedial Third District "was also precleared under Section 5" (McDonald Reply to Brunell p.11). In other words, the Department of Justice approved a previous version of the Third District with a Black VAP of 50.5%, which is *less* than Plaintiffs' Alternative Third District of 51.0%.[1] Implicit in this observation is that Plaintiffs' Alternative Third District would have been precleared by the Department of Justice. Indeed, the fact that the Adopted Third District contains a Black VAP closer to that of the Unconstitutional Third District (struck down by the Court in *Moon v. Meadows*) while the Alternative Third District contains a Black VAP substantially similar to that of the Remedial Third District, indicates that the Alternative Third District has a greater racial balance than the Adopted Third District.

---

[1] This calculation uses the inclusive method, which I opine is the correct one to apply as a comparison point to the Remedial District and with which neither Dr. Brunell nor Mr. Morgan have disagreed.

Moreover, Mr. Morgan's Voting Rights Act "analysis" has no basis in either the Voting Rights Act or the maps approved by the Virginia General Assembly.

Mr. Morgan explains that since all of the majority-minority districts in the House of Delegates had at least a 55% Black VAP, the General Assembly "had ample reason to believe" that a 55% Black VAP was "appropriate to obtain Section 5 preclearance, even if it meant raising the Black VAP above the levels in the benchmark plan" (Morgan pp. 26-27). This explanation is problematic for several reasons.

First, if the General Assembly used the House of Delegates districts as a guide for the Third Congressional District, there is nothing in the public record indicating that is the case. This information is therefore likely private information that Mr. Morgan possesses as a participant in the map-drawing process for the General Assembly, and it is undisclosed in his report.

Second, Mr. Morgan's statement that the General Assembly imposed a minimum racial quota of 55% Black VAP to the Third District, unsupported by any analysis of what was actually required by the Voting Rights Act, essentially concedes that the Adopted Third District is a racial gerrymander.

Third, Mr. Morgan is only telling part of the story, as the Senate's majority-minority districts were also precleared even though they contained Black VAPs less than 55%.

The Black VAP percentage for the five majority-minority Adopted Senate districts are listed in Table 1 (in descending order of the Black VAP). Like the House of Delegates districts Mr. Morgan refers to, these Senate districts overlap with the Third Congressional District. Notably, the Department of Justice precleared these districts in the Adopted Senate plan.

| Senate District | Black VAP | |
|---|---|---|
| | Exclusive Method | Inclusive Method |
| 5 | 53.6% | 54.4% |
| 18 | 53.5% | 54.0% |
| 16 | 53.1% | 53.7% |
| 2 | 51.2% | 52.2% |
| 9 | 50.8% | 51.4% |

**Table 1. Adopted Senate Districts, Black VAP of African-American Majority Districts**

Unlike the House of Delegates majority-minority districts, which all had a Black VAP of at least 55.2% (inclusive) or 55.9% (exclusive), none of the comparable Senate districts has a Black VAP over 55%. Following Mr. Morgan's logic that the district with the lowest Black VAP provides a guide as to the minimal acceptable level for the Third District, then the 9th Senate district serves as that guide, with a Black VAP of 50.8% (exclusive) or 51.4% (inclusive).

2

The House of Delegates was well aware of the Adopted Senate plan, since that chamber voted in favor of the bill enacting those districts in 2011. The map-drawers of the Adopted Congressional Districts were also well aware that the Department of Justice had precleared the Senate districts under Section 5 *before* the new congressional districts were adopted in 2012. Thus, it is disingenuous for Mr. Morgan to assert that a 55% Black VAP quota was what the "General Assembly believed was appropriate to obtain preclearance" (Morgan p.27) of the Third District.

Fourth, a simple analysis of voting patterns demonstrates that the Alternative Third District does not retrogress the minority group's ability to elect its candidate of choice. In the section of my initial report entitled "Historical Performance of Candidates to the Third District" (McDonald report p. 11), I describe how the African-American incumbent, Rep. Bobby Scott, has been reelected by overwhelming majorities, with an average vote share of 85%, from 2002 to 2012. In my reply report, I further explained: "Since the Third District has a Black VAP substantially less than 85%, simple logic reveals that there must be substantial White crossover voting for Rep. Scott such that the Third District's Black VAP can be safely lowered below the Adopted Third District's 56.3% (exclusive method) or 57.2% (inclusive method) and continue to elect the African-American candidate of choice" (McDonald Reply pp. 11-12).[2]

Finally, Mr. Morgan ignores evidence, supplied in his report, that further indicates the minority group will elect its candidate of choice in the Alternative Third District. Mr. Morgan aggregates into congressional districts the votes for candidates of the two major political parties in the 2008 and 2012 presidential elections (Morgan p. 12, 15). His statistics show that McCain's vote share was increased from 49.5% in the Benchmark Second District to 49.7% in the Adopted Second District, and that Romney's vote share was increased from 48.2% in the Benchmark Second District to 48.6% in the Adopted Second District. According to Mr. Morgan, these changes "improved the re-election prospects of Congressman Rigell" (Morgan p. 13).

In contrast, McCain's vote share in the Alternative Third District is 27.8%, while Romney's vote share is 25.4%. This is the strongest performing district by far for any political party in the Alternative Plan, one Rep. Rigell and every other incumbent would presumably look upon with envy. Yet later Mr. Morgan claims that the Alternative Third District has "less...respect for incumbency than every other district" (Morgan p.25). To arrive at this conclusion, Mr. Morgan has to pretend that, like Rep. Rigell, Democratic incumbent Rep. Scott was somehow vulnerable

---

[2] Notably, Mr. Morgan does not proclaim to be a voting rights expert. His curriculum vita describes his redistricting background and expertise as (1) "[p]erformed redistricting work in 19 states, in the areas of map drawing, problem solving, and redistricting software operation" and (2) "[p]erformed political work in 40 states, providing analysis and strategy to both statewide and legislative races" (Morgan CV, p. 2). His voting rights expertise is summarized as having occurred in the 1990-1991 redistricting cycle; when working on statewide and congressional redistricting plans in eight states he "[f]ocused primarily on Voting Rights Act issues with Black, Hispanic, and Asian communities" (Morgan CV, p. 2). What "focus" means is unknown; he has produced no scholarly work, never provided voting rights expert testimony, nor ever been invited to speak on voting rights issues. It is one thing to draw a map at the direction of political leaders; it is something much different to provide an expert opinion on whether a map adheres to Voting Rights Act and constitutional requirements.

in the Benchmark Third District - where McCain won 24.7% and Romney won 23.3%. If not evident from these presidential elections, the history of congressional elections in the Benchmark Third District, described above, clearly shows that he is not. Mr. Morgan makes the further leap that slightly increasing the Republican performance in a strongly Democratic district such that the district is still strongly Democratic somehow weakens Rep. Scott. Mr. Morgan provides no support for this assumption, and the district's electoral patterns directly refute it.

**A Racial Bloc Voting Analysis**

It is my opinion that Virginia bears the burden of providing a racial bloc voting analysis to substantiate its increase of the Black VAP in the Adopted Third District (let alone its apparent 55% Black VAP quota for the Adopted Third District). However, since neither of Defendants' experts has provided any analysis whatsoever to support the race-based redistricting of the Adopted Third District, I provide a racial bloc voting analyses of the 2008 presidential and 2009 governor elections here.

Racial bloc voting analyses estimate the vote shares that the minority candidate of choice may expect to receive from the minority community and the non-minority community. Courts have held that the most probative election contests are those in which a minority candidate competes against a White candidate. Therefore, I consider the 2008 presidential election more probative than the 2009 governor election. The unit of analysis is all VTDs within the localities that are part of the Adopted Third District. I define the minorities as Black, using the inclusive method, and non-minorities as non-Black.

I employ two commonly used methods, what are known as Goodman's Double Regression and Homogeneous Precinct Analysis. The statistics estimate racial groups' vote shares, which thereby reveal the candidate of choice for the minority community.

Goodman's Double Regression is a statistical procedure whereby the vote shares for the candidate of choice are essentially correlated with the racial composition of the VTDs. Goodman's Double Regression is a two-step statistical procedure that models (1) turnout of the minority community and (2) support for the major-party candidates, to arrive at an estimate that allows for dissimilar turnout.

Homogeneous Precinct Analysis examines the performance of the minority candidate of choice in the most heavily minority and most heavily non-minority VTDs. Here, I have chosen the ten most Black VTDs and ten most non-Black VTDs to be representative of homogeneous precincts. All are composed of 90%+ of their respective racial groups.

The estimates from the racial bloc voting analyses are presented in Table 2.

4

| | | Percent Voting for Black Candidate of Choice | |
|---|---|---|---|
| | | Goodman's Double Regression | Homogeneous Precincts (average of top ten) |
| President 2008 | *Black* | 104.3% | 96.1% |
| | *Non-Black* | 38.6% | 43.6% |
| | *Estimated Vote for Candidate of Choice in 51% BVAP District* | 69.9% | 70.3% |
| Governor 2009 | *Black* | 110.7% | 94.2% |
| | *Non-Black* | 28.8% | 33.2% |
| | *Estimated Vote for Candidate of Choice in 51% BVAP District* | 65.1% | 64.4% |

**Table 2. Racial Bloc Voting Analysis**

In the 2008 presidential election, according to the Goodman's Double Regression method, the Black candidate of choice received 104.3% support from Blacks and 38.8% from non-Blacks. According to the Homogeneous Precinct Analysis, the Black candidate of choice received 96.1% support from Blacks and 43.6% from non-Blacks.

In the 2009 governor election, according to the Goodman's Double Regression method, the Black candidate of choice received 110.7% support from Blacks and 28.8% from non-Blacks. According to the Homogeneous Precinct Analysis, the Black candidate of choice received 94.2% support from Blacks and 33.2% from non-Blacks.

Estimates over 100% support for a candidate are, of course, impossible.[3] The standard practice in this situation is to interpret values over 100% as equal to 100%. I do so to simulate the expected vote in a district composed of 51% Black VAP, the Black VAP of the Alternative Third District, by multiplying the Black support estimate from both methods by 51% and the non-Black by 49% and then adding these two values together.

There are two important points to draw from this racial bloc voting analysis.

---

[3] My examination of the raw data leads me to believe that they arise from uneven turnout across some VTDs, likely related to sizable military populations found in the Tidewater region that vote absentee in other locations. My examination of the raw data, and the confirming estimates from the Homogeneous Precinct Analysis, do not indicate the presence of statistical issues that would greatly affect Goodman's Double Regression estimates. Both methods estimate similar support among racial groups for the minority candidate of choice.

First, the racial bloc voting analyses corroborate the evidence that the minority candidate of choice would be elected from Alternative District Three. The Black candidates of choice receive nearly unanimous support from Black voters and in the mid to high 30% crossover vote from non-Black voters. The baseline support for the minority candidates of choice in a 51% Black VAP district is in the mid to upper 60% range.

Second, these statistics provide no basis for a "sensible" (Brunell p.3) increase in the Black VAP of District Three to a level above 51% Black VAP (and certainly not above the benchmark Black VAP of the district) to comply with Section 5 of the Voting Rights Act. To be sure, they provide no basis whatsoever for a 55% Black VAP quota.

**Mr. Morgan Mischaracterizes Plaintiffs' Alternative Plan**

Mr. Morgan and I agree on a key point, that "Plaintiffs' Alternative Districts are different from the Adopted Districts only in the shared boundary between the Adopted Second and Third Districts" (McDonald Analysis of Alternative p. 1), or as Mr. Morgan states, that "the only difference between the Enacted Plan and the Alternative Plan is the placement of the boundary between Districts 2 and 3" (Morgan p.3).

We also agree that, by my own analysis, Alternative District 3 retains many geographical features I previously opined indicated where race predominated in the creation of the Adopted Third District. As I state in my analysis of Plaintiffs' Alternative Plan:

> Alternative Third District does not cure all the problems identified in the Adopted Third District, but, in my opinion, the use of race is narrowly tailored to maintain a majority-minority district without unnecessarily compromising traditional redistricting criteria. Additionally, *Plaintiffs' attempt to minimize the changes to the Adopted Map* contributes in large part to the fact that the Alternative Map does not cure all of the issues identified in my first report (McDonald Analysis of Alternative p. 9,emphasis added).

Where we disagree is in Mr. Morgan's opinion that the "the Alternative Plan is at least as race-conscious, and arguably even more race-conscious" than the Adopted Plan (Morgan p. 10). Mr. Morgan claims that "[n]one of the Alternative Plan's trades between Districts 1, 2 and 3 are explained on non-racial grounds" (Morgan p. 10). Mr. Morgan only mentions two non-racial grounds of "politics and incumbency protection" (Morgan p. 10). To arrive at his opinion that no trade can be described on non-racial grounds, Mr. Morgan must discount entire sections of my analysis of Plaintiffs' Alternative Plan which describe how (1) "the Alternative Districts more closely adhere to locality boundaries" (McDonald Analysis of Alternative p. 3), are (2) "more compact" (ibid p. 6), and (3) no longer use water contiguity with the effect of "bypassing White communities" (ibid p.7).

Since the substance of our disagreement begins with these three traditional redistricting principles described in my report, I respond to these in turn.

*Locality and VTD Splits*

In my analysis of Plaintiffs' Alternative Third District, I provide evidence that "[t]he Alternative Districts more closely adhere to locality boundaries than the Adopted Districts" (McDonald Analysis of Alternative, p.3). Mr. Morgan agrees that the Alternative Plan splits *"one fewer locality* than the Enacted Plan" (Morgan p. 19, original emphasis).[4]

To arrive at Mr. Morgan's assertion that "[t]here is no reason to conclude that this marginal difference in split localities is significant" (Morgan p.20), Mr. Morgan ignores, as reported in Table 3 of my analysis of Plaintiffs' Alternative Plan, that in the Adopted Plan "a total of 241,096 persons, or 33.1% of the total population, are affected by the splits [at issue] of these districts" (McDonald Analysis of Alternative, p.5). In contrast, in Plaintiffs' Alternative Plan, a small split of Portsmouth with the intent to balance districts' populations affects "1,016 total persons, or 0.14% of the total population of these districts" (ibid). The aligning of district boundaries in Plaintiffs' Alternative Plan is not "marginal" (Morgan p. 20) as it greatly reduces the affected populations of those whose localities are split by district lines, by hundreds of thousands of people.

Better aligning district boundaries with locality boundaries, and thereby respecting the expressed wishes of the citizens of these localities (ibid, see pp.5-6 for citizens' statements), is clearly a non-racial goal that is better satisfied by Plaintiffs' Alternative Plan.

On the issue of VTD splits, Mr. Morgan reopens an issue previously discussed by Dr. Brunell and myself: how to count splits where zero population is involved (what Virginia refers to as "technically split" in their Section 5 submission to the Department of Justice (Section 5 Statement of Change p. 11)). Mr. Morgan favors ignoring "technically split" VTDs, as he notes a "net of 6 such splits that Dr. McDonald identifies as different between the plans are in the 'technically split' precincts involving no population. Where population is concerned, the numbers of split VTDs and VTD splits in the Enacted Plan are the same as the numbers of split VTDs and VTD splits in the Alternative Plan" (Morgan pp.22-23).[5] I agree with this characterization, but there is an important racial component to these "technically split" VTDs that is intertwined with contiguity.

---

[4] Mr. Morgan quibbles with my counting of locality splits (Morgan p.19), intended to illustrate how the number of times districts splitting localities is further reduced, isolating only the changes from the Adopted Plan to the Alternative Plan. Since we agree that the number of locality splits is reduced, I will proceed with my analysis on this point of agreement.

[5] Mr. Morgan again quibbles about my method of counting VTD splits (Morgan p.21), as though the counting method is somehow significant. It is not in this instance. No VTD is split by more than two districts. Counting the number of times VTDs split districts or the number of districts split VTDs *results in the same number*. Mr. Morgan disingenuously proceeds "using Dr. McDonald's preferred measure" (ibid p.22) as though his favored counting method for VTD splits would produce a different number, when it would not.

*Contiguity*

Mr. Morgan disregards an important characteristic of these "technically split" VTDs. They are VTDs that extend into the James River and are split with the express purpose of using the James River to bypass White communities. Mr. Morgan never acknowledges the fact that the "*Moon v. Meadows* court found water contiguity without a connecting bridge to be a factor weighed in its determination that race predominated in the creation of the Unconstitutional Third District" (McDonald Reply to Brunell p.10). The six fewer "technically split" VTDs in Plaintiffs' Alternative Plan directly rectify VTD splits in the Adopted Plan where water was used without a connection to bypass White communities.

Furthermore, as I noted in my initial report, the Adopted Plan similarly uses water contiguity in Norfolk, in this case to bypass Black communities so that White communities can be placed in the Second District (McDonald Report p.21). By assigning the entirety of Norfolk to the Second District, the Alternative Plan rectifies this use of water to bypass racial communities.

Mr. Morgan is therefore incorrect in stating that "[t]he Alternative Plan thus achieves contiguity in District 3 exactly the same way as the Enacted Plan" (Morgan p. 24). While the Adopted Plan uses water contiguity in order to bypass racial communities, the Alternative Plan uses it to connect adjacent localities separated by water. Thus, it is my opinion, and consistent with the reasoning of the *Moon v. Meadows* Court, that Plaintiffs' Alternative Plan rectifies a constitutionally improper use of race, thereby converting the goal of water contiguity that was used for a racial purpose into a non-racial goal.

*Compactness*

Mr. Morgan does not dispute the fact that, based on the three compactness Virginia relied upon in its Section 5 submission (Section 5 Statement of Change, pp. 10-11) and analyzed in my reports, Adopted District Three is the least compact district. Mr. Morgan agrees that Adopted District Three is less compact on these three measures (Morgan p.17). Mr. Morgan also agrees that Alternative District Three is no longer the least compact on these measure (ibid p.18).[6]

Mr. Morgan complains that I do not evaluate at least two additional compactness measures, the Ehrenburg test and the Population Polygon Test. Mr. Morgan fails to point out, however, that the three compactness measures I used were the same ones used by the General Assembly in determining how well districts met the Virginia constitutional requirement of compactness. Mr. Morgan's cherry-picking of additional compactness measures adds little to the analysis. There

---

[6] Mr. Morgan helpfully corrects a typo where the Schwartzberg measure for the Alternative District Three is reported as 2.04 when it is in fact 2.61 (McDonald Analysis of Alternative p. 7). This error does not affect my conclusion that Alternative District Three is more compact according to the Schwartzberg measure and is no longer the least compact district.

are over thirty different compactness measures discussed by scholars in the field.[7] I do not evaluate all these compactness measures and, significantly, neither does Mr. Morgan.

Mr. Morgan notes that I do "not suggest that Alternative District 3 meets a professionally accepted standard for minimally acceptable compactness, which Enacted District 3 does not satisfy and Alternative District 3 does" (Morgan p.17). Mr. Morgan is "not aware of any such standard" (ibid), nor am I. The scholarly consensus is that there is no one-size-fits-all standard for compactness measures; they are interpreted in the context of the jurisdiction being redistricted and the characteristics of the compactness measure.[8]

I have viewed the district boundaries, considered the three compactness measures I have previously examined, and considered Mr. Morgan's additional two compactness measures. My opinion remains unchanged: (1) the non-compact character of the Third District is indicative that improper racial considerations were present in the formation of the Adopted Third District, particularly with respect to how the Adopted Third District segregates non-compact racial communities in the Hampton, Newport News and Norfolk localities; and (2) the Alternative Third District, by not dividing non-compact racial communities within these localities along racial lines, is more compact and reduces the racial character of the non-compactness of the Third District.

### The 2011 Senate Criteria and Senate Congressional Plan

Mr. Morgan continues his analysis by examining additional factors to determine "whether the Alternative Plan achieves the political goals in the Enacted Plan" (Morgan p.14). The political goals Mr. Morgan repeatedly refers to are the criteria adopted by the Democratically-controlled Virginia Senate in 2011. A section of my reply report to Dr. Brunell entitled "The Criteria Used for the Congressional Redistricting" (McDonald Reply pp. 2-4) explains that the House of Delegates "never formally adopted any redistricting criteria" and that "the criteria adopted by the Democratic-controlled Senate in 2011 were not binding on the Republican-controlled Senate in 2012" (McDonald Reply p.3).

Although Mr. Morgan claims to have read my reply report to Dr. Brunell, he never refutes these facts about the circumstances revolving around the legislative process that produced the Adopted Plan. Mr. Morgan, like Dr. Brunell, must overlook the glaring *post-hoc* rationalization implied in Virginia's Section 5 submission that the 2011 Senate Criteria guided the Adopted Plan because

---

[7] Richard G. Niemi, Bernard Grofman, Carl Carlucci and Thomas Hofeller. "Measuring Compactness and the Role of a Compactness Standard in a Test for Partisan and Racial Gerrymandering." *The Journal of Politics* Vol. 52, No. 4 (Nov., 1990), pp. 1155-1181.

[8] For example, the Population Polygon Test, *ceteris paribus*, tends to score districts containing within their borders a uniform population density as more compact than those that do not. Thus, District Ten fares poorly on this measure since it combines densely populated urban areas of Northern Virginia with lightly populated rural areas stretching to the West Virginia border. District Three scores better than District Ten because District Three is comparably composed of more densely-populated urban areas.

there is only one plan adopted by a Virginia legislative body that was ostensibly drawn to adhere to those criteria. It is not the Adopted Plan. It is the congressional plan the Senate adopted in 2011.

The House of Delegates, where the Adopted congressional plan originated, *debated and then failed to adopt any criteria for congressional redistricting*. As a result, the House of Delegates had no formal goals or criteria other than the requirements of federal and state law: (1) equal population, (2) adherence to the Voting Rights Act, (3) contiguity, and (4) compactness (Virginia Constitution, Article II § 6).

All other criteria that Dr. Brunell and Mr. Morgan discuss as guiding the development of the Adopted congressional plan are distractions, since they were not formally operative. While I analyze the components of the 2011 Senate Criteria in my previous reports, it is for the purpose of following the methodology applied by the *Moon v Meadows* court to analyze the degree to which race predominated, not to assess how well the Adopted or Alternative Plans adhere to the non-operative 2011 Senate Criteria.

**Race or Politics?**

Mr. Morgan states that I do "not even mention the political considerations in the Enacted Plan, much less separate those considerations from race and show that race predominated in the Enacted Plan" (Morgan p.11). In so doing, Mr. Morgan has ignored the section in my reply report to Dr. Brunell entitled clearly "Race or Politics?" (McDonald Reply pp. 6-8). To summarize, I examined the racial and political character of the VTDs in the localities in or adjacent to the Third District and "conclude[d] from this analysis that race trumped politics" (McDonald Reply to Brunell p.8), in that among VTDs with similar political characteristics, predominantly greater Black VAP VTDs were assigned to the Adopted Third District. Mr. Morgan does not dispute this fact.

Mr. Morgan himself notes that, according to the non-operative 2011 Senate Criteria, compliance with the Voting Rights Act was "the highest priority for the Enacted Plan after compliance with the Constitutional equal-population requirement" (Morgan p.25). By his own analysis, then, all other criteria would be therefore subsumed to compliance with the Voting Rights Act.

Mr. Morgan asserts that protecting Rep. Rigell, the Republican incumbent of the Second District, was a goal of the Adopted Plan. This goal is not specifically noted in the non-operative 2011 Senate Criteria, and Mr. Morgan does not reveal his basis for knowing this purported goal. Nor does he analyze how this goal might conflict with the Senate Criteria's higher priority of compliance with the Voting Rights Act.[9]

_____

[9] While it may seem self-evident that protection of Rep. Rigell would be a goal of Virginia Republicans since he is a Republican incumbent member of Congress, there are numerous examples where a party did not protect their incumbents because other considerations intervened. For instance, in 2012, Louisiana Republicans paired

For the sake of argument, however, I will proceed by entertaining Mr. Morgan's assertion (Morgan pp. 11-16) that protecting Rep. Rigell was a legitimate political goal.

It is instructive, then, that the 2011 Senate's congressional plan also protects Rep. Rigell without increasing the Black VAP of the Third District. A map showing how the Senate approached protecting Rep Rigell is displayed in Figure 1 of my reply report to Dr. Brunell (McDonald Reply p. 4). Instead of assigning portions of Hampton and Newport News to the Second District, the Second District is given the localities to the north of Hampton and Newport News: James City, Poquoson, Williamsburg, and York.

As reported by Mr. Morgan (Morgan p. 12), in the 2008 presidential election Obama received 49.3% and McCain received 49.7% of the vote within the Adopted Second District, a difference of 0.4 percentage points favoring McCain. The Virginia legislature provides reports of the 2008 presidential vote in the 2011 Senate Second District on the redistricting website.[10] In the 2011 Senate's Second Congressional District, Obama received 44.6% of the vote while McCain received 54.6%, a 10.0 percentage point difference favoring McCain. Thus, the 2011 Senate plan demonstrates how the political goal of protecting Rep. Rigell can be achieved without unnecessarily increasing the Black VAP of the Third District.

Furthermore, the map-drawers of the 2011 Senate plan apparently believed the Black VAP of the Third District could be safely lowered to 42.2% (exclusive) or 43.0% (inclusive) and still obtain preclearance from the Department of Justice. It is noteworthy that the incumbent, Rep. Scott, publicly provided support for this configuration of the Third District.[11]

**District Cores**

Like Dr. Brunell (Brunell p.6), Mr. Morgan opines that the preservation of district cores, found in the non-operative 2011 Senate Criteria, was a guiding redistricting principle (Morgan pp. 24-25). Neither expert has addressed my observation that "if preservation of district cores was a value the legislature held in high regard, the legislature would not have removed population from the under-populated Benchmark Third District, as that only made the redistricting task more complicated. Removal of population is only *the detriment* of the preservation of cores" (McDonald Reply to Brunell p. 9, original emphasis).

Mr. Morgan instead provides statistics purporting to demonstrate that Alternative District Three, which preserves 69.2% of its predecessor district, is the *"worst performing* district in terms of

---

Republican incumbents Rep. Boustany, Jr. and Rep. Landry. Louisiana had lost a congressional seat to apportionment, and as prominent Republican consultant Jim Ellis noted "[s]ince the New Orleans-anchored 2nd CD is a Voting Rights Act protected district, the Republicans had no other choice but to forfeit a seat." *See* http://jimellisinsights.wordpress.com/2012/12/10/boustany-wins-in-la-and-why/, accessed March 21, 2014.
[10] http://redistricting.dls.virginia.gov/2010/Data/congressional%20plans/SB5004_Locke_substitute/SB5004_Locke_substitute.htm.
[11] See, e.g., http://www.washingtonpost.com/blogs/virginia-politics/post/scott-backs-senates-influence-district-proposal/2011/04/11/AFpNs1LD_blog.html.

preservation of cores" (Morgan p.24, original emphasis). Setting aside the issue that the Benchmark District is constitutionally suspect (McDonald Reply to Brunell p.6) and therefore the preservation of district cores would simply perpetuate any constitutional defect, the 2011 Senate's congressional plan provides perspective on how the body that adopted the Senate Criteria interpreted and applied the preservation of district cores. While 386,968 residents of Benchmark District Three were assigned to the 2011 Senate's Third District, 503,129 residents of Benchmark District Three were assigned to Alternative District Three. Thus, the Alternative Third District performs substantially better than the 2011's Senate's Third District, which was ostensibly drawn to achieve the goal of preservation of district cores.

The Senate, in practice, did not weigh preservation of district cores highly over other criteria. I am not the only expert who comes to this assessment, as Dr. Brunell provides a laundry list of trivial reasons why he believes district cores may be violated, including "want[ing] their grandbaby's preschool in their district" (Brunell p.7).

**Conclusion**

Upon reviewing Mr. Morgan's report, my conclusions not only remain the same but are bolstered. Race was the predominant consideration in the formation of the Adopted Third District. Virginia and Defendants' experts have not provided compelling evidence that the Black VAP of the Benchmark Third District should be increased to comply with the Voting Rights Act. Indeed, Mr. Morgan provides glaring evidence of an unconstitutional use of race when he asserts a racial quota of 55% Black VAP was adopted for the Third District by the General Assembly.

Furthermore, all evidence indicates that a district like Plaintiffs' Alternative Third District, designed to be narrowly tailored to elect a Black candidate of choice with a Black VAP of 51.0%, would indeed elect the minority candidate of choice and present no "obstacles to preclearance" (Morgan p.4).

I declare that under the penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on March 24, 2014 in Fairfax, Virginia.

Michael P. McDonald

13

# PLAINTIFFS' TRIAL EXHIBIT NO. 34

# Report of John Morgan regarding Plaintiffs' Alternative Plan and the Enacted Plan

**Report of John B. Morgan Regarding Plaintiffs' Alternative Plan and the Enacted Plan**

*Page v. State Board of Elections*

**Background Information**

My name is John B. Morgan.  I have been retained by the defendants to offer an expert opinion regarding Plaintiffs' Alternative Plan and the Enacted Plan.  I hold a B.A. in History from the University of Chicago.  As detailed in my CV, attached as Exhibit A, I have extensive experience in the field of redistricting, working on redistricting plans in the redistricting efforts following the 1990 Census, the 2000 Census, and the 2010 Census. I have testified as an expert witness in demographics and redistricting.  I am being compensated at a rate of $250 per hour for my services in this case.

In preparing this analysis, I considered the following:  the legal briefs submitted to the court, reports by Dr. Michael McDonald and Dr. Thomas Brunell, court cases mentioned in the briefs and reports, relevant portions of the Sec. 5 preclearance submissions to the Department of Justice, various maps and datasets from the current and previous congressional districts, the Plaintiffs' Alternative Plan maps and data, the 2010 redistricting PL94-171 data and Census geography data from the Census Bureau, political and redistricting data from the Department of Legislative Services and the Virginia State Board of Elections, and the Maptitude for Redistricting geographic information system (GIS) software and manuals from Caliper Corporation.

The redistricting geographic information system (GIS) software package used for this analysis is Maptitude for Redistricting from Caliper Corporation.  The redistricting software was loaded with the census PL94-171 data from the Census and the Census geography as well as available redistricting and political data from Department of Legislative Services and the Virginia State Board of Elections.  The full suite of census geography was available, including Census Places, Voting Districts, water bodies, and

1

The Enacted Plan preserves between 71% and 96% of the cores of the Benchmark districts, and preserves 83% or more of the cores of 9 of the 11 districts, including District 3.  The Enacted Plan preserves 85% of the core of District 2 and 83% of the core of District 3.

The Alternative Plan performs significantly worse than the Enacted Plan on this criterion.  The Alternative Plan preserves only 69.2% of the core of District 3, down from 83% in the Enacted Plan.  In other words, Alternative District 3 would be the *worst performing* district in terms of preservation of cores in either the Enacted or the Alternative Plan.  Dr. McDonald offers no explanation as to why the only majority-minority district in Virginia should be entitled to less continuity and respect for incumbency protection than every other district.

**Protection of Incumbents**

The Senate Criteria included the factor of "incumbency considerations."  Senate Criteria V.  This factor encompasses not just preserving the cores of districts but also strengthening incumbents politically.  As explained, the Enacted Plan respects this factor significantly, while the Alternative Plan undermines it, particularly in District 2, where Congressman Rigell would be gravely weakened in his re-election prospects.

**Compliance with the Voting Rights Act**

The Senate Criteria treated compliance with the Voting Rights Act, "including compliance with protections against unwarranted retrogression or dilution of racial or ethnic minority voting strength," as the highest priority for the Enacted Plan after compliance with the Constitutional equal-population requirement.  Senate Criteria II.  I understand that a redistricting plan complies with Section 5 only if it does not diminish the ability of minority voters to elect their candidates of choice.

The Enacted Plan increased District 3's Black VAP on both of Dr. McDonalds' preferred measures

3.2% (exclusive) and 3.3% (inclusive).  2/21/14 McDonald, page 8.  The Enacted Plan thus did not diminish the ability of black voters to elect their candidates of choice.  The Enacted Plan received preclearance from the Department of Justice.

In 2011, Virginia was one of the first states to complete its statewide legislative redistricting and seek Section 5 preclearance from the Department of Justice.  The General Assembly passed a redistricting plan for the House of Delegates which required preclearance for the 2011 elections.  The benchmark House of Delegates plan had 12 districts in which African-Americans formed a majority of the total and voting age populations.   Many of those districts were located in the geography covered by Congressional District 3.  During the redistricting process, the House of Delegates considered a number of proposed plans that preserved the 12 majority-black districts.  Some of these alternative plans had Black VAP below 55%. House of Delegates Section 5 Submission, Statement of Minority Impact, page 5.

But the House of Delegates plan that the General Assembly enacted had a Black VAP of above 55% in all 12 majority-black districts – including the districts within Congressional District 3.  This required increasing the Black VAP in some of the 12 majority-black benchmark districts from the Black VAP level at the time of the 2010 census.  Eight of the 12 members of the House of Delegates Black Caucus voted in favor of the Enacted House of Delegates plan.  House of Delegates Section 5 Submission, Statement of Minority Impact, page 5.

Thus, the General Assembly enacted, with strong support of bipartisan and black legislators, a House of Delegates redistricting plan with a 55% Black VAP as the floor for black-majority districts subject to Justice Department preclearance under Section 5, including districts within the geography covered by Congressional District 3.  The General Assembly therefore had ample reason to believe that legislators of both parties, including black legislators, viewed the 55% black VAP for the House of Delegates districts as appropriate to obtain Section 5 preclearance, even if it meant raising the Black

VAP above the levels in the benchmark plan.  The General Assembly acted in accordance with that view for the congressional districts and adopted the Enacted Plan with the District 3 Black VAP at 56.3%

The Alternative Plan, by contrast, decreases District 3's Black VAP by 2.9% and drops it to a razor-thin majority of 50.2% (exclusive) and 51% (inclusive).  These levels are below the 55% that the General Assembly found appropriate to comply with Section 5 for House Districts.

Dr. McDonald states that "a racial bloc voting analysis" is required to prove what Black VAP is necessary to comply the Voting Rights Act. 1/20/14 McDonald, page 11.  Dr. McDonald provides no such analysis of the Alternative Plan.  Thus Dr. McDonald cannot – and does not – opine that the Alternative Plan could or would have received preclearance under Section 5.

Therefore the Alternative Plan would have presented obstacles to obtaining Section 5 preclearance that the Enacted Plan did not present.   The Alternative Plan drops District 3's Black VAP well below the 55% that the General Assembly believed was appropriate to obtain preclearance for House Districts and decreases District 3's Black VAP to a razor-thin majority below the Benchmark Black VAP level.  Had the Alternative Plan been before it, the General Assembly had ample reason to prefer the Enacted Plan, which increased District 3's Black VAP above 55% and faced none of these hurdles to achieving Section 5 preclearance.

**The Alternative Plan Does Not Bring About Significantly Greater Racial Balance Than the Enacted Plan**

I have been asked to analyze whether the Alternative plan brings about "significantly greater racial balance" than the Enacted Plan.  As I understand it, the purpose of this requirement is to cure the alleged racial gerrymander and turn the gerrymandered district into one that is not racially identifiable. The Alternative Plan fails that purpose because it preserves District 3 as a racially identifiable majority-

black district on both of Dr. McDonald's Black VAP measurements.  The Alternative Plan District 3 replaces a black-majority district with a black-majority district and in doing so would not seem to cure the alleged racial predominance that Dr. McDonald criticizes in the Enacted Plan, including the changes to the Benchmark District 3 that the Alternative Plan replicates.

### The Enacted Plan is not a Racial Gerrymander

Based on my review and analysis of the available data discussed throughout this report, I also conclude that the Enacted Plan is not a racial gerrymander.  In my opinion, politics rather than race predominated and the Enacted Plan is consistent with traditional redistricting principles, including the criteria identified by the Virginia Senate and followed by the General Assembly.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed on March 14, 2014 in Fairfax, Virginia.

John B. Morgan

# PLAINTIFFS' TRIAL EXHIBIT NO. 47

## Transcription of Video footage of
## 2011 HB5004 Floor Session
## taken on April 12, 2011

———————————————————————————

State of Virginia Regular Session

HB 5004 Floor Session Footage

April 12, 2011

Verbatim Transcript of Proceedings

Transcribed from Audio/Video Recording

———————————————————————————

1         THE CLERK:  Mr. Speaker, calendar of the House of

2    Delegates 2011, Special Session 1, for Tuesday, April 12,

3    2011.  House bill on second reading, regular calendar.

4         House Bill 5004, a bill to amend the code of

5    Virginia and to repeal Section 24.2-302.1 of the code of

6    Virginia related to congressional districts.  Report for

7    personal elections April 11 with an amendment.

8         And, Mr. Speaker, there are floor amendments.

9         MR. SPEAKER:  The gentleman from Henrico, Mr. Janis.

10        MR. JANIS:  Thank you, Mr. Speaker.  I move the

11   House adopt the committee amendment.

12        MR. SPEAKER:  The questions on adoption of the

13   committee amendment.  As many as favor that motion will say

14   aye.

15        RESPONSE:  Aye.

16        MR. SPEAKER:  Those opposed, no.

17        Committee amendment is agreed to.  Gentleman from

18   Henrico.

19        MR. JANIS:  Thank you, Mr. Speaker.

20        Mr. Speaker, members of the House, House Bill 5004

21   is a bill to redraw the boundary lines of the 11 Virginia

22   congressional districts pursuant to the mandate of the

23   United States Constitution and the constitution of the

24   commonwealth of Virginia that every ten years we reapportion

25   these districts.

1          The congressional district boundary lines reflected

2    in House Bill 5004 were drawn based on several criteria.

3          First, and most importantly, the districts that were

4    drawn to 3rd Congressional District conform to the mandates

5    of the United States Constitution and the Constitution of

6    Virginia, and specifically to comply with the

7    one-person-one- vote rule, which occurs in both of these

8    constitutional documents.

9          This was a significant change and a significant

10   challenge, given the dramatic and nonuniform shifts in

11   population in the commonwealth over the last ten years, and

12   specifically the dramatic population growth in northern

13   Virginia compared to population loss in certain parts of the

14   south side of the southwest and slower population growth in

15   other parts of the commonwealth.

16         The second criteria that's applied in House Bill

17   5004 is that the districts were drawn to conform with all

18   mandates of federal law, and, most notably, the Voting

19   Rights Act.  The Voting Rights Act mandates that there be no

20   retrogression in minority voter influence in the 3rd

21   Congressional District, and House Bill 5004 accomplishes

22   that.

23         The federal law also applies what's called a zero-

24   variance rule.  And what zero-variance rule means is that

25   each of the 11 congressional districts must be drawn in such

1    a way as to encompass a territory where there are no fewer

2    than 727,365 residents but no more than 727,366 residents.

3    There can be no more than a one-person variation between

4    each of the congressional districts.  House Bill 5004

5    complies with this.

6         Third, the districts were drawn to respect to the

7    greatest degree possible the will of the Virginia electorate

8    as it was expressed in the November 2010 elections.  And

9    these districts are based on the core of the existing

10   congressional districts with the minimal amount of change or

11   disruption to the current boundary lines, consistent with

12   the need to expand or contract the territory of each

13   district to reflect the results of the 2010 census and to

14   ensure that each district had the right 727,365 benchmark.

15        House Bill 5004 respects the will of the electorate

16   by not cutting out currently elected congressmen from their

17   current districts nor drawing current congressmen into

18   districts together.  And it attempts to do this while still

19   making sure that we comply with the constitutional mandate

20   and the federal law mandates.

21        Wherever possible, we also attempt to keep together

22   jurisdictions and localities, counties, cities, and towns.

23   We try to either keep them intact or, in some cases, reunite

24   counties, cities, or towns that were splintered in previous

25   redistricting plans.

1          In fact, House Bill 5004 splits fewer jurisdictions

2     than the current congressional district lines.  You'll

3     notice in the plan that three counties: the county of

4     Allegheny, the county of Brunswick, and the county of

5     Caroline are reunited into single congressional districts

6     under this plan.  One city, the city of Covington, is also

7     reunited under this plan.

8          Wherever possible, the plan also seeks to preserve

9     existing local communities of interest, and, in some cases,

10    to reunite such communities that may have been fractured in

11    the course of previous reapportionment plans, most notably,

12    Reston in northern Virginia.

13         The district boundary lines were drawn based in part

14    on specific and detailed recommendations that were provided

15    by each of the 11 current members of the United States

16    Congress in the Virginia delegation.  Both Republican and

17    Democrat members provided specific detailed and significant

18    input in recommendations to how best to draw the lines for

19    their districts.

20         The boundaries of the current districts seek to

21    preserve local communities of interest based on these

22    recommendations and given the need to expand or contract the

23    districts to meet the 727,365 person benchmark population.

24         I have personally spoken with each member of the

25    Virginia congressional delegation, both Republican and

1   Democrat, and they have each confirmed for me and assured me

2   that the lines for their congressional district as they

3   appear in this legislation conform to the recommendations

4   that they provided.  And they have each confirmed for me

5   that they support the lines of their congressional district

6   as it is drawn in House Bill 5004.

7          And, accordingly, that's why we drew the lines this

8   way was to, to the greatest degree possible, conform with

9   the United States Constitution and federal law and pursuant

10  to the significant population shifts over the last ten

11  years, to respect the core of the existing congressional

12  district boundaries with the least amount of disruption in

13  the continuity of representation on the part of the

14  constituents of these districts.

15         Prior to answering any questions that the members

16  may have, I do have a technical amendment, and at the

17  appropriate time, I'd like to offer the technical amendment

18  to correct the problem with one of the precincts.  I can

19  speak to the amendment when that's at the appropriate time,

20  Mr. Speaker.

21         MR. SPEAKER:  Clerk will record a floor amendment.

22         THE CLERK:  Yes, Mr. Speaker, floor amendments to

23  House Bill 5004 offered by Delegate Janis.  Mr. Speaker,

24  there are three.

25         Amendment 1, line 66, after "precincts," strike the

1           MR. SPEAKER:  Gentleman yield?

2           MR. JANIS:  I yield.

3           MR. SPEAKER:  Gentleman yields.

4           MR. ARMSTRONG:  Can the gentleman tell me what

5    voting performance analysis that he conducted of the various

6    congressional districts, particularly with regard to

7    minority participation in the development of House Bill

8    5004.

9           MR. JANIS:  I would say to the gentleman that one of

10   the paramount concerns in the drafting of the bill was the

11   constitutional and federal law mandate under the Voting

12   Rights Act that we not retrogress minority voting influence

13   in the 3rd Congressional District.

14          And so we looked at the census data as to the

15   current percentage of voting age African-American population

16   in the 3rd Congressional District and what that percentage

17   would be in the proposed lines to ensure that the new lines

18   that were drawn for the 3rd Congressional District would not

19   retrogress in the sense that they would not have less

20   percentage of voting age African-American population under

21   the proposed lines in 5004 than exist under the current

22   lines under the current congressional district.

23          MR. ARMSTRONG:  Would the gentleman yield for an

24   additional question, Mr. Speaker?

25          MR. SPEAKER:  Will the gentleman yield?

1            MR. JANIS:  I yield.

2            MR. SPEAKER:  Gentleman yields.

3            MR. ARMSTRONG:  Can the gentleman tell me then what

4    effective minority voting participation percentage is found

5    in the 3rd Congressional District since this analysis was

6    done?

7            MR. JANIS:  I've got the number here, and I've got a

8    -- if the gentleman will indulge me for a moment, I'll find

9    the number, the percentage.

10           I would say to the gentleman that, based on the

11   information from the Census Bureau as a result of the 2010

12   census, under the current lines, boundary lines, for the 3rd

13   Congressional District, there are 52.62 percent voting age

14   population that is African-American under the current lines

15   of the 3rd Congressional District.  Under the lines that are

16   proposed in House Bill 5004, the voting age population

17   African-American for the 3rd Congressional District would be

18   55.9 percent.

19           MR. ARMSTRONG:  Would the gentleman yield for an

20   additional question?

21           MR. SPEAKER:  Gentleman yield?

22           MR. JANIS:  I yield.

23           MR. SPEAKER:  Gentleman yields.

24           MR. ARMSTRONG:  Would the gentleman agree with me

25   that the current case law that is available in interpreting

1    the Voting Rights Act indicates that it is necessary to

2    conduct an analysis of more than just the percentage of

3    minority representation.  That in order to determine whether

4    or not the minority population in a given district is able

5    to elect its candidate of choice, that an analysis of the

6    historic voting patterns of that minority be conducted?

7              MR. JANIS:  I would say to the gentleman that I've

8    been advised by lawyers who practice election law -- that is

9    not an area of the law that I practice -- and also been

10   consulting with lawyers who have looked at the lines as they

11   are drawn in this plan, and they believe that these lines as

12   they are drawn are constitutionally permissible and comply

13   with all federal mandates under existing federal law and are

14   defensible either through the Justice Department review or

15   through any litigation that might result.  That these lines

16   are constitutionally permissible and conform to all mandates

17   of federal law.

18             MR. ARMSTRONG:  Would the gentleman yield for an

19   additional question, Mr. Speaker?

20             MR. SPEAKER:  Will the gentleman yield?

21             MR. JANIS:  I yield.

22             MR. SPEAKER:  Gentleman yields.

23             MR. ARMSTRONG:  While I appreciate the gentleman's

24   opinion that the plan complies with the Voting Rights Act,

25   my question is whether or not an analysis was done to

1   determine whether or not the minority population of the 3rd

2   Congressional District, or what percentage it would take for

3   that minority population to elect its candidate of choice.

4   It is, was an analysis of that particular voting district

5   and others conducted by him or others in the majority party

6   in the development of House Bill 5004?

7           MR. JANIS:  And I would say to the gentleman that

8   the lines for House Bill 5004 were the product of

9   recommendations received from all 11 congressmen, including

10  Congressman Scott in the 3rd Congressional District and

11  based on the census data that came from the Census Bureau

12  and took into consideration very specifically the Census

13  Bureau data about the -- which indicates the current

14  percentage of voting age population of African-Americans

15  within 3rd Congressional District lines and also took as

16  part of the analysis what the voting age population of

17  African-Americans would be under the proposed lines.

18          MR. ARMSTRONG:  Would the gentleman yield for an

19  additional question?

20          MR. SPEAKER:  Will the gentleman yield?

21          MR. JANIS:  I yield.

22          MR. SPEAKER:  Gentleman yields.

23          MR. ARMSTRONG:  What I did not hear is that an

24  analysis of the means that I suggested was conducted.  Would

25  the gentleman agree with me that that analysis was not done?

1          MR. JANIS:  I would say to the gentleman that I

2    described the method that we used in the analysis the we did

3    of the data that we received from the Census Bureau and that

4    it was -- we took into account population shifts, which

5    required the 3rd Congressional District to gain in

6    population by approximately 63,975 residents in order to

7    meet the 727,365 ideal congressional district benchmark.

8    And also took into consideration the population data from

9    the Census Bureau, specifically the population data

10   involving voting age African- American population.

11         MR. ARMSTRONG:  Would the gentleman yield for an

12   additional question?

13         MR. SPEAKER:  Will the gentleman yield?

14         MR. JANIS:  I yield.

15         MR. SPEAKER:  Gentleman yields.

16         MR. ARMSTRONG:  Can the gentleman identify who he

17   was referring to when he used the pronoun "we"?

18         MR. JANIS:  What I will say is this is my

19   legislation.  I looked at this legislation.  I looked at the

20   data.  We looked at the recommendations of the congressional

21   district.  We tried to reconcile sometimes competing

22   recommendations from various congressional members.  We

23   looked at the data from the Census Bureau.

24         We were very -- I was most especially focused on

25   making sure that the 3rd Congressional District did not

1    retrogress in its minority voting influence.  These lines as

2    they appear in 5004, in my opinion, meet the criteria that's

3    mandated by the Justice Department.

4            MR. ARMSTRONG:  Would the gentleman yield for an

5    additional question?

6            MR. SPEAKER:  Will the gentleman yield?

7            MR. JANIS:  I yield.

8            MR. SPEAKER:  Gentleman yields.

9            MR. ARMSTRONG:  I would ask the gentleman -- I would

10   first -- the type of analysis that I've described in my

11   previous several questions, I would -- I think I previously

12   used the term "retrogression analysis," and I'm going to ask

13   the gentleman to assume that that's what I mean when I say

14   an analysis to determine whether or not a minority

15   population in a given district is able to elect its

16   candidate of choice.

17           Having defined the term, I would ask the gentleman

18   whether anyone outside of the Division of Legislative

19   Services conducted such retrogression analysis in the

20   preparation of House Bill 5004.

21           MR. JANIS:  I'm not aware of anyone outside of

22   legislative services that conducted any analysis.

23           MR. ARMSTRONG:  Would the gentleman yield for an

24   additional question?

25           MR. SPEAKER:  Will the gentleman yield?

 1           MR. JANIS:  I yield.

 2           MR. SPEAKER:  Gentleman yields.

 3           MR. ARMSTRONG:  I would ask the gentleman whether

 4    the Division of Legislative Services conducted the type of

 5    retrogression analysis that I've described?

 6           MR. JANIS:  I would say to the gentleman that the

 7    lines are drawn based on the Census Bureau data, which

 8    provides what the voting age African-American population

 9    under the current district boundaries would be, which is

10    52.62 percent based on the 2010 census.

11           And it indicates -- this data indicates that under

12    the proposed lines, that the voting age African-American

13    population in the 3rd Congressional District would be 55.9

14    percent.  This represents a 3.28 percent difference.

15           And that -- based on my understanding of what

16    federal law requires under the Voting Rights Act, that this

17    does not retrogress the district and therefore is acceptable

18    under the Voting Rights Act and complies with the mandate of

19    both the Voting Rights Act and all the constitutional case

20    law regarding what the mandate would be to ensure that there

21    be no retrogression in minority voter influence in the 3rd

22    Congressional District.

23           MR. ARMSTRONG:  Would the gentleman yield for an

24    additional question?

25           MR. SPEAKER:  Will the gentleman yield?

Page 17

1           MR. JANIS:  I yield.

2           MR. SPEAKER:  Gentleman yields.

3           MR. ARMSTRONG:  The gentleman has already enunciated

4    that he believes that the Voting Rights Act would -- has

5    jurisdiction over the reapportioning of congressional

6    district lines; is that correct?

7           MR. JANIS:  That's correct.

8           MR. ARMSTRONG:  Would the gentleman yield for an

9    additional question?

10          MR. SPEAKER:  Will the gentleman yield?

11          MR. JANIS:  I yield.

12          MR. SPEAKER:  Gentleman yields.

13          MR. ARMSTRONG:  Would the gentleman also agree that

14   under Article 1, Section 2 of the United States Constitution

15   and various other relevant case law, including Cartro

16   (phonetic) versus Daggett that the gentleman has described

17   that essentially we have virtually a 0 percent deviation, or

18   I think a one-person deviation in each of the congressional

19   districts; is that correct?

20          MR. JANIS:  And I would say to the gentleman, I'm

21   familiar with Cartro v. Daggett, which is the Supreme Court

22   case that requires us to do one-person-one-vote and Bossier

23   Parish v. United States, which interprets that to mean that

24   there can be a one person deviation from one district to the

25   next.  Meaning that each one of these districts must be

1   drawn based on the census data from 2010 with no fewer of

2   727,365 residents and no more than 727,366 residents.

3          MR. ARMSTRONG:  Would the gentleman yield for an

4   additional question, Mr. Speaker?

5          MR. SPEAKER:  Will the gentleman yield?

6          MR. JANIS:  I yield.

7          MR. SPEAKER:  Gentleman yields.

8          MR. ARMSTRONG:  I would ask the gentleman that

9   besides the Voting Rights Act and the one-person-one-vote

10  criteria he has just enunciated, can the gentleman explain

11  to me what other criteria were used -- and I would preface

12  my question by saying that in the preparation of the House

13  redistricting plan, there was criteria developed by the

14  House P&E committee that were similar criteria developed

15  above and beyond the Voting Rights Act and the

16  one-person-one-vote rule established in Karcher.

17         MR. JANIS:  And I would say to the gentleman that

18  the criteria we tried to apply were in part -- some of the

19  criteria were mandatory -- most of the criteria were

20  mandatory.  Some of the criteria were permissive.

21         The first criteria that we applied was, it had to

22  comply with all mandates of the United States Constitution

23  and the Constitution of Virginia, most especially it must

24  comply with the one-person-one-vote rule as interpreted by

25  appropriate case law, Karcher v. Daggett, Bossier Parish,

Page 19

1   and so forth.

2          Second, that it was drawn to conform with all

3   mandates of federal law, and most notably the Voting Rights

4   Act and most specifically, that it follow a zero-variance

5   rule, which is the 727,365 rule, and also that there be no

6   retrogression in the minority voter influence in the 3rd

7   Congressional District.

8          Those are the mandatory criteria that are not

9   permissive, that there is no discretion in the application

10  of those.

11         Then, consistent with those criteria and the 2010

12  census data that mandated significant shifts in population

13  between the various congressional districts, the third

14  criteria that we tried to apply was, to the greatest degree

15  possible, we tried to respect the will of the Virginia

16  electorate as it was expressed in the November 2010

17  congressional elections.

18         And what that meant was we based the territory of

19  each of these districts on the core of the existing

20  congressional districts.  We attempted -- I attempted to not

21  disrupt those lines, to the minimum degree possible,

22  consistent with the need to either expand or contract the

23  territory of these districts.

24         We respected the will of the electorate by not

25  placing -- one of the criteria was not placing two

1    congressmen in a district together.  And one of the criteria

2    was that we would not take the district lines and draw a

3    congressman out of his existing district.

4         The last criteria that we applied that was

5    permissive was, to the greatest degree possible, consistent

6    with the constitutional mandates, the federal law mandates,

7    and the population shifts, we attempted to the greatest

8    degree wherever possible not to split counties, cities, and

9    towns, local jurisdictions, and to reunite wherever possible

10   jurisdictions such as Allegheny County, Brunswick County,

11   Caroline County, and the city of Covington.

12        And then we also tried not to split local

13   communities of interest based on the recommendations we

14   received from the current members of the congressional

15   delegation.

16        MR. ARMSTRONG:  Further question, Mr. Speaker.

17        MR. SPEAKER:  Gentleman yield?

18        MR. JANIS:  I yield.

19        MR. SPEAKER:  Gentleman yields.

20        MR. ARMSTRONG:  Regarding the splitting of

21   jurisdictions, the gentleman was not particularly successful

22   with Henry County in the 5th Congressional -- 9th

23   Congressional District, was he?

24        MR. JANIS:  I would say to the gentleman that the

25   plan as it appears, the lines as they appear in House Bill

1   Virginia and the Voting Rights Act as well as the zero

2   variance rule, which is required under federal case law in

3   this matter, to ensure that the 3rd Congressional District

4   did not retrogress in its minority voting influence.

5          MR. ARMSTRONG:  Further question, Mr. Speaker?

6          MR. SPEAKER:  Will the gentleman yield?

7          MR. JANIS:  I yield.

8          MR. SPEAKER:  Gentleman yields.

9          MR. ARMSTRONG:  So the answer to my question is no.

10         MR. JANIS:  I think I've answered the gentleman's

11  question.  What we tried to do is not retrogress the 3rd

12  Congressional District.

13         MR. ARMSTRONG:  Would the gentleman yield for an

14  additional question, Mr. Speaker?

15         MR. SPEAKER:  Will the gentleman yield?

16         MR. JANIS:  I yield.

17         MR. SPEAKER:  Gentleman yields.

18         MR. ARMSTRONG:  The gentleman is certainly entitled

19  not to answer my question if he so chooses, but my question

20  was, was any consideration given to the creation of a

21  minority influence district?

22         I'm extremely aware, because the gentleman has

23  repeated it about six times, regarding the retrogression

24  analysis for the 3rd Congressional District.  I'm asking the

25  gentleman whether or not any consideration whatsoever was

1    given to the creation of a minority influence district?

2         MR. JANIS:  And I've answered the gentleman now

3    seven times that the methodology that we used, the

4    methodology that I used in drawing these lines was that I

5    focused on the 3rd Congressional District and ensuring,

6    based on recommendations that I received from Congressman

7    Scott and from all 11 members of the congressional

8    delegation, Republican and Democrat -- one of the paramount

9    concerns and considerations that was not permissive and

10   nonnegotiable under federal law and under constitutional

11   precedent is that the 3rd Congressional District not

12   retrogress in minority voter influence.

13        And that's how the lines were drawn, and that was

14   the primary focus of how the lines in House Bill 5004 were

15   drawn was to ensure that there be no retrogression in the

16   3rd Congressional District.  Because if that occurred, the

17   plan would be unlikely to survive a challenge either through

18   the Justice Department or the courts because it would not

19   comply with the constitutionally mandated requirement that

20   there be no retrogression in the minority voting influence

21   in the 3rd Congressional District.

22        MR. ARMSTRONG:  Would the gentleman yield for an

23   additional question?

24        MR. SPEAKER:  Will the gentleman yield?

25        MR. JANIS:  I yield.

Page 50

1                    C E R T I F I C A T E

2

3          STATE OF WASHINGTON      )

4                                   )

5          COUNTY OF KING           )

6

7              I, the undersigned, under my commission as a

8    Notary Public in and for the State of Washington, do hereby

9    certify that the foregoing audiotape, videotape, and/or

10   hearing was transcribed under my direction as a

11   transcriptionist; and that the transcript is true and

12   accurate to the best of my knowledge and ability; and that I

13   am not a relative or employee or any attorney or counsel

14   employed by the parties hereto, nor financially interested

15   in its outcome.

16             IN WITNESS WHEREOF, I have hereunto set my hand

17   and seal this 9th day of April, 2014.

18

19        _____
          Grace Hitchman,   CET-663
20        In and for the State of Washington,
          residing at Seattle.
21        Commission expires April 27, 2016

22

23

24

25

# INTERVENOR-DEFENDANTS' TRIAL EXHIBIT NO. 18

# The Committee On Privileges and Elections Hearing Transcript

1

IN THE MATTER OF

THE COMMITTEE ON PRIVILEGES AND ELECTIONS


Notice of Public Meeting for House Bill No. 5004

Amendment in the Nature of a Substitute

_____


BEFORE:   JANET HOWELL, CHAIRPERSON

PLACE:    COMMONWEALTH OF VIRGINIA

          VIRGINIA STATE CAPITOL

          CAPITOL SQUARE

          EAST GRACE STREET

          RICHMOND, VIRGINIA  23219

DATE:     APRIL 12, 2011

REPORTER: LANIEDA D. BRIGGS, CSR and Notary Public.

PANEL:    JANET HOWELL, 32nd Senate District

          STEPHEN MARTIN, 11th Senate District

          R. CREIGH DEEDS, 25th Senate District

          MARY MARGARET WHIPPLE, 31st Senate

               District

          PHILLIP P. PUCKETT, 38th Senate District

          JOHN S. EDWARDS, 21st Senate District

          DONALD A. MCEACHIN, 9th Senate District

          CHAP PETERSEN, 34th Senate District

PANEL MEMBERS Continued:

Crane-Snead & Associates, Inc.

14

1    I didn't ask as to whether or not if any of them

2    supported the plan in its totality.

3              SENATOR DEEDS:  Did you speak with anyone

4    who plans to run against those incumbents as to what

5    their position was as to this plan?

6              DELEGATE JANIS:  No, I didn't.

7              SENATOR DEEDS:  Do you have any knowledge

8    as to how this plan improves the partisan

9    performance of those incumbents in their own

10   district?

11             DELEGATE JANIS:  I haven't looked at the

12   partisan performance.  It was not one of the factors

13   that I considered in the drawing of the district.

14             MADAM CHAIR:  Senator Petersen.

15             SENATOR PETERSEN:  Further question.  The

16   plan we have before us, was that plan presented to

17   you or is this something that you put together

18   yourself?

19             DELEGATE JANIS:  The plan is my piece of

20   legislation.

21             MADAM CHAIR:  Senator Petersen.

22             SENATOR PETERSEN:  That's not quite my

23   question, delegate.  Did someone else present this

24   plan to you?

25             DELEGATE JANIS:  I had assistance in