**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**



DAWN CURRY PAGE, <u>et al.</u>,

    Plaintiffs,

v.                                        Civil Action No. 3:13cv678

VIRGINIA STATE BOARD
OF ELECTIONS, <u>et al.</u>,

    Defendants.

### MEMORANDUM OPINION

This matter is before the Court on the non-party Christopher Marston's MOTION TO QUASH SUBPOENAS TO ROBERT B. BELL, WILLIAM ROBERT JANIS, AND CHRISTOPHER MARSTON AND/OR FOR A PROTECTIVE ORDER, Docket No. 61. For the reasons set forth below, the Motion will be denied in part.

### BACKGROUND

Dawn Curry Page, Gloria Personhuballah, and James Farkas ("Plaintiffs") filed this action against Virginia State Board of Elections, Don Palmer, Kimberly Bowers, Charlie Judd, and Kenneth Cuccinelli II, ("Defendants")[1] alleging that the Plaintiffs' rights under the Equal Protection Clause of the

---

[1] Palmer, Bowers, and Judd were sued in their official capacities as members of the Virginia State Board of Elections. Cuccinelli was sued in his official capacity as the Attorney General of Virginia.

United States Constitution were violated by the racial gerrymander of Virginia Congressional District 3 during the 2011-12 redistricting cycle.   The Plaintiffs' request for hearing by a three-judge court pursuant to 28 U.S.C. § 2284(a) was granted by the Chief Judge of the United States Court of Appeals for the Fourth Circuit.

Kenneth Cuccinelli II (then the Attorney General of Virginia) and the Virginia State Board of Elections have been dismissed from this case by consent of the parties.   Virginia's Republican Congressional delegation filed an unopposed motion to intervene as defendants. After the Court denied motions for summary judgment submitted by the Defendants and the Intervenor Defendants, Dawn Curry Page withdrew as a plaintiff upon consent of the parties.

The pending motion was originally filed by non-parties Robert B. Bell, William Robert Janis, and Christopher Marston, in response to a series of subpoenas issued by the Plaintiffs. Bell and Janis were members of the Virginia House of Delegates at the time of the redistricting.   They were subpoenaed to give depositions, but Plaintiffs have since withdrawn the subpoenas, and Janis and Bell are no longer parties to this motion. From Marston, the Plaintiffs sought documents pertaining to the redistricting process. Marston has refused to produce those documents, claiming that the attorney-client privilege and the

legislative privilege protect them from disclosure. The Court has completed an in camera review of the documents Marston claims to be protected by the attorney-client privilege and has upheld some claims of privilege while rejecting others. See Docket No. 90. Accordingly, this opinion will address only Marston's assertion of a legislative privilege.

In his declaration, Marston avers that, during the relevant time period, he "was Executive Director of and Counsel to the Virginia House Republican Caucus," but that he "was paid as an independent contractor by the House Republican Campaign Committee." The parties agree that the membership of the Caucus and the Campaign Committee is the same. However, at oral argument, counsel for Marston acknowledged that, notwithstanding the overlap in membership, the organizations are distinctly different. The Caucus functions within the confines of the House of Delegates, whereas the Campaign Committee serves a political function, helping Republican delegates to be elected or re-elected.

Marston also avers that, while he served as "legal counsel to the Speaker of the Virginia House of Delegates and the Virginia House Republican Caucus," he "also worked in a legislative capacity for the Republican members of the Virginia House of Delegates." His job in the latter capacity was coordinating communications and legislative strategy. Marston

asserts that there were four staff members, but that, in his consulting capacity, he "effectively was lead staff for the redistricting efforts of the Virginia House of Delegates."

In his role of consultant, Marston "participated in crafting redistricting legislation; coordinating and gathering analysis of data and information from which redistricting legislation was introduced; assisted members of the House of Delegates in holding hearings on redistricting; assisted in preparing statements to members about redistricting; advised members and their staff regarding strategy for passage of redistricting legislation; and regularly engaged in frank discussions with members concerning the creation, evolution, and passage of redistricting legislation." Marston recites that, when performing those responsibilities, he "was a consultant due to the manner in which [he] was compensated."

## DISCUSSION

Testimonial and evidentiary privileges exist against the backdrop of the general principle that all reasonable and reliable measures should be employed to ascertain the truth of a disputed matter. Privileges are therefore strictly construed and accepted only where the public good associated with the exclusion of relevant evidence overrides the general principle in favor of admission. Trammel v. United States, 445 U.S. 40, 50

4

(1980). See also Herbert v. Lando, 441 U.S. 153, 175 (1979) ("Evidentiary privileges in litigation are not favored"). "A party asserting privilege has the burden of demonstrating its applicability." N.L.R.B. v. Interbake Foods, LLC, 637 F.3d 492, 501 (4th Cir. 2011). A conclusory assertion of privilege is insufficient to establish a privilege's applicability to a particular document; thus, the proponent of a privilege must "demonstrate specific facts showing that the communications were privileged." RLI Ins. Co. v. Conseco, Inc., 477 F. Supp. 2d 741, 751 (E.D. Va. 2007).

"Legislative privilege clearly falls within the category of accepted evidentiary privileges." E.E.O.C. v. Wash. Suburban Sanitary Comm'n, 631 F.3d 174, 180 (4th Cir. 2011). The privilege is rooted in the absolute immunity granted to federal legislators by the Speech or Debate Clause of the United States Constitution and exists to safeguard that immunity. Id. at 180-181. In Tenney v. Brandhove, the Supreme Court of the United States found that the Speech or Debate Clause was part of a broader common law "tradition [of legislative privilege] . . . well grounded in history" and extended the benefit of that tradition (though not the Speech or Debate Clause itself) to state legislators. 341 U.S. 367, 372-76 (1951). See also United States v. Johnson, 383 U.S. at 169, 180 (1966). The privilege "covers all those properly acting in a legislative capacity, not

5

just actual officeholders." Wash. Suburban Sanitary Comm'n, 631 F.3d at 181 (citing Supreme Ct. of Va. v. Consumers Union of U.S., Inc., 446 U.S. 719, 731-34 (1980)).

## 1.  Eligibility for the Legislative Privilege

The parties do not contest the existence of a legislative privilege.  However, they sharply dispute whether Marston or the documents that were subpoenaed are protected by the privilege.

Marston relies on McCray v. Md. Dep't of Transp., Md. Transit Admin., 741 F.3d 480, 484 (4th Cir. 2014) and Doe v. McMillan, 412 U.S. 306, 312 (1973), to support the proposition that, as an independently contracted legislative consultant, he is covered by the same privilege as elected legislators. But in both cases, the extension of the legislative immunity or privilege was circumscribed by the specific nature of the consultant's duties. In Doe v. McMillan, an action was brought directly against, among others, legislators, legislative committee staff, a committee investigator, and a committee consultant. 412 U.S. at 309. The Supreme Court of the United States held that the suit against the parties was barred by the Speech or Debate Clause, but only insofar as it sought relief "for introducing materials at Committee hearings that identified particular individuals, for referring the Report that included the material to the Speaker of the House, and for voting for publication of the report." Id. at 312.  In reaching that

decision, the Court held that those activities were "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings." Id. at 314 (quoting Gravel v. United States, 408 U.S. 606, 625 (1972)). For that reason, the legislative immunity created by the Speech or Debate Clause foreclosed litigation over those activities. But the activities described in McMillan are quite unlike the consulting activities for which Marston claims the privilege. Nor does McMillan announce, or even suggest, the blanket extension of legislative privilege or immunity to legislative consultants that Marston urges.[2]

McCray is perhaps even less helpful to Marston's position. In McCray, the Fourth Circuit commented favorably on the concept of extending legislative privilege to government agency officials who gave counsel to executive officials tasked with carrying out legislative budget cuts. 741 F.3d at 484-85. But, the Court of Appeals also reversed the trial court's application of that privilege because the plaintiff's complaint alleged discriminatory actions by agency officials that predated any legislative action. Id. at 485-86. In light of that remand and the observation that, "McCray's lawsuit has not yet implicated

---

[2] Indeed, McMillan appears to involve a consultant who was directly retained and compensated by a legislative committee. This would make him much more like a legislative aide than a consultant who receives payment from a partisan political group.

legislative immunity," id. at 487, the Fourth Circuit's comments about the application of legislative privilege to non-legislators must necessarily be considered dicta. Moreover, those claiming the privilege were government agency officials, not a consultant who was employed by a partisan political committee.

In their opposition, the Plaintiffs argue that "non-legislators must be 'properly acting in a legislative capacity' before they can seek to assert legislative privilege." Opp. at 8 (quoting Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md., 684 F.3d 462, 470 (4th Cir. 2012)). The Plaintiffs have cited a pair of out-of-Circuit cases to bolster their argument that independent contractors should not have the benefit of legislative privilege. First, they rely on Rodriguez v. Pataki, 280 F. Supp. 2d 89, aff'd, 293 F. Supp. 2d 302 (S.D.N.Y. 2003), wherein a magistrate judge ordered the production of documents from an advisory task force on redistricting. Notwithstanding that the advisory committee had been created by statute to provide technical assistance to the New York legislature and had been given all the powers of a legislative committee, the court ruled that the presence of non-legislators on the task force foreclosed use of the legislative

privilege by any of the members of the task force.[3] 280 F. Supp. 2d at 101-103. This decision appears to have been influenced by another district court decision, Florida Ass'n of Rehab. Facs. v. State of Fla. Dep't of Health & Rehab. Servs., 164 F.R.D. 257 (N.D. Fla. 1995), which favored legislative privilege for the personal staff of individual legislators but disfavored extension of the privilege to legislative employees who provided information to the collective legislature. See 164 F.R.D. at 267; Rodriguez, 280 F. Supp. 2d at 101 (citing Florida Ass'n and providing a parenthetical explanation of its reasoning). The Rodriguez court concluded that "the legislatively-mandated structure of [the advisory committee] makes its working more akin to a conversation between legislators and knowledgeable outsiders, such as lobbyists, to mark up legislation – a session for which no one could seriously claim privilege." 280 F. Supp. 2d at 101.

In the other cited case, Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elecs., Case No. 11C5065, 2011 WL 4837508 (N.D. Ill. Oct. 12, 2011) the court held that legislative privilege did not apply to "[c]ommunications between [state legislators] and outsiders to the legislative process . . .

---

[3] This decision speaks to both the scope of the privilege and the issue of waiver; the non-legislators were not within the scope of the privilege, and therefore the legislators had effectively waived the privilege by disclosing the documents to third parties outside the scope of the privilege.

includ[ing] lobbyists, members of Congress and the Democratic Congressional Campaign Committee." Id. at *10. The same holding was applied to "experts and/or consultants retained or utilized by [legislators] to assist in the redistricting process." Id. The Court expressed a concern that "[a] contrary ruling would allow a legislator to cloak any communication with legislative privilege by simply retaining an outsider in some capacity." Id. (quoting ACORN v. County of Nassau, Case No. 05-2301, 2007 WL 2815810, at *6 (E.D.N.Y. Sept. 25, 2007) (describing discussions between legislators and consultants before the consultants issued a report as "more like conversations between legislators and knowledgeable outsiders" and holding that such discussions are discoverable)).

In sum, none of the decisions cited by the parties addresses a circumstance such as that presented here by Marston's affidavit which sets out the details about his relationship with the Virginia General Assembly. Docket No. 84, Exh. A. There, Marston says that he was employed full-time as the "Executive Director of and Counsel to the Virginia House Republican Caucus" during the period relevant to this litigation. Id. at ¶ 3. He describes himself as "work[ing] in a legislative capacity for the Republican members of the Virginia House of Delegates, coordinating communications and legislative strategy." Id. at ¶ 5. However, Marston acknowledges that he

10

"was paid as an independent contractor by the House Republican
Campaign Committee." Nonetheless, he seeks the benefit of the
legislative privilege because, in his words, "I effectively was
lead staff for the redistricting efforts of the Virginia House
of Delegates." Id. at ¶¶ 9-12. Marston's position is that these
facts make his status equivalent to a legislative aide in
Virginia's General Assembly.

However, as the Plaintiffs have pointed out, the Virginia
Code specifically identifies the personnel that can be employed
by individual legislators and standing legislative committees in
the General Assembly, and the Code also specifies the procedures
for appropriating the funds to compensate those staff members.
See Va. Code Ann. § 30-10.4. The Code does not authorize
individual General Assembly members to employ consultants,
contractors, or counsel or consultants for the party caucuses,
an omission that the Court must regard as significant under the
legislative interpretative rule of expressio unius. Cf.
Commonwealth v. Brown, 259 Va. 697, 704-05, 529 S.E.2d 96, 100
(2000). And, while the statute might conceivably permit a
consultant to be retained by a standing legislative committee as
"other staff personnel," Marston has neither claimed nor
demonstrated that he was retained by such a committee.

11

Even more telling is Va. Code Ann. § 30-19.20, which reads:

> The House of Delegates and the Senate and
> the clerks thereof are authorized to employ
> such personnel as may be deemed necessary
> for the efficient operation of the General
> Assembly as prescribed by the rules or
> resolutions of the respective houses. The
> House of Delegates and the Senate shall by
> resolution   or   resolutions   set   the
> compensation of the personnel employed by
> each house, and the personnel shall be paid
> from the contingent fund of each house,
> respectively.

This statutory provision invites the House of Delegates and Senate to identify any personnel "deemed necessary for the efficient operation of the General Assembly," and then allows compensation of those personnel through legislative action and the contingent fund of the legislative house that employs the particular staff member. As a matter of simple logic, then, a decision not to pay an individual from the contingent fund of either house is tantamount to an acknowledgement that the individual in question is not "necessary to the efficient operation of the General Assembly" and therefore not a staff member of the General Assembly.

Precedent demands that, under certain circumstances, formal staff members should be treated as the functional equivalent of legislators for the purpose of legislative immunity and legislative privilege. That is because "[t]he day-to-day work of such aides is so critical to the Members' performance that

12

they must be treated as the latter's alter egos." <u>Gravel v. United States</u>, 408 U.S. 606, 616-617 (1972). Even then, there is some reason to question whether committee or general legislative staff members should receive the same deference as staff members who work exclusively for a particular legislator. <u>See</u> <u>Florida Ass'n of Rehab. Facs. v. State of Fla. Dep't of Health & Rehab. Servs.</u>, 164 F.R.D. 257, 267 (N.D. Fla. 1995).

Marston asks the Court to automatically treat the functional equivalent of an Assembly-wide staff member as the functional equivalent of an individual legislator, and that is a bridge too far. When state statute specifically provides a structure for the retention of aides and assistants by individual legislators and standing committees, and even provides a mechanism for the retention of at-large legislative assistants where "necessary to the efficient operation of the General Assembly," a legislative consultant and independent contractor paid by a political group, the House Republican Campaign Committee, has no grounds to claim that he is so critical to the performance of the legislature that he should be treated as a legislative alter ego and extended the benefit of legislative privilege.[4]   To hold otherwise would be to ignore the

---

[4] It is not necessary to reach the question whether Marston would have been covered by the legislative privilege if he had been formally retained by the General Assembly or one of its committees (as opposed to retention by an individual legislator

structural limits imposed by Virginia law. Those limits serve to identify those whose work is sufficiently important to the functioning of the General Assembly that they are "an integral part of the deliberative and communicative process" by which legislators participate in legislative proceedings. Gravel v. United States, 406 U.S. at 625. And, it is those people who are encompassed by the legislative privilege.

Moreover, a requirement that a legislative assistant or aide be directly employed and paid by an individual legislator, a legislative committee, or the legislature as a whole provides a sensible and defensible bulwark against excessive use of the legislative privilege. It prevents legislators from enveloping lobbyists and outside experts in a cloak of invisibility, while permitting state legislatures the freedom to make their own decisions about what staff members are sufficiently important to be formally retained by the state government and thus be eligible for the privilege. And, indeed, that is a salutary result of applying the Virginia statutes to determine Marston's status.

For the foregoing reasons, the Court finds that Marston is not eligible to receive the benefit of legislative privilege.

---

capable of asserting the privilege). For the purposes of this case, it is enough to say that the informal nature of Marston's retention prevents him from receiving the privilege.

## 2.   Balancing of the Legislative Interests

Even if it is assumed that Marston is entitled to legislative privilege, it would be necessary to determine whether the privilege forecloses the document discovery sought by the Plaintiffs' subpoenas. As the Fourth Circuit has held, the legislative privilege "falls within the category of accepted evidentiary privileges," E.E.O.C. v. Wash. Suburban Sanitary Comm'n, 631 F.3d 174, 180 (4th Cir. 2011). And, the "legislative privilege is one of non-evidentiary use of legislative acts against a legislator, not one of non-disclosure." E.E.O.C. v. Wash. Suburban Sanitary Comm'n, 666 F. Supp. 2d 526, 532 (D. Md. 2009), aff'd 631 F.3d 174 (4th Cir. 2011) (citing In re Grand Jury, 821 F.2d 946, 958 (3d Cir. 1987)). Thus, here as in Wash. Suburban Sanitary Comm'n, the argument that legislative privilege is an impenetrable shield that completely insulates any disclosure of documents" is not tenable. Id.

The teaching of Marylanders for Fair Representation, Inc. v. Schaefer, 144 F.R.D. 292 (D. Md. 1992), wherein a three judge court was confronted with a challenge to legislative redistricting, is instructive here:

> Legislative redistricting is a sui generis process. While it is an exercise of legislative power, it is not a routine exercise of that power. The enactment of statutes ordinarily involves the implication of public policy by a duly constituted legislative body. Redistricting involves the

15

>establishment of the electoral structure by
>which the legislative body becomes duly
>constituted.    Inevitably,    it    directly
>involves   the   self-interest   of   the
>legislators themselves.

Id. at 304 (Murnaghan & Motz, JJ., concurring). That significant

difference prompted the court to require a flexible approach to

resolving discovery objections based on legislative privilege.

In   assessing   the   applicability   of   the   legislative

privilege, it is necessary to remember that the privilege is an

outgrowth of the doctrine of legislative immunity because the

privilege was thought necessary to effectuate the immunity.

E.E.O.C. v. Wash. Suburban Sanitary Comm'n, 631 F.3d at 181.

That  immunity,  held  the  court  in  Marylanders  for  Fair

Representation, "does not however, necessarily prohibit judicial

inquiry into legislative motive where the challenged legislative

action is alleged to have violated an overriding, free-standing

public policy." Marylanders for Fair Representation v. Schaefer,

144 F.R.D at 304 (Murnaghan & Motz, JJ., concurring) (citing

Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429

U.S. 252, 268 (1977)). With that precept in mind, the court

permitted discovery of the non-legislators on the Governor's

Redistricting Advisory Committee.[5] Here, there is an overriding,

---

[5] The court actually permitted depositions to be taken. It is not
necessary to reach that issue in this case because no deposition
of Marston is sought. The only thing required is document
disclosure.

free-standing public policy reflected in the Equal Protection Clause of the federal Constitution and the Voting Rights Act. Both parties have placed squarely into issue the legislative motive in enacting the redistricting legislation. Applying the principles announced in Marylanders for Fair Representation, it is, therefore, appropriate to permit the discovery of documents from a non-legislator that are demanded in the subpoena.

Other courts have used a more fact-intensive set of factors to balance the interests in deciding whether the legislative privilege applies to a given redistricting case. The analysis is somewhat less flexible than the one heralded by Marylanders for Fair Representation, but the essential factors as applied in this case provide added justification for disclosure of the documents sought by the Plaintiffs' subpoena.

For example, in determining whether a qualified privilege should be applied when discovery of legislative documents was at issue, the court, in Rodriguez v. Pataki, 280 F. Supp. 2d 89 (S.D.N.Y. 2003), another case involving a Congressional redistricting plan, used a five-factor analysis incorporating: "(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of government in the litigation; and (v) the possibility of future timidity by government employees." Id. at 100-01. Other

17

redistricting decisions have followed suit. See Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elecs., Case No. 11C5065, 2011 WL 4837508, at *7-*10 (N.D. Ill. Oct. 12, 2011) (applying same five factors); Favors v. Cuomo, 285 F.R.D. 187, 217-21 (E.D.N.Y. 2012) (same). Application of those factors to the facts of this case produces results similar to those that come from using the approach to legislative privilege called for by Marylanders for Fair Representation.

### A.  The Relevance of the Evidence and the Role of the Government in the Litigation

The state government's role in the events giving rise to the present litigation is central to the Plaintiffs' claims. The Plaintiffs seek strict scrutiny review of facially neutral redistricting legislation, a standard only triggered "if it can be proved that the law was motivated by a racial purpose or object or if it is unexplainable on grounds other than race." Hunt v. Cromartie, 526 U.S. 541, 546 (1999) (internal citations and quotations omitted). The subjective decision-making process of the legislature is at the core of the Plaintiffs' claims, cf. Favors, 285 F.R.D. at 219-20; Fair and Balanced Map, 2011 WL 4837508, at *8. And, once strict scrutiny has been triggered, "the government has the burden of proving that racial [criteria] 'are narrowly tailored measures that further compelling government interests.'" Johnson v. California, 543 U.S. 499, 505

18

(2005) (quoting <u>Adarand Constructors, Inc. v. Peña</u>, 515 U.S. 200, 227 (1995)). The question of narrow tailoring must also inevitably involve an inquiry into the subjective motivations of the legislature.

Obviously, any documents containing the opinions and subjective beliefs of legislators or their key advisors would be relevant to the broader inquiry into legislative intent and the possibility of racially motivated decisions that were not adequately tailored to a compelling government interest. But even purely factual material can shed light on what factors and considerations were foremost in the legislature's mind while the legislation was pending. Given the centrality of the legislature's motivations and Marston's inability to offer more than a conclusory assertion that "the vast majority" of the documents in dispute "are not, in fact, highly relevant to Plaintiffs' claims,"[6] the Court finds that the Relevance factor and the Role of Government factor weigh in favor of disclosure.

### B.   Availability of Other Evidence

Marston argues that, "in order to establish their case, Plaintiffs 'need not offer direct evidence of discriminatory intent.'" Reply at 6 (quoting <u>Comm. for a Fair and Balanced Map v. Ill. State Bd. of Elecs.</u>, No. 11C5065, 2011 WL 4837508, at *3 (N.D. Ill. Oct. 12, 2011)). He correctly points out that

---

[6] <u>See</u> Reply at 6, Docket No. 84.

plaintiffs are generally entitled to rely on circumstantial factors such as district shape, racial bloc voting, low minority registration, and minority retrogression when litigating redistricting decisions. See id. But, when defendants do not base their entire defense on the absence of race-based motivations, the value of circumstantial evidence is decreased. The Intervenor-Defendants in this action have argued that any race-based redistricting decisions were narrowly tailored to the compelling government interest of compliance with Section 5 of the Voting Rights Act. See Docket No. 44 (Int. Def's Opp. to Motion for Summary Judgment). The circumstantial factors iterated by Marston provide little insight into what the legislature deemed necessary for "compliance" or whether less race-based alternatives were given serious consideration.

Admittedly, the Plaintiffs can obtain and introduce some direct evidence even without the benefit of Marston's documents. For example, they have already signaled their intent to include direct evidence about the views of Delegate Janis, the chief architect of the enacted 2012 redistricting plan. See Plaintiffs' Trial Brief, Docket No. 86, at 3-5. And, they may rely on the previously identified circumstantial evidence. However, the availability of statements made by Janis and that circumstantial evidence does not mean that the Plaintiffs must confine their proof to those statements or to the circumstantial

evidence. The real proof is what was in the contemporaneous record in the redistricting process. Taken as a whole, the Court finds that this factor does not militate against disclosure of the documents in Marston's possession.

### C.   Seriousness of the Claims

The right to vote and the rights conferred by the Equal Protection Clause are of cardinal importance. And, there is no dispute over the seriousness of the Plaintiffs' claims.

As in Fair and Balanced Map, "Plaintiffs raise profound questions about the redistricting process and the viability of the [map produced by that process.]" Fair and Balanced Map, 2011 WL 4837508, at *6. "Additionally, although this [redistricting] suit is not brought on behalf of the United States, there can be no question that it raises serious charges about the fairness and impartiality of some of the central institutions of our state government." Rodriguez v. Pataki, 280 F. Supp. 89, 102 (S.D.N.Y. 2003). The Court finds that the nature of the claims in this action weigh strongly in favor of document disclosure.

### D.   Potential for a Chilling Effect

Finally, it is necessary to consider the potential for "future timidity" within the halls of the legislature that may "inhibit frank and full deliberations" in legislative activity. See Favors, 285 F.R.D. 187, 220. To be sure, the disclosure of communications between an independent contractor who is

21

consulting with a legislative group and the members of that group does not have as a great of a chilling effect as the forced disclosure of deliberations between two legislators. But, any effort to disclose the communications of legislative aides and assistants who are otherwise eligible to claim the legislative privilege on behalf of their employers threatens to impede future deliberations by the legislature. Other courts have taken this threat quite seriously, and have sought to mitigate it. Accordingly, Rodriguez v. Pataki, 280 F. Supp. 2d 89 (S.D.N.Y. 2003), while rejecting the general assertion of legislative privilege, prevented disclosure of "information concerning the actual deliberations of the Legislature." Id. at 102-03. And the majority of the panel in Marylanders for Fair Representation, Inc. v. Schaefer, 144 F.R.D. 292 (D. Md. 1992) permitted the deposition of non-legislators, but only as to actions taken before the redistricting legislation reached the floor of the legislature. Id. at 304-05 (Murnaghan & Motz, JJ., concurring). With an eye towards accounting for the three factors that favor disclosure in this matter, while acknowledging the threat of a legislative chill and the partial availability of other evidence, this Court finds that, even if Marston were eligible to claim the legislative privilege, he would be entitled to withhold only those documents concerning

the actual deliberations of the Legislature once the redistricting legislation had been formally introduced.

### 3. Scope of the Document Production Request

Although Marston has not presented any specific objections to the scope of the document production request appended to the subpoena, it is nonetheless appropriate to examine the scope of the production request closely in order to monitor the discovery process and manage the litigation. Having done so, the Court finds that paragraph 1 is overly broad. The request is thus modified to call for "all maps and draft maps in your possession that were considered in the 2012 Virginia redistricting process, and all communications in your possession about those maps." The request in paragraph 2 is also too broad and is hereby modified to call for "all communications between members of the General Assembly, the staff of the General Assembly, and you [the recipient of the subpoena] that mention the 2012 Virginia redistricting process." The request in paragraph 7 is so broad as to be untenable, and is stricken in its entirety. The requests in paragraphs 3, 4, 5, and 6 are reasonable, are reasonably calculated to lead to the discovery of relevant evidence, and are clearly focused upon the claims and defenses of the parties as presented in their various papers filed with the Court.

## CONCLUSION

For the reasons set forth above, the non-party Christopher Marston's MOTION TO QUASH SUBPOENAS TO ROBERT B. BELL, WILLIAM ROBERT JANIS, AND CHRISTOPHER MARSTON AND/OR FOR A PROTECTIVE ORDER, Docket No. 61, is DENIED IN PART with respect to the assertion of a legislative privilege. Marston shall turn over all documents that are responsive to the demands of subpoena (as modified by the Court) except for those previously identified by the Court as being covered by the attorney-client privilege.

It is so ORDERED.

                              /s/                    REP
                     Robert E. Payne
                     Senior United States District Judge
                     For the Court

Richmond, Virginia
Date:  May _8_, 2014

24