**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| Dawn Curry Page, et al., | |
| Plaintiffs, | Civil Action No. 3:13-CV-678-REP-LO-AKD |
| v. | |
| Virginia State Board of Elections, et al., | |
| Defendants. | |

## PLAINTIFFS' POST-TRIAL BRIEF

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.    ARGUMENT .................................................................................................. 3

    A.    Race Was the Predominant Factor Behind CD3 .................................... 3

        1.    The Enacted Plan's Author Stated that Race Was the Predominant Factor ....................................................................... 4

        2.    The General Assembly Used a Racial Quota to Draw CD3 ...................... 7

        3.    The Senate Criteria Confirm that Race Was the Predominant Factor .................................................................... 11

        4.    CD3's Bizarre Shape Is Evidence of Racial Gerrymandering ................. 12

        5.    CD3's Composition Shows That Race Was the Predominant Factor ...... 14

        6.    CD3 Subordinates Traditional Redistricting Criteria to Race. ................ 16

    B.    Race, Not Party, Was the Predominant Factor Behind CD3 .............................. 22

    C.    Plaintiffs' Alternative Plan Confirms that Race Was the Predominant Factor Behind CD3. ............................................................ 25

    D.    Defendants Have Failed to Show that Enacted CD3 Satisfies Strict Scrutiny ............................................................................. 29

        1.    Defendants Cannot Show that CD3 Serves a Compelling State Interest ................................................................... 30

        2.    CD3 Is Not Narrowly Tailored to Serve Any Compelling Interest ......... 31

    E.    The Court Should Impose an Immediate and Effective Remedy ....................... 34

III.    CONCLUSION ............................................................................................. 35

IV.    APPENDIX .................................................................................................. 36

77257-0011/LEGAL121547196.5

# CASES

*Ala. Legislative Black Caucus v. Alabama*,
-- F. Supp. 2d --, 2013 WL 6925681 (M.D. Al. Dec. 20, 2013) ........................................36, 37

*Ala. Legislative Black Caucus v. Alabama*,
No. 13-895 (U.S. Dec. 20, 2013) ........................................................................................37

*Beer v. United States*,
425 U.S. 130 (1976) ............................................................................................................31

*Bush v. Vera*,
517 U.S. 952 (1996) ..................................................................................................... passim

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989) ..............................................................................................................7

*Clark v. Putnam Cnty.*,
293 F.3d 1261 (11th Cir. 2002) ....................................................................................10, 11

*Cromartie v. Hunt*,
133 F. Supp. 2d 407 (E.D.N.C. 2000), *rev'd sub nom. Easley v. Cromartie*,
532 U.S. 234 (2001) ............................................................................................................25

*Easley v. Cromartie*,
532 U.S. 234 (2001) ................................................................................................25, 26, 29

*ePlus Inc. v. Lawson Software, Inc.*,
946 F. Supp. 2d 503 (E.D. Va. 2013) ..................................................................................36

*Grutter v. Bollinger*,
539 U.S. 306 (2003) ..............................................................................................................7

*Hilton v. Braunskill*,
481 U.S. 770 (1987) ............................................................................................................36

*Landis v. North American, Co.*,
299 U.S. 248 (1936) ............................................................................................................36

*McDaniel v. Mehfoud*,
702 F. Supp. 588 (E.D. Va. 1988) ......................................................................................35

*Miller v. Johnson*,
515 U.S. 900 (1995) ..................................................................................................... passim

*Moon v. Meadows*,
952 F. Supp. 1141 (E.D. Va. 1997), *aff'd*, 521 U.S. 1113 (1997) ................................. passim

77257-0011/LEGAL121547196.5

*Parents Involved in Cmty Schs. v. Seattle Sch. Dist. No. 1*,
   551 U.S. 701 (2007) .............................................................................................30

*Regents of Univ. of Cal. v. Bakke*,
   438 U.S. 265 (1978) (Powell, J.) ..........................................................................7

*Scott v. Germano*,
   381 U.S. 407 (1965) .............................................................................................35

*Shaw v. Hunt*,
   517 U.S. 899 (1996) ....................................................................................... passim

*Shaw v. Reno*,
   509 U.S. 630 (1993) ....................................................................................... passim

*Shelby Cnty., Ala. v. Holder*,
   133 S. Ct. 2612 (2013) ..................................................................................30, 31

*Sixty-Seventh Minn. State Senate v. Beens*,
   406 U.S. 187 (1972) .............................................................................................34

*Smith v. Beasley*,
   946 F. Supp. 1174 (D.S.C. 1996) ........................................................................11

*Wilkins v. West*,
   571 S.E.2d 100 (Va. 2002) ..................................................................................18

*Wise v. Lipscomb*,
   437 U.S. 535 (1978) .............................................................................................35

**STATUTES**

28 U.S.C. § 1253 ............................................................................................................37

Va. Code Ann. § 24.2-101 ..............................................................................................35

Va. Code Ann. § 24.2-515 ..............................................................................................35

**OTHER AUTHORITIES**

U.S. Const. amend. XIV .............................................................................................1, 3

Va. Const. Art. II, § 6 ................................................................................................17, 18

## I.      INTRODUCTION

The Equal Protection Clause of the Fourteenth Amendment forbids race-based redistricting absent a compelling state interest, and even then only when narrowly tailored to meet that state interest.  The evidence before this Court demonstrates that, in 2012, the Virginia General Assembly used race as the predominant factor for shaping its Third Congressional District ("CD3"), had no compelling state interest for doing so and, in all events, failed to narrowly tailor that district to the purported state interest.  Plaintiffs' respectfully submit that the Court should enter judgment for Plaintiffs and implement an immediate remedy to cure the General Assembly's constitutional violation.

The evidence plainly demonstrates that race, not politics, predominated.   There is no dispute that when discussing the congressional plan's purpose on the floor of the House of Delegates, the legislator who drew the plan ("Enacted Plan") openly and repeatedly admitted that adding Black voters to CD3 was his "paramount concern," "primary focus," and that he was "especially focused" on doing so.  Plaintiffs' Trial Exhibit ("Pl. Ex.") 43 at 10, 14, 25.  That racial purpose was confirmed by the Intervenor-Defendants and Defendants (together "Defendants") when they conceded, based on the legislative record and the testimony of their own expert, that the General Assembly used a floor to measure how many Black voters should be added to CD3.  Trial Brief of Intervenor-Defendants and Defendants ("Def. Tr. Br."), Dkt. # 85, at 26.  Indeed, the General Assembly's use of a racial quota, unaccompanied by even the most rudimentary racial block voting analysis, vividly demonstrates that race predominated.

The abundance of circumstantial evidence further confirms that race was the predominant factor behind the Enacted Plan.  That evidence shows that CD3, the Plan's only majority-minority district, has a bizarre shape, flaunts Virginia's traditional redistricting criteria, and was

cobbled together by selectively swapping White residents for Black residents based on their race. This evidence leaves little doubt that race was the predominant factor in drawing the district.

The record belies Defendants' assertion that politics, not race, shaped CD3. Defendants provide no direct evidence to support this claim; no trial testimony and no documents from the legislative process contradict Del. Janis's statements that race predominated. Lacking evidence that is contemporaneous with the General Assembly hearings that led to enactment of the Plan, Defendants are forced to rely on post-hoc political performance statistics and the argument that, because the construction of CD3 is consistent with Republican political interests, politics must have predominated. But this revisionist history is contradicted by the evidence, defies logic, and is belied by the admission of Defendants' own expert that political performance statistics created after the Plan was enacted do not prove that politics drove the General Assembly's construction of CD3.

Defendants have failed, moreover, to identify any compelling state interest for the race-based drawing of CD3. Without a racial block voting analysis, the General Assembly could not have had a "strong basis in evidence" to believe that increasing the BVAP of CD3 to 57.2% was required by the Voting Rights Act. For precisely the same reason, Defendants cannot credibly contend that the use of race was narrowly tailored to meet an undefined, unknown state interest. Indeed, a statistically reliable racial block voting analysis is essential to proving that the use of race was narrowly tailored, and the complete absence of such an analysis is fatal to Defendants.

Plaintiffs respectfully request that the Court invalidate the Enacted Plan and take the remedial steps necessary to ensure that in the upcoming elections in November 2014, the citizens of Virginia are able to exercise their voting rights under a constitutional congressional redistricting plan.

## II.    ARGUMENT

The Equal Protection Clause of the Fourteenth Amendment prohibits racial gerrymandering. *Shaw v. Reno* ("*Shaw I*"), 509 U.S. 630, 644 (1993). "The right to vote freely for the candidate of one's choice is the essence of a democratic society," and states cannot use "subtle . . . instruments" to deny this right on the basis of race. *Id*. at 639 (internal quotation marks and citation omitted). Packing members of a minority group into one district to stifle their influence in other districts is one method of race-based redistricting. *Id*. at 640, 647. This type of "racially gerrymandered districting scheme, like all laws that classify citizens on the basis of race, is constitutionally suspect." *Shaw v. Hunt* ("*Shaw II*"), 517 U.S. 899, 904 (1996).

Plaintiffs challenging the constitutionality of a plan as a racial gerrymander bear the burden of proving that race was the predominant purpose behind the districting decision. *Miller v. Johnson*, 515 U.S. 900, 916 (1995). Once plaintiffs have made this showing, the burden shifts to defendants to satisfy strict scrutiny by proving that: (1) the state had a compelling governmental interest in making the race-based districting decision; and (2) the decision was narrowly tailored to achieve that interest. *Bush v. Vera*, 517 U.S. 952, 976 (1996).

The evidence presented at trial plainly shows that race was the predominant factor behind CD3, and Defendants and Intervenors have not satisfied their burden to show that the plan served a compelling interest and was narrowly tailored.

## A.    Race Was the Predominant Factor Behind CD3

Race is the predominant purpose behind a districting plan when it "becomes the 'dominant and controlling' consideration." *Shaw II*, 517 U.S. at 905 (quoting *Miller*, 515 U.S. at 913). Such an unconstitutional purpose exists when a state packs or "concentrate[s] a dispersed minority population in a single district by disregarding traditional districting principles," including the principles of "compactness, contiguity, and respect for political subdivisions."

- 3 -

*Shaw I*, 509 U.S. at 647.  A plaintiff can meet its burden of proving race as the predominant

purpose "either through circumstantial evidence of a district's shape and demographics or more

direct evidence going to legislative purpose."  *Miller*, 515 U.S. at 916.

This standard does not require a court to conclude that race was the *only* factor behind a

districting decision; to the contrary, courts regularly find that race was the predominant factor

even if other interests may have had an influence.  *Shaw II*, 517 U.S. at 906-7 ("That the

legislature addressed [other] interests does not in any way refute the fact that race was the

legislature's predominant consideration.").  Even if non-race factors are present, race is still the

predominant consideration if it "was the criterion that, in the State's view, could not be

compromised."  *Id*.[1]  Here, Plaintiffs' evidence shows that racial considerations were the polestar

districting principle behind CD3.

### 1.      The Enacted Plan's Author Stated that Race Was the Predominant Factor

First, and most importantly, Delegate Bill Janis, the author of the Enacted Plan, admitted

that race was the predominant factor in the creation of CD3.  When the Enacted Plan came up for

its first vote in the House of Delegates on April 12, 2011, Del. Janis candidly explained its

purpose on the House floor, announcing that the two most important criteria for the Enacted Plan

were adhering to the one-person, one-vote mandate of the U.S. Constitution and ensuring that

CD3 had a certain racial composition, pointedly emphasizing that "there be no retrogression in

minority voter influence" in the district.  Pl. Exs. 43 at 3.[2]

---

[1] A plurality of the Supreme Court came to a similar conclusion in *Bush*, 517 U.S. at 959.  That case was "a mixed motive suit" where "one of Texas' goals . . . was to produce majority-minority districts, but . . . evidence [also showed] that other goals, particularly incumbency protection . . . , also played a role in the drawing of district lines." *Id*.  The Court concluded that the district court's "findings—that the State substantially neglected traditional redistricting criteria such as compactness, that it was committed from the outset to creating majority-minority districts, and that it manipulated district lines to exploit unprecedentedly detailed racial data—together weigh in favor of the application of strict scrutiny."  *Id*. at 962.

[2] These statements were consistent with his remarks to the House and Senate Committees on Privileges and Elections.  Del. Janis explained to the House Committee that his first two considerations for the Enacted Plan were

Del. Janis left no doubt about the predominant role of race in his decision making.  He stated that "I was *most especially focused* on making sure that the Third Congressional District did not retrogress in its minority voting influence."  Pl. Exs. 43 at 14 (emphasis added).  To drive home the point further, he stated a second time that "the *primary focus* of how the lines in HB5004 were drawn was to ensure that there be no retrogression [of Black voters] in the Third Congressional District." Pl. Exs. 43 at 25 (emphasis added).  Even his opening pronouncement stated that "one of the *paramount concerns* in the drafting of the Bill was the constitutional and federal law mandate under the Voting Rights Act that we not retrogress minority voting influence in the Third Congressional District."  Pl. Exs. 43 at 10 (emphasis added).

During this discussion before the House of Delegates, Del. Janis explained his particular method for drawing CD3.  When asked whether he or anyone else had conducted a racial block voting analysis—that is, an analysis of voting patterns that shows how many voters of a racial group are needed in a district to elect their candidate of choice—Pl. Exs. 43 at 10, 12-13, Del. Janis did not identify any such analysis and instead explained that he simply

> looked at the census data as to the current percentage of Voting Age African American Population in the Third Congressional District and what that percentage would be in the proposed lines to ensure that the new lines that were drawn for the Third Congressional District would not retrogress in the sense that they would not have less percentage of Voting Age African American population under the proposed lines in 5004 that exist under the current lines under the current Congressional district.

---

compliance with the one-person, one-vote rule and the "mandate that there be no retrogression in minority voters in the Third Congressional District."  Pl. Ex. 13 at 2-5.  Similarly, before the Senate Committee, Del. Janis repeated that the Enacted Plan first and foremost had to comply with the one-person, one-vote rule and had to avoid "retrogression of a minority voter influence . . . most specifically vis-à-vis the lines for the 3rd Congressional District."  Pl. Ex. 14 at 5, 6.  He described these as "the most important criteria" for the Enacted Plan.  *Id*. at 9.

- 5 -

*Id.* at 10.  Not only did Del. Janis state that his goal was to maintain a certain racial composition for CD3, he emphasized that he ensured that result by looking exclusively at racial data. [3]

These are precisely the kinds of statements that the Supreme Court has found compelling evidence that race was the predominant factor behind a districting decision.  In *Shaw II*, for example, the Supreme Court "fail[ed] to see how the District Court could have reached any conclusion other than that race was the predominant factor" based largely on two statements like those made by Del. Janis.  517 U.S. at 906 (internal quotation marks and citation omitted).  North Carolina's Section 5 submission stated that the "*overriding* purpose [of the redistricting plan] was to comply with the dictates of the Attorney General's . . . letter and to create two congressional districts with effective black voting majorities."  *Id.*  "This admission was confirmed by Gerry Cohen, the plan's principal draftsman, who testified that creating two majority-black districts was the 'principal reason' for Districts 1 and 12."  *Id.*

Similarly, in holding that there was "substantial direct evidence of the legislature's racial motivations" in *Bush*, 517 U.S. at 960, the Supreme Court cited three sets of statements.  First, Texas's Section 5 Submission stated that three new congressional districts "should be configured in such a way as to allow members of racial, ethnic, and language minorities to elect Congressional representatives."  *Id.*  Second, the litigants said that the districts "were created for the purpose of enhancing the opportunity of minority voters to elect minority representatives."  *Id.* at 961 (internal quotation marks and citation omtited).  Finally, legislators had commented that the decision to draw majority-minority districts "was made at the outset of the process and never seriously questioned."  *Id.* at 961.  Where the Supreme Court found these statements to be

---

[3] In his presentation to the House Committee, Del. Janis similarly explained that he wanted "to have no less than percentages [of Black voters] that we have under the existing lines with the existing census data."  Pl. Ex. 13 at 8.  Del. Janis then received a number of questions about why the BVAP percentage for CD3 *increased* in the 2012 Plan.  *Id.* at 9-11.  Del. Janis did not answer the question, but simply asserted that he "looked at the voting age African American population" and compared the BVAP under the Benchmark and Enacted Plans.  *Id.* at 9-12.

strong evidence that race predominated, Del. Janis's unequivocal and powerful statements that race was his "primary" and "paramount" purpose conclusively establish Plaintiffs' burden here.

There is no question that Del. Janis was the sole author of CD3 and the most knowledgeable about its purpose. Del. Janis explained to the House of Delegates that "this is my legislation. I looked at this legislation. I looked at the data." Pl. Ex. 43 at 14. Even Chris Marston, the attorney for the House of Delegates Republican Caucus, remarked that Del. Janis was responsible for the map, describing him as "pretty Lone Ranger on this one." Pl. Ex. 53. As the Enacted Plan's sole author, Del. Janis's explanation of its purpose provides uniquely persuasive evidence that race was the predominant factor behind CD3.

Unable to point to any direct evidence to refute Del. Janis's assertions, Defendants attempt to dismiss them and undermine their significance, proclaiming it "absurd" for anyone to think that the statements show anything more than that Del. Janis merely understood Virginia had to comply with the Voting Rights Act. Trial Transcript ("Tr. Trans.") 17:12-21. But Del. Janis's statements express far more than a simple understanding of Voting Rights Act requirements. Where the Supreme Court has been swayed by precisely the kinds of statements Del. Janis repeatedly made on the legislative record, it would be "absurd" to ignore this significant evidence of race as the predominant purpose.

### 2.    The General Assembly Used a Racial Quota to Draw CD3

Second, if there were any doubt on the score, Defendants themselves and their expert, John Morgan, have candidly conceded that the General Assembly enacted CD3 to satisfy a racial quota. The Supreme Court has time and again treated "rigid racial quota[s]" with the highest skepticism. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 499 (1989); *see also Grutter v. Bollinger*, 539 U.S. 306, 335 (2003); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 315 (1978) (Powell, J.). Racial quotas in the districting context are no different: "we would no doubt apply

strict scrutiny if a State decreed that certain districts had to be at least 50 percent white, and our analysis should be no different if the State so favors minority races." *Bush*, 517 U.S. at 996 (Kennedy, J., concurring).

Mr. Morgan's report explains that the Virginia General Assembly adopted a 55% BVAP floor to avoid Section 5 liability. As he wrote, "the General Assembly enacted, with strong support of bipartisan and black legislators, a House of Delegates redistricting plan with a 55% Black VAP as the *floor* for black-majority districts." Intervenor-Defendants Trial Exhibit ("Int.-Def. Ex.") 13 at 26 (emphasis added); Tr. Trans. 351:20-352:9. According to Mr. Morgan, the General Assembly "found [the 55% BVAP floor] appropriate to comply with Section 5 for House Districts." Int.-Def. Ex. 13 at 27. He continued that "the General Assembly therefore had ample reason to believe that legislators of both parties, including black legislators, viewed the 55% black VAP . . . as appropriate to obtain Section 5 preclearance, even if it meant raising the Black VAP above the levels in the benchmark plan." *Id*.; Tr. Trans. 352:10-19. The General Assembly then "acted in accordance with that view for the congressional districts and adopted the Enacted Plan with the District 3 Black VAP at 56.3%." Int.-Def. Ex. 13 at 27.

Defendants wholeheartedly adopted these facts in their trial brief. They argued that "the General Assembly had 'a strong basis in evidence' to believe that Section 5 prohibited reducing District 3's BVAP below the benchmark level, and that 55% BVAP was a reasonable level for preserving the ability to elect." Def. Tr. Br. at 26 (internal citation omitted). Defendants concluded that "[t]he General Assembly acted accordingly when it adopted the Enacted Plan with 56.3% BVAP in District 3." *Id*. They even quote the legislative record to show that delegates demanded a 55% quota. According to Defendants, Del. Dance "advocated a 55% minimum BVAP for majority-black districts" when he stated in a public hearing that:

> So I know Delegate McClellan was at 50 percent, currently she's at a 50 district, as far as African American district.  For Delegate McClellan, that's not an issue.  Even though she's an African American, she can win that district.  But if Delegate McClellan leaves that and goes on to become a State Representative, state-wide representative, Congress or whatever, could another African American minority person, if you will, still be able to keep that as one of the 12 minority districts?  Not so.

*Id*. at 26 (quoting Int.-Def. Ex. 30 at 13-14).

The legislative record vividly confirms this use of a racial quota.  Intervenor-Defendants' Exhibit 32 shows that Republican Senator Jill Vogel argued that a 55% BVAP floor was necessary to comply with Section 5.  She stated that "when it came to Section 5—I just want to be very clear about this—that we believed that that was not really a question that was subject to debate.  The lowest amount of African Americans in any district that has been precleared by the Department of Justice is 55.0."  Int.-Def. Ex. 32 at 18.  She further explained that "we were just simply following what, I believe, is not subject to any question; that is, as of today, the lowest percentage that the Department of Justice has ever approved is 55.0."  *Id*. at 20.  According to Sen. Vogel, "it has been the position of the Department of Justice, and I will speak to this very confidently, that 55.0 is the percentage that they believe is what is qualified."  *Id*. at 22.

Even Virginia's Section 5 submission supports Mr. Morgan's account.  It consistently uses a 55% BVAP threshold to explain each plan's impact on racial minorities.  Describing the BVAP increase in CD3, the Section 5 submission states that "both total and voting age populations are increased to over 55 percent."  *Id*. at 2.  The Submission repeats this analysis *three more times*, once for each of the legislature's other proposed plans.  Pl. Ex. 6 at 2, 3.

Of course, there was and is no justification for this 55% BVAP quota.  The General Assembly never conducted a racial block voting analysis to determine either the minimum number of Black voters needed to preserve their voting strength in CD3 or whether Black voters

- 9 -

needed to be added to CD3.  Tr. Trans. 98:16-20, 99:3-6, 328:10-12, 354:18-23; Pl. Ex. 42, 43 at

15.  Without this analysis, the General Assembly could not and did not know whether it had to

add Black voters to CD3 to avoid retrogression, or whether Black voters could be removed.  The

General Assembly's single-minded adherence to a racial quota, adopted without any requisite

analysis of racial voting patterns, not only establishes Plaintiffs' burden to show that race was the

predominant purpose, but also negates any argument that Defendants could satisfy strict scrutiny.

Indeed, even without a racial block voting analysis, the facts available to the General

Assembly showed that there was no basis for applying a 55% BVAP quota.  Contrary to Sen.

Vogel's adamant testimony, the DOJ has frequently precleared districts with a BVAP below

55%, *including Virginia's own CD3*, which had been precleared with a BVAP of 50.47% in 1998

and a BVAP of 53.2% in 2001.  Pl. Exs. 20, 22.  Moreover, and perhaps most compellingly, by

the time the General Assembly adopted the Enacted Plan in 2012, the DOJ had precleared

Virginia's state senate plan even though each of its five majority-minority districts had a BVAP

below 55%.  Pl. Ex. 30 at 2; Int.-Def. Ex. 34 at 28.  The General Assembly had that information

at hand but simply chose to ignore it, to refrain from any sort of racial voting analysis, and

instead to adopt a rigid racial quota.

Courts have consistently rejected such an approach.  In *Clark v. Putnam Cnty.*, 293 F.3d

1261, 1279 (11th Cir. 2002), the Eleventh Circuit held that a redistricting plan that attempted to

increase the BVAP in two existing majority-minority districts to meet a 60% BVAP quota was

unconstitutional.[4]  The court's decision rested in large part on direct evidence from the map-

drawer that "her predominant consideration in crafting the plan was to maintain the core of the

existing majority minority districts and strive toward a 60% black VAP."  *Id*. at 1267.  Just as

---

[4] In their Trial Brief, Defendants state that "no case has ever found a *Shaw* violation where a legislature has
preserved an existing majority-minority district."  Def. Tr. Br. at 13.  *Clark* shows that this is simply inaccurate.

increasing BVAP to meet a quota in existing majority-minority districts was unconstitutional in *Clark*, so is it unconstitutional here.

A three-judge panel in South Carolina came to a similar conclusion.  In *Smith v. Beasley*, 946 F. Supp. 1174, 1207 (D.S.C. 1996), the court found that South Carolina's state legislative redistricting plan was an unconstitutional racial gerrymander.  The court paid particular attention to the legislature's use of a 55% BVAP quota, characterizing the legislature as having the attitude that "[i]f a district needed more black citizens to reach the goal of 55% BVAP, it mattered little where they came from."  *Id*. at 1207.  As the court concluded, "[t]his is the very evil condemned in *Shaw*, *Miller*, and *Bush*."  *Id*.

Defendants have studiously—but unsuccessfully—tried to backtrack from their admission of the use of a racial quota.  In their trial briefs, Defendants argue the General Assembly had a "strong basis" for believing that a 55% BVAP quota would pass Section 5 review and "acted accordingly" when drawing CD3.  Def. Tr. Br. at 26.  Defendants, moreover, concluded that the General Assembly acted in accordance with the the BVAP floor and used it when drawing CD3.  *Id*.  At trial, however, Mr. Morgan tried to back away from his previous account, testifying that the General Assembly did not, in fact, use a 55% BVAP floor when drawing CD3.  Tr. Trans. 326:10-13.  He then quickly contradicted himself yet again and said that the General Assembly may have used the floor to justify the district's BVAP.  Tr. Trans. 328:21-23.   None of this is persuasive.  The record amply supports Defendants' admission that the General Assembly utilized a racial quota to draw CD3; Mr. Morgan's belated and contradictory efforts to evade those facts and his own prior admission is as unpersuasive as it is unsupported.

### 3.     The Senate Criteria Confirm that Race Was the Predominant Factor

Defendants rely heavily on the "Senate Criteria" to show the Enacted Plan's purpose, and those criteria confirm that race was the predominant factor behind CD3.  Mr. Morgan testified

that the Senate Criteria are "a reliable and useful guide in describing traditional districting

principles," Tr. Trans. 308:15-18, a view shared by Defendants who regularly cite the Senate

Criteria in their Trial Brief, *see* Def. Tr. Br. at 5, 18.  According to Mr. Morgan, "the Senate

Criteria treated compliance of the Voting Rights Act, including compliance with protections

against unwarranted retrogression or dilution of racial or ethnic minority voting strength *as the*

*highest priority* for the Enacted Plan after compliance with the constitutional equal protection

guarantees."  Tr. Trans. 332:23-333:5 (emphasis added); Int.-Def. Ex. 13 at 25; Def. Tr. Br. at

18.  Thus, the General Assembly's "highest priority for the Enacted Plan" after compliance with

the one-person, one-vote mandate was ensuring a certain racial composition for CD3.

### 4.  CD3's Bizarre Shape Is Evidence of Racial Gerrymandering

The General Assembly's focus on race is further evident in the very shape of CD3.

"[R]eapportionment is one area in which appearances do matter," *Shaw I*, 509 U.S. at 647, and a

district's "bizarre" or "irregular" shape shows that racial considerations predominated, *see*

*Miller*, 515 U.S. at 914.  In particular, districts that attempt to connect disparate communities by

narrowly complying with contiguity requirements are often considered "bizarre" and probative

of an improper racial purpose.  *See Shaw II*, 517 U.S. at 903, 905-06 (district that snaked along

freeway collecting areas with Black residents was evidence of racial purpose); *Miller*, 515 U.S.

at 917 (narrow land bridges that connected areas with high concentrations of Black residents

showed that race was the predominant purpose); *Moon v. Meadows*, 952 F. Supp. 1141, 1147

(E.D. Va. 1997) (CD3 had bizarre shape indicating racial purpose) *aff'd*, 521 U.S. 1113 (1997).

CD3 is an archipelago of largely Black communities connected by the James River.  Pl.

Ex. 48.  The district starts north of Richmond and slides down the northern shore of the James

River, ending abruptly at the border of James City.  It then jumps over James City, which is part

of CD1, and lands in a horseshoe shape in Newport News.  It then leaps over southern and

- 12 -

eastern Newport News in CD2 and stops in Hampton.  The second half of CD3 starts anew on the southern shore of the James River, first darting west to swallow Petersburg and then sliding east through Surry.  It then hops over Isle of Wight, which is in CD4, grabs Portsmouth, and runs up into Norfolk, tearing CD2 into areas on either side of the city.

Virginia legislators confirmed that CD3 has a bizarre shape.  In a public hearing in 2010, a speaker described Benchmark CD3 to a panel of state legislators.  Pl. Ex. 12 at 48-50. Although Benchmark CD3 is different than Enacted CD3, the two districts closely resemble one another, as both connect almost all of the same communities along the James River.  *See* Pl. Ex. 48.  The speaker described CD3 as "a monstrosity because it's been gerrymandered by . . . 90 miles of James River bottom to connect wide areas of Norfolk with the City of Richmond."  Pl. Ex. 12 at 49.  He further described CD3 as "packing pretty much every black community up and down the James River into one" district.  *Id*.  Stephen Martin, a Virginia state senator, responded that he "would agree with that and did not care for the 3rd, the way the 3rd was done."  *Id*. at 50.

In *Moon v. Meadows*, the Court found that the shape of Enacted CD3's predecessor showed that the district was unconstitutional, and many of the district's troubling qualities remain.  952 F. Supp. at 1147 ("the shape and racial characteristics of the district prove that race predominated in drawing its boundaries.").  *Moon* characterized CD3 as a "grasping claw," and that epithet applies just as well today.  *Id*.; *see also* Pl. Ex. 48.  Branches of CD3 reach to Richmond and Petersburg, forming a claw set to crush Hopewell.  *Moon* further held that "every one of the [district's] fingers which reaches . . . into the divided cities, uses . . . barren stretches of river, or other dubious connectors" to join the disparate communities in one district.  952 F. Supp. at 1147.  The same is true of Enacted CD3.  Moreover, both versions of CD3 connect the same communities including Richmond, Petersburg, Newport News, Hampton, Portsmouth, and

Norfolk.  *Id.* at 1144-45; *see also* Pl. Ex. 48.  Just as the shape of CD3 in *Moon* "[gave] credence and confirmation to the racial segregation manifest in the district," Enacted CD3's bizarre shape is evidence of the General Assembly's unconstitutional purpose.  952 F. Supp. at 1147.[5]

### 5. CD3's Composition Shows That Race Was the Predominant Factor

The General Assembly's use of a quota to increase CD3's Black population is evident in the ultimate composition of the district.  Consistent with its targeted goal, the Enacted Plan significantly increased the total number of Black voting age residents in CD3, adding 44,711 such residents to the district.  Pl. Ex. 27 at 14.  This change also increased the percentage of Black voting age residents in CD3, raising the BVAP from 53.9% in Benchmark CD3 to 57.2% in Enacted CD3.  *Id.*  Black voters accounted for over 90% of the added voting age residents.  *Id.*

The General Assembly added Black voters to CD3 and increased its BVAP percentage even though the district had performed as a safe majority-minority district for twenty years.  Pl. Ex. 27 at 11; Tr. Trans. 52:18-54:5.  Congressman Bobby Scott has represented CD3 since 1991.  Pl. Ex. 21 at 33; Tr. Trans. 52:18-21.  In the six elections from 2002 to 2012, he ran unopposed in three.  Pl. Ex. 27 at 11; Tr. Trans. 53:9-12  He was opposed in the general election in 2010 and 2012 but reelected in both.  Pl. Ex. 27 at 11.  In 2010, he won 70% of the vote, and in 2012— under the Enacted Plan—he won by an even larger margin, with no less than 81.3% of the vote.  *Id.*; Tr. Trans. 53:17-22.  What's more, as mentioned above, the authors of the Enacted Plan did not even conduct a racial block voting analysis to determine whether increasing the BVAP in CD3 was necessary to preserve the ability of Black voters to elect candidates of their choice.  Tr. Trans. 354:18-24; Pl. Ex. 43 at 15.

---

[5] It is not Plaintiffs' burden to prove that CD3's shape is bizarre.  *See Miller*, 515 U.S. at 913.  It is simply further evidence that race was the predominant factor behind CD3.

77257-0011/LEGAL121547196.5

The General Assembly's method for adding Black voting age residents to CD3 further shows that the General Assembly relied primarily on race when increasing the district's population to meet the ideal.  Specifically, the General Assembly increased Enacted CD3's population by first removing White voters and then adding more Black voters.  Tr. Trans. 80:22-81:19.  The General Assembly, for example, removed from Benchmark CD3 25,501 people—18.8% of whom were Black voting age residents—and relocated them into CD2 under the Enacted Plan.  Pl. Ex. 27 at 15; Tr. Trans. 83:12-84:17.  The General Assembly then moved from Benchmark CD2 into the new CD3 a different set of 27,917 people—37.9% of whom were Black voting age residents.  Pl. Ex. 27 at 15; Tr. Trans. 83:12-84:17.  This swap relocated 53,418 people to increase the population in CD3 by only 2,416, a substantial disruption for a modest increase in population.  The swap, however, achieved its real purpose:  transferring 4,011 Black voting age residents from CD2 to CD3.  The General Assembly conducted similar swaps between CD3 and all of its neighboring districts, and as the following table shows, these swaps ultimately made Enacted CD3 more similar to the version of CD3 found unconstitutional in *Moon v. Meadows* than the post-*Moon* remedial plan.  *See* Pl. Exs. 6, 20, 22, 24, 50.

|  |  | **1991** | **1998** | **2001** | **2012** |
|---|---|---|---|---|---|
| **CD3** | Total Black Population | 63.98% | 53.59% | 56.8% | 59.5% |
|  | BVAP | 61.17% | 50.47% | 53.2% | 56.3% |

Defendants, remarkably, contend that this evidence shows politics, and not race, prevailed.  *See* Tr. Trans. 259:3-267:7.  But even their expert disagrees with them.  Mr. Morgan testified that the addition of Black voters to CD3 and removal of White voters from the district correlates with both racial *and* partisan considerations.  Tr. Trans. 267:1-7, 356:24-357:13.  As

- 15 -

his testimony shows, other evidence must be reviewed to determine whether these districting decisions were driven by racial or political considerations.  Tr. Trans. 357:14-18.  But Mr. Morgan reviewed only a limited amount of information and did not read any hearing transcripts or consult any legislators about the purpose behind the Enacted Plan.  Tr. Trans. 245:22-246:14; 342:5-10.  Mr. Morgan, accordingly, simply cannot say what drove the districting decisions.  Tr. Trans. 339:13-23, 342:5-10.  But the evidence Mr. Morgan would review—the direct evidence submitted here—overwhelmingly indicates that the purpose of the swaps was to increase the number of Black voters in CD3.

> **6.      CD3 Subordinates Traditional Redistricting Criteria to Race.**

The General Assembly subordinated other traditional redistricting criteria, such as compactness, contiguity, and respect for political subdivisions, to racial considerations.  Race, in other words, "was the criterion that, in the State's view, could not be compromised."  *Shaw II*, 17 U.S. at 907.  Del. Janis explicitly confirmed this when he explained that he drew CD3 to comply with the one-person, one-vote mandate and the Voting Rights Act requirement "that there be no retrogression in the minority voter influence in the 3rd Congressional District.  Those are the mandatory criteria that are not permissive, that there is no discretion in the application of those."  Pl. Ex. 43 at 19.  Other criteria, he explained, were permissive and subordinate to the equal population and racial considerations: "the primary focus of how the lines in House Bill 5004 were drawn was to ensure that there be no retrogression in the 3rd Congressional District.  Because if that occurred, the plan would be unlikely either to survive a challenge through the Justice Department or the courts."  Pl. Ex. 43 at 25.  Race was the criteria that Del. Janis refused to compromise; all other traditional redistricting criteria were subordinated to it.

###### a.       Compactness

A non-compact majority-minority district is strong evidence that race predominated.  *See*

*Shaw II*, 517 U.S. at 905-06 (race predominated where a majority-minority district had a shape

that was "highly irregular and geographically non-compact"); *Bush*, 517 U.S. at 962 ("These

findings—that the State substantially neglected traditional districting criteria such as

compactness . . . —together weigh in favor of the application of strict scrutiny.").  Compactness

is particularly important in Virginia because it is one of two redistricting criteria required by the

Virginia Constitution.  Va. Const. Art. II, § 6 ("Every electoral district shall be composed of

contiguous and compact territory . . .").  Despite the importance of compactness, no one claims

that CD3 is compact.

There is no dispute that CD3 is Virginia's least compact congressional district.  Tr. Trans.

73:10-14; Pl. Ex. 27 at 7.  Dr. McDonald, Plaintiffs' expert, measured the compactness of all of

Virginia's congressional districts under the Reock, Polsby-Popper, and Schwartzberg tests—the

tests used in Virginia's Section 5 submission and, with regards to the first two tests, the measures

preferred by Mr. Morgan.  Pl. Ex. 27 at 7; Pl. Ex. 4 at 10; Tr. Trans. 375:3-24.  Under all three

tests, CD3 was the least compact.

This is no surprise given Del. Janis's admission that he did not consider compactness

when drawing CD3.  Del. Janis explained to the Senate Committee on Privileges and Elections

that he paid no attention to compactness when drawing the Enacted Plan.  Pl. Ex. 14 at 8.  He

admitted that he "didn't examine compactness scores" and was "not competent to offer an

opinion about the relative compactness" of districts or plans.  *Id*.  This flagrant disregard for

compactness when drawing the Enacted Plan's only majority-minority district is strong evidence

that the General Assembly subordinated traditional redistricting criteria to race.

### b.      Contiguity

Contiguity is also an important redistricting criteria in Virginia because, like compactness, it is required by the Virginia Constitution.  *See* Va. Const. Art. II, § 6.  The Virginia Supreme Court has concluded that "[s]hort of an intervening land mass totally severing two sections of an electoral district, there is no *per se* test for the constitutional requirement of contiguity."  *Wilkins v. West*, 571 S.E.2d 100, 109 (Va. 2002).  While the General Assembly has construed this standard to allow waterways to connect parts of districts, the Enacted Plan goes much further and uses a number of land masses to sever CD3, in direct violation of the Virginia Supreme Court's definition of contiguity.  In particular, land in CD2 completely severs Newport News from Hampton, land in CD4 completely severs Portsmouth from Prince George County, and land in James City completely severs Newport News from Charles City.  *See* Pl. Ex. 48.  The General Assembly, moreover, flouted the contiguity requirement specifically to exclude White residents from the district.  For example, the VTDs that could have been part of CD3 but that now split the parts of Newport News and Hampton that are in CD3 have a BVAP of only 23.1%.  *See* Pl. Ex. 27 at 17.  The General Assembly's attempts to manipulate the contiguity requirement raise serious constitutional questions, and this disregard for contiguity in Virginia's only majority-minority district further shows that traditional criteria were subordinated to race.

### c.      Local Political Subdivision Boundaries

CD3 splits more counties and cities than any other congressional district in Virginia and contributes to most of the locality splits of its neighboring districts.  Pl. Ex. 27 at 8-9; Tr. Trans. 76:10-79:3.  CD3 splits local counties and cities nine times.  Pl. Ex. 27 at 8-9; Tr. Trans. 77:6-14.  The district with the second highest number of splits is CD1, with only 5 splits, two of which are due to CD1's boundary with CD3.  Pl. Ex. 27 at 8-9; Tr. Trans. 77:6-14.  CD3 also splits more voting precincts than any of Virginia's other congressional districts.  Tr. Trans. 78:17-19.  The

Enacted Plan splits 20 voting precincts in all; CD3 participates in 14 of them.  Pl. Ex. 27 at 8-9.

The fact that Virginia's only majority-minority congressional district splits more localities than

any other district also shows that race predominated.

Defendants appear to concede that CD3 splits more localities than any other

congressional district in Virginia, but they argue that many of the split VTDs are "technical" and

therefore irrelevant.  But, as Dr. McDonald testified, technical or not, the VTD splits are used

precisely to connect communities with higher concentrations of Black residents and cut out areas

with higher concentrations of White residents.  Tr. Trans. 79:18-80:21.  Thus, these "technical"

VTD splits had a very real impact on the racial composition of the district.

### d.   Protecting District Cores

Defendants contend that protecting district cores explains the composition of CD3, but

they grossly inflate core preservation's role.  This criterion was given little, if any, consideration.

According to Defendants and Mr. Morgan, the Senate Criteria accurately set forth

Virginia's traditional districting criteria, Tr. Trans. 308:15-18, but the Senate Criteria never even

mention maintaining district cores.  *See* Pl. Ex. 5; Tr. Trans. 379:18-22.  Mr. Morgan attempts to

gloss over this glaring omission by arguing that district core preservation falls under the Senate

Criteria's mention of "governmental jurisdictions."  Tr. Trans. 311:7-10.  But the Senate Criteria

do not bear this far-fetched interpretation, and even if they did, the fact that preserving district

cores is not explicitly mentioned confirms that it had the lowest priority.

The only direct evidence in the record that suggests preserving district cores was a factor

at all is Del. Janis's testimony.  He stated that one of the criteria for the Enacted Plan was "to

respect, to the greatest degree possible, consistent with the constitutional mandates and federal

law mandates, most especially the Voting Rights Act, with the core—it would respect the core of

the existing congressional districts."  Pl. Ex. 43 at 41.  Defendants have been reluctant to cite

- 19 -

Del. Janis as an authority on the Enacted Plan's purposes, and for good reason: his statements overwhelmingly prove that race predominated, and even this testimony regarding preservation of district cores confirms that preserving district cores was a lower priority than preserving the racial composition of CD3. *Id.*

Finally, even if the General Assembly did consider district cores when drawing the Enacted Plan, it did little to respect them. CD3, for example, needed 63,976 additional residents to meet the ideal population, but instead of just adding people to the district, the General Assembly *removed* over 58,782 residents from the district. Tr. Trans. 80:22-81:12 Indeed, the General Assembly removed over 180,000 people from their existing districts simply to increase the population of CD3 by 63,976 people. Tr. Trans. 87:7-17. The General Assembly's massive dissection of districts' core populations demonstrates that preserving cores was a low priority, if even considered at all.

### e.   Protecting Incumbents

Defendants also erroneously argue that incumbent protection was a traditional redistricting criteria that took priority over racial considerations. Del. Janis admitted that protecting incumbents was one criterion he considered when drawing the Enacted Plan, but he made it clear that incumbency protection was considered primarily because he wanted to avoid unseating congressmen midterm. Specifically, Del. Janis wanted to avoid drawing two incumbents into one district, which would certainly unseat a congressman only one year into a two-year term. Pl. Ex. 43 at 4 ("House Bill 5004 respects the will of the electorate by not cutting out currently elected congressmen from their current districts nor drawing current congressmen into districts together.").

Del. Janis also made it clear that he considered incumbency protection and other criteria only after he made sure CD3 had a certain racial composition:

- 20 -

> [M]ost of the criteria were mandatory.  Some of the criteria were permissive.  The first criteria that we applied was . . . the one-person-one-vote rule . . . .  Second, . . . the Voting Rights Act and most specifically, . . . that there be no retrogression in the minority voter influence in the 3rd Congressional District.  Those are the mandatory criteria that are not permissive . . .  Then, consistent with those criteria . . . the third criteria that we tried to apply was, to the greatest degree possible, we tried to respect the will of the Virginia electorate.

*See* Pl. Ex. 43 at 18-19.  Equal population and adding Black voters to CD3 were viewed as

"mandatory" and, accordingly, were Del. Janis's top priorities.  Only after those did he consider

incumbency protection.

Defendants resort to misrepresentation to fend off this clear conclusion.  They contend

that "Representative Janis stated, in probably the most candid statement you'll ever see on the

floor of any legislature, that the incumbents drew their own districts.  He said, I met with each of

them, they gave me specific directions, suggestions on how to draw the districts, and I met with

them, and they all confirmed that I had followed their directions."  Tr. Trans. 16:16-23.  This

argument, however, patently contradicts Del. Janis's testimony and Intervenor-Defendants'

discovery responses.

First, Del. Janis clearly stated that he spoke with congressmen to seek their input about

*communities of interest*, not to ask them to draw their own districts.  Pl. Ex. 43 at 22 (he received

"recommendations . . . from each of the 11 currently elected congressmen . . . about how best to

preserve local communities of interest, local jurisdictions"), 26 ("when looking for input as to

how to best preserve local communities of interest . . . it was relevant and it was reasonable to

seek input and recommendations from those current congressmen").  Del. Janis never stated or

even implied that congressmen drew their own districts.

Second, Intervenor-Defendants submitted discovery responses that show they had

minimal contact, if any, with Del. Janis.  Pl. Exs. 33-40.  According to their discovery responses,

the four congressmen who represented the districts surrounding CD3 and who would have benefitted the most from packing Black voters into CD3 under Defendants' theory—Rep. Wittman (CD1), Rep. Rigell (CD2), Rep. Forbes (CD4), and Rep. Cantor (CD7)—had almost no input into Del. Janis's map.  Rep. Wittman, for instance, never spoke to Del. Janis about redistricting (Rog 1), attended only one meeting about redistricting, which Del. Janis did not attend (Rog 6), and had no draft maps or communications in his possession related to redistricting (RFP 1-4).  Pl. Ex. 39.  Similarly, Rep. Forbes stated that he did not provide any feedback on the Enacted Plan when Del. Janis asked for it (Rog 1), never attended any meetings related to redistricting (Rog 6), and had no draft maps or communications with General Assembly members or staff about redistricting (RFP 1, 2).  Pl. Ex. 34.  Rep. Rigell's and Rep. Cantor's discovery responses similarly show that far from drawing their own districts, the congressmen had little to no input in the Enacted Plan.  Pl. Exs. 33, 38.

## B.     Race, Not Party, Was the Predominant Factor Behind CD3

Defendants' near constant refrain has been that party, not race, was the predominant factor behind CD3, but saying it does not make it so.  Defendants presented no direct evidence to show that political considerations were behind CD3, and their own expert conceded that the demographic data was as consistent with race as the predominant purpose. Tr. Trans. 357:7-13.

In fact, the direct evidence shows that the Enacted Plan's author did not even consider political performance when drawing the map.  When explaining the purpose behind the Enacted Plan, Del. Janis stated unequivocally that "*I haven't looked at the partisan performance.  It was not one of the factors that I considered in the drawing of the district.*"  Int.-Def. Ex. 9 at 14 (emphasis added).  This is entirely consistent with his description of his redistricting criteria, which never once mentioned partisan performance.  *See* Pl. Ex. 43 at 3-7, 18-20.  Indeed, Del. Janis repeated many times that his efforts were bipartisan as he sought the input of Republican

and Democratic congressmen alike.  *Id*. at 27-28 (he sought "the input of the existing congressional delegation, both Republican and Democrat, in a bipartisan manner").

The General Assembly's racial quota is further evidence that race, not party, was the predominant factor behind CD3.  As set forth above, the General Assembly used a 55% BVAP quota.  This quota measures *race,* not politics.  The General Assembly certainly could have utilized a political quota or measuring stick, but nothing in the record even hints at such a device.  Race, not politics, was the yardstick used by the General Assembly.  Race, not politics, predominated.

Dr. McDonald also testified that his analysis of the VTDs included and excluded from CD3 showed that race, not party, was the predominant factor behind CD3.  Dr. McDonald analyzed VTDs in CD3 and in localities adjacent to CD3 that were strongly Democratic and showed that such districts with a high BVAP were included in CD3 while such districts with a lower BVAP were not.  Pl. Ex. 28 at 6-7; Tr. Trans. 87:18-89:23, 397:13-403:13.  While Mr. Morgan attempted to use the same data to show that party, not race, explained the inclusion and exclusion of Democratic VTDs, he found only that the difference between the average Democratic performance and the BVAP in the two VTD groups was roughly the same.  Thus, as he acknowledged at trial, his analysis was not helpful to show whether race or politics predominated.  Tr. Trans. 372:13-373:7.

Perhaps more significantly, his analysis did not consider all of the relevant VTDs, as it failed to consider those VTDs that were in Benchmark CD3 but not in Enacted CD3—that is, those that were *dropped* by the General Assembly in the Enacted Plan.  Tr. Trans. 373:8-10; Int.-Def. Ex. 50; Pl. Ex. 57.  As Dr. McDonald testified, the high-performing Democratic VTDs that had been removed from CD3 under the Enacted Plan had a BVAP of only 21.1%, and the

difference in BVAP between this group of VTDs and those included in Enacted CD3 was much larger (36 percentage points) than the difference in Democratic performance (only 19.2 percentage points), rather dramatically demonstrating that race, not party, motivated the exclusion of these VTDs from Enacted CD3.  Tr. Trans. 405:11-412:24.  Of the high-performing Democratic VTDs, relatively white VTDs were dropped while much higher BVAP VTDs were added or retained.[6]

Failing to provide any evidence that party predominated over race, Defendants ask the Court to simply disregard Del. Janis's public statement that partisan performance was not a factor in the Enacted Plan.  According to Defendants, this statement must be ignored because Del. Janis is a politician and must have concealed his true political motives.  Tr. Trans. 18:9-23.  The Court should reject Defendants' unprincipled and dangerous request for two reasons.  First, Defendants essentially ask the Court to find that Del. Janis lied to his colleagues, his constituents, and the Virginia public even though there is no evidence in the record to support such censure.  Second—and perhaps most importantly—finding that Del. Janis privileged politics over race despite his public statements to the contrary would be the death knell for racial gerrymandering claims.  If—as Defendants suggest—it must always be assumed that political performance is the  primary consideration behind redistricting, regardless of direct evidence to the contrary, then race could never be the predominant factor behind a districting decision, and the Equal Protection Clause would no longer protect against racial gerrymandering.  Moreover, the Court would provide future legislators with the perfect recipe for defeating racial

---

[6] At trial, Defendants suggested that Dr. McDonald's analysis should be discounted or disregarded because "only" five high-performing Democratic VTDS were removed from CD3 while thirty similar VTDs were added.  Tr. Trans. 426:24-428:3.  But that's hardly remarkable:  CD3 needed to gain population, not lose it.  Of course one would expect more VTDs to have been added than dropped.  The significance of the analysis is the remarkable racial disparity between otherwise similarly situated VTDs, which reveals what the rest of the record so vividly demonstrates:  that race, not politics, predominated.  Moreover, as Dr. McDonald testified, those particular VTDs were removed from CD3 to include predominantly white VTDs in CD2 and contributed to the split of Norfolk, further emphasizing that race predominated.  Tr. Trans. 436:17-437:10.

gerrymandering claims: simply tell your constituents one thing during the redistricting process, and then change your story during litigation to say that politics drove your decisions.  No court has ever sanctioned such a disingenuous and cynical approach, and it is directly contrary to the controlling decisions.

## C.   Plaintiffs' Alternative Plan Confirms that Race Was the Predominant Factor Behind CD3.

Plaintiffs have submitted an alternative plan for Virginia's congressional districts ("Alternative Plan") that shows the Commonwealth could have achieved its redistricting goals while creating significantly greater racial balance.  A "hypothetical alternative district[] [that] would have better satisfied the legislature's other nonracial political goals as well as traditional nonracial districting principles" would show an "improper legislative motive."  *Easley v. Cromartie*, 532 U.S. 234, 249 (2001).  Plaintiffs' Alternative Plan does just that and shows that the Enacted Plan "is unexplainable on grounds other than race." *Id*. at 242 (internal quotation marks and citation omitted).

Plaintiffs have submitted their Alternative Plan even though *Easley* does not control here. Unlike the *Easley* defendants, Defendants have presented no direct evidence that shows the General Assembly had any legitimate political objectives.  The *Easley* defendants were state lawmakers, and they called as witnesses state legislators who provided first-hand accounts of the challenged plan's political purpose. *Cromartie v. Hunt*, 133 F. Supp. 2d 407, 408, 411-12 (E.D.N.C. 2000), *rev'd sub nom. Easley v. Cromartie*, 532 U.S. 234 (2001).  Accordingly, the Supreme Court held that "[c]aution is especially appropriate in this case, where the State has articulated a legitimate political explanation for its districting decision." *Easley*, 532 U.S. at 242. Defendants have done no such thing here.  None of them are state legislators; they had little to no involvement in Virginia's redistricting, Pl. Exs. 31-40; and they decided not to call even one

legislator to testify about the possible political purpose behind the Enacted Plan.  Defendants have presented no direct evidence to show the General Assembly had any distinct political objective, let alone any evidence demonstrating how they sought to achieve such an objective. *Easley*'s "cautious approach" is therefore inapplicable.

      *Easley*'s specific requirements for circumstantial evidence are, similarly, inapplicable. The *Easley* plaintiffs presented no direct evidence that race was the predominant redistricting purpose, and the Supreme Court accordingly required an alternative plan as additional circumstantial proof.  By contrast, Plaintiffs have presented the affirmative and unequivocal statements of the plan's principal map drawer that race predominated over other districting criteria, together with a variety of supporting evidence.  In light of that evidence, *Easley*'s circumstantial evidence requirement has no bearing on this case.

      Plaintiffs nonetheless have submitted an Alternative Plan that serves the General Assembly's redistricting goals better than the Enacted Plan and creates significantly greater racial balance.  As an initial matter, the Alternative Plan was drawn with the primary purpose of making minimal changes to district boundaries and leaving the vast majority of the map unaffected out of respect for the General Assembly.  Like the Enacted Plan, the Alternative Plan creates eleven equal-population congressional districts, and Alternative CD3 preserves Black voters' ability to elect candidates of their choice, as shown in Dr. McDonald's racial block voting analysis.  Pl. Ex. 29 at 5; Pl. Ex. 30 at 4-6; Tr. Trans. 114:23-115:1.  Alternative CD3 is more compact according to the compactness tests preferred by Mr. Morgan and used in Virginia's Section 5 submission.  Tr. Trans. 73:15-25, 347:13-348:18, 373:17-376:13. Alternative CD3 also connects by land areas that had previously been connected only by water. Finally, the Alternative Plan splits fewer localities than the Enacted Plan, and it decreases the

number of residents affected by the splits by a whopping 240,080.  Pl. Ex. 29 at 3-5.  Thus, the

Alternative Plan respects Virginia's traditional and constitutional districting criteria of equal

population, compactness, contiguity, and respecting local political boundaries *better* than the

Enacted Plan.

Defendants contend that the Alternative Plan's preservation of district cores is not

comparable to the Enacted Plan's.  But, as explained above, preserving district cores was a low

priority, if considered at all, when drawing the Enacted Plan, and the Alternative Plan compares

favorably to the Enacted Plan's alleged consideration of this criterion.  First, both the Enacted

and Alternative Plans moved many more people out of their existing districts than was necessary

to simply meet equal population requirements.  *See* Pl. Ex. 29 at 8-9.  Second, 69.2% of

Alternative CD3's residents also lived in Benchmark CD3, and this percentage is consistent with

the general range of core preservation established by the Enacted Plan (71.2% to 96.2%). Int.-

Def. Ex. 13 at 24.  Third, because the primary purpose of the Alternative Plan was to change as

few districts as possible, it did not change the Enacted Plan's approach to core protection for

nine out of eleven districts.  *Id.*  The Alternative Plan's relative success in preserving district

cores throughout Virginia is evident from the fact that, on average, 84.5% percent of the

residents in each district lived in the same district under the Benchmark Plan, only 1.5% less than

under the Enacted Plan.  *Id.*

Also, as explained above, improving partisan performance was not one of the General

Assembly's redistricting goals.  To the extent it was a goal to avoid drawing incumbents into the

same district, neither the Enacted Plan nor the Alternative Plan does so.  Tr. Trans. 112:12-14.

Finally, the Alternative Plan creates significantly greater racial balance than the Enacted

Plan.  Tr. Trans. 116:1-117:5.  As Mr. Morgan conceded at trial, "significantly greater racial

balance" could be defined as "a more even distribution of racial groups across districts" or "a more even distribution of racial groups within a district."[7]  Tr. Trans. 385:7-386:9.  By those measures, the Alternative Plan has significantly greater racial balance than the Enacted Plan. Because there are fewer Black and more White voters in Alternative CD3 than Enacted CD3, the Alternative Plan makes the percentages of Black and White voters in the district more balanced, and because the Alternative Plan adds Black voters to Alternative CD2, the percentages of Black voters in CD3 and CD2 are more balanced.  Tr. Trans. 116:1-117:5.  Thus, the Alternative Plan serves the General Assembly's redistricting goals and shows that Virginia could have achieved greater racial balance by adhering more closely to traditional redistricting criteria.

       None of Defendants' assaults on the Alternative Plan succeed.  First, their contention that the Alternative Plan must be "race neutral" is made out of whole cloth.  *See* Def. Tr. Br. at 1, 14-15.  Defendants cite *Miller v. Johnson* to support this proposition, but *Miller* never mentions any requirement that Plaintiffs even submit an alternative plan, let alone a plan that is "race neutral." To the contrary, the Supreme Court "never has held that race-conscious state decisionmaking is impermissible in *all* circumstances," *Shaw I*, 509 U.S. at 642, and it has acknowledged that redistricting almost always involves racial considerations, *see Miller*, 515 U.S. at 916 ("Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates . . . .").  Moreover, the very notion of a "race-

---

[7] In his report and again at trial, Mr. Morgan contended that an alternative plan achieves "significantly greater racial balance" when it "turn[s] the gerrymandered district into one that is not racially identifiable."  Int.-Def. Ex. 13 at 27; Tr. Trans. 384:2-17.  This definition is untenable, as Mr. Morgan's testimony at trial showed.  He testified that "a majority-minority district is by definition, a racially identifiable district," *id*., and therefore, according to his logic, a majority-minority district would cease to be "racially identifiable" by eliminating its majority-minority status altogether.  Thus, according to Mr. Morgan, an alternative plan achieves greater racial balance only when it turns a majority-minority district into a majority-White district.  This inherently favors majority White districts as the remedy for racial gerrymandering claims, a result that is not only unjust but directly at odds with Defendants' alleged interest in race neutrality.

neutral alternative" is ludicrous because every districting plan has a racial component, whether it involves drawing a majority-White district or a majority-minority district.

Defendants further depart from the law and common sense when they argue that Plaintiffs' whole case fails due to the goals of a private map drawer who drafted a map that has never been adopted by any branch of government.  Def. Tr. Br. at 1; Tr. Trans. 19:2-6.  As just explained, the purpose of the Alternative Plan is to show that the state could have achieved significantly greater racial balance by simply applying its legitimate districting criteria.  *See Easley*, 532 U.S. at 247.  The Alternative Map therefore is relevant only as circumstantial evidence of what was possible; the state of mind of a hired expert during litigation is completely irrelevant.

Defendants further contend that the Alternative Plan does not respect Virginia's districting goals because it does not serve the same political goals as the Enacted Plan.  But, as explained above, the plan's drafter did not consider partisan performance.  Defendants cannot invent a *post-hoc* partisan justification for the Enacted Plan and then fault Plaintiffs for not adhering to their imagined goals of the actual map-drawer.

In sum, the Alternative Plan shows that Virginia could have improved the  racial balance in its congressional plan by relying primarily on legitimate districting criteria rather than racial factors.

## D.    Defendants Have Failed to Show that Enacted CD3 Satisfies Strict Scrutiny

Race was the predominant factor in the General Assembly's creation of CD3, and, as a result, Defendants "must demonstrate that [Virginia's] districting legislation is narrowly tailored to achieve a compelling interest."  *Miller*, 515 U.S. at 920.  There can be no dispute that Defendants bear the burden of proof for this requirement.  *See id*.; *see also Shaw II*, 517 U.S. at 908.  This is an exacting standard, as "racial classifications are simply too pernicious to permit

- 29 -

any but the most exact connection between justification and classification." *Parents Involved in Cmty Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (internal quotation marks and citation omitted).  Defendants failed to provide any evidence that showed Enacted CD3 was narrowly tailored to achieve a compelling state interest.

### 1.    Defendants Cannot Show that CD3 Serves a Compelling State Interest

Defendants continue to assume that the General Assembly's alleged goal of complying with Section 5 is a compelling state interest.  It is not.  Section 5 compliance cannot justify Virginia's race-based redistricting of CD3 where the General Assembly failed to conduct any Section 5 analysis whatsoever.  Without conducting a racial block voting analysis, the General Assembly did not know if there was any retrogression that required a remedy.  "When a state governmental entity seeks to justify race-based remedies to cure the effects of past discrimination, [courts do] not accept the government's mere assertion that the remedial action is required.  Rather, [they] insist on a strong basis in evidence of the harm being remedied." *Miller*, 515 U.S. at 922.  Without a racial block voting analysis, however, the General Assembly had no clue how many Black voters were needed in CD3 to maintain their voting strength and therefore had no idea whether it needed to add Black voters to the district.  The General Assembly simply had no basis in evidence for remedying retrogression and therefore no compelling state interest for adding Black residents to CD3.

Moreover, as explained in Plaintiffs' Trial Brief, Dkt. No. 86, and in Plaintiffs' Response in Opposition to Defendants' and Intervenors' Motions for Summary Judgment, Dkt. No. 42, Section 5 compliance is no longer a compelling interest.  Case law and common sense compel this conclusion. *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612, 2631 (2013), held that the coverage formula of the Voting Rights Act was unconstitutional.  Accordingly, Section 5 no longer applies to certain jurisdictions, including Virginia.  As such, Section 5 compliance is no

- 30 -

longer a compelling interest that justifies Virginia's race-based redistricting. *Shelby County* itself confirms this conclusion by holding that "the Act imposes current burdens and must be justified by current needs." *Id*. at 2619.

### 2. CD3 Is Not Narrowly Tailored to Serve Any Compelling Interest

Even assuming Defendants could establish a compelling interest in the race-based redistricting of CD3, Defendants failed to meet their burden to prove that CD3 was narrowly tailored. *Shaw II*, 517 U.S. at 908; *Bush*, 517 U.S. at 976; *Miller*, 515 U.S. at 920. A districting decision must be "required under a correct reading of § 5" to be narrowly tailored, *Shaw II*, 517 U.S. at 911, and "[a] reapportionment plan would not be narrowly tailored to the goal of avoiding retrogression if the State went beyond what was reasonably necessary to avoid retrogression." *Shaw I*, 509 U.S. at 655. "[C]overed jurisdictions [do not have] *carte blanche* to engage in racial gerrymandering in the name of nonretrogression," *id*., and the Supreme Court has consistently struck down plans that were not narrowly tailored to achieve Voting Rights Act compliance. *See*, *e.g.*, *Bush*, 517 U.S. at 983 (finding Texas "went beyond what was reasonably necessary to avoid retrogression"); *Shaw II*, 517 U.S. at 910-18 (concluding that districts were not narrowly tailored to comply with the VRA); *see also Miller*, 515 U.S. at 921 (rejecting districts as unconstitutional where not required under a correct reading of the VRA).

Defendants have done nothing to show that increasing the BVAP in CD3 was "reasonably necessary" to avoid "retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States*, 425 U.S. 130, 141 (1976). The General Assembly never conducted a racial block voting analysis, and it had no idea how many Black voters were needed in CD3 to avoid retrogression. Tr. Trans. 98:16-99:6, 354:18-355:2; Pl. Ex. 43 at 15. Its failure to conduct this analysis was particularly egregious because the Department of Justice Section 5 guidelines made it clear that retrogression decisions

were based on the kind of information such an analysis would provide.  Defendants Trial Exhibit ("Def. Ex.") 9; Tr. Trans. 62:25-63:15.  Even Defendants' expert testified that a racial block voting analysis is an important part of any Section 5 determination.  Tr. Trans. 342:16-18. Having failed to "t[ake] any steps" to narrowly tailor its use of race in drawing the district, *Moon*, 952 F. Supp. at 1150, the General Assembly's myopic decision to increase the number of Black voters cannot satisfy strict scrutiny.[8]

The General Assembly's use of a racial quota further shows that CD3 was not narrowly tailored.  The quota was not based on an analysis of how many Black voters were "reasonably necessary" to avoid retrogressing CD3, but rather was based on a mere guess (or a flawed understanding of DOJ's historical practice) that increasing the BVAP percentage would comply with the DOJ's interpretation of Section 5.  Dr. McDonald's racial block voting analysis shows that this guess was wildly inaccurate because there was no risk that CD3's Black voters would fail to elect their congressional candidate of choice with even a 51% BVAP.  Pl. Ex. 30.

Defendants nonetheless ask the Court to believe that the General Assembly's use of the 55% BVAP quota and its decision to *exceed* that quota by 2.2% were narrowly tailored to comply with Section 5.  Defendants cite the "strong basis in evidence" standard as governing the narrow tailoring requirement and make the circular argument that because the General Assembly thought the BVAP quota was justified, it was.  But the "strong basis in evidence" standard is not the standard for determining whether a remedy was narrowly tailored; it is the standard for determining whether a remedy is needed at all.  *See Miller*, 515 U.S. at 922; *Shaw I*, 509 U.S. at 656.  Thus, Defendants' reasons for believing that packing Black voters into CD3 was narrowly tailored are irrelevant; all that matters is whether doing so was "reasonably necessary" to avoid retrogression.  And as the record demonstrates, it most assuredly was not.

---

[8] Mr. Morgan admitted that he had no opinion about whether CD3 was narrowly tailored.  Tr. Trans. 349:16-19.

77257-0011/LEGAL121547196.5

Even under the Defendants' preferred standard, however, the General Assembly had no "strong basis in evidence" for using the 55% BVAP quota. According to Defendants, the General Assembly applied a 55% BVAP quota because prior experience showed it was necessary for DOJ preclearance. But history actually demonstrated that no such quota was necessary. By the time the General Assembly adopted the Enacted Plan in 2012, Virginia's own Senate plan had been precleared even though all of its majority-minority districts had a BVAP below 55%. Pl. Ex. 30 at 2. CD3 itself had *twice* been precleared with a BVAP below 55%, first in 1998 and again in 2001. Pl. Exs. 20, 22. Not only does this record provide no "strong basis in evidence" for believing that Section 5 required a 55% BVAP floor, it provides a "strong basis in evidence" that Section 5 dictates no precise quota for majority-minority districts. There is no credible argument based on the record or on existing case law that a strict racial quota is or was required; the Voting Rights Act guidance issued by the Department of Justice explicitly rejects precisely such a contention. Def. Ex. 9. As the DOJ unequivocally explained, "in determining whether the ability to elect exists in the benchmark plan and whether it continues in the proposed plan, the Attorney General does not rely on *any predetermined or fixed demographic percentages* at any point in the assessment." *Id.* at 7471 (emphasis added).

Defendants further attempt to excuse the General Assembly's packing of Black residents into CD3 by making the unsubstantiated claim that the General Assembly did not have enough money to protect voters' constitutional rights by conducting the requisite racial block voting analysis. Def. Tr. Br. at 25. Defendants provide no evidence to support this astonishing contention and it's not difficult to understand why: none exists. As Dr. McDonald testified, he has been paid $35,000 for his work on this case, and that *included* conducting a racial block voting analysis. Tr. Trans. 28:24-25. Other states regularly pay for racial block voting analyses

- 33 -

to ensure Section 5 compliance.  Tr. Trans. 64-65.  Defendants' desperate attempts to excuse the General Assembly's failure by referencing budgeting concerns fall flat, particularly when stacked against Plaintiffs' constitutional rights.

Defendants try to distract from their own failure to prove narrow tailoring by arguing that Alternative CD3 is not *more* narrowly tailored than Enacted CD3.  But even if this were true, the extent to which Alternative CD3 is narrowly tailored is completely irrelevant to whether Enacted CD3 is narrowly tailored.  Defendants forget that it is *their* burden to satisfy both elements of strict scrutiny, not Plaintiffs' burden to provide alternative maps to prove lack of narrow tailoring.  Moreover, Dr. McDonald's racial block voting analysis shows that Black voters would have an excellent chance of electing their congressional candidate of choice in Alternative CD3 and that the district minimizes the BVAP in CD3 while complying with any Section 5 and Section 2 requirements.  Tr. Trans. 114:23-115:1; Pl. Ex. 30 at 4-6.[9]

Simply put, Defendants have simply failed to establish any compelling interest or narrow tailoring that would justify Enacted CD3.

## E.     The Court Should Impose an Immediate and Effective Remedy

The Enacted Plan is an unconstitutional racial gerrymander and must be invalidated and remedied as quickly as possible.  As explained in Plaintiffs' Trial Brief, Dkt. No. 86, and its briefs on possible remedies, Dkt. Nos. 30, 34, the Court can and should invalidate Enacted CD3 and delay impending election deadlines to allow itself enough time to adopt a new congressional plan.  *See*, *e.g.*, *Sixty-Seventh Minn. State Senate v. Beens*, 406 U.S. 187, 201 n.11 (1972) ("If time presses too seriously, the District Court has the power appropriately to extend the time limitations imposed by state law.").  If time allows, a court should give the appropriate

---

[9] Defendants contend that Dr. McDonald's analysis asks the "wrong question," but that clearly is not so.  *See* Def. Tr. Br. at 28.  He examined whether Black voters in CD3 would almost certainly elect their candidate of choice in Enacted CD3 and Alternative CD3 and concluded that they would.  *See* Pl. Ex. 30 at 4-6.

legislative body an opportunity to enact a new plan that avoids the constitutional infirmities in the invalidated plan. *See McDaniel v. Mehfoud*, 702 F. Supp. 588, 596 (E.D. Va. 1988). But, where it is clear that the appropriate legislative body will not or cannot enact a valid plan in time, as when the "imminence of . . . [an] election makes [referral to the legislative branch] impractical . . . it becomes the 'unwelcome obligation' of the federal court to devise and impose a reapportionment plan pending later legislative action." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (principal opinion) (internal citation omitted).

The General Assembly no longer has time to enact a new plan, and the Court should draw an interim plan, either by engaging a special master or by adopting the Alternative Plan. *See Scott v. Germano*, 381 U.S. 407, 409 (1965) (courts have the "power . . . [either] to require valid reapportionment or to formulate a valid redistricting plan."). Primary elections are scheduled for June 10, 2014. Va. Code Ann. § 24.2-515. General elections will take place on November 4, 2014. Va. Code Ann. § 24.2-101. There simply is no more time for the General Assembly to draw a remedial plan. Instead, Plaintiffs request that the Court reschedule the primary elections for late August, as the General Assembly did in 2011, and take the steps necessary to adopt an interim plan for the 2014 primary and general elections. *See* Pl. Ex. 8 at 5 (General Assembly delayed primary elections to provide more time to draw new districts).

### III.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court invalidate the Enacted Plan, adopt a remedial plan, and award Plaintiffs their reasonable attorneys' fees, expert fees, and costs.

# IV.    APPENDIX

In the status conference held on June 5, 2014, the Court asked the parties to address in their post-trial briefs whether the appeal to the Supreme Court of *Ala. Legislative Black Caucus v. Alabama*, -- F. Supp. 2d --, 2013 WL 6925681 (M.D. Al. Dec. 20, 2013), should affect how this case proceeds.  Plaintiffs believe that the appeal should have no effect on this case or its schedule because any delay will further injure Plaintiffs and the public interest.  The parties have submitted their evidence; no party has moved to delay a final decision; and little time remains to resolve this case before the November 2014 elections.  The Court should issue a final decision in this case without delay and enter an immediate and effective remedy.

Courts do not delay or stay cases in such circumstances absent "a clear case of hardship or inequity in being required to go forward." *Landis v. North American, Co.*, 299 U.S. 248, 255 (1936).  "Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law." *Id.*  A court determines whether such circumstances exist by "weigh[ing] competing interests." *Id.*  Similar to the considerations in other contexts, those interests include whether the parties or the public interest will be injured by delay. *See ePlus Inc. v. Lawson Software, Inc.*, 946 F. Supp. 2d 503, 507 (E.D. Va. 2013) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

Delaying a decision until the Supreme Court issues an opinion in *Alabama Legislative Black Caucus* would cause considerable harm to Plaintiffs.  The Supreme Court has just announced that it would hear the appeal, and the Court could wait for a year or more before issuing an opinion.  After that, this Court would take additional time to decide whether the opinion applies and how to remedy Plaintiffs' harms.  Plaintiffs could continue to wait for a remedy until late 2015 or even later.  In the meantime, Virginia's congressional elections will go

forward on November 4, 2014, and will exacerbate Plaintiffs' injury.  Thus, further delay would cause considerable harm to Plaintiffs.

There is also good reason to doubt that the Supreme Court's decision would have any effect on this case.  The appeal presents two questions, and one has nothing to do with Plaintiffs' claims.  *See* Jurisdictional Statement, *Ala. Legislative Black Caucus v. Alabama*, No. 13-895 (U.S. Dec. 20, 2013).  The question relates to whether the constitutional one-person, one-vote mandate is implicated by the population deviation between Alabama's state legislative districts.  *Id*. at i.  This issue has no bearing here, and resolution of Plaintiffs' claims could be delayed for no reason at all.  While the second issue presented in the Alabama case could theoretically affect the case at hand, it is far from certain that the Court will even reach that question, much less announce a decisional rule that would materially modify existing law.

This delay would also cause substantial harm to the public.  Over 700,000 Virginians live in unconstitutional CD3, and about four times as many live in its neighboring districts.  All of their rights are at stake, and further delay would cause them considerable injury.

Finally, delaying a decision in this case would set a dangerous precedent.  Appeals in the redistricting context are governed by 28 U.S.C. § 1253, which provides that any decision by a three-judge panel is appealed directly to the Supreme Court.  Delaying a decision here because another racial gerrymandering case is before the Supreme Court would suggest that any pending racial gerrymandering case should be delayed when another such case is before the Supreme Court.

Neither Plaintiffs nor Defendants nor Intervenor-Defendants have requested a stay in light of the Supreme Court's review of *Ala. Legislative Black Caucus*, and the Court should resolve this case without any further delay.

Dated:  June 6, 2014                          Respectfully submitted,


By /s/_____
    John K. Roche (VSB# 68594)
    Marc Erik Elias (admitted *pro hac vice*)
    John Devaney (admitted *pro hac vice*)
    Perkins Coie LLP
    700 13th St. N.W., Suite 600
    Washington, D.C. 20005-3960
    Phone:  (202) 434-1627
    Fax:  (202) 654-9106
    Email: JRoche@perkinscoie.com
    Email: MElias@perkinscoie.com
    Email: JDevaney@perkinscoie.com

    Kevin J. Hamilton (admitted *pro hac vice*)
    Perkins Coie LLP
    1201 Third Avenue, Ste. 4900
    Seattle, WA 98101-3099
    Phone:  (206) 359-8000
    Fax:  (206) 359-9000
    Email: KHamilton@perkinscoie.com

    *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of June, 2014, I caused the foregoing to be electronically filed with the Clerk of this Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Mike Melis
Office of the Attorney General
900 East Main Street
Richmond, Virginia  23219
(804) 786-2071
Fax:  (804) 786-1991
mmelis@oag.state.va.us

*Attorneys for Defendants Charlie Judd,
Kimberly Bowers, and Don Palmer in their
official capacities*

Frederick W. Chockley , III
Baker & Hostetler LLP
1050 Connecticut Ave NW
Suite 1100
Washington, DC 20036
(202) 861-1500
fchockley@bakerlaw.com

Jennifer Marie Walrath
Baker & Hostetler LLP (DC)
1050 Connecticut Ave NW
Suite 1100
Washington, DC 20036
202-861-1702
Fax: 202-861-1783
jwalrath@bakerlaw.com

*Attorneys for Movants Robert B. Bell,
Christopher Marston, and William Janis*

Jonathan Andrew Berry
Jones Day
51 Louisiana Ave NW
Washington, DC 20001
202-879-3939
Fax: 202-626-1700
jberry@jonesday.com

John Matthew Gore
Jones Day
51 Louisiana Ave NW
Washington, DC 20001
(202) 879-3930
Fax: (202) 626-1700
jmgore@jonesday.com

Michael Anthony Carvin
Jones Day
51 Louisiana Ave NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com

*Attorneys for Intervenor-Defendant Virginia
Representatives*

Cullen Dennis Seltzer
Sands Anderson PC
1111 E Main Street
24th Floor
P O Box 1998
Richmond, VA 23218-1998
804-648-1636
Fax: 804-783-7291
cseltzer@sandsanderson.com

*Attorneys for Interested Parties Clerk of the
Virginia Senate, Clerk of the Virginia House, and
Division of Legislative Services*

Respectfully submitted,

By_____/s/_____
    John K. Roche (VA Bar No. 68594)
    Perkins Coie LLP
    700 13th St., N.W., Suite 600
    Washington, D.C. 20005-3960
    Phone:  (202) 434-1627
    Fax:  (202) 654-9106
    JRoche@perkinscoie.com

    *Attorneys for Plaintiffs*

77257-0011/LEGAL121547196.5