**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| **DAWN CURRY PAGE, et al.,** )<br>)<br>**Plaintiffs,** )<br>)<br>**v.** )<br>)<br>**VIRGINIA STATE BOARD OF** )<br>**ELECTIONS, et al.,** )<br>)<br>**Defendants.** )<br>)<br>) | **Civil Action No.: 3:13-cv-678** |

## POST-TRIAL BRIEF OF INTERVENOR-DEFENDANTS AND DEFENDANTS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 6

I.    PLAINTIFFS FAILED TO SHOW THAT RACE RATHER THAN POLITICS
      PREDOMINATED IN THE ENACTED PLAN ............................................. 6

      A.    Politics Explains The Enacted Plan And District 3 ............................... 8

      B.    Plaintiffs' Flawed Evidence Failed To Defeat The Political Explanation
            For District 3 ....................................................................................... 10

            1.    Delegate Janis Unequivocally Stated That The Enacted Plan
                  Respected The Will Of The Electorate And Conformed To The
                  Recommendations Of Incumbents, Including Congressman Scott .......... 11

            2.    Dr. McDonald's Flawed VTD Analysis Actually Proves That
                  Politics Explains The Enacted Plan ......................................... 13

            3.    The Alternative Plan Undermines The General Assembly's
                  Political Goals Because It Turns District 2 Into A Heavily
                  Democratic District ............................................................... 16

II.   PLAINTIFFS FAILED TO PROVE THAT THE ENACTED PLAN
      SUBORDINATED TRADITIONAL DISTRICTING PRINCIPLES TO RACE .......... 17

      A.    The Traditional Districting Principles Of Preservation Of Cores And
            Incumbency Protection Explain The Enacted Plan ............................... 18

      B.    Plaintiffs Have Provided No Alternative Plan That Complies With
            Traditional Districting Principles As Well As The Enacted Plan ....................... 20

      C.    Plaintiffs Provided No Alternative Plan That Comparably Complies With
            Traditional Districting Principles And Brings About Significantly Greater
            Racial Balance Than The Enacted Plan ............................................... 25

      D.    Plaintiffs' Other Evidence Fails To Support Their *Shaw* Claim ....................... 27

III.  THE ALTERNATIVE PLAN IS NO MORE NARROWLY TAILORED THAN
      THE ENACTED PLAN ............................................................................... 30

      A.    The Enacted Plan Meets Any Narrow Tailoring Requirement ............................ 31

      B.    Plaintiffs Fail To Defeat This Showing Of Narrow Tailoring ............................ 32

IV.   THERE IS NO BASIS TO IMPOSE A REMEDY NOW ................................. 36

      A.    The Court Cannot Implement A Remedy Before The 2014 Election ................ 36

      B.    The Supreme Court's Eventual Decision In The Alabama Case Is Unlikely
            To Affect This Case ................................................................................ 37

i

## TABLE OF AUTHORITIES

**Page**

CASES

*Abrams v. Johnson*,
   521 U.S. 74 (1997)....................................................................................27

*Ala. Leg. Black Caucus v. State of Ala.*,
   No. 2:12-cv-691, at 162–72 (N.D. Ala. Dec. 20, 2013).........................33

*Backus v. State*,
   857 F. Supp. 2d 553 (D.S.C. 2012), *summ. aff'd*, 133 S. Ct. 156 (2012) ......................4, 9, 30

*Bush v. Vera*,
   517 U.S. 952 (1997)........................................................................ passim

*Clark v. Putnam*,
   293 F.3d 1261 (11th Cir. 2002) .............................................................28

*Colleton County Council v. McConnell*,
   201 F. Supp. 2d 618 (D.S.C. 2002) (three-judge court)...................27, 30

*Easley v. Cromartie*,
   532 U.S. 234 (2001)........................................................................ passim

*Fletcher v. Lamone*,
   831 F. Supp. 2d 887 (D. Md. 2011) (three-judge court),
   *summ. aff'd*, 133 S. Ct. 29 (2012) ..................................................6, 7, 24

*Gaffney v. Cummings*,
   412 U.S. 735 (1973)............................................................................2, 13

*Georgia v. Ashcroft*,
   539 U.S. 461 (2003)...............................................................................31

*Hunt v. Cromartie*,
   526 U.S. 541 (1991)..................................................................................6

*Hunter v. Underwood*,
   471 U.S. 222 (1985)...............................................................................11

*Karcher v. Daggett*,
   462 U.S. 725 (1983)...................................................................17, 19, 20

*Miller v. Johnson*,
   515 U.S. 900 (1995)......................................................................1, 17, 21, 25

*Moon v. Meadows,*
  952 F. Supp. 1141, 1151 (E.D. Va. 1997) (three-judge court),
  *summ. aff'd* 521 U.S. 1113 (1997) ..................................................................8, 19, 23, 31

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
  461 U.S. 190 (1983) ....................................................................................................11

*Perry v. Perez,*
  132 S. Ct. 934 (2012) ..................................................................................................27

*Shaw v. Hunt,*
  517 U.S. 899 (1996) ............................................................................................ passim

*Shaw v. Reno,*
  509 U.S. 630 (1993) .............................................................................................17, 1

*Smith v. Beasley,*
  946 F. Supp. 1174 (D.S.C. 1996) ..............................................................................28

*Wilkins v. West,*
  264 Va. 447 (2002) ............................................................................................. passim

*Wilson v. Kasich,*
  981 N.E.2d 814 (2012) ..................................................................................................9

## STATUTES

42 U.S.C. § 1973c(b) ........................................................................................................31

42 U.S.C. § 1973c(c) ........................................................................................................32

42 U.S.C. § 1973c note ....................................................................................................31

Va. Stat. § 24.2-305 .........................................................................................................22

## OTHER AUTHORITIES

David A. Fahrenholdt, *What Went Wrong For Eric Cantor?*, Washington Post A8 (June
  12, 2014) ........................................................................................................................1

Michael P. McDonald, *Regulating Redistricting*, 40 PS: Political Science & Politics 677
  (2007) ...........................................................................................................................13

## INTRODUCTION

Plaintiffs' *Shaw v. Reno* claim fails at the threshold because Plaintiffs' own expert, Dr. Michael McDonald, *admits* that the General Assembly had dispositive *non-racial* reasons for creating the alleged deficiencies in Enacted District 3 that Plaintiffs now challenge. Specifically, Dr. McDonald conceded that it would have made "perfect sense" for the General Assembly to adopt Enacted District 3 for *political* reasons even if every affected voter "was *white*." Trial Tr. 128–29 (emphasis added). Dr. McDonald further agreed that the Enacted Plan's trades involving District 3 had a "clear political effect" on the four surrounding Republican districts from which "[y]ou could infer . . . a political purpose." *Id.* at 128. Thus, Plaintiffs cannot prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without" District 3. *Miller v. Johnson*, 515 U.S. 900, 916 (1995). In fact, before he was retained as Plaintiffs' expert, Dr. McDonald described the Enacted Plan *not* as a racial gerrymander, but instead as a "political gerrymander" that created "a 8-3 partisan division of the state" in favor of Republicans and "also protected all incumbents." Int.-Def. Ex. 55 at 816; *see also* Trial Tr. 129, 137, 150–51. And he has reverted to this view since trial: although his trial testimony criticized the Enacted Plan's movement of New Kent County from District 3 to Eric Cantor's District 7 as predominantly racial, *see* Trial Tr. 178, after the June 10 primary election, he stated that "*New Kent was given to Cantor in redistricting to help him out*" politically, *not* for racial reasons, David A. Fahrenholdt, *What Went Wrong For Eric Cantor?*, Washington Post A8 (June 12, 2014) (emphasis added) (Ex. A). These concessions foreclose Plaintiffs from showing that "race *rather than* politics" explains the shape and composition of District 3, and their *Shaw* claim fails. *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (emphasis in original).

Plaintiffs nonetheless attempt to escape their own concessions by arguing that—perhaps for the first time in American history—politics somehow played no role in the Enacted Plan. *See*

Pl. Br. 2, 22–23.  Plaintiffs rest this incredible argument on a cherry-picked statement from

Delegate Bill Janis that he did not consider "partisan performance."  *Id.* (citing Int.-Def. Ex. 9 at

14).  Even assuming that the specific information examined by one legislator somehow denotes

and delimits what factors motivated the entire legislature, Delegate Janis never suggested that the

plan did not reflect political motives.  Indeed, Delegate Janis's statements from the very same

hearing completely refute Plaintiffs' position; he said repeatedly that each incumbent

congressman—including Bobby Scott in District 3—"support[s] the lines for how their district is

drawn," which incorporated their "specific, detailed and significant recommendations."  Int.-Def.

Ex. 9 at 8–9.  Because "[p]olitics and political considerations are inseparable from districting,"

*Gaffney v. Cummings*, 412 U.S. 735, 753 (1973), any incumbent's "recommendations" for his

own district necessarily reflect his political preferences.  Thus, whether Delegate Janis himself

considered *measures* of *partisan performance* is irrelevant because the *incumbents* who

effectively drew their own districts plainly considered *politics*.

1.     Thus, Plaintiffs have facially failed to meet their threshold burden of proving that

politics does not explain the challenged district.  This is particularly true because Plaintiffs have

failed to provide an alternative plan that accomplishes the General Assembly's "legitimate

political goals" but does not subordinate traditional districting principles to race.  *Easley*, 532

U.S. at 258.  In any event, Plaintiffs have also failed to meet their burden of demonstrating that

the General Assembly's alleged race-conscious goal of creating a majority-minority district was

not only a "factor" (which is permissible), but caused the subordination of traditional districting

principles.  *Id.* at 241.  Plaintiffs thus must "at least" produce a plan that does not deliberately

create such a district—and thus achieves a "significantly greater racial balance"—and does not

subordinate the General Assembly's "traditional districting principles."  *Id.* at 258.  But Plaintiffs

here have not even attempted this basic task of providing a *non-subordinating* alternative, so that the Court can intelligently assess whether the General Assembly's allegedly racial plan adhered to traditional districting principles as well as a plan where race was not improperly considered. Plaintiffs' claim thus fails as a matter of law under *Easley. See id.*

Instead, Plaintiffs offer an Alternative Plan which concededly subordinates neutral districting principles to the line-drawer's goal of a narrow, majority-black district in District 3. *See* Trial Tr. 172–73, 180. As an evidentiary matter, this alternative inherently cannot provide a baseline for assessing the extent to which the General Assembly's alleged desire for a majority-black district caused it to subordinate neutral districting principles and, as a remedial matter, it cannot be entered because it concededly *manifests* the constitutional defect—racial subordination of traditional districting principles—purportedly being *cured*.

Moreover, Plaintiffs' failure of proof is particularly obvious because their alternative concededly does not equally serve the General Assembly's traditional districting principles of preserving district cores and protecting incumbents, or its political goal of helping to re-elect the first-time GOP incumbent in District 2. As noted, *Shaw* plaintiffs must show that race caused subordination of traditional districting principles (by establishing that a less race-conscious plan would not subordinate) and eliminate politics as an explanatory factor (by showing that a less race-conscious plan would have accomplished the legislature's political goals). Here, this would mean an alternative that is less race-conscious but nevertheless fulfills the neutral goals of preserving district cores and politically protecting (at least) Republican incumbents. Instead, Plaintiffs provide a plan that not only is concededly driven by racial purpose, but does *not* equally serve the Legislature's non-racial goals of core preservation and political protection. Since the alternative both uses race as a predominant factor and does not satisfy the Legislature's

neutral districting goals, it, by definition, cannot show that the Legislature could have accomplished those non-racial goals through a district where race did not predominate.

As this reflects, Plaintiffs' "racial gerrymander" claim has nothing to do with eliminating race from Virginia's congressional redistricting, but is simply an obvious effort to *use* race to advance Democratic *political* interests, by redeploying heavily Democratic black voters. This is unsurprising: the Alternative Plan was drafted by the National Committee for an Effective Conference ("NCEC"), a liberal organization whose avowed purpose is to seek election of "progressive candidates" to Congress. Def. Ex. 10; Trial Tr. at 230, 272. Plaintiffs thus advocate a 6% reduction in District 3's BVAP not to cure an alleged predominant use of race in District 3, but instead to swing District 2 nearly 6% in the Democratic Party's political favor.

Plaintiffs' other supposed "evidence" of a racial gerrymander is of no moment. Dr. McDonald's analysis of voting tabulation districts ("VTDs") is even less defensible than the similar analysis the Supreme Court rejected as a matter of law in *Easley*, and his analysis of the trades involving District 3 is "incomplete and unconvincing" because, as in South Carolina, it fails to account for non-racial explanations such as incumbency protection. *Backus v. State*, 857 F. Supp. 2d 553, 562 (D.S.C. 2012) (three-judge court), *summ. aff'd*, 133 S. Ct. 156 (2012). Moreover, although Plaintiffs contend *ad nauseam* that Delegate Janis's entirely correct statements that the *federal* non-retrogression mandate of Section 5 is "paramount" to inferior *state*-law policies, this routine recognition of the Supremacy Clause hardly suggests a violation of the Equal Protection Clause. Pl. Br. 4–7. If acknowledging the "primary" importance of Voting Rights Act compliance somehow proves a *Shaw* violation, *every* redistricting plan violates *Shaw*. And Plaintiffs' oft-repeated assertion of a 55% BVAP "quota" is a wholly unsupported figment of their own imagination.

4

2.     Because compliance with Section 5 of the Voting Rights Act is an affirmative defense that justifies subordinating traditional districting principles to race, Plaintiffs' failure to prove such subordination dooms their claim without any need to inquire whether such a use was justified by Section 5.  *See Shaw v. Hunt*, 517 U.S. 899, 918 (1996) (*Shaw II*).  In any event, Plaintiffs' claim concerning a Section 5 defense also fails.

Contrary to Plaintiffs' fundamental premise, the test for whether a plan is "narrowly tailored" to comply with Section 5 is not whether the district's BVAP is as close as possible to the BVAP which a racial bloc voting analysis suggests is needed to avoid retrogression.  *See* Pl. Br. 31–34.  Any such rule would improperly require "endless beauty contests" among competing minority districts and *increase* racial redistricting by requiring *precise* BVAP for every Section 5 district.  *Bush v. Vera*, 517 U.S. 952, 977 (1997) (plurality op.).

Rather, the only question is whether the Enacted Plan "*substantially addresses*" the requirements of Section 5.  *Id.*  The Enacted Plan easily satisfies that standard because (i) maintaining District 3's BVAP was a far more sensible and effective way of satisfying Section 5's new, vigorous prohibition against "diminishing" minorities' "ability to elect" than Plaintiffs' preferred course of diminishing BVAP pursuant to an inherently unpersuasive "racial bloc voting" analysis; (ii) for this reason, the independent proposals from a bipartisan commission to which Dr. McDonald served as an advisor called for at least maintaining District 3's BVAP; and (iii) in 2011, black delegates in areas covered by District 3 advocated 55% BVAP for majority-black districts in the House of Delegates.  In any event, even if Plaintiffs' "lowest BVAP needed to avoid retrogression" were the standard for narrow tailoring, Plaintiffs' Alternative Plan flunks: it preserves a 50% BVAP in District 3 even though Dr. McDonald's racial bloc voting analysis demonstrates that black voters could elect candidates of their choice at a 30% BVAP level.

Plaintiffs thus have failed to prove their *Shaw* claim, much less any right to demand that the Court void the results of Virginia's completed primary election and speed to a remedy before the November general election. The Court should enter judgment for Defendants.

## ARGUMENT

## I. PLAINTIFFS FAILED TO SHOW THAT RACE RATHER THAN POLITICS PREDOMINATED IN THE ENACTED PLAN

Because "race and political affiliation" are often "highly correlated," Plaintiffs must decouple the two and show that "race *rather than* politics" predominates in Enacted District 3. *Easley*, 532 U.S. at 242. Indeed, because a political purpose does not violate *Shaw*, a legislature may subordinate traditional principles to gerrymander (or support) Democrats "even if it so happens that the most loyal Democrats happen to be African-American Democrats and even if the State were conscious of that fact." *Hunt v. Cromartie*, 526 U.S. 541, 551 (1991). Thus, in *Easley*, the Supreme Court overturned as *clearly erroneous* a three-judge court's finding of a *Shaw* violation because the evidence was equally consistent with a political and a racial purpose, and therefore failed to prove that "race *rather than* politics *predominantly* explain[ed]" the plan. 532 U.S. at 243, 257–58 (emphases in original).

Another three-judge court in the Fourth Circuit recently applied this rule to grant summary judgment to the defendants in a *Shaw* case because "the plaintiffs have not shown that the State moved African-American voters from one district to another because they were African-American and not simply because they were Democrats." *Fletcher v. Lamone*, 831 F. Supp. 2d 887, 901 (D. Md. 2011) (three-judge court), *summ. aff'd*, 133 S. Ct. 29 (2012). The Supreme Court summarily affirmed. *See* 133 S. Ct. 29.

This case is even easier than *Fletcher* because Plaintiffs have *concededly* not shown that Virginia moved black voters between district because they were black "and not simply because

they were Democrats." 831 F. Supp. 2d at 901.  Dr. McDonald *agreed* that it would have made "perfect sense" for the General Assembly to adopt the Enacted Plan for *political* reasons even if every affected voter "*was white*."  Trial Tr. 128 (emphasis added).  In fact, before he was retained on Plaintiffs' payroll, Dr. McDonald concluded that the Enacted Plan was a "political gerrymander" and that the General Assembly's "intent was to create an 8-3 Republican majority" that "also protected all incumbents." *Id.* at 129; Int-Def. Ex. 55 at 816.  Dr. McDonald also agreed that the Republicans in the General Assembly supported increasing District 3's BVAP and opposed increasing District 4's BVAP not for racial reasons, but because they "wished to preserve" District 4's "Republican character."  Trial Tr. 151; Int.-Def. Ex. 55 at 816.

These were no off-hand statements: in his law review article, Dr. McDonald "evaluated the partisan performance of the districts," assessed their "partisan composition" under the 2008 Presidential election results, and reviewed alternative plans.  Trial Tr. 128, 129, 134, 140.  Based on that analysis, he concluded that the General Assembly made "conscious choices" to effectuate a "political gerrymander," not a racial gerrymander, through the Enacted Plan. *Id.* at 136–37.

Plaintiffs' post-trial brief does not so much as mention their threshold burden to prove that "race *rather than* politics" predominates in Enacted District 3, *Easley*, 532 U.S. at 242, or Dr. McDonald's repeated concessions that politics explains the Enacted Plan *regardless* of race. Rather, the most Plaintiffs can say is that the evidence at trial showed that the Enacted Plan and its changes to District 3 "correlate[] with both racial *and* partisan considerations."  Pl. Br. 15; *see also id.* at 22.  But even if that were true, Plaintiffs would lose because they bear the burden to show that race *predominated*, not that race and politics *equally* explain the challenged plan. *See Easley*, 532 U.S. at 242.  In all events, the evidence at trial demonstrated that politics explains both the General Assembly's decision to retain District 3 and its changes to District 3 and, thus,

that Plaintiffs' *Shaw* claim fails at the outset.

### A.    Politics Explains The Enacted Plan And District 3

Plaintiffs' concessions are unsurprising because the evidence indisputably shows that politics explains the Enacted Plan.  As Mr. Morgan explained, the Enacted Plan treats District 3 "the same way" as the majority-white districts by preserving its essential core and making relatively minimal changes to benefit the incumbents in District 3 and adjacent districts.  Trial Tr. 256.  *Preserving* the core of highly Democratic District 3 made political sense for the Republican-controlled General Assembly because it kept Democrats in District 3 and out of Districts 1, 2, 4, and 7, the four surrounding Republican districts.  *See id.* at 127–28.

Moreover, as even Dr. McDonald agrees, the Enacted Plan's *changes* to District 3 had a "clear political effect" for the four surrounding Republican incumbents from which "[y]ou could infer . . . a political purpose."  *Id.* at 128.  This political effect extended to District 2, which prior to the Enacted Plan was "a very closely divided district" where Barack Obama and John McCain each captured 49.5% of the vote in 2008.  *Id.* at 258.  District 2 elected Republican Thelma Drake to Congress in 2004 and 2006, voted her out in favor of Democrat Glenn Nye in 2008, and voted Mr. Nye out in favor of Republican Scott Rigell in 2010.  *Id.*  That recent history gave the General Assembly "reason to protect incumbent Congressman Rigell," which it did by moving more Republican areas into, and more Democratic areas out of, District 2.  *Id.* at 258–61.

As Dr. McDonald acknowledged, this pattern adhered in all four Republican districts, as shown by the fact that all of the District 3 changes moved Democrats out of the adjacent Republican districts and into District 3 and, thus, "were politically beneficial for the Republican incumbents."  *Id.* at 122.  The Enacted Plan moved a 64% Democratic area from District 2 to District 3 in exchange for a nearly identically-sized 47% Democratic area.  *Id.* at 259–67; Int.-Def. Ex. 21.  The Enacted Plan moved an 86% Democratic area from District 4 to District 3 in

exchange for a 53% Democratic area.  Trial Tr. 259–67; Int.-Def. Ex. 21.  The Enacted Plan also

traded an 85% Democratic area from District 7 for an area from District 3 that was only 36%

Democratic.  Trial Tr. 259–67; Int.-Def. Ex. 21.  And the Enacted Plan shed a large number of

Democratic voters from District 1 in exchange for a much smaller number of Democratic voters

from District 3.  Trial Tr. 259–67; Int.-Def. Ex. 21.

Thus, while Plaintiffs attempt to infer a *racial* purpose from the racial effect of the

changes to District 3, *see* Pl. Br. 14–16, it is at least equally possible to infer a *political* purpose

from the clear political effect of those changes—as Dr. McDonald agreed.  Trial Tr. 128.  Thus,

*both* experts agree that the General Assembly would have had ample political reason to adopt the

Enacted Plan *regardless* of the race of the affected voters.  *See id.* at 128–29 (Dr. McDonald),

266 (Mr. Morgan).[1]

In fact, the differences in the political and racial composition of areas moved between

District 3 and surrounding districts were "essentially the same," *id.* at 261–66, and thus confirm

that Plaintiffs cannot show that "race *rather than* politics" predominated in those trades, *Easley*,

532 U.S. at 242.  The areas moved between District 2 and District 3 had "about a 17 percent

difference" in Democratic vote share and "about 18 percent difference" in BVAP.  *Id.* at 261.

The areas moved between District 4 and District 4 had a difference in Democratic vote share of

"33 percent" and a difference in BVAP of "34 percent."  *Id.* at 264.  And in the areas moved

---

[1] As this reflects, Dr. McDonald's analysis here is indistinguishable from his analysis that another three-judge court recently rejected as "incomplete and unconvincing."  *Backus*, 857 F. Supp. 2d at 562.  There, as here, Dr. McDonald "identified districts that exchanged population in a manner that resulted in a district experiencing a net [BVAP] increase."  *Id.* at 561.  He then "examined whether traditional districting principles were subordinated" and, "[i]f they were[,] concluded that race was the predominant factor."  *Id.* at 561–62.  But Dr. McDonald "relied on incomplete information" because he did not examine "communities of interest" or "incumbency protection."  *Id.* at 562; *see also Wilson v. Kasich*, 981 N.E.2d 814, 827 (2012) (noting *Backus* and rejecting Dr. McDonald's "defective" opinion); Int.-Def. Trial Br. 23 (DE 85).

between District 7 and District 3, the Democratic vote share difference was "essentially 49 percent," while the BVAP difference was "50 percent." *Id.* at 264–65.[2]

### B.   Plaintiffs' Flawed Evidence Failed To Defeat The Political Explanation For District 3

Plaintiffs attempt to sidestep their *Easley* burden by contending—for the first time in this case—that "*Easley* does not control here" because "Defendants have presented no direct evidence that shows the General Assembly had any legitimate political objectives." Pl. Br. 25. But the Supreme Court's formulation of the *Easley* burden did *not* turn on the fact that the defendants had "called as witnesses state legislators who provided first-hand accounts of the challenged plan's political purpose." *Id.* Instead, the Supreme Court articulated the "*general[]*" rule that *every Shaw* plaintiff must prove "at least" that "the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles" and bring about "significantly greater racial balance." *Easley*, 532 U.S. at 258 (emphasis added). Thus, *every* plaintiff bears the burden to show that "race *rather than* politics" predominated as a threshold element of a *Shaw* claim, *regardless* of whether the defendants come forward with a certain type of evidence. *Id.* at 242.

Plaintiffs' evidence failed to carry this demanding burden. Plaintiffs cherry-pick a quote from Delegate Janis about "partisan performance" measures, but they ignore his repeated

---

[2] Plaintiffs attempt to distort the size of the racial effect of the trades, falsely stating that "[b]lack voters accounted for over 90% of the . . . voting age residents" added to District 3. Pl. Br. 14. But *none* of the areas that the Enacted Plan moved into District 3 had a BVAP anywhere near 90%, and many of those areas were not even *majority* black. *See* Pl. Ex. 27 at 14; Trial Tr. 300–01. Plaintiffs' 90% number is a "mathematical construct[]" of a "net" number comparing the areas moved into District 3 with the areas moved out of District 3. Trial Tr. 302–03. Indeed, Plaintiffs generate this 90% number even though the Enacted Plan increased District 3's BVAP by only 3.2%. *See id.* at 300–03. Plaintiffs also generate a 22.8% net number for the Alternative Plan's corresponding trades, even though they decreased District 3's BVAP by a comparable 3%. *See id.*; *see also* Pl. Ex. 27 at 13–14. These "net" numbers thus are simply misleading, and not "useful" in analyzing the Enacted or the Alternative Plan. Trial Tr. 302–03.

statements that the Enacted Plan was designed to "respect the will of the electorate as expressed in the 2010 elections" and that, to accomplish this political goal, he solicited and precisely followed the "detailed and specific recommendations" of the incumbent congressmen.  Int.-Def. Ex. 9 at 6–9.  Moreover, as Defendants have explained, Dr. McDonald's VTD analysis is even less defensible than a similar analysis rejected as a matter of law in *Easley*—indeed, it actually *confirms* that politics explains the Enacted Plan.  Int.-Def. Trial Br. 9–13 (DE 85).  Finally, as Dr. McDonald conceded, the Alternative Plan undermines, rather than advances, the General Assembly's political goals.  It therefore is no proof that race rather than politics predominated.

> **1.    Delegate Janis Unequivocally Stated That The Enacted Plan Respected The Will Of The Electorate And Conformed To The Recommendations Of Incumbents, Including Congressman Scott**

In response to a question as to whether he reviewed a "partisan performance" measure for the Enacted Districts, Delegate Janis stated that "I haven't looked at partisan performance.  It was not one of the factors that I considered in the drawing of the district."  Int.-Def. Ex. 9 at 14.  Plaintiffs invoke this single statement to argue that the General Assembly did not actually consider politics in the Enacted Plan.  *See* Pl. Br. 22.  Even in isolation, this slender reed cannot bear the weight that Plaintiffs pile upon it—and it completely collapses under the weight of Delegate Janis's other statements that Plaintiffs conveniently ignore.

In the first place, "[p]roving the motivation behind official action is often a problematic undertaking," *Hunter v. Underwood*, 471 U.S. 222, 228 (1985), and "an unsatisfactory venture" because "[w]hat motivates one legislator to vote for a statute is not necessarily what motivates scores of others to enacted it," *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 216 (1983).  Thus, even if Delegate Janis had said that *he* did not consider politics—and, as explained below, he said no such thing—such a statement would not prove that the *General Assembly* eschewed any and all political considerations.

Moreover, far from saying that he did not consider election results or politics, Delegate Janis repeatedly said that his main objective was "to respect to the greatest degree possible the will of the Virginia electorate as it was expressed in the November 2010 election."  Int.-Def. Ex. 9 at 6, 7; Pl. Ex. 43 at 4, 19.  Thus, the underlying goal of the plan was to preserve the 2010 electoral results; *i.e.*, to maintain the 8 districts where Republicans prevailed, and the 3 Districts where Democrats prevailed, in 2010.  Accordingly, the plan preserved "the core of the existing congressional district boundaries with the least amount of disruption" possible.  Pl. Ex. 43 at 6; *see also id.* at 4, 19, 28, 41; Int.-Def. Ex. 9 at 6.  In addition, as Delegate Janis candidly avowed, any minimal changes to the districts would not be politically harmful to the 2010 incumbents, because he solicited and faithfully implemented the incumbent congressmen's directions regarding their districts.  As even Plaintiffs are forced to acknowledge, Delegate Janis sought "the input of the existing congressional delegation, both Republican and Democrat, in a bipartisan manner."  Int.-Def. Ex. 9 at 14 (quoted at Pl. Br. 23).  Yet the incumbents' involvement did not end with mere "input": as Delegate Janis made clear, "the district boundary lines were drawn in part based on specific and detailed recommendations . . . from each of the eleven members currently elected to [C]ongress, both Republican and Democrat."  *Id.* at 8.  After the Enacted Plan was drawn, Delegate Janis "spoke[] with each" incumbent and "showed them a map of the lines" in his bill.  *Id.*  "[E]ach member of the congressional delegation both [R]epublican and [D]emocrat has told me that the lines . . . *conform to the recommendations* that they provided me, and they support the lines for how their district is drawn."  *Id.* at 9 (emphasis added); *see id.* at 10; Pl. Ex. 13 at 4, 6; Pl. Ex. 43 at 5, 6, 13, 14, 20, 22, 23, 25, 26, 29, 30, 38.

Thus, Delegate Janis had no need to personally examine any "partisan performance" measure because he received and implemented recommendations directly from knowledgeable

and self-interested incumbents.  Obviously, incumbents do not make recommendations for their own districts that *hurt* their re-election chances.  Plaintiffs' theory that the Enacted Plan does not reflect politics requires ignoring this incontrovertible fact, the truism that "[p]olitics and political considerations are inseparable from districting," *Gaffney*, 412 U.S. at 753, and Delegate Janis's forthright, candid admission that the incumbents effectively drew their own districts.

Plaintiffs attempt to avoid this inescapable conclusion by asserting that Delegate Janis sought incumbents' input only with respect to "communities of interest." Pl. Br. 33.  But Delegate Janis only occasionally, not always, mentioned "communities of interest" as the topic of the incumbents' input.  *See* Int.-Def. Ex. 9 at 8–14.  Moreover, communities of interest are not *different* from politics; they *encompass* politics.  As Dr. McDonald has recognized, "communities of interest" is a "nebulous standard . . . for achieving any *political* goal."  Michael P. McDonald, *Regulating Redistricting*, 40 PS: Political Science & Politics 677 (2007) (emphasis added) (Ex. B).  The Democratic-authored 2011 Senate Criteria also recognized that identifiable "communities of interest" may center around "*political beliefs, voting trends*, and *incumbency* considerations."  Pl. Ex. 5 at 2 (emphasis added).  Thus, at a minimum, the incumbents who effectively drew their own districts could always characterize their efforts to unite people with "political beliefs" similar to the incumbent's as preserving "communities of interest."[3]

## 2.   Dr. McDonald's Flawed VTD Analysis Actually Proves That Politics Explains The Enacted Plan

Plaintiffs alternatively argue that Dr. McDonald's VTD analysis "showed that race, not party, was the predominant factor behind CD 3." Pl. Br. 23.  Dr. McDonald purports to identify

---

[3] Plaintiffs also try to make something of the Intervenor-Defendants' discovery responses, *see* Pl. Br. 21–22, but nothing in those responses warrants "disregard[ing] Del. Janis's public statement[s]" about the incumbents' recommendations, *id.* at 23.  Even on Plaintiffs' view of direct interactions between the incumbents and Janis, Delegate Janis could have easily solicited and implemented those recommendations through staff members or consultants.

the VTDs in "the localities that comprise or are adjacent to the [Enacted] Third District" that have a "Democratic performance greater than 55%," which he describes as "heavily Democratic."  Pl. Ex. 28 at 7–8; Trial Tr. 152–53.  He points out that the average BVAP in the 189 such VTDs in District 3 is 59.5% and in the 116 such VTDs in adjacent localities is 43.5%, and from this 16% BVAP difference leaps to the conclusion "that race trumped politics" in the decision to include or exclude these VTDs from District 3, Pl. Ex. 28 at 8, and that the goal of the Enacted Plan was "to increase" District 3's BVAP, Trial Tr. 104.

As Defendants explained at length in their pretrial brief, Dr. McDonald's VTD analysis is fatally flawed and actually confirms that politics explains the Enacted Plan.  *See* Int.-Def. Trial Br. 9–13 (DE 85).  Most fundamentally, the VTD samples selected by Dr. McDonald have a *political* pattern no different than their *racial* pattern, and thus inherently cannot show that race trumped politics.  Specifically, the "highly" Democratic VTDs in Enacted District 3 are not just 16% more *black*, but also 15.5% more *Democratic*, than the "highly" Democratic VTDs in localities adjacent to District 3.  *See* Int.-Def. Corr. Ex. 50; Pl. Ex. 57.  Dr. McDonald thus has done nothing to show that "the excluded white precincts were as reliably Democratic as the African-American precincts that were included in" District 3, or to rebut the possibility that the General Assembly, "by placing reliable Democratic precincts within a district without regard to race, end[ed] up with a district containing more heavily African-American precincts, but the reasons w[ere] political rather than racial."  *Easley*, 532 U.S. at 245–46.

Indeed, the most straightforward proof that Dr. McDonald's VTD analysis does not show a racial purpose to increase District 3's BVAP is that *Plaintiffs' own* Alternative Plan shows a *similar* pattern.  Dr. McDonald has not bothered to conduct his VTD analysis on the Alternative Plan, *see* Trial Tr. 156, but his own data confirms that the 160 "highly Democratic" VTDs in

14

Alternative District 3 are *13.5%* more black and 11.8% more Democratic than the 145 "highly Democratic" VTDs in localities adjacent to Alternative District 3, *see* Int.-Def. Corr. Ex. 50; Pl. Ex. 57.  Since the Alternative Plan shows a racial (and political) pattern materially indistinguishable from that of the Enacted Plan and its avowed purpose was "to *decrease*" District 3's BVAP, Trial Tr. 432 (Dr. McDonald) (emphasis added), Dr. McDonald's analysis conclusively cannot establish that the VTDs were selected to *increase* District 3's BVAP in the Enacted Plan (as opposed to political reasons).

As this reflects, all Dr. McDonald's analysis "shows" is that *any* plan which largely preserved District 3's core would have a disproportionate number of high-BVAP VTDs, simply because the majority-black Benchmark District 3 obviously had more predominantly black VTDs than the adjacent majority-white districts.  It is undisputed that *84%* of Dr. McDonald's 189 heavily-Democratic VTDs in District 3 were simply retained from the benchmark District 3. *See id.* at 156.  Thus, this analysis cannot reflect a race-conscious selection pattern by the 2012 General Assembly, but only confirms the truism that the Enacted Plan preserved the core of District 3.  And, as noted, it is also undisputed that the *changes* to District 3 reveal a *Democratic* effect equal to a BVAP effect—thus refuting any suggestion that the changes to District 3 reveal a racial, rather than political, purpose.  *See* pp. 8–10, *supra*.  Thus, Dr. McDonald's analysis undermines, rather than supports, the notion that the General Assembly placed overwhelmingly black VTDs in District 3 but placed similarly Democratic white VTDs in the adjacent districts.

This outcome is unsurprising.  As detailed in the pre-trial brief, Dr. McDonald's VTD methodology was "unreliable," Trial Tr. 270, and contained all the flaws of the methodology the Supreme Court rejected in *Easley*, Int.-Def. Trial Br. 9–13; *see also* Trial Tr. 271 (Dr. McDonald includes VTDs that are "up to 30 miles away from District 3"); *id.* at 154 (Dr. McDonald

includes VTDs in "the middle" of District 3 that could not have been moved without "dismantl[ing] District 3 and chang[ing] its form quite dramatically"); *id.* at 164 (Dr. McDonald treats all 55%-Democratic VTDs as equal, even though he concedes that some are more Democratic than others).[4]

Plaintiffs do not even mention, much less attempt to rehabilitate, the flaws in Dr. McDonald's VTD analysis. *See* Pl. Br. 23–24. Instead, Plaintiffs criticize Mr. Morgan for "fail[ing] to consider those VTDs that were in Benchmark CD3 but not in Enacted CD3," *id.* at 23 (even though Dr. McDonald did not consider those VTDs until his rebuttal testimony, *see* Trial Tr. 409–12). But that analysis similarly *refutes* Dr. McDonald's assertions that race trumped politics. According to Dr. McDonald's own chart, the 5 highly Democratic VTDs the Enacted Plan *removed* from District 3 are significantly *less* Democratic *and less black* than the 30 highly Democratic VTDs it *added* to District 3. *See* Pl. Ex. 57; Trial Tr. 426–28. Thus, as Dr. McDonald was forced to concede, the Enacted Plan's swap of these groups of VTDs had the *political* effect of making District 3 more Democratic and strengthening the surrounding Republican incumbents. *See* Trial Tr. 426–31.

### 3. The Alternative Plan Undermines The General Assembly's Political Goals Because It Turns District 2 Into A Heavily Democratic District

As part of their burden to prove that "race *rather than* politics" predominated, Plaintiffs were required to show "at least" that "the legislature could have achieved its legitimate political objectives in alternative ways" that were race-neutral. *Easley*, 532 U.S. at 258. But as Dr. McDonald concedes, the Alternative Plan undermines "the General Assembly's political goals of having an 8/3 incumbency protection plan." Trial Tr. 180. Instead, the Alternative Plan

---

[4] The NCEC dataset upon which Dr. McDonald based his VTD analysis was riddled with errors: it omitted four localities, used the 2012 VTDs rather than the 2010 VTDs used in the Enacted Plan, and double-counted VTDs. Trial Tr. 270–74.

proposes a 7-4 partisan division that fatally weakens Congressman Rigell by turning District 2 from an evenly divided "49.5 percent Democratic" district into a 54.9 % "heavily Democratic" district. *Id.* at 304; *see also id.* at 152; Int.-Def. Ex. 22.  The Alternative Plan's 5.4% swing in District 2's Democratic vote share is "the largest change of any district" compared to the Benchmark Plan and is unique because "it would be against the party of the incumbent."  Trial Tr. 305.  That the Alternative Plan is not a "bipartisan incumbency protection plan" like the Enacted Plan, *id.* at 306, is unsurprising: it was drafted by NCEC and, thus, seeks the election of a "progressive" candidate in District 2, Def. Ex. 10.

## II.   PLAINTIFFS FAILED TO PROVE THAT THE ENACTED PLAN SUBORDINATED TRADITIONAL DISTRICTING PRINCIPLES TO RACE

Even if Plaintiffs could survive their lack of proof that race rather than politics explains Enacted District 3, they still must show more than that race was "*a* motivation for the drawing of" District 3, *Easley*, 532 U.S. at 241 (emphasis in original), but rather that race was the "predominant factor" for why the General Assembly "subordinated traditional race-neutral districting principles," *Miller*, 515 U.S. at 916.  That burden is particularly daunting here: unlike in the ordinary *Shaw* case, the General Assembly *preserved* an existing majority-black district rather than creating a new one.  *Shaw v. Reno*, 509 U.S. 630, 635–37 (1993) (*Shaw I*).  The General Assembly therefore had ample non-racial reasons for maintaining the status quo in District 3, such as the traditional principles of "preserving cores" and protecting incumbents. *Karcher v. Daggett*, 462 U.S. 725, 740 (1983); *Wilkins v. West*, 264 Va. 447, 463–64 (2002).

*Shaw* obviously does not discourage—much less *prohibit*—the General Assembly from applying the *same* continuity criteria to District 3 that it applied to other districts.  *See Bush*, 517 U.S. at 977 (plurality op.) (*Shaw* does not "limit a State's discretion to apply traditional districting principles in majority-minority, as in other, districts").  Such a rule would

17

*discriminate* on the basis of race by subjecting majority-black districts to separate criteria. Thus, *Shaw* is triggered only when a legislature treats majority-minority districts *differently* because of their racial composition. *See* 509 U.S. at 639–49. And since it is undisputed that the General Assembly preserved district cores and protected incumbents in *all* districts, its *similar* treatment of District 3 was not *differential* treatment, much less *race-based* differential treatment.

In fact, the General Assembly had particularly good reasons to preserve the core of District 3 because it was adopted as a *Shaw* remedy in 1998. The *Moon v. Meadows* court's order enjoined Virginia from "conducting an election of any person to membership in the United States House of Representatives from the Third Congressional District" until the General Assembly "enacts, and the Governor approves, a new redistricting plan . . . which conforms to all requirements of law, including the Constitution of the United States." 952 F. Supp. 1141, 1151 (E.D. Va. 1997) (three-judge court), *summ. aff'd* 521 U.S. 1113 (1997). Thus, the fact that the 1998 version of District 3 was used in the 1998 and 2000 congressional elections means that it "conform[ed] to all requirements of law," including *Shaw*. *Id.* Similarly, the 2001 Benchmark Plan perpetuated the 1998 version of District 3 and was not subject to *any Shaw* challenge, even though Virginia voters mounted *Shaw* challenges to the 2001 House of Delegates and Senate plans virtually identical to Plaintiffs' challenge to the Enacted Plan. *See Wilkins*, 264 Va. 447. The General Assembly thus had ample reason to believe that preserving District 3 in 2012 would "conform to all requirements of law" and *satisfy*, not *violate*, *Shaw*. *Moon*, 952 F. Supp. at 1151.

### A. The Traditional Districting Principles Of Preservation Of Cores And Incumbency Protection Explain The Enacted Plan

Delegate Janis—whom Plaintiffs otherwise seek to treat as the oracle of the Enacted Plan—stated repeatedly that the Enacted Plan complies with traditional districting principles. Int.-Def. Ex. 9 at 4–9; Pl. Ex. 13 at 1–5. In particular, two traditional principles, preservation of

cores and incumbency protection, explain the Enacted Plan and District 3.

**Preservation of Cores**.  "[P]reserving the cores of prior districts" is a non-racial traditional districting principle, *Karcher*, 462 U.S. at 740; *Wilkins*, 264 Va. at 463–64, and made unusually good sense here because District 3 had been judicially blessed as "conform[ing] to all requirements of law" in 1998, *Moon*, 952 F. Supp. at 1151, and had not been challenged under *Shaw* in 2001.  Even Dr. McDonald conceded that the Enacted Plan performs "significant[ly]" better than the Alternative Plan with respect to the preservation of District 3's core.  Trial Tr. 422–23.  The Enacted Plan preserves 83.1% of District 3's core, while the Alternative Plan preserves only 69.1% of District 3's core.  *Id.* at 312–13; Int.-Def. Ex. 27.  The Enacted Plan thus treated District 3 "equally" to other districts, while the Alternative Plan proposes to treat District 3 *worse* than any other district on this metric.  Trial Tr. 313.

Plaintiffs' effort to downplay these undisputed facts fails.  *First*, Plaintiffs argue that the General Assembly gave "little, if any, consideration" to core preservation, Pl. Br. 19, but their own quotes from Delegate Janis make clear that the Enacted Plan "respect[ed] the core of existing districts," Pl. Ex. 43 at 41 (quoted at Pl. Br. 19).  Delegate Janis even repeated this point several times in statements that Plaintiffs do not cite.  *See id.* at 4, 6, 19, 28; Int.-Def. Ex. 9 at 6. Likewise, the fact that the Senate Criteria do not use the term "preservation of cores" is a purely semantic irrelevance because they authorized preservation of "communities of interest" around "governmental jurisdictions" such as the Benchmark Districts.  Sen. Criteria V.

*Second*, Plaintiffs contend the General Assembly "did little to respect" district cores because it "removed over 180,000 people from their existing districts simply to increase the population of CD3 by 63,976 people."  Pl. Br. 20.  But, again, it is undisputed that District 3 preserved 83% of the benchmark district, which is indisputably significant core preservation by

any standard, regardless whether it preserved cores to the maximum extent theoretically possible. (And, of course, the 180,000 people were not moved just to equalize *District 3's* population, but those of the adjacent districts as well, and Plaintiffs' Alternative Plan moved *more than twice* as many people—384, 498—across those districts.  Pl. Ex. 29 at 8–9.)

*Third*, Plaintiffs point out that the Alternative Plan's *average* core-preservation percentage is only 1.5% lower than the Enacted Plan's *average*.  *See* Pl. Br. 27.  But that unremarkable fact merely reflects that the Alternative Plan made *no* changes to "nine out of eleven districts."  *Id.*  Where the Alternative Plan actually departed from the Enacted Plan, it made what Dr. McDonald called a "large change," a "big change," and a "significant" change to District 3's core preservation.  Trial Tr. 422–23.

**Protection Of Incumbents**.  Incumbency protection is a traditional districting principle. *Karcher*, 462 U.S. at 740; *Wilkins*, 264 Va. at 463–64; Sen. Criteria V.  Even Dr. McDonald agrees that the Enacted Plan better protects incumbents than the Alternative Plan, as he must since the Alternative Plan harms Congressman Rigell.  *See* Trial Tr. 152.

Plaintiffs now contend that Delegate Janis limited the Enacted Plan's advancement of this principle to "avoid[ing] drawing two incumbents into one district."  Pl. Br. 20.  Once again, however, Plaintiffs ignore Delegate Janis's myriad other statements that the Enacted Plan was designed to "preserve the will of the electorate in 2010" and that he incorporated incumbents' specific, detailed recommendations.  *See* pp. 11–13, *supra*.

**B.    Plaintiffs Have Provided No Alternative Plan That Complies With Traditional Districting Principles As Well As The Enacted Plan**

Faced with the overwhelming evidence—and their own concessions—that the Enacted Plan faithfully preserves district cores and protects incumbents, Plaintiffs retreat to the untenable argument that the General Assembly could have drawn a plan that better complied with *other*

traditional districting principles such as split localities and compactness. *See* Pl. Br. 16–22. But Plaintiffs concede that *no* alternative plan performs as well as the Enacted Plan on preservation of cores and incumbency protection. *See id.* at 27. Plaintiffs therefore are asking the Court to hold that the only way for the General Assembly to have avoided *Shaw* liability was to change the shape of District 3, sacrifice the traditional principles of preserving cores and incumbency protection, and elevate other neutral principles in their stead. *See id.*

But *Shaw* precludes choosing *race* over traditional districting principles; it in no way requires choosing some (plaintiff-preferred) traditional districting principles over those the legislature prefers. Indeed, even Plaintiffs recognize that there is no principled basis to judicially override the General Assembly's preferences. Dr. McDonald agreed that there is "no principle that says" that avoiding split localities is "more important than" core preservation or incumbency protection. Trial Tr. 223. In fact, he agreed that it would have been "reasonable" for the General Assembly "to choose the Enacted Plan over the Alternative Plan" if it preferred preservation of cores and incumbency protection over avoiding split localities. *Id.* at 222. And the law is clear that "the General Assembly must balance . . . competing" traditional districting principles—and that courts are not permitted to upset that balance in the *Shaw* context. *Wilkins*, 264 Va. at 463–64; *Miller*, 515 U.S. at 915.

In all events, Plaintiffs have provided *no* evidence to show that the General Assembly could have improved compliance with other traditional principles if it had sacrificed core preservation and incumbency protection and changed District 3's shape. As Dr. McDonald emphasized, the Alternative Plan *maintains* District 3's shape, so it necessarily proves nothing about how a plan that changes District 3's shape would fare on traditional principles. *See* Trial Tr. 176–85; 222–23. Moreover, both the Alternative Plan and the plans proposed by the

Independent Bipartisan Advisory Commission On Redistricting perform no better than the Enacted Plan on Plaintiffs' preferred traditional principles.

**Split Localities**.  The Commission's three proposals for congressional redistricting—including Option #1, which made "*significant changes* to the current districts"—all performed *worse* than the Enacted Plan on split localities (even though the Commission had made avoidance of such splits a priority).  *See* Int.-Def. Ex. 28 at 19–27.  Plaintiffs point out that the Alternative Plan has one fewer split locality than the Enacted Plan, *see* Pl. Br. 18–19, but Dr. McDonald conceded that there is "no principle" for preferring that marginal improvement over the Enacted Plan's "significant[ly]" better preservation of cores, Trial Tr. 222, 422–23.  In fact, Dr. McDonald conceded that the Enacted Plan scores "highly" with respect to split localities, *id.* at 137–38, and Mr. Morgan explained that "[t]here is no reason to conclude that this marginal difference" of one split locality "is significant," Int.-Def. Ex. 13 at 20.

The General Assembly's preference for significantly better preservation of cores was especially sensible here because District 3 had received judicial imprimatur following *Moon*. *See* p. 18, *supra*.  Moreover, while locality splits are not wholly insignificant, they have not been an important traditional principle—much less more important than other principles—for four decades.  The Virginia Constitution was amended in 1970 to eliminate respect for "political subdivisions" as a traditional principle.  Int-Def. Ex. 55 at 782.  In 2000, the General Assembly identified by statute certain important traditional principles, but respecting localities was not one of them.  *See* Va. Stat. § 24.2-305.  *Wilkins* lists "preservation of existing districts" and "incumbency" as traditional districting principles, but does not even mention preserving political boundaries.  264 Va. at 464.  Reflecting this consensus view, the Senate Criteria noted that local government lines "may reflect communities of interest to be balanced, but they are entitled to no

greater weight as a matter of state policy than any other identifiable communities of interest."
Sen. Criteria V.  The Criteria thus emphasized that the "discernment, weighting, and balancing of
the varied factors that contribute to communities of interest is an intensely political process best
carried out by elected representatives of the people."  *Id.*

Plaintiffs attempt to seek refuge in the fact that the Alternative Plan's split localities
affect fewer people than the Enacted Plan's split localities, Pl. Br. 26–27, but they ignore the
Alternative Plan's *greater* effect on *other* co-equal communities of interest.  Enacted District 3
*maintained* splits in localities that were split in the Benchmark Plan and, therefore, preserved
communities of interest formed around the Benchmark Districts.  Trial Tr. 323.  The Alternative
Plan, by contrast, moves more than *twice* as many people in and out of District 3 than the
Enacted Plan, *see, e.g.*, Pl. Ex. 29 at 8–9, and thereby splits those Benchmark communities of
interest.  At the same time, the Alternative Plan creates a *new* split dividing 1,016 residents away
from the rest of Portsmouth and Benchmark District 3.  As Dr. McDonald recognized, it would
have been "reasonable" for the General Assembly to reject these sweeping changes in and
around District 3 in favor of preserving cores and protecting incumbents.  Trial Tr. 222.[5]

**Compactness**.  While Plaintiffs contend that Enacted District 3 is not compact, there is

---

[5] Dr. McDonald also previously attempted to manufacture a disparity in the number of
VTD splits in the Alternative Plan and the Enacted Plan, but it is now undisputed that the number
of VTD splits *affecting population*—the only relevant number—is the *same* in both plans.  *See*
Trial Tr. 325.  Dr. McDonald nonetheless reprises his theme that the Enacted Plan's VTD splits
are racially motivated because they are used to "bypass" white communities.  *Id.* at 220.  But, as
with Dr. McDonald's contiguity argument, he ignores the *political* reason to "bypass" these
communities.  In any event, even if the Enacted Plan "bypassed" these communities for a racial
reason, such a racial factor did not *subordinate* any traditional districting principles because no
such principle precludes splitting the unpopulated parts of VTDs or "contiguity by water."  *See*
*Wilkins*, 264 Va. at 261.  Indeed, Dr. McDonald conceded both that preserving VTDs is not a
traditional districting principle and that, unlike the *Moon* district, Enacted District 3 does not
split VTDs to place the black part of the population in the challenged district.  Trial Tr. 218–22;
*see Moon*, 952 F. Supp. at 1147–48 (finding *Shaw* violation in plan with 54 split precincts, "37
of them" in District 3, where "most of the precincts split along racial lines").

no evidence of any alternative that is cognizably more compact and, more specifically, no evidence that a district drawn without regard to race would be more compact, so there is no basis for concluding that Enacted District 3's majority-black status caused any subordination of compactness. Dr. McDonald concedes that Alternative District 3 "is not compact." Trial Tr. 176. And, given the absence of a more compact, non-racial alternative, there is no basis for concluding that Enacted District 3 is less compact than feasible, much less that its departures from some ideal of compactness are attributable to race.

In any event, all of Plaintiffs' criticisms of Enacted District 3's shape apply equally to Benchmark District 3, which the new District 3 "closely resembles." Trial Tr. 171. (Plaintiffs do not suggest that the new District 3 is less compact than the Benchmark District and their own Alternative Plan shows that *any* effort to preserve District 3's core would not satisfy their view of acceptable "compactness"). Thus, Plaintiffs' compactness and shape argument is, at best, simply another variant on their argument that the General Assembly could not preserve District 3's core. As noted, that assertion is untenable because Virginia was not required to treat District 3 *worse* on core preservation than the majority-white districts and because the General Assembly had every reason to think District 3's shape was acceptable since it was a *Shaw remedy. See also Fletcher*, 831 F. Supp. 2d at 903 (rejecting *Shaw* claim against "unusually odd" districts because their "basic shape has not changed since the last redistricting").

Plaintiffs nonetheless suggest that Alternative District 3 is more compact than Enacted District 3 because of extremely minor differences in their scores on the Reock, Polsby-Popper, and Schwartzberg tests. Pl. Br. 17–18. But Dr. McDonald concedes that those differences "are relatively small" and "not significant under any professional standard." Trial Tr. 217. He further agrees that Alternative District 3 is *less* compact than Enacted District 3 on the Ehrenburg and

24

Population-Polygon measures, and that there is "no professional standard" saying that his three measures are more reliable than these two. *Id.* at 217–18. Dr. McDonald also agrees that all of the more than thirty statistical compactness measures are "inherently manipulable" and that there is no "minimum score" or "professional standard" for judging compactness. *Id.* at 217.[6]

### C.    Plaintiffs Provided No Alternative Plan That Comparably Complies With Traditional Districting Principles And Brings About Significantly Greater Racial Balance Than The Enacted Plan

As noted, Plaintiffs were required to show "at least" that "the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles" and that bring about "significantly greater racial balance." *Easley*, 532 U.S. at 258. This requirement makes perfect sense: a federal court must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race," and cannot test whether a redistricting plan "subordinate[s] traditional . . . districting principles" to race unless it knows how a plan where race is not predominant treats traditional districting principles. *Miller*, 515 U.S. at 916.

Plaintiffs, however, came forward with no such race-neutral plan. Rather, the Alternative Plan—as Dr. McDonald conceded—"subordinates traditional districting principles to race" to achieve a 50% racial "quota" in District 3. Trial Tr. 172–73, 180.[7] Since the only alternative

---

[6] Plaintiffs, moreover, misstate the record when they suggest that Delegate Janis "admi[tted] that he did not consider compactness." Pl. Br. 17. He said only that he did not "examine compactness scores" and was "not competent" to opine on the relative compactness of competing districts, Pl. Ex. 14 at 8. In that same hearing, Delegate Janis stated that the Enacted Districts are "compact." *Id.* 7.

[7] The Alternative Plan is identical to the Enacted Plan except for the boundary between Districts 2 and 3. Trial Tr. 172. It therefore contains all of the same flaws in District 3 that Plaintiffs allege the Enacted Plan contains—such as the continuation of Benchmark District 3, the move of predominantly black Petersburg to District 3, and swaps in New Kent County, Richmond, and Henrico—except those along the boundary with District 2. *See id.* at 172–78. And, in the District 2 boundary area, the Alternative Plan "corrects" the Enacted Plan's alleged

plan *mimics* the General Assembly's alleged evil of subordinating districting principles to the racial goal of creating a majority-black district, there is no basis for assessing whether a plan which *departed* from this impermissible desire for a majority-black district would better adhere to neutral principles, and therefore no basis for concluding that creating the majority-black district *caused* any departure from traditional districting principles. This is precisely why *Easley* requires Plaintiffs to produce a plan *not* infected with the racial goal of a majority-minority district—*i.e.*, one that would produce a "significantly greater racial balance" than the challenged plan, 532 U.S. at 258—so that the Court can assess whether traditional districting principles would have been better served absent the allegedly impermissible motive.[8]

In any event, even if the Alternative Plan achieved significantly greater racial balance than the Enacted Plan, it fails the other *Easley* requirements. *First*, the Alternative Plan *undermines* the General Assembly's "political objectives" because it turns Republican Congressman Rigell's District 2 from a toss-up district into a highly Democratic district, consistent with Plaintiffs' and NCEC's political preferences. *See* pp. 16–17, *supra*; *Easley*, 532 U.S. at 258. *Second*, the Alternative Plan indisputably performs "significant[ly]" *worse* than the

_____

(continued…)

predominant use of race to increase District 3's BVAP with a conceded predominant use of race to decrease District 3's BVAP to a "50% quota." *Id.* at 178–80; Int.-Def.' Trial Br. 14–16.

[8] Plaintiffs make the almost comical suggestion that their plan has a "significantly greater racial balance" because it is closer to *50%* BVAP than the Enacted Plan. Pl. Br. 27–28. But *Easley* obviously was not requiring competing *majority-black* districts which replicate the legislature's alleged *Shaw* evil of segregating and stigmatizing minority voters by artificially placing them in a racially identifiable "minority district" (the challenged district in *Easley* was only 47% black). *See* 532 U.S. at 240, 258. Rather, this requirement was imposed to provide a basis for assessing how the desire for a majority-minority district affected neutral districting principles, by examining what a district representing the state's overall racial balance would look like. Here, Virginia's statewide BVAP is 19.4%, *see* Pl. Ex. 1 at 40, but the Alternative Plan keeps District 3's BVAP above 50% and increases District 2's BVAP to 27.8%, *see* Int.-Def. Ex. 10 at 10, farther away from the statewide level than Enacted District 2's 21.3% BVAP, *see* Pl. Ex. 16 at 3.

Enacted Plan on preservation of cores and incumbency protection, *see* pp. 18–20, *supra*; Trial Tr. 422–23—and, as Dr. McDonald agrees, *not* "significant[ly]" better on Plaintiffs' preferred principles of split localities and compactness, Trial Tr. 217; *Easley*, 532 U.S. at 258.

### D.     Plaintiffs' Other Evidence Fails To Support Their *Shaw* Claim

Plaintiffs attempt to fill the gaps in their evidence by rewriting the record, but once again this effort fails.  Delegate Janis's statements confirm that race did not predominate, and Plaintiffs' inflammatory accusation of a racial "quota" is invented out of whole cloth.

1.     Plaintiffs once again trot out a series of quotes from Delegate Janis, arguing that his statements that compliance with the Voting Rights Act was a "'paramount concern'" and "'primary focus'" prove that race predominated.  Pl. Br. 1 (quoting Pl. Ex. 43 at 10, 25).  But because federal law is mandatory and supreme over state law, *every* legislature or court that draws a redistricting plan must and does treat compliance with the Voting Rights Act as "paramount" and a *higher* priority than compliance with state-law traditional principles.

Under Plaintiffs' attempt to equate Voting Rights Act compliance with racial predominance, every *court-drawn* redistricting plan constitutes a *Shaw* violation because they all mimic Delegate Janis's truisms.  *See, e.g.*, *Colleton County Council v. McConnell*, 201 F. Supp. 2d 618 (D.S.C. 2002) (three-judge court) (court drawing a remedial plan must first "comply with . . . the Voting Rights Act" and "[s]econd, in satisfying these federally mandated requisites," look to "historical redistricting policies of the state, *but only insofar as those policies do not lead to violations of the Constitution or the Voting Rights Act*" (emphasis added)); *Perry v. Perez*, 132 S. Ct. 934, 941 (2012) (same); *Abrams v. Johnson*, 521 U.S. 74, 79 (1997) (same).

As this reflects, *Shaw*'s prohibition on subordinating traditional principles to race obviously does not outlaw recognizing the supremacy of federal law over state law, but prohibits *violating* state-law principles for racial reasons—*i.e.*, redistricting in such a way that "race" is the

sole "criterion that could not be compromised." *Shaw II*, 517 U.S. at 907.  Thus, Plaintiffs'

effort to analogize this case to *Shaw II* and *Bush*, *see* Pl. Br. 6–7, simply fails.  In *Shaw II*, the

state *admitted* that race was the "overriding" and "principal reason" for the challenged districts.

517 U.S. at 906.  And in *Bush*, the legislature's "consensus" was  to redistrict in a way that

maximized minority representation, *regardless* of the mandates of the Voting Rights Act—and it

violated traditional districting principles to do so.  *See* 517 U.S. at 960–61; *see also Clark v.*

*Putnam*, 293 F.3d 1261, 1279 (11th Cir. 2002) (finding *Shaw* violation where race was

"predominant consideration" and plan violated traditional principles) (cited at Pl. Br. 10); *Smith*

*v. Beasley*, 946 F. Supp. 1174, 1207–08 (D.S.C. 1996) (same) (cited at Pl. Br. 11).

      These statements thus are not "like those made by Del. Janis," Pl. Br. 6, because they

consciously elevate *race* above all other criteria, and do not simply recognize the supremacy of

the Voting Rights Act over state-law principles.  Moreover, as Delegate Janis painstakingly

explained—in statements Plaintiffs largely ignore—the Enacted Plan *comports with* rather than

violates Virginia's traditional districting principles.  *See* p. 18, *supra*.  The Enacted Plan thus

does not "subordinate" traditional principles *at all*, much less in a way that violates *Shaw*.[9]

      **2.**     In a last-ditch effort to meet their *Shaw* burden, Plaintiffs accuse the General

Assembly of using a 55% "racial quota" to draw Enacted District 3, *see* Pl. Br. 7, but the

evidence falls far short of proving that accusation.  *First*, Plaintiffs point out that Mr. Morgan

recited that the General Assembly in 2011—with strong biracial and bipartisan support—adopted

a House of Delegates plan "with 55% Black VAP as the *floor* for black-majority districts."  Int.-

Def. Ex. 13 at 27 (emphasis added).  But the "floor" refers to the minimum BVAP number that

was *actually contained* in the House of Delegates plan, not some *mandatory* minimum quota

---

[9] For these same reasons, Plaintiffs are wrong when they argue that the Senate Criteria's recognition of the supremacy of federal law "confirm[s]" that race predominated.  Pl. Br. at 11.

they *had* to achieve.  And, of course, if Mr. Morgan *had* said there was a 55% quota for District 3 (which he plainly did not), this assertion would be valueless since Mr. Morgan had nothing to do with, and no knowledge of, the General Assembly's congressional redistricting efforts.  Trial Tr. 243.  In fact, Mr. Morgan's comments simply convey the obvious point that the House of Delegates experience provided the General Assembly with a "strong basis in evidence" to believe that a 55% BVAP for District 3 would, on the one hand, "substantially address[]" Section 5's requirements (as shown by the House of Delegates plan's preclearance), *see Bush*, 517 U.S. at 977, and, on the other, would not be "excessive" because the 55% BVAP levels in the House received overwhelming black support, Int.-Def. Ex. 13 at 27–28;  *See* p. 32, *infra*.

*Second*, Plaintiffs point to statements by Delegate Dance and Senator Vogel—but they fail to mention that they were addressing the *House of Delegates* and *Senate* plans respectively, not the Enacted Plan.  *See* Pl. Br. 8–9; Int.-Def. Ex. 30 at 13–14; Int.-Def. Ex. 32 at 18.  These statements therefore are no proof of a quota in the Enacted Plan.

*Third*, Plaintiffs point to Virginia's Section 5 submission, which noted that the Enacted Plan increased District 3's total and voting-age black populations "to over 55 percent."  Pl. Ex. 6 at 3; *see also* Pl. Br. 9.  But, of course, the Submission's accurate recitation of District 3's BVAP hardly suggests that this BVAP resulted from some pre-ordained quota.

*Finally*, public statements from Delegate Janis again completely refute Plaintiffs' accusation.  Delegate Janis stated that the only BVAP percentage he considered was not 55% but 53.2%, the Benchmark BVAP in District 3, because he focused on whether the Enacted Plan "retrogress[ed] in the sense" of lowering District 3's BVAP.  Pl. Ex. 43 at 10 (quoted at Pl. Br. 5); *see also* Pl. Ex. 13 at 8.  Delegate Janis also made clear that the Enacted Plan did not treat the Benchmark BVAP as a *pre-drafting* quota, but that he "looked" *post-drafting* "at the census

data" to determine whether the BVAP "in the proposed lines" would be less than the Benchmark. Pl. Ex. 43 at 10 (quoted at Pl. Br. 5). Moreover, when asked about BVAP changes in Districts 3 and 4, Delegate Janis explained that the changes to those districts were based on "all the information I received from [incumbent] Congressman Scott [and] Congressman Forbes" and "the recommendations that they provided." Pl. Ex. 13 at 11. Even Dr. McDonald agreed—at least prior to being retained as Plaintiffs' expert—that Republicans in the General Assembly supported increasing District 3's BVAP and decreasing District 4's BVAP because they "wished to preserve" District 4's "Republican character," not because they sought to implement a racial quota in District 3. Int.-Def. Ex. 55 at 816. There was no quota in the Enacted Plan.

## III. THE ALTERNATIVE PLAN IS NO MORE NARROWLY TAILORED THAN THE ENACTED PLAN

The affirmative defense of narrow tailoring is not even triggered in this case because Plaintiffs have failed to carry their *prima facie Shaw* burden. *See Shaw II*, 517 U.S. at 908. Even where narrow tailoring is triggered, the enacted district need not "defeat rival compact districts designed by plaintiffs' experts in endless 'beauty contests.'" *Bush*, 517 U.S. at 977 (plurality op.). Indeed, in this context, the Supreme Court "adhere[s] to [its] longstanding recognition of the importance in our federal system of each State's sovereign interest in implementing its redistricting plan." *Id.* States thus retain "flexibility" in how they "respect" traditional principles and undertake "reasonable efforts to avoid" Voting Rights Act liability. *Id.*

Thus, narrow tailoring does not turn on whether the Enacted Plan achieves the most minimal possible compliance with the Voting Rights Act, or whether Plaintiffs' Alternative more minimally complies. Rather, narrow tailoring is shown if "the districting that is based on race 'substantially addresses the [Voting Rights Act] violation.'" *Id.* (quoting *Shaw I*, 509 U.S. at 656; *Shaw II*, 517 U.S. at 918); *Colleton County*, 201 F. Supp. 2d at 639; *Backus*, 857 F. Supp.

2d at 599; *Moon*, 952 F. Supp. at 1149.  Since it is undisputed that Enacted District 3

"substantially addresses" the need to avoid retrogression under Section 5, it is narrowly tailored

regardless whether it could have complied with a lower BVAP.  In any event, Plaintiffs' lower-

BVAP alternative cannot be viewed as "better" (even if that were relevant to narrow tailoring)

because it is certainly not a better way to comply with Section 5 and a concededly far worse way

to further the General Assembly's neutral districting goals.  Far from achieving the General

Assembly's neutral Section 5 and traditional districting objectives through *less* consideration of

race, the Alternative Plan considers race to at least the same degree but nonetheless makes it

more difficult to achieve compliance with both Section 5 and the Legislature's neutral goals.

### A.    The Enacted Plan Meets Any Narrow Tailoring Requirement

In 2003, the Supreme Court construed Section 5 to permit conversion of majority-

minority districts into minority-minority districts in certain cases.  *Georgia v. Ashcroft*, 539 U.S.

461, 479–80 (2003).  Congress amended Section 5 three years later to overturn *Ashcroft*, which

"misconstrued and narrowed the protections afforded by Section 5."  42 U.S.C. § 1973c note,

Findings (b)(6).  Thus, the 2006 version of Section 5 prohibited any change that would

"diminish[]" minority voters' ability to elect their "candidates of choice."  42 U.S.C. § 1973c(b).

This new "ability to elect" standard afforded the General Assembly more than a "strong

basis in evidence" to conclude that Section 5 prohibited *any* reduction in District 3's BVAP,

*Bush*, 517 U.S. at 977 (plurality op.), which could diminish minority voters' ability to elect their

"candidates of choice" by making a safe black district less safe, 42 U.S.C. § 1973c(b).

Moreover, the General Assembly opted not to conduct a costly racial bloc voting analysis, and

the "best course" to achieving preclearance, absent such an analysis, is to not reduce District 3's

BVAP below the Benchmark level.  Trial Tr. 199–203 (Testimony of Dr. McDonald); *see also*

Pl. Ex. 43 at 10.  The Independent Bipartisan Advisory Commission On Redistricting formed by

Governor McDonnell—to which Dr. McDonald served as an advisor—took a similar view and, in the absence of a racial bloc voting analysis, maintained "a percentage of minority voting-age population within the range accepted by the Department of Justice in 2001." Int.-Def. Ex. 28 at 18. Thus, the Commission proposed three congressional districting options, all of which had a BVAP in District 3 between 52.5% and 55.1%. *See id.* at 22–27.

The General Assembly also had evidence that 55% BVAP was a reasonable threshold for obtaining, and would "substantially address," Section 5 preclearance. *Bush*, 517 U.S. at 977 (plurality op.); Int.-Def. Trial Br. 24–27. In 2011, the General Assembly considered proposed redistricting plans for the House of Delegates and its 12 majority-black districts. *See* Int.-Def. Ex. 13 at 25–27. Some of these proposals, including the Independent Commission's two proposals, had majority-black districts with BVAPs below 55%. *See id.*

At least one black Delegate from an area covered by District 3, Delegate Dance of Petersburg, and black community leaders advocated a 55% minimum BVAP for majority-black districts in the House plan. *See* Int.-Def. Ex. 30 at 13–14; Int.-Def. Ex. 31 at 20, 28. The General Assembly enacted a House plan with a BVAP of 55% or higher in all 12 majority-black districts, including districts within the geography covered by District 3, and even increased the BVAP in some districts. *See* Int.-Def. Ex. 13 at 26. Eight of the 12 members of the House Black Caucus voted in favor of the plan. *See id.* The Justice Department precleared that Plan, meaning that Virginia carried its burden to prove that the Plans lacked "any discriminatory purpose," 42 U.S.C. § 1973c(c), even though one of the key factors the Department considers is "whether minorities are overconcentrated in one or more districts," Def. Ex. 9 at 7472.

## B.    Plaintiffs Fail To Defeat This Showing Of Narrow Tailoring

Plaintiffs offer no persuasive argument to defeat this showing of narrow tailoring. *First*, Plaintiffs assert that Section 5 is not a compelling state interest because, *after* the Enacted Plan

was adopted, the Supreme Court invalidated the Section 5 coverage formula in *Shelby County*.

*See* Pl. Br. 30.  But for all the reasons explained in Intervenor-Defendants' summary judgment

memorandum, the only relevant question is whether the General Assembly had a compelling

interest when it took the challenged action in the real world, not whether it would have had that

interest in a hypothetical 2012 world where Section 5 did not exist.  *See* Int.-Def. Summ. J.

Memo. 11–20 (DE 39).  In all events, the Alabama three-judge court rejected Plaintiffs'

argument, *see Ala. Leg. Black Caucus v. State of Ala.*, No. 2:12-cv-691, at 162–72 (N.D. Ala.

Dec. 20, 2013) (Ex. C), and Plaintiffs have asked the Court to resolve this case before the

Supreme Court's decision in the Alabama case, *see* Pl. Br. 36–37.

　　　*Second*, Plaintiffs' main argument is that the Enacted Plan is not narrowly tailored

because it did not reduce District 3's BVAP to the point at which a racial bloc voting analysis

would show that black-preferred candidates could be elected.  *See id.* at 30–31.  This is wrong

for a number of reasons.  In the first place, a racial bloc voting analysis is not "required" to prove

that a plan does not diminish minority voting strength, *id.*, because the Enacted Plan received

preclearance *without* one.  If a racial bloc voting analysis is not required to prove *compliance*

with Section 5, it cannot possibly be required to prove that a plan *substantially addresses* Section

5's requirements.  And all agree that the "best course" in the absence of an unnecessary racial

bloc voting analysis is to maintain the benchmark BVAP, as the Commission did.  Trial Tr. 199–

203 (Dr. McDonald).

　　　Moreover, Plaintiffs are flatly wrong in suggesting that narrow tailoring prohibits any

BVAP above the minimum level at which black voters could elect their candidate.  *See* Pl. Br.

30–34.  This contention is directly contradicted by the Supreme Court's recognition that states

can "substantially address" Section 5 in many ways and, thus, retain "flexibility" in how they

"respect" traditional principles and undertake "reasonable efforts to avoid" Voting Rights Act

liability. *Bush*, 517 U.S. at 977 (plurality op.). And Plaintiffs' requirement, far from being the

least race-conscious option, would place states in a racial straightjacket and interject even *more*

race-consciousness into redistricting by requiring states to precisely calibrate BVAP levels.

It is clear that *less* racial fine-tuning is required if the new Section 5 districts are in the

range of the benchmark BVAP than if they replicate it precisely. For example, Plaintiffs' rule

would require race-conscious actions to *offset* any increase in BVAP above the benchmark

BVAP, just as Plaintiffs' Alternative Plan had to deliberately *shed* BVAP from District 3 to

District 2 in order to offset the *increased* BVAP District 3 obtained from other Districts. At a

minimum, increasing BVAP above the benchmark is a problem only if it constitutes "packing"

or if the *increase* subordinates traditional districting principles. Here, however, Dr. McDonald

has conceded that District 3 is not "packed," Trial Tr. 205, and there is no suggestion that the

3.2% "increase" from 53.1% to 56.3% BVAP departed from traditional districting principles, *id.*

at 326–27. To the contrary, the 56.3% Enacted District 3 performs *better* than the 53.1%

Benchmark District 3 on the traditional districting principle of reducing split localities. *See id.* at

321–24. If a 53.1% district performed better on traditional districting principles, Plaintiffs would

have introduced one. But Plaintiffs did not do so because they could not gain a marginal

advantage of one fewer split locality until they reduced District 3's BVAP to just above 50%.

Because Plaintiffs have made no showing that a 53.1% district outperforms the 56.3% Enacted

District 3 on traditional districting principles, the Enacted Plan's *increase* of District 3's BVAP

has nothing to do with *subordinating* traditional principles or violating *Shaw*.

Indeed, Plaintiffs' own Alternative Plan and Dr. McDonald's racial bloc voting analysis

reveal the flaws in their argument. As Dr. McDonald agrees, his racial bloc voting analysis

shows that blacks could elect their candidates of choice at a 30% BVAP level in District 3.  *See* Trial Tr. 196.  In the real world, however, a reduction from 53.1% to 30% BVAP would almost certainly be denied preclearance as retrogressive (which is why Plaintiffs did not propose such an alternative) and no sensible legislature would produce such a plan.  Rather, racial bloc voting analyses like Dr. McDonald's reflect only that the votes received by *Barack Obama* (who twice won Virginia, a state with 19.4% BVAP) and the *white* Democratic 2009 gubernatorial candidate say nothing about what a first-time black congressional candidate could expect in District 3— which is the only relevant question.  (Nor could non-retrogression for a non-incumbent be proved by looking at District 3's actual congressional elections since they involved a powerful black incumbent and were often completely uncontested.  *Id.* at 53, 193–96.)

Conversely, the *failure* to reduce the BVAP to 30% would require invalidation under Plaintiffs' view of *Shaw*, since it "gratuitously" has a BVAP above that that needed to avoid retrogression.  For example, Plaintiffs' Alternative District 3 is at least 20% above the 30% "non-retrogression" BVAP.  Thus, Plaintiffs' misguided view of narrow tailoring creates a Catch-22: either reduce BVAP to the "no retrogression" level dictated by the racial bloc voting analysis (and seriously risk a Section 5 objection in the real world) or fail to make such a reduction (and have the district invalidated under *Shaw* due to a lack of narrow tailoring).

As this reflects, Plaintiffs' Alternative Plan is *not* narrowly tailored even if Plaintiffs' legal view of narrow tailoring is fully accepted: the 50% BVAP number in their Alternative District 3 is not related to Section 5 compliance since it far exceeds the 30% non-retrogression number.  Instead, it is simply an arbitrary number which gratuitously requires racial redistricting to achieve a BVAP far above any needed to comply with Plaintiffs' conception of Section 5.  Thus, at best, it concededly contains the same flaw that purportedly dooms the Enacted Plan:

drawing a District 3 that gratuitously increases BVAP above the point needed to satisfy Section 5.  (And, as shown, Alternative District 3 does not better serve traditional districting principles.)

*Finally*, Plaintiffs argue that the Enacted Plan is not narrowly tailored because District 3 was precleared "with a BVAP below 55%" in 1998.  Pl. Br. at 33.  But that past history proves nothing.  The question under Section 5 is whether a plan retrogresses minority voting strength compared to the benchmark plan, which is "the last legally enforceable redistricting plan."  Def. Ex. 9 at 7470.  Because "[a] plan found to" violate *Shaw* "cannot serve as the Section 5 benchmark," the benchmark for the 1998 post-*Moon* version of District 3 was the redistricting plan adopted in Virginia in the 1980s.  *Id.*  The highest BVAP in any district in that plan was less than 37%, so it is unsurprising that the 1998 version of District 3 received preclearance with 50.47% BVAP.  *See* Pl. Ex. 23 at 26.  (Likewise, it is unsurprising that the next plan, the 2001 Benchmark Plan which *increased* District 3's BVAP to 53.2%, also received preclearance.)

## IV.   THERE IS NO BASIS TO IMPOSE A REMEDY NOW

### A.   The Court Cannot Implement A Remedy Before The 2014 Election

Plaintiffs have failed to prove their *Shaw* claim or any basis for a remedy, much less on their unworkable timeline.  *See* Pl. Br. 34–35.  Virginia's primary election was *completed* on June 10—and it would simply be impossible to void the results of that election, afford the General Assembly an adequate opportunity to adopt a remedy, create a court-drawn plan if needed, and order a new election in time to comply with the federal MOVE Act.  *See* Int.-Def. Rem. Br. 19–22 (DE 33).  Even if feasible, surely Plaintiffs are not seriously suggesting that the Court *disenfranchise* all June 10 primary voters by *cancelling* the results of that lawful election, and then hold "do-over" primaries.  As this Court has pointed out, Plaintiffs have no one but themselves to blame for the timing of this case: they allowed the Enacted Plan to be used for the 2012 election and waited more than three months after *Shelby County* to file suit.  *See* Order (DE

36

54).  Plaintiffs cannot be heard now to demand that the Court speed to final relief in the little more than three months between the July 22 oral argument and the November 4 general election.

**B.     The Supreme Court's Eventual Decision In The Alabama Case Is Unlikely To Affect This Case**

Defendants agree that there is "good reason to doubt that the Supreme Court's decision" in *Alabama Legislative Black Caucus v. Alabama* "would have any effect on this case."  Pl. Br. 37.  As explained, Plaintiffs failed to prove their *Shaw* claim under a number of well-established legal rules, and the Supreme Court is unlikely to "announce a decisional rule that would materially modify existing law."  *Id.*  Moreover, the public interest militates in favor of removing any ambiguity surrounding the Enacted Plan.  Defendants therefore agree that the Court should resolve this case without awaiting the Supreme Court's decision in the Alabama case.

## CONCLUSION

The Court should grant judgment to Defendants and Intervenor-Defendants.

Dated:   June 20, 2014

Respectfully submitted,

/s/ Mike F. Melis
Mark R. Herring,
Attorney General of Virginia

Cynthia E. Hudson,
Chief Deputy Attorney General

Rhodes B. Ritenour
Deputy Attorney General

*Trevor S. Cox (VSB No. 78396)
Deputy Solicitor General

*Mike F. Melis (VSB No. 43021)
Assistant Attorney General

Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
(804) 786-2071
Fax: (804) 786-1991
tcox@oag.state.va.us
mmelis@oag.state.va.us
*Counsel of Record

*Attorneys for Defendants Charlie Judd,
Kimberly Bowers, and Don Palmer in their
official capacities*

/s/ Jonathan A. Berry
Michael A. Carvin (*pro hac vice*)
John M. Gore (*pro hac vice*)
Jonathan A. Berry (VSB #81864)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Tel: (202) 879-3939
Fax: (202) 626-1700
Email: macarvin@jonesday.com
Email: jmgore@jonesday.com
Email: jberry@jonesday.com

*Counsel for Intervenor-Defendants
Virginia Representatives*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 20, 2014, a copy of the POST-TRIAL BRIEF OF INTERVENOR-

DEFENDANTS AND DEFENDANTS was filed electronically with the Clerk of Court using the

ECF system, which will send notification to the following ECF participants:

John K. Roche, Esq.
Mark Erik Elias, Esq.
John Devaney, Esq.
PERKINS COIE, LLP
700 13th Street, N.W., Suite 600
Washington, D.C. 20005-3960
Tel. (202) 434-1627
Fax (202) 654-9106
JRoche@perkinscoie.com
MElias@perkinscoie.com
JDevaney@perkinscoie.com

Kevin J. Hamilton, Esq.
PERKINS COIE, LLP
1201 Third Avenue, Ste. 4800
Seattle, WA 98101-3099
Tel. (202) 359-8000
Fax (202) 359-9000
KHamilton@perkinscoie.com

*Counsel for Plaintiffs*

Mike F. Melis
Office of the Attorney General
900 East Main Street
Richmond, VA 23219
Telephone: (804) 786-2071
Fax: (804) 371-2087
mmelis@oag.state.va.us

*Counsel for Defendants*

Dated: June 20, 2014

/s/ Jonathan A. Berry
Jonathan A. Berry

*Counsel for Intervenor-Defendants Virginia
Representatives*