# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | |
|---|---|
| DAWN CURRY PAGE, et al., | |
| Plaintiffs, | Civil Action No. 3:13-CV-678-REP-LO-AKD |
| v. | |
| VIRGINIA STATE BOARD OF ELECTIONS, et al., | |
| Defendants. | |

## PLAINTIFFS' POST-TRIAL REPLY BRIEF

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ....................................................................................... 1

II.    ARGUMENT .............................................................................................. 3

    A.    Race, Not Politics, Was the Predominant Factor Behind CD3............................. 3

        1.    Del. Janis's Statements Show Consideration of Race Predominating Above All Other Redistricting Factors............................. 4

        2.    The 55% BVAP Quota Shows that Race Was a Central Concern to the Legislature........................................................................... 6

        3.    Dr. McDonald's Testimony and VTD Analysis Support the Conclusion that Race Predominated. ......................................... 7

        4.    CD3 Subordinated Traditional Redistricting Criteria to Race. ................. 9

        5.    Plaintiffs' Alternative Plan Is Further Proof that Race Was the Predominate Factor Behind CD3. ........................................... 11

        6.    Defendants Fail to Even Address Key Evidence Showing that Race Predominated. ..................................................................... 13

    B.    The Enacted Plan Does Not Satisfy Strict Scrutiny............................................. 14

    C.    The Court Should Impose an Immediate Remedy. .............................................. 16

III.    CONCLUSION......................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bush v. Vera*,
    517 U.S. 952 (1996) ......................................................................6, 7, 14, 16

*Clark v. Putnam Cnty.*,
    293 F.3d 1261 (11th Cir. 2002) .................................................................7

*Desena v. Maine*,
    793 F. Supp. 2d 456 (D. Me. 2011) ........................................................17

*Diaz v. Silver*,
    978 F. Supp. 96 (E.D.N.Y. 1997) .............................................................6

*Easley v. Cromartie*,
    532 U.S. 234 (2001) ...................................................................11, 12, 13

*Hunt v. Cromartie*,
    526 U.S. 541 (1999) ..................................................................................4

*Miller v. Johnson*,
    515 U.S. 900 (1995) ................................................................................11

*Moon v. Meadows*,
    952 F. Supp. 1141 (E.D. Va. 1997) ........................................................10

*Rodriguez v. Harris Cnty., Tex.*,
    964 F. Supp. 2d 686 (S.D. Tex. 2013) .....................................................2

*Shaw v. Hunt*,
    517 U.S. 899 (1996) ......................................................................4, 6, 14

*Shaw v. Reno*,
    509 U.S. 630 (1993) ...............................................................3, 4, 11, 14

*United States v. City of Euclid*,
    580 F. Supp. 2d 584 (N.D. Ohio 2008) ...............................................2, 16

OTHER AUTHORITIES

U.S. Const. amend XIV ...................................................................................3

## I.      INTRODUCTION

Rather than addressing the facts in the record before the Court, Defendants' Post-Trial Brief instead misconstrues the record evidence while conjuring new legal standards out of thin air.  Neither tactic is persuasive.

Defendants dismiss Del. Janis's emphatic admissions that race predominated in the drawing of Virginia's Third Congressional District ("CD3") and that the General Assembly did not consider incumbency protection by claiming Delegate Janis was a lone delegate who did not mean what he so clearly said.  But neither he nor his statement can hardly be so cavalierly dismissed:  he was the General Assembly's primary map-drawer, aptly described as a "lone ranger" on map drawing.  And his statements made clear beyond dispute that race predominated in drawing CD3 and politics took a back seat.

In a similar resort to revisionism, Defendants hastily retreat from their prior admissions that the General Assembly used a 55% BVAP quota when adopting CD3.  Their own expert witness, however, readily admitted that in drawing CD3, the General Assembly relied on the same 55% BVAP floor that the House of Delegates used for minority districts in its reapportionment plan.  Defendants cannot now credibly disavow that testimony, and, indeed, they eventually revert to the argument that the General Assembly's use of the 55% BVAP floor in drawing CD3 had a "strong basis in evidence" because it used that same floor in the pre-cleared House of Delegates' plan.  Def. Post-Trial Br. at 29.  This concession, coupled with the statements from Del. Janis, leave no doubt that race was the predominant purpose.

Defendants fare no better when it comes to their discussion of the law.  Attempting to meet their burden of proving that the General Assembly's use of race in CD3 was narrowly tailored, Defendants make the remarkable claim that the 2006 amendments to the Voting Rights

Act ("VRA") somehow loosened the requirement of narrow tailoring.  Under this novel reading

of the amendments, it is no longer necessary to use race as narrowly as possible to meet a state

compelling state interest, and the only limiting standard is whether the General Assembly used

race in a way that "substantially addresses" the requirements of Section 5.  Def. Post-Trial Br.

at 5, 31.  Defendants provide no authority for this startling proposition and for good reason: there

is none.

The 2006 amendments to the VRA did not alter the narrow tailoring requirement in any

way and most assuredly did not, as Defendants suggest, make a racial bloc voting analysis a

disregarded relic of the past.  Indeed, since 2006, courts have repeatedly relied on racial bloc

voting analyses, *see, e.g.*, *Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 760-68 (S.D.

Tex. 2013); *United States v. City of Euclid*, 580 F. Supp. 2d 584, 596 (N.D. Ohio 2008), and no

court has ever held that a legislature is free to use race as broadly as it sees fit so long as the use

"substantially addresses" the requirements of Section 5.  The argument is little more than an

attempt to shape the law to fit two damning facts Defendants must confront:   the General

Assembly's use of a racial quota and its decision not to conduct a racial bloc voting analysis.

These facts establish that Defendants cannot meet their strict scrutiny burden of establishing

narrow tailoring.

Rather than address the actual record before the Court or address the law that so plainly

defeats Defendants' primary contentions, Defendants Post-Trial Brief instead devotes most of its

attention to attacking plaintiffs' alternative map.  But Defendants cite no authority for their

assertion that plaintiffs must present a "race-neutral" plan, and seek to distract from the

constitutional flaws in the enacted redistricting plan by nitpicking plaintiffs' alternative map,

which—apart from being a significant improvement over the enacted plan—is simply not the

question before this Court.  Plaintiffs created the alternative map to show how the legislature could have better accomplished its goals without running afoul of the Fourteenth Amendment. The alternative map, unlike the enacted map, does not go beyond what is "reasonably necessary" to comply with the Voting Rights Act.  *See Shaw v. Reno* ("*Shaw I*"), 509 U.S. 630, 655 (1993).

Plaintiffs have submitted both direct and circumstantial evidence that proves race was the predominant factor behind CD3.  Defendants have failed to show that the district meets strict scrutiny.  This Court, Plaintiffs respectfully submit, should order an immediate and effective remedy.

## II.      ARGUMENT

### A.      Race, Not Politics, Was the Predominant Factor Behind CD3.

Plaintiffs have the burden of proving through circumstantial or direct evidence that race was the predominant purpose behind the redistricting plan.  *See* Pl. Post-Trial Br. at 3-4. Plaintiffs have more than met this burden.  The evidence presented at trial shows that the map-drawer admitted race predominated, Pl. Post-Trial Br. at 4-6, the General Assembly used a 55% BVAP quota, Pl. Post-Trial Br. at 8-9, Senate Criteria confirm that race was more important than other factors, Pl. Post-Trial Br. at 11-12, the district has a bizarre shape, Pl. Post-Trial Br. at 12-14, and African Americans were moved into CD3 while their white neighbors were moved out, Pl. Post-Trial Br. at 14-16.

Defendants scramble to discredit these facts individually, and argue that politics was the General Assembly's primary concern.  Yet while there is substantial evidence in the record that racial considerations drove the changes to CD3, Defendants stand bereft before the Court with no direct evidence to show that politics predominated.[1]  *Cf. Hunt v. Cromartie*, 526 U.S. 541, 549

---

[1]Defendants mischaracterize Plaintiffs' actual argument in favor of a straw man:  they emphatically insist that of course politics played "a role" in the redistricting and thus that Plaintiffs' case must necessarily fail.  Tr. Br. at 1-2.

(1999) (evidence that politics predominated was presented by "affidavit testimony of the two members of the General Assembly responsible for developing the State's 1997 plan.").  Looking at all of the evidence together, race was unmistakably the predominant factor behind CD3.

### 1.    Del. Janis's Statements Show Consideration of Race Predominating Above All Other Redistricting Factors.

Defendants wildly extrapolate from Del. Janis's statements regarding consultation with incumbents to conclude that politics was the driving force behind the creation of CD3.  Def. Post-Trial Br. at 11-13.  This conclusion is completely unsupported in context and directly contradicted by several explicit statements that race—not politics—was in fact the predominant consideration in drawing CD3.

Contrary to Defendants' assertion, Del. Janis's statements provide no support for the idea that he considered politics when drawing the enacted map, let alone CD3.  He explicitly stated that he did not consider politics, and Defendants would undercut this unqualified admission about CD3 by suggesting that Del. Janis's consultations with incumbents converted the redistricting process into a political maximization game.  But Del. Janis's statements do nothing of the kind.  In the most detailed discussion of his role, Del. Janis explained that he first drew districts according to his understanding of the mandatory criteria, which included increasing the number of Black residents in CD3 to comply with his erroneous view of the Voting Rights Act.  Pl. Ex. 43 at 22-23.  Only then did he consider "the permissive criteria [] based on recommendations received from each of the 11 currently elected congressmen, both Republican

---

But all Plaintiffs need show is that race *predominated* over politics.  *See Shaw v. Hunt* ("*Shaw II*"), 517 U.S. 899, 907 (1996) ("We do not quarrel with the dissent's claims . . . that partisan politicking was actively at work in the districting process.  That the legislature addressed these interests does not in any way refute the fact that race was the legislature's predominant consideration.").  Merely showing that political considerations were involved or considered hardly defeats a *Shaw* claim.  If that were the case, then no *Shaw* claim could *ever* prevail, as politics is obviously intertwined at some level in every redistricting effort.  But where, as here, race *predominates*, then the burden shifts to the Defendants to show narrow tailoring.  *Id.* at 908.  Defendants' overwrought efforts to distract the Court from the actual standard is telling.

and Democrat, about how best to preserve local communities of interest, local jurisdictions, given their knowledge of their districts." *Id*. at 23.  Even Defendants acknowledge that Del. Janis's plan was only drawn "*in part* based on" the congressmen's suggestions.  Def. Post-Trial Br. at 12; Int.-Def. Ex. 9 at 14 (emphasis added).  Any recommendations from congressmen related only to criteria that Del. Janis considered *after* determining how to maintain a certain racial composition for CD3.

Moreover, the congressmen's own discovery responses show that their contributions were minimal.  Def. Post-Trial Br.  Defendants are well aware that discovery requests asked for any correspondence the congressmen or their staff had with regard to redistricting, and their responses produced no such evidence of incumbent usurpation of the redistricting process.  *See* Pl. Post-Trial Br. at 21-22; *see also* Pl. Exs. 33-40.  The record can be searched in vain for any evidence to support Defendants' claim that the incumbents essentially drew their own districts. There is none.

In fact, Del. Janis's statements support just the opposite conclusion:  that race predominated in the drawing of CD3.  *See* Pl. Post-Trial Br. at 4-6.  Defendants attempt to elude this clear and explicit evidence by claiming that his remarks "simply recognize the supremacy of the Voting Rights Act over state-law principles."  Def. Post-Trial Br. at 28.  The record speaks for itself.  Janis stated that a primary goal of the redistricting changes for CD3 was that "there be no retrogression in minority voter influence" in the district.  Pl. Exs. 43 at 3.  "I was most especially focused on making sure that the Third Congressional District did not retrogress in its minority voting influence." Pl. Exs. 43 at 14. "[T]he primary focus of how the lines in HB5004 were drawn was to ensure that there be no retrogression [of Black voters] in the Third

Congressional District."  Pl. Exs. 43 at 25.  These statements go far beyond some meaningless legal platitudes.  With regard to CD3, it is clear that race predominated.[2]

Recognizing that Del. Janis's admissions are more than a little problematic, Defendants nervously hedge their bets and insist that his statements in any event don't matter.  Defendants argue that "even if Delegate Janis had said that he did not consider politics . . . such a statement would not prove that the General Assembly" was in accord.  *See* Def. Post-Trial Br. at 11.  Yet his statements are *exactly* the kind of evidence that the Supreme Court has held to be compelling proof that race predominated a redistricting decision.  *See, e.g.*, *Shaw II*, 517 U.S. at 906 (noting that the principal draftsman testified that "creating majority-black districts was the 'principal reason'" for the challenged districts); *Bush*, 517 U.S. at 960-61.  As Plaintiffs have shown, Del. Janis is the one who actually drew the district lines.  *See* Pl. Post-Trial Br. at 7.  His statements are the best evidence of the motives underlying the redrawing of CD3.

**2.     The 55% BVAP Quota Shows that Race Was a Central Concern to the Legislature.**

Defendants remarkably conceded prior to trial that the General Assembly utilized a 55% BVAP quota in drawing CD3, apparently under the mistaken assumption that this fact might support their defense.  Recognizing the vulnerability, Defendants now scramble to take it back.  Def. Post-Trial Br. 28-29; *see also* Def. Tr. Br. at 25-26 ("The General Assembly also had evidence that 55% BVAP was a reasonable threshold for obtaining Section 5 preclearance.").  But Defendants' expert's statement, the statements of contemporaneous legislators, and the Section 5 submission all mention 55% as the minimum for preclearance.  *See* Pl. Post-Trial Br.

---

[2] *Compare Bush v. Vera*, 517 U.S. 952, 961 (1996) (citing "testimony of individual state officials confirm[ing] that the decision to create the districts now challenged as majority-minority districts was made at the outset of the process and never seriously questioned"); *Diaz v. Silver*, 978 F. Supp. 96, 117 (E.D.N.Y. 1997) ("Both the referees' final report and the testimony of Dr. Alan Gartner [drafters of the plan] provide direct evidence of the intent to segregate voters by race in the plan. The referees' report lists the strictures of population equality and the Voting Rights Act as most fundamental to their redistricting efforts, after which they considered traditional criteria. This prioritization demonstrates the predominance of race in their redistricting plan.") (internal citation omitted).

at 7-11.  In the face of this compelling evidence, Defendants inexplicably assert that "[t]here was no quota in the Enacted Plan."  Def. Post-Trial Br. at 30.  But denial, no matter how vehement, cannot blink away the evidence in the record.

There is ample evidence that at the time of redistricting, Del. Janis and members of the Virginia legislature were acting under the mistaken impression that a 55% BVAP floor was necessary.  *See* Def. Post-Trial Br. at 32 ("The General Assembly also had evidence that 55% BVAP was a reasonable threshold for obtaining . . . Section 5 preclearance.").  That is why CD3 was drawn the way it is, and that is why it was adopted.  That evidence, standing alone, mandates a finding that race predominated, as courts have routinely held.[3]

### 3.  Dr. McDonald's Testimony and VTD Analysis Support the Conclusion that Race Predominated.

Defendants seize upon the testimony of Plaintiffs' expert witness, Dr. McDonald, as the linchpin for their claim that CD3 was politically, rather than racially, motivated.  Def. Post-Trial Br. at 1, 7-9.  But the argument simply misconstrues the record.  Dr. McDonald never testified that politics predominated, and his supposed "concession" that packing Black residents into CD3 helped Republicans is hardly even noteworthy.  Def. Post-Trial Br. at 1.  Just because a districting plan benefits a certain group does not mean the plan was drawn for that purpose.  In fact, Defendants' own expert, Dr. Morgan, made the equivalent "concession" that his analysis was consistent with race as the predominant factor behind CD3:

> Q: I think the point that you made yesterday was that the impact on politics and the impact on race was essentially the same. Isn't that the point you made yesterday?

---

[3] *See Bush*, 517 U.S. at 976 (districts that are "unexplainable on grounds other than the racial quotas established for those districts . . . are the product of presumptively unconstitutional racial gerrymandering"); *id.* at 996 (1996) (Kennedy, J., concurring) ("In my view, we would no doubt apply strict scrutiny if a State decreed that certain districts had to be at least 50 percent white, and our analysis should be no different if the State so favors minority races."); *Clark v. Putnam Cnty.*, 293 F.3d 1261, 1278 (11th Cir. 2002) ("Awarding public office on the basis of racial quotas . . . offends the equal protection clause.").

A: That they were—yeah, they were very similar. They were correlated, yes.

Q: So if we wanted to discern, like I believe this Court is going to have to, whether or not race predominated over other factors, this doesn't help us one way or the other. It doesn't explain that it was politics predominating over race. At best, it just shows it's neutral; isn't that true?

A: I could agree with that.

Tr. Trans. at 357.  Defendants repeat *ad nauseum* that expected partisan results based on historical performance prove that politics, not race, predominated, but this narrow analysis ignores the abundant evidence that shows CD3 was drawn with race as the predominant factor. Dr. McDonald repeatedly stated that his conclusion was based on an examination of many factors, such as Virginia's decision to increase CD3's BVAP, CD3's shape, its subordination of traditional districting criteria, its similarity to the previous unconstitutional district, its movement of Black residents into CD3 and White residents out, the use of VTD splits to exclude White areas from CD3, *and* political performance.  *See* Tr. Trans. at 72-92; *see also* Pl. Exs. 27-30. Def. Post-Trial Br.

And based on all of the evidence, Dr. McDonald concluded that race, and not party, explains the configuration of CD3.  Defendants nonetheless attack this analysis with the same arguments that they made before trial.  *See* Def. Post-Trial Br. 15; *see also* Def. Tr. Br. at 9-13. They contend that because 84% of the high-performing Democratic districts included in CD3 were in Benchmark CD3, Dr. McDonald's VTD analysis confirms only that the General Assembly protected the core of CD3.  But, at trial, Dr. McDonald foreclosed this argument by showing that the VTDs that had been dropped from CD3 had an average BVAP of only 21.1%, and the difference in BVAP between this group of VTDs and those included in Enacted CD3 was much larger than any difference in political performance.  *See* Pl. Post-Trial Br. at 23; *see also*

- 8 -

Tr. Trans. 405-12.  Defendants' expert admitted that he did not look at these VTDs when conducting his purported political analysis, Tr. Trans. 373, but an analysis of these VTDs confirms that race predominated.[4]  Pl. Ex. 57.  Despite their efforts, Defendants cannot sidestep this unrebutted trial testimony and evidence.

Finally, Defendants seek to impugn Dr. McDonald's credibility with statements made outside of court.  Def. Post-Trial Br. at 1, 7.  As Dr. McDonald testified, however, his law review article relied on public perceptions of the causes for the Enacted Plan, and he only analyzed the racial motivations for CD3 specifically when retained by Plaintiffs.  Tr. Trans. 226.  Once he had reviewed all the evidence, Dr. McDonald consistently concluded that race was the predominant factor behind CD3.[5]

### 4.    CD3 Subordinated Traditional Redistricting Criteria to Race.

Defendants fail to refute key evidence that Enacted CD3 subordinated traditional redistricting criteria to race.  See Def. Post-Trial Br. 20-25.  It is undisputed that Enacted CD3 was both the least compact congressional district in Virginia and only majority-minority district.  Enacted CD3 is barely contiguous.  See Pl. Post-Trial Br. at 18.  The disregard for traditional

---

[4] Plaintiff's Exhibit 57 analyzed not only the VTDs that were *added* to CD3, but also those that the General Assembly chose to *drop*.  That analysis is particularly significant for two reasons.  First, it addresses Defendants' critique of the other portions of Dr. McDonald's VTD analysis – that many of the VTDs were already in CD3 and the General Assembly's decision to leave them in the district is somehow less probative of its intent.  The argument is misplaced in all events as the General Assembly could and did make a decision with respect to each of those VTDs.  But even if accepted, the argument is – by definition – irrelevant to the VTDs *that the General Assembly chose to drop*.  Second, and more significantly, the VTDs dropped by the General Assembly demonstrates a vivid pattern:  those added to CD3 were both more Democratic and contained a higher percentage of BVAP, while those dropped from Benchmark CD3 were slightly less Democratic but contained a *dramatically* lower BVAP population (21.1%).  In other words, white Democratic voters were dropped while black Democratic voters were added.  Tr. Trans. at 414:4-17.  That, of course, comes as no surprise given the quota that the General Assembly set out to (and did) achieve.  Finally, the sheer number of VTDs dropped is obviously smaller than those added, but that's precisely what one would expect in a congressional district that needed to gain, not lose, population.

[5] Defendants quote from a recent newspaper editorial from Dr. McDonald supposedly contradicting his trial testimony.  Def. Br. at 1.  At the risk of stating the obvious, the newspaper article is not in the record before the Court and the Court has had no opportunity to examine the article in context or hear an explanation from Dr. McDonald of its relevance to this litigation.  It is inadmissible hearsay offered after the conclusion of the trial and should be stricken.  Even if it were admissible, Defendants misquote Dr. McDonald.  What he said, in full, is: "Ironically, New Kent was given to Cantor in redistricting to help him out. Instead, it backfired."

redistricting criteria is undeniable, and this factor, when considered alongside the author's statements about the race-based reasons for its shape, only confirms that a racial gerrymander occurred.

Defendants nonetheless implausibly contend that "core preservation" justifies CD3's bizarre shape and lack of compactness. Def. Post-Trial Br. 23. Essentially, they argue that CD3 simply maintained the status quo. *See* Def. Post-Trial Br. at 17-20. Yet the evidence shows clearly that the district was not intended to, nor did it, maintain the status quo. The Enacted Plan *increased* the BVAP in CD3 by 3.3%. Pl. Ex. 27 at 14. Core preservation was given hardly any credence at all when large swaths of population were removed from their districts in service of achieving this racial composition. *See* Pl. Post-Trial Br. at 19-20. If core preservation was a factor, it was a badly abused factor at best. *Id.* Finally, to the extent Defendants attempt to rely on Del. Janis's remarks on this point, Def. Post-Trial Br. at 19, he explicitly stated that race predominated over all other factors in the unique case of CD3.

Defendants badly misread the legal history of CD3 in averring that its predecessor district was "judicially blessed as 'conform[ing] to all requirements of law.'" Def. Post-Trial Br. at 19 (*quoting Moon v. Meadows*, 952 F. Supp. 1141, 1151 (E.D. Va. 1997). A fuller quote from that opinion reads: "[Defendants] are enjoined from coordinating and/or conducting an election . . . from the Third Congressional District until such time as the Virginia General Assembly enacts . . . a new redistricting plan for said district which *conforms to all requirements of law.*" *Moon*, 952 F. Supp. at 1151 (emphasis added). No court entered an order confirming that the remedial plan for CD3 was constitutional, and the mere lack of a judicial challenge cannot be celebrated as a judicial blessing. Additionally, the General Assembly's remedial plan was replaced in 2001 with the Benchmark plan, upon which no court has opined. Indeed, even if Benchmark CD3 had

received a judicial seal of approval, it would have little bearing on the current case.  Enacted

CD3 exacerbated the district's problems in ways that echo the unconstitutional CD3.  Enacted

CD3 engulfs Petersburg, for example, as did the unconstitutional CD3, and it further splits

Norfolk.

>
> **5.      Plaintiffs' Alternative Plan Is Further Proof that Race Was the Predominate Factor Behind CD3.**

To distract from the myriad evidence that CD3 was predominantly race-motivated,

Defendants spend a substantial amount of time putting Plaintiffs' alternative map on trial.  Def.

Post-Trial Br. at 2-4, 16, 20-27.  This approach misapprehends the purpose of the alternative

map.  *Easley* does not mandate an alternative map at all, since that case simply found that the

relatively circumstantial evidence presented by the plaintiffs did not show the predominance of

race over politics where there was substantial evidence to the contrary.  *Easley v. Cromartie*, 532

U.S. 234, 241-43 (2001) ("The issue in this case is evidentiary. . . . [Our] review leaves us with

the definite and firm conviction that the District Court's key findings are mistaken.") (internal

citation and quotation marks omitted).  Not surprisingly, *Easley* does not overrule the general

principle that direct evidence can suffice to make out a *Shaw* claim.  *See Miller v. Johnson*, 515

U.S. 900, 916 (1995) (stating that a plaintiff can meet its burden with "direct evidence going to

legislative purpose").

Plaintiffs nonetheless submitted the alternative plan to show that, had the legislature been

truly interested in traditional redistricting criteria rather than race, they could have drawn CD3

with greater respect for traditional criteria and with much less racial disparity.  No authority says

that such an alternative plan must be race neutral. Def. Post-Trial Br. at 25-26.  Rather,

Plaintiffs' map shows that the General Assembly could have better complied with redistricting

criteria, as a whole, if they had not been focused on meeting a racial quota within CD3.

Defendants create out of whole cloth a new "*Easley*" test that would require an alternative plan to perform better on all traditional criteria.  Def. Post-Trial Br. at 20-26.  But that is not the law and Defendants cite no authority for their reformulation of the applicable standard.  The alternative only has to be "comparably consistent" with the traditional criteria of the enacted plan.  The Alternative Plan performs as well as or better under traditional criteria than the Enacted Plan.

Defendants stress the factors of "core preservation" and "incumbency protection," but core preservation was a low priority under the Enacted Plan, as it moved nearly two hundred thousand citizens between districts.  Tr. Trans. 87.  Defendants contend that keeping 83% of an *underpopulated* district like CD3 is evidence of core preservation.  *See* Def. Post-Trial Br. 19.  In fact, it demonstrates the opposite.  The district needed *more* people, not *fewer*.  Yet, curiously, the enacted plan only retained 83%.  The record vividly demonstrates why:  white voters were removed from the district so that additional black voters could be added.  Defendants, moreover, go too far in their "core preservation" argument, using it as a categorical bar on any alternative because any alternative would affect core preservation. *See* Def. Post-Trial Br. 20-21, 23-24. Plaintiff's Alternative Plan, however, complies with the actual *Easley* standard as it proposes no change at all to 9 of Virginia's 11 congressional districts and has core preservation statistics consistent with the Enacted Plan for the other two districts.  *See* Pl. Exs. 29 at 1; Def. Ex. 13 at 24-25.  Thus, the Alternative Plan's core preservation is "comparably consistent" with the Enacted Plan.

As for the role of incumbency protection, Del. Janis gave it, at best, only modest attention.  *Compare* Int.-Def. Ex. 9 at 9 ("[Each incumbent] said that they could support the lines in this plan as they are currently drawn . . . .") *with id.* at 14  ("I haven't looked at the partisan

performance. It was not one of the factors that I considered in the drawing of the district."). Essentially, the enacted plan did not radically upset incumbent districts, and neither does the alternative map, which has no effect on 9 of 11 districts.

Finally, it's important to note that unlike the defendants in *Easley*, Defendants here introduced no direct evidence that politics was actually the goal in creating CD3.  In fact, no legislators testified and no confidential redistricting materials were offered that might have demonstrated such a goal.  Defendants are left instead with their own blanket assertions and post-hoc speculation that politics predominated the map-drawing process.  But these cannot trump direct evidence from the legislative record.

### 6.    Defendants Fail to Even Address Key Evidence Showing that Race Predominated.

Defendants do not even address contiguity or the Senate Criteria.  Plaintiffs argued that CD3 was not contiguous and raised substantial constitutional concerns, Pl. Post-Trial Br. at 18, but Defendants do not even respond.  Defendants also backtrack from their prior reliance on the Senate Criteria.  *See* Def. Tr. Br. at 5, 18.  For the reasons already explained, Pl. Post-Trial Br. at 11-12, the Senate Criteria also supports the conclusion that race predominated.

Indeed, when considered all together, the evidence in this case leaves no room for serious doubt that racial motivations predominated in the drawing of CD3.  The enacted plan's sole author explicitly stated that racial considerations were paramount for CD3.  In addition, Plaintiffs—and, indeed, Defendants—offered up evidence that the Virginia legislature believed (mistakenly) that it should respect a 55% BVAP quota for CD3.  Plaintiffs also produced a large amount of evidence all tending to show that race, not politics, predominated—including direct evidence from the map-drawer himself disavowing any reliance on political performance. Defendants hopscotch around the direct evidence, and choose to focus their attacks on the

alternative map for failing to satisfy non-existent standards.  Yet when all the evidence is considered together, the conclusion that race predominated the drawing of CD3 is inescapable.

**B.      The Enacted Plan Does Not Satisfy Strict Scrutiny**

As Plaintiffs previously argued, because the enacted plan goes well beyond what is necessary to comply with the Voting Rights Act, it is not narrowly tailored.  Pl. Post-Trial Br. at 29-34.  Defendants, however, refuse to articulate the correct standard.  Defendants have apparently abandoned the "strong basis in evidence" standard they proposed in their trial brief, Def. Tr. Br. at 3, 24, and now assert a new one: "[N]arrow tailoring is shown if 'the districting that is based on race substantially addresses the Voting Rights Act violation.'"  *See* Def. Post-Trial Br. 30 (*quoting Bush*, 517 U.S. at 977.  But Defendants still don't get it right.  They conveniently omit the first part of the sentence quoted in *Bush*, which expressly requires a "strong basis in evidence."  *Bush*, 517 U.S. at 977.  "A reapportionment plan would not be narrowly tailored to the goal of avoiding retrogression if the State went beyond what was *reasonably necessary* to avoid retrogression."  *Shaw v. Reno*, 509 U.S. 630, 655 (1993) (emphasis added).  Critically, this standard means that simply invoking nebulous preclearance or retrogression concerns will not do—a racially motivated decision under the Voting Rights Act can be made only on "a correct reading" of the Voting Rights Act.  *Shaw II*, 517 U.S. at 911.  As Plaintiffs have already demonstrated, increasing the BVAP in CD3 was in no way reasonably necessary.  Pl. Post-Trial Br. at 31-34.

On this point, Defendants fail to address almost all of the arguments in Plaintiffs' Post-Trial Brief, *compare* Pl. Post-Trial Br. at 31-34 *with* Def. Post-Trial Br. at 32-33, and choose instead to combat arguments of their own invention.  Defendants rail against any suggestion that Virginia was required to reduce the BVAP in CD3.  Def. Post-Trial Br. at 35.  In fact, Plaintiffs have never made such an argument.  Plaintiffs merely contend that the General Assembly had no

permissible reason to purposefully *increase* the BVAP in CD3.  *See, e.g.*, Pl. Post-Trial Br. at 2 (arguing that the General Assembly could not have had a strong basis "to believe that increasing the BVAP of CD3 to 57.2% was required"), 11 (arguing that "increasing BVAP to meet a quota" is unconstitutional), 31 (arguing that "Defendants have done nothing to show that increasing the BVAP is CD3 was 'reasonably necessary'").  But Defendants never address this key argument or explain why increasing the BVAP was "reasonably necessary."  They simply have not met their burden to prove that CD3 was narrowly tailored.

Defendants also continue their legally irrelevant attacks on Plaintiffs' alternative plan. *See* Def. Post-Trial Br. at 34-35.  Alternative CD3 was constructed for litigation purposes to help show that race predominated.  It has absolutely no bearing on whether racially motivated changes to increase the BVAP in CD3 were "reasonably necessary."  Defendants' suggestion that their strict scrutiny burden is somehow satisfied by reference to Plaintiffs' litigation map completely misunderstands the nature of the inquiry.  And while Alternative CD3 is not the district on trial here, it is narrowly tailored.  Alternative CD3 respects traditional redistricting criteria and uses racial considerations only to the extent necessary to satisfy a *correct* reading of the Voting Rights Act.  *See* Tr. Trans. 114-15; Pl. Ex. 30 at 4-6.

Finally, Defendants argue that requiring a racial bloc voting analysis would result in ever more "racial fine-tuning."  Def. Post-Trial Br. at 34.  This is not true either.  If a legislature increases a district's BVAP to a certain level as required by the VRA, the use of race would satisfy strict scrutiny, and there would be no constitutional problem.  Defendants seek a standard that would allow states to make racially motivated redistricting decisions as long as they err on the side of packing.  Needless to say, such a solution has never been approved or adopted by any

court and would compromise citizens' constitutional rights in the name of administrative convenience. This cannot be allowed.

To the extent Defendants rely on the 2006 Amendments to the VRA as eliminating the need for a racial bloc voting analysis, Def. Post-Trial Br. at 31, that is patently absurd. In order to satisfy strict scrutiny, a state must show that its actions were "reasonably necessary" to comply with the VRA, and a state simply cannot know whether it has a VRA problem without substantial evidence. *See Bush*, 517 U.S. at 978 (to use race permissibly, a state "must have a strong basis in evidence for finding that the threshold conditions for § 2 liability are present") (internal quotation marks omitted). Nothing has changed since the 2006 Amendments—racial bloc voting analysis remains the preferred methodology for beginning to determine whether these threshold conditions are met. *See United States v. City of Euclid*, 580 F. Supp. 2d 584, 596 (N.D. Ohio 2008) ("In assessing whether racial bloc voting exists in a designated political subdivision, courts often begin with a statistical analysis of voting behavior."). Even Defendants' expert conceded that a racial bloc voting analysis can be "an important factor in any Section 5 case." Tr. Trans. at 342. Defendants bear the burden to prove narrow tailoring, and they have utterly failed to carry it.

## C.     The Court Should Impose an Immediate Remedy.

Defendants conveniently contend that, even if Plaintiffs prevail on their constitutional claims, there is simply no time to impose a remedy before the 2014 election. In so arguing, Defendants completely ignore the Court's inherent authority to regulate elections to remedy the violation and restore Plaintiffs' fundamental voting rights. *See* Pls.' Remedy Br. at 8-10 (Dec. 6, 2013). Indeed, Defendants' suggestion that any remedy imposed here would effectively "cancel[] the results of [a] lawful election," Def. Post-Trial Br. at 36, belies their misunderstanding of the stakes at issue in this case: a ruling in Plaintiffs' favor on liability

would mean that *any* election held under Enacted CD3 is not lawful, but instead a constitutional violation.  Courts can and should remedy such a violation "once apparent," and "at the earliest practicable date."  *Desena v. Maine*, 793 F. Supp. 2d 456, 462 (D. Me. 2011).

### III.   CONCLUSION

For all the foregoing reasons, this Court should find for the Plaintiffs and order immediate and effective relief.

Dated:  June 27, 2014                                 Respectfully submitted,

By:     /s/
John K. Roche (vsb# 68594)
Marc Erik Elias (admitted *pro hac vice*)
John M. Devaney (admitted *pro hac vice*)
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C.  20005-3960
Telephone:  202.434.1627
Facsimile:   202.654-9106
Email: JRoche@perkinscoie.com
Email: MElias@perkinscoie.com
Email: JDevaney@perkinscoie.com

Kevin J. Hamilton (admitted *pro hac vice*)
PERKINS COIE LLP
1201 Third Avenue, Ste. 4800
Seattle, WA 98101-3099
Phone:  (206) 359-8000
Fax:  (206) 359-9000
Email: KHamilton@perkinscoie.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of June, 2014, I caused the foregoing to be electronically filed with the Clerk of this Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Mike Melis
Office of the Attorney General
900 East Main Street
Richmond, Virginia  23219
(804) 786-2071
Fax:  (804) 786-1991
mmelis@oag.state.va.us

*Attorneys for Defendants Charlie Judd, Kimberly Bowers, and Don Palmer in their official capacities*

Frederick W. Chockley , III
Baker & Hostetler LLP
1050 Connecticut Ave NW
Suite 1100
Washington, DC 20036
(202) 861-1500
fchockley@bakerlaw.com

Jennifer Marie Walrath
Baker & Hostetler LLP (DC)
1050 Connecticut Ave NW
Suite 1100
Washington, DC 20036
202-861-1702
Fax: 202-861-1783
jwalrath@bakerlaw.com

*Attorneys for Movants Robert B. Bell, Christopher Marston, and William Janis*

Jonathan Andrew Berry
Jones Day
51 Louisiana Ave NW
Washington, DC 20001
202-879-3939
Fax: 202-626-1700
jberry@jonesday.com

John Matthew Gore
Jones Day
51 Louisiana Ave NW
Washington, DC 20001
(202) 879-3930
Fax: (202) 626-1700
jmgore@jonesday.com

Michael Anthony Carvin
Jones Day
51 Louisiana Ave NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com

*Attorneys for Intervenor-Defendant Virginia Representatives*

Cullen Dennis Seltzer
Sands Anderson PC
1111 E Main Street
24th Floor
P O Box 1998
Richmond, VA 23218-1998
804-648-1636
Fax: 804-783-7291
cseltzer@sandsanderson.com

*Attorneys for Interested Parties Clerk of the Virginia Senate, Clerk of the Virginia House, and Division of Legislative Services*

Respectfully submitted,

By_____/s/_____
    John K. Roche (VA Bar No. 68594)
    Perkins Coie LLP
    700 13th St., N.W., Suite 600
    Washington, D.C. 20005-3960
    Phone:  (202) 434-1627
    Fax:  (202) 654-9106
    JRoche@perkinscoie.com

    *Attorneys for Plaintiffs*