**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

DAWN CURRY PAGE,
<u>et al.</u>,

    Plaintiffs,

v.                                Civil Action No. 3:13cv678

VIRGINIA STATE BOARD
OF ELECTIONS, <u>et al.</u>,

    Defendants.


**MEMORANDUM OPINION**

Before DUNDAN, Circuit Judge, O'GRADY, District Judge and PAYNE, Senior District Judge.

DUNCAN, Circuit Judge:

In the political landscape prior to the Supreme Court's June 25, 2013, decision in <u>Shelby County v. Holder</u>, 133 S. Ct. 2612 (2013), the Virginia legislature undertook the task of crafting United States congressional districts with the overarching goal of compliance with the Voting Rights Act of 1965 ("VRA") as it was then interpreted. In describing the methodology used in drawing the abstract lines currently under consideration, Delegate William Janis, the architect of that legislation, explained it thus:

> I focused on the [Third] Congressional District and ensuring, based on recommendations that I received from Congressman Scott[,the representative from the Third Congressional District,] and from all 11 members

of the congressional delegation, Republican and
Democrat--one of the paramount concerns and
considerations that was not permissive and
nonnegotiable under federal law and under
constitutional precedent is that the [Third]
Congressional District not retrogress in minority
voter influence.

And that's how the lines were drawn . . . .[T]he
primary focus of how the lines in [the redistricting
legislation] were drawn was to ensure that there be no
retrogression in the [Third] Congressional District.
Because if that occurred, the plan would be unlikely
to survive a challenge either through the Justice
Department or the courts because it would not comply
with the constitutionally mandated requirement that
there be no retrogression in the minority voting
influence in the [Third] Congressional District.

Pl.'s Trial Ex. 43, at 25.[1]  Delegate Janis's efforts were

successful.  His proposed legislation was approved by the United

States Department of Justice ("DOJ"), which found that it did

not effect any retrogression in the ability of minorities to

elect their candidates of choice.[2]  As we explain below, however,

the Supreme Court's Shelby County decision significantly altered

the status quo.

---

[1] Because of Delegate Janis's key role as sponsor of the
legislation at issue, we cite his views frequently.

[2] As we discuss in greater detail below, in distinguishing
the case before us from that in Shaw v. Hunt (Shaw II), 517 U.S.
899 (1996), the dissent finds it significant that the
legislative goal of maintaining minority voting strength in the
Third Congressional District was not also articulated in the
preclearance submission.  With respect, we do not.

Before turning to a description of the history of the litigation and an analysis of the issues it presents, we wish to emphasize at the outset what we hope will be clear throughout. We imply no criticism of Delegate Janis or Defendants, and do not question that all attempted to act appropriately under the circumstances as they understood them to be at the time. We must nevertheless determine whether the Virginia legislation passes constitutional muster, particularly in the wake of <u>Shelby County</u>.

## I.   THE LITIGATION

Plaintiffs Dawn Curry Page, Gloria Personhuballah, and James Farkas[3] ("Plaintiffs") bring this action against Defendants Charlie Judd, Kimberly Bowers, and Don Palmer--in their respective official capacities of Chairman, Vice-Chair, and Secretary of the Virginia State Board of Elections[4]--and Intervenor-Defendants Eric Cantor, Robert J. Wittman, Bob Goodlatte, Frank Wolf, Randy J. Forbes, Morgan Griffith, Scott Rigell, and Robert Hurt--all Congressmen in the Commonwealth of

---

[3] Named Plaintiff Dawn Curry Page was dismissed from this case via stipulation of dismissal on April 9, 2014. (ECF No. 79).

[4] Original Defendants, the Virginia State Board of Elections and Kenneth T. Cuccinelli, II, Attorney General of Virginia, were dismissed from this case via stipulation of dismissal on November 21, 2013. (ECF No. 14).

Virginia--(collectively, "Defendants")[5] challenging the constitutionality of Virginia's Third Congressional District as a racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. In light of the evidence, and as State Board of Elections Defendants have acknowledged, we conclude that compliance with Section 5 of the VRA ("Section 5"), and accordingly, race, "was the [legislature's] predominant purpose . . . underlying [the Third Congressional District's] racial composition in 2012." (Int-Def.'s Mem. Supp. Mot. Summ. J. 15, ECF No. 39). Moreover, the redistricting plan cannot survive the strict scrutiny required of race-conscious districting because it is not narrowly tailored.[6]

Equitable considerations preclude remediation prior to Virginia's November 2014 elections. Because, however, the constitutional infirmities of the Third Congressional District cannot be remedied in isolation, Virginia should act within the

---

[5] Plaintiffs do not seek different remedies against Defendants and Intervenor-Defendants. Since there is no distinction between the interests of Defendants and Intervenor-Defendants, we refer to them collectively.

[6] Defendants do not contend otherwise. Defendants make only limited narrow tailoring arguments, but do not assert that any kind of racial voting analysis informed their decisions.

next legislative session to draw electoral districts based on permissible criteria.

Resolution of the issues before us involves an analysis of the interplay between the VRA and Virginia law governing voting rights and the redistricting process.  We therefore begin by laying out the framework that will guide that analysis.  We then set out the factual background and procedural history of this litigation, before proceeding to the issues at hand.

A.   **Voting Rights Act Background**

A brief description of the history and purpose of the VRA, and its impact on Virginia, is a useful predicate for the discussion that follows.  The VRA, passed in 1965, "was originally perceived as a remedial provision directed specifically at eradicating discriminatory practices that restricted blacks' ability to register and vote in the segregated South."  Holder v. Hall, 512 U.S. 874, 893 (1994) (Thomas, J., concurring).  The VRA "is a complex scheme of stringent remedies aimed at areas where voting discrimination has been most flagrant."  South Carolina v. Katzenbach, 383 U.S. 301, 315 (1966).

Section 4 of the VRA outlines "a formula defining the States and political subdivisions to which [the statute's] . . . remedies apply."  Id.  This "coverage formula" includes states or political subdivisions with the following characteristics: 1)

as of November 1964, they maintained a test or device as a prerequisite for voting or registration; and 2) 1964 census data indicated that less than 50% of the voting-age population was registered to vote. See 42 U.S.C. § 1973b(b)(1)-(2). Section 5 contains specific redistricting requirements for jurisdictions deemed covered under Section 4. See id. § 1973c.

In November 1964, Virginia met the criteria to be classified as a "covered jurisdiction" under Section 5. See id. § 1973b-c. As such, Virginia was required to submit any changes to its election or voting laws to the DOJ for federal preapproval, a process called "preclearance." See id. § 1973c. To obtain preclearance, Virginia had to demonstrate that a proposed change had neither the purpose nor effect "of denying or abridging the right to vote on account of race or color." Id. § 1973c(a).

The legal landscape changed dramatically in 2013, when the Supreme Court ruled that Section 4's coverage formula, described above, was unconstitutional. Shelby Cnty., 133 S. Ct. at 2620-31. The Court concluded that the formula, although rational in practice and theory when the VRA was passed in 1965, was no longer justified by current voting conditions. Id. As a result of the invalidation of the coverage formula under Section 4, Virginia is no longer obligated to comply with the preclearance requirements of Section 5. See id.

## B.   Factual Background

We turn now to the Virginia constitutional and statutory scheme.   The Virginia Constitution requires the state legislature to reapportion Virginia's United States congressional districts every ten years based on federal census data.   Districts must be "contiguous and compact territory . . . constituted as to give, as nearly as practicable, representation in proportion to the population of the district."   Va. Const. art. II, § 6.

Virginia's Third Congressional District was first created as a majority African-American district in 1991.   See Va. Code §§ 24.1-17.303 (1991); 24.1-17.303 (1992); 24.2-302 (1993).   At that time, the Third Congressional District had an African-American population of 63.98%, and a black voting-age population ("BVAP," the percentage of persons of voting age who identify as African-American) of 61.17%.   Moon v. Meadows, 952 F. Supp. 1141, 1143-44 (E.D. Va. 1997).

The 2010 federal census showed that Virginia's population grew 13% between 2000 and 2010.   Pl.'s Trial Ex. 1, at 18. Because the growth was unevenly distributed, Virginia had to redraw its congressional districts in order to balance population totals within each district.   See id.   Pursuant to that goal, Virginia's Senate Committee on Privileges and Elections adopted Committee Resolution No. 2, establishing goals

and criteria concerning applicable legal requirements and policy objectives for redrawing Virginia's congressional districts. See Pl.'s Trial Ex. 5.  The criteria included: 1) population equality among districts; 2) compliance with the laws of the United States and Virginia, including protections against diluting racial minority voting strength and putting minority voters in a worse position than they were before the redistricting change ("retrogression"); 3) contiguous and compact districts; 4) single-member districts; and 5) consideration of communities of interest.  Id. at 1-2.  The Virginia Senate noted that, although "[a]ll of the foregoing criteria [would] be considered in the districting process[,] . . . population equality among districts and compliance with federal and state constitutional requirements and [the VRA] [would] be given priority in the event of conflict among the criteria."  Id. at 2 (emphasis added).

Delegate Janis used the 2010 census data to draw a new plan for Virginia's United States congressional districts. Delegate Janis presented his plan, House Bill 5004, to the House of Delegates on April 6, 2011; the House adopted it six days later.  Pl.'s Trial Ex. 8, at 7.  The Virginia Senate, however, rejected Delegate Janis's plan and replaced it with a plan sponsored by State Senator Mamie Locke.  Id.  The House and

Senate were unable to reconcile the competing plans and the redistricting effort stalled. Id. at 8.

The November 2011 elections changed the composition of the Virginia Senate, and, in January 2012, the newly seated House and Senate adopted Delegate Janis's plan without any changes.[7] See id. Governor Bob McDonnell signed the plan into law on January 25, 2012. Id. at 9. The congressional districting plan ("2012 Plan") is codified at Va. Code Ann. § 24.2-302.2.

The 2012 Plan divides Virginia into eleven congressional districts. Plaintiffs describe the boundaries of the Third Congressional District as follows:

> The northwest corner of the district includes parts of Richmond and the north shore of the James River. It then crosses the James River for the first time and juts west to capture parts of Petersburg. The district again crosses to the north shore of the James River to include parts of Newport News, though this portion of the district is not contiguous with any other part of the district. The district then hops over part of Congressional District 2 to include part of Hampton and crosses the James River and Chesapeake Bay to capture part of Norfolk, which is not contiguous with any other part of [the district].

(Compl. ¶ 34, ECF No. 1). A majority of the voting age population in the 2012 Plan's Third Congressional District is African-American. Whereas the BVAP of the previous iteration of the Third Congressional District ("Benchmark Plan"), formed

---

[7] Delegate Janis's bill was renamed House Bill 251 but remained identical to the original House Bill 5004.

after the 2000 census, was 53.1%, the BVAP of the 2012 Plan's Third Congressional District is 56.3%. Pl.'s Trial Ex. 27, at 14. There is no indication that this increase of more than three percentage points was needed to ensure nonretrogression, however, because the 2012 Plan was not informed by a racial bloc voting or other, similar type of analysis. See Trial Tr. 342:11-23, 354:18-355:2. A racial bloc voting analysis, which legislatures frequently use in redistricting, studies the electoral behavior of minority voters and ascertains how many African-American voters are needed in a congressional district to avoid diminishing minority voters' ability to elect their candidates of choice. Trial Tr. 62:22-63:7, 98:16-99:6, 198:5-8; Pl.'s Trial Ex. 43, at 15.

Virginia submitted the 2012 Plan to the DOJ for Section 5 preclearance. As we have noted, the DOJ precleared the plan on March 14, 2012, finding that it did not effect any retrogression in the ability of minorities to elect their candidates of choice. (Def.'s Mem. Supp. Mot. Summ. J. 7, ECF No. 37).

On June 25, 2013, the Supreme Court issued its decision in Shelby County. As a result, as we have explained, Section 5's requirements of review and preclearance for covered areas no longer apply to Virginia with respect to future changes to its voting and election laws. See Shelby Cnty., 133 S. Ct. at 2627-31.

C.    **Procedural History**

Plaintiffs[8] brought this action on October 2, 2013, alleging that Virginia used the Section 5 preclearance requirements as a pretext to pack African-American voters into Virginia's Third Congressional District and reduce these voters' influence in other districts.  (Compl. ¶¶ 3, 40, ECF No. 1).  Plaintiffs seek a declaratory judgment that Virginia's Third Congressional District, as drawn in the 2012 Plan, is a racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment.  Id. at 10.  Plaintiffs also seek to permanently enjoin Defendants from giving effect to the boundaries of the Third Congressional District, including barring Defendants from conducting elections for the United States House of Representatives based on the current Third Congressional District.  Id.

Any action under Section 5 must "be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28."  42 U.S.C. § 1973c; see also Allen v. State Bd. of Elections, 393 U.S. 544, 560-63 (1969).  Because Plaintiffs' action "challeng[es] the constitutionality of the apportionment of congressional districts" in Virginia, the Chief

---

[8] Named Plaintiffs are all United States citizens who are registered to vote in the Commonwealth of Virginia and reside in the Third Congressional District.  (Compl. ¶¶ 7-9, ECF No. 1).

Judge of the United States Court of Appeals for the Fourth Circuit granted Plaintiffs' request for a hearing by a three-judge court pursuant to 28 U.S.C. 2284(a) on October 21, 2013. (ECF No. 10).

Virginia Congressmen Eric Cantor, Robert J. Wittman, Bob Goodlatte, Frank Wolf, Randy J. Forbes, Morgan Griffith, Scott Rigell, and Robert Hurt moved to intervene as Defendants in the case on November 25, 2013. (ECF No. 14). On December 20, 2013, all Defendants moved for summary judgment. (ECF Nos. 35, 38). We denied the motions on January 27, 2014. (ECF No. 50). A two-day bench trial began on May 21, 2014. (ECF Nos. 100, 101). We then ordered the parties to file post-trial briefs. (ECF No. 99). After reviewing those briefs, we determined on June 30, 2014, that further oral argument would not assist in the resolution of the issues before the Court. (ECF No. 108). Therefore, this case is now ripe for disposition. We have jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. § 1357.

## II.  ANALYSIS

To successfully challenge the constitutionality of the Third Congressional District under the Equal Protection Clause, Plaintiffs first bear the burden of proving that the legislature's predominant consideration in drawing its electoral boundaries was race. If they make this showing, the assignment

of voters according to race triggers the court's "strictest scrutiny." Miller v. Johnson, 515 U.S. 900, 915 (1995).  Then, the burden of production shifts to Defendants to demonstrate that the redistricting plan was narrowly tailored to advance a compelling state interest.  See Shaw II, 517 U.S. at 908.

For the reasons that follow, we find that Plaintiffs have shown race predominated.  We find that the Third Congressional District cannot survive review under the exacting standard of strict scrutiny.  While compliance with Section 5 was a compelling interest when the legislature acted, the redistricting plan was not narrowly tailored to further that interest.  Accordingly, we are compelled to hold that the challenged Third Congressional District violates the Equal Protection Clause of the Fourteenth Amendment.

## A.   Race As the Predominant Consideration in Redistricting

As with any law that distinguishes among individuals on the basis of race, "equal protection principles govern a State's drawing of congressional districts." Miller, 515 U.S. at 905. "Racial classifications with respect to voting carry particular dangers.  Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters . . . ." Shaw v. Reno (Shaw I), 509 U.S.

630, 657 (1993).  As such, "race-based districting by our state legislatures demands close judicial scrutiny."  Id.

To trigger strict scrutiny, Plaintiffs first bear the burden of proving that race was not only one of several factors that the legislature considered in drawing the Third Congressional District, but that race "predominated."  Bush v. Vera, 517 U.S. 952, 963 (1996).  The Supreme Court has emphasized that this burden "is a 'demanding one,'" Easley v. Cromartie (Cromartie II), 532 U.S. 234, 241 (2001) (quoting Miller, 515 U.S. at 928):

> The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.  To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations.

Miller, 515 U.S. at 916.  The Supreme Court has cited several specific factors as evidence of racial line drawing: statements by legislators indicating that race was a predominant factor in redistricting, see id., 515 U.S. at 917-18; evidence that race or percentage of race within a district was the single redistricting criterion that could not be compromised, see Shaw II, 517 U.S. at 906; creation of non-compact and oddly shaped

districts beyond what is strictly necessary to avoid retrogression, see Shaw I, 509 U.S. at 646-48; use of land bridges in a deliberate attempt to bring African-American population into a district, see Miller, 515 U.S. at 917; and creation of districts that exhibit disregard for city limits, local election precincts, and voting tabulation districts ("VTDs"), see Bush, 517 U.S. at 974. As we demonstrate below, all of these factors are present here.[9] Moreover, we do not view any of these factors in isolation. We consider direct evidence of legislative intent, including statements by the legislation's sole sponsor, in conjunction with the circumstantial evidence

---

[9] In contending that Plaintiffs do not make this "initial" showing, the dissent notes, among other things, that Plaintiffs failed to produce an adequate alternative plan showing "that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional redistricting principles." Cromartie II, 532 U.S. at 258. While the dissent acknowledges "that the attacking party is not confined in its form of proof to submitting an alternative plan," post at 49, it makes much of the fact that the alternative plan proffered by Plaintiffs accomplishes a more favorable result for Democrats than does the Enacted Plan. However, the significance of the discrepancy between these political outcomes is overstated, and relies on an assumption that the legislature's political objective was to create an 8-3 incumbency protection plan. See Trial Tr. 180-81 (noting that the Alternative Plan would only undermine incumbency protection objectives if it was the legislature's political goal to have an 8-3 split, which is something "we don't have knowledge of"). This inference is not supported by the record, as we develop more fully below.

supporting whether the 2012 Plan complies with traditional redistricting principles.

### 1. Direct Evidence of Legislative Intent

When analyzing the legislative intent underlying a redistricting decision, we agree with the dissent that there is a "presumption of good faith that must be accorded legislative enactments." Miller, 515 U.S. at 916. This presumption "requires courts to exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." Id. Such restraint is particularly warranted given the "complex interplay of forces that enter a legislature's redistricting calculus," id. at 915-16, making redistricting possibly "the most difficult task a legislative body ever undertakes," Smith v. Beasley, 946 F. Supp. 1174, 1207 (D.S.C. 1996) (three-judge court).

Nevertheless, "the good faith of the legislature does not excuse or cure the constitutional violation of separating voters according to race." Id. at 1208. Here, "[w]e do not question the good faith of the legislature in adopting [the 2012 Plan]" so long as "[t]he members did what they thought was required by [Section 5] and by the Department of Justice at the time." Id. At this stage of the analysis, we are concerned only with whether legislative statements indicate that "race was the predominant factor motivating the legislature's decision to

place a significant number of voters within or without [the Third Congressional District]." Miller, 515 U.S. at 916. We find such statements here, drawn from multiple sources.

We must also note, however, that it is inappropriate to confuse this presumption of good faith with an obligation to parse legislative intent in search of "proper" versus "improper" motives underlying the use of race as the predominant factor in redistricting, as the dissent does here. The legislative record here is replete with statements indicating that race was the legislature's paramount concern in enacting the 2012 Plan. Yet the dissent urges us to consider such statements as mere legislative acknowledgments of the supremacy of federal law, specifically the VRA. The dissent argues that subjecting a redistricting plan to strict scrutiny when it separates voters according to race as a means to comply with Section 5 "trap[s] [legislatures] between the competing hazards of [VRA and Constitutional] liability," Bush, 517 U.S. at 992 (O'Connor, J., concurring),[10] but this is a red herring. While "[a]pplying

---

[10]  The dissent relies solely on Justice O'Connor's concurrence in Bush to make this argument. The language quoted by the dissent appears in the context of Justice O'Connor's assertion that compliance with Section 2 of the VRA is a compelling state interest, see Bush, 517 U.S. at 990-93 (O'Connor, J., concurring), but Justice O'Connor's opinion also specifically notes that using race as a proxy for VRA compliance should be subject to strict scrutiny, see id.

traditional equal protection principles in the voting-rights context is 'a most delicate task,'" <u>Shaw II</u>, 517 U.S. at 905 (quoting <u>Miller</u>, 515 U.S. at 905), we must apply strict scrutiny when, as here, there is strong direct and circumstantial evidence that race was the only "nonnegotiable" criterion.

### a. Defendants' Statements

Defendants concede that avoiding retrogression in the Third Congressional District and ensuring compliance with Section 5 was the legislature's primary priority in drawing the 2012 Plan. Defendants acknowledge that the legislature's top two priorities were "compliance with applicable federal and state laws, expressly including the [VRA]" and population equality. (Def.'s Mem. Supp. Mot. Summ. J. 12, ECF No. 37). Moreover, Defendants "concede[] that compliance with Section 5 was [the legislature's] predominant purpose or compelling interest underlying District 3's racial composition in 2012." (Int-Def.'s Mem. Supp. Mot. Summ. J. 15, ECF No. 39). Of course, we do not view the language of the Intervenor-Defendants' summary judgment brief as a "binding concession," as the dissent suggests. Rather, we take it for what it is--a candid acknowledgement of the incontrovertible fact that the shape of the Third Congressional District was motivated by the desire to avoid minority retrogression in voting.

**b.    Racial Threshold As the Means to Achieve Section 5 Compliance**

Defendants' expert, John Morgan, also acknowledged that the legislature "adopted the [2012 Plan] with the [Third Congressional District] Black VAP at 56.3%" because legislators were conscious of maintaining a 55% BVAP floor.   Int. Def.'s Trial Ex. 13, at 27.   In 2011, the legislature enacted "a House of Delegates redistricting plan with a 55% Black VAP as the floor for black-majority districts" with strong bipartisan support.   Id. at 26.   Given the success of this prior usage of a 55% BVAP floor, the legislature considered a 55% BVAP floor for the 2012 congressional redistricting "appropriate to obtain Section 5 preclearance, even if it meant raising the Black VAP above the [53.1%] level[] in the Benchmark plan."   Id. at 26-27. The legislature therefore "acted in accordance with that view," id. at 27, when adopting the 2012 Plan, despite the fact that the use of a 55% BVAP floor in this instance was not informed by an analysis of voter patterns.   Indeed, when asked on the House floor whether he had "any empirical evidence whatsoever that 55[% BVAP] is different than 51[%] or 50[%]," or whether the 55% floor was "just a number that has been pulled out of the air," Delegate Janis, the redistricting bill's author, characterized the use of a BVAP floor as "weighing a certainty against an uncertainty."   Pl.'s Trial Ex. 45, at 7.

**c.   Statements   by   the   Author   of   the   2012 Congressional Maps**

In   addition   to   Defendants'   statements,   we   credit explanations by Delegate Janis, the legislation's sole author, stating that he considered race the single "nonnegotiable" redistricting criterion.   Pl.'s Trial Ex. 43, at 25.   In disagreeing, the dissent attempts to discount the meaning of these statements by placing great reliance on remarks by legislative opponents characterizing the redistricting legislation as an incumbency protection plan, and by parsing Delegate Janis's statements regarding compliance with federal law generally from the necessary antecedent of relying on race to do so.   In the face of Delegate Janis's clear words, we do not find these efforts persuasive.[11]

---

[11] Perhaps this is also the appropriate juncture at which to address the dissent's rejection of the credibility of Plaintiffs' expert, Dr. Michael McDonald, and endorsement of Defendants' expert, Mr. Morgan, which we find somewhat puzzling. We find it no more damning that Dr. McDonald has testified differently in different contexts than that Mr. Morgan has testified consistently on the same side.   Nor is the exploration of issues in an academic piece, written before Dr. McDonald was retained by Plaintiffs and before he fully evaluated the evidence here, of particular relevance.   We do, however, find significant the following facts: that Mr. Morgan proffers no academic work, does not have an advanced degree, that his undergraduate degree was in history, that he has never taken a course in statistics, that he has not performed a racial bloc voting analysis, that he did not work with or talk to any members of the Virginia legislature, and that he miscoded the entire city of Petersburg's VTDs.   See Trial Tr. 334-35, 338-43, 361-65.

Delegate Janis emphasized that his "primary focus" in drawing Virginia's new congressional maps was ensuring that the Third Congressional District maintained at least as large a percentage of African-American voters as had been present in the district under the Benchmark Plan.  Pl.'s Trial Ex. 43, at 25; see also Pl.'s Trial Ex. 13, at 8 ("[W]e can have no less [percentage of African-American voters] than percentages that we have under the existing lines.").

For example, at the second floor reading of the redistricting bill in Virginia's House of Delegates on April 12, 2011, Delegate Janis noted that "one of the paramount concerns in the drafting of the bill was [the VRA mandate] that [the legislature] not retrogress minority voting influence in the 3rd Congressional District."  Pl.'s Trial Ex. 43, at 10 (emphasis added).  He continued to reiterate this sentiment, noting that he was "most especially focused on making sure that the [Third] Congressional District did not retrogress in its minority voting influence." Id. at 14-15 (emphasis added).

Delegate Janis also stated that the avoidance of retrogression in the Third Congressional District took primacy over other redistricting considerations because it was "nonnegotiable":

> [O]ne of the paramount concerns and considerations
> that was not permissive and nonnegotiable . . . is
> that the 3rd Congressional District not retrogress in

> minority voter influence. . . .[T]he primary focus of
> how the lines in House Bill 5004 were drawn was to
> ensure that there be no retrogression in the 3rd
> Congressional District.  Because if that occurred, the
> plan would be unlikely to survive a challenge either
> through the Justice Department or the courts because
> it would not comply with the constitutionally mandated
> requirement that there be no retrogression in the
> minority voting influence in the 3rd Congressional
> District.

Id. at 24-25 (emphasis added).  Unlike the dissent, we deem it

appropriate to accept the explanation of the legislation's

author as to its purpose.  And there is further support.

### 2. Circumstantial Evidence of the Third Congressional District's Shape and Characteristics

In addition to the evidence of legislative intent, we also

consider the extent to which the district boundaries manifest

that legislative will.[12]  Evidence of a "highly irregular"

reapportionment plan "in which a State concentrated a dispersed

---

[12] At this juncture, we must take issue with the manner in
which the dissent considers Plaintiffs' circumstantial evidence.
When evaluating evidence of the Third Congressional District's
shape, compactness, contiguity, political subdivision splits,
and population swaps, the dissent considers each in isolation,
concluding that no factor alone carries Plaintiffs' burden of
showing that race predominated.  In addition, the dissent
implies that Plaintiffs must, for each of these factors, make a
"necessary showing" that these circumstantial irregularities,
considered individually, resulted from racial, rather than
political, motivations.  See post at 34.  Precedent counsels,
however, that courts must consider whether these circumstantial
factors "together weigh in favor of the application of strict
scrutiny."  Bush, 517 U.S. at 962 (emphasis added).  No one
factor need be "independently sufficient" to show race
predominated.  Id.

minority population in a single district by disregarding traditional districting principles such as compactness, contiguity, and respect for political subdivisions," indicates that racial considerations predominated during the 2011-12 redistricting cycle. Shaw I, 509 U.S. at 647. We consider each of these factors below.

### a. Shape and Compactness

As the Supreme Court has recognized, "reapportionment is one area in which appearances do matter," Shaw I, 509 U.S. at 647, and the "obvious fact that the district's shape is highly irregular and geographically non-compact by any objective standard" supports the conclusion that race was the predominant factor in drawing the challenged district. Shaw II, 517 U.S. at 905-06 (internal quotation marks omitted). Moreover, compactness is one of two redistricting criteria required by the Virginia Constitution. Va. Const. art. II, § 6 ("Every electoral district shall be composed of contiguous and compact territory . . . .").

Because, as he explained to the Senate Committee on Privileges and Elections, Delegate Janis "didn't examine compactness scores" when drawing the 2012 congressional maps, Pl.'s Trial Ex. 14, at 8, we begin with a visual, rather than mathematical, overview of the Third Congressional District's shape and compactness. See Karcher v. Daggett, 462 U.S. 725,

762 (Without applying any mathematical measures of compactness, "[a] glance at the [congressional] map shows district configurations well deserving the kind of descriptive adjectives . . . that have traditionally been used to describe acknowledged gerrymanders.").

Plaintiffs contend that the Third Congressional District is the least compact congressional district in Virginia.  Trial Tr. 73:10-14.  And, indeed, the maps of the district reflect both an odd shape and a composition of a disparate chain of communities, predominantly African-American, loosely connected by the James River.  See Trial Tr. 42:13-16; Pl.'s Trial Ex. 48.  Defendants do not disagree.  In fact, Defendants' expert, Mr. Morgan, concedes that the three primary statistical procedures used to measure the degree of compactness of a district all indicate that the Third Congressional District is the least compact congressional district in Virginia.  Trial Tr. 375:21-24, 376:9-13.  While Defendants acknowledge the irregularity of shape and lack of compactness reflected by the Third Congressional District, they submit that a desire to protect Republican incumbents explains the District's shape, a contention we discuss later.  See infra section II.A.3; see also Trial Tr. 14:24-15:6.

### b. Non-Contiguousness

In addition to requiring compactness, the Virginia Constitution also requires the legislature to consider contiguity when drawing congressional boundaries. *See* Va. Const. art. II, § 6. The Virginia Supreme Court has concluded that "land masses separated by water may . . . satisfy the contiguity requirement in certain circumstances." *Wilkins v. West*, 571 S.E.2d 100, 109 (Va. 2002). While the Third Congressional District is not contiguous by land, it is legally contiguous because all segments of the district border the James River. Trial Tr. 74:22-24. Therefore, the Third Congressional District is legally contiguous under Virginia Law. *See Wilkins*, 571 S.E.2d at 109; *see also* Trial Tr. 221:12-14.

Yet contiguity and other traditional districting principles are "important not because they are constitutionally required," but rather "because they are objective factors" courts may consider in assessing racial gerrymandering claims. *Shaw I*, 509 U.S. at 647. To show that race predominated, Plaintiffs need not establish that the legislature disregarded every traditional districting principle. *See Miller*, 515 U.S. at 917 (holding that circumstantial evidence such as shape does not need to be sufficient, standing alone, to establish a racial gerrymandering claim). Rather, we consider irregularities in the application of these traditional principles together. Here, the record

25

establishes that, in drawing the boundaries of the Third Congressional District, the legislature used water contiguity as a means to bypass white communities and connect predominantly African-American populations in areas such as Norfolk, Newport News, and Hampton.  See Trial Tr. 75:15-76:1.  Such circumstantial evidence is one factor that contributes to the overall conclusion that the district's boundaries were drawn with a focus on race.

### c. Splits in Political Subdivisions

"[R]espect for political subdivisions" is an important traditional districting principle.  Shaw I, 509 U.S. at 647.  A county or city is considered split by a congressional district when a district does not entirely contain that county or city within its borders.  See Pl.'s Trial Ex. 27, at 8.  The Third Congressional District splits more local political boundaries than any other district in Virginia.  Trial Tr. 76:18-20.  It splits nine counties or cities, the highest number of any congressional district in the 2012 Plan.  Pl.'s Trial Ex. 27, at 9.  Moreover, the boundaries of the Third Congressional District contribute to the majority of splits in its neighboring congressional districts.  See id.

The Third Congressional District also splits more voting tabulation districts, or VTDs, than any of Virginia's other congressional districts.  Trial Tr. 78:17-19; see also Pl.'s

Trial Ex. 27, at 10.  A VTD is a Census Bureau term referring to what is commonly thought of as a voting precinct.  Trial Tr. 78:5-8.  In total, the 2012 Plan splits 20 VTDs; the Third Congressional District contributes to 14 of them.  Trial Tr. 78:20-21; see also Pl.'s Trial Ex. 27, at 10.  While some of these are "technical splits" (i.e., a VTD split that does not involve population; for example, a split across water), such technical splits were used strategically here, as they would not have been necessary "if [the legislature was not] trying to bypass [white] communities using water" and bring predominantly African-American communities into the district.  Trial Tr. 79-80.

The dissent contends that the population swaps involving the Third Congressional District--and resulting locality splits--were necessary to achieve population parity in accordance with the constitutional mandate of the one-person-one-vote rule,[13] and can also be explained by the traditional redistricting criterion of "preserving district cores."[14]  See post at 28, 36.  The

---

[13] This principle, contained in art. I, §2 of the United States Constitution, requires all congressional districts to contain roughly equal populations.  See Wesberry v. Sanders, 376 U.S. 1, 17 (1964).

[14] A new district preserves district cores when it retains most of the previous benchmark district's residents within its boundaries.  Trial Tr. 379.

evidence does not substantiate either of these arguments.  It is true that the Virginia legislature needed to add 63,976 people to the Third Congressional District to achieve population parity.  See Trial Tr. 87.  Yet, though the dissent asserts that "it is extremely unlikely that any combination of 'whole' localities in the vicinity of [the Benchmark Plan] could have been added to the [Third Congressional] District to augment the population by exactly 63,976 people," post at 36, Plaintiffs' alternative plan maintains a majority-minority district and achieves the population increase needed for parity, while simultaneously minimizing locality splits and the number of people affected by such splits.  See Pl.'s Trial Ex. 29, at 1. Although this alternative plan results in only one less locality split than the 2012 Plan, it reduces the number of people affected by the locality splits between the Third Congressional District and Second Congressional District by 240,080.[15]  See Trial Tr. 112; Pl.'s Trial Ex. 29, at 5, tbl. 3.  The alternative plan also reduces the number of VTD splits involving the Third Congressional District from 14 in the 2012 Plan to 11.

---

[15] The total population affected by the Third Congressional District's locality splits with the Second Congressional District in the 2012 Plan is 241,096, while the population affected by the splits between these districts in the alternative plan is only 1,016.  Trial Tr. 112; Pl.'s Trial Ex. 29, at 5, tbl. 3.

Trial Tr. 111.   Moreover, Plaintiffs' alternative plan, unlike the 2012 Plan, keeps the cities of Newport News, Hampton, and Norfolk intact.[16]   See id. at 112.   This is a particularly important accomplishment because it reflects the fulfillment of a strong public sentiment, as expressed during 2010 redistricting forums,[17] against splitting localities, and in favor of keeping the integrity of cities like Hampton and Norfolk intact.   See Pl.'s Trial Ex. 29, at 5; see also Pl.'s Trial Ex. 11-12.

The evidence similarly undercuts the dissent's contention that the boundaries of the Third Congressional District reflect an allegiance to the traditional redistricting principle of preserving district cores.   Far from attempting to retain most of the Benchmark Plan's residents within the new district

---

[16] The fact that the 2012 Plan splits these cities, despite the demonstrated feasibility of achieving population parity while keeping them whole, further refutes the dissent's contention that the population swaps were based on "a desire to limit locality splits."   Post at 36.   Despite the fact that doing so was unnecessary, the legislature split Newport News and Hampton when it excluded certain low-BVAP VTDs from the Third Congressional District.   See Pl.'s Trial Ex. 27, at 17 (showing that VTDs in Newport News and Hampton with BVAPs of 23.1% were excluded from the Third Congressional District).   Similarly, the legislature's removal of predominantly white VTDs from the Third Congressional District contributed to otherwise unnecessary splits in Norfolk.   See Trial Tr. 436-39.

[17] Virginia attached the transcripts of these hearings to its Section 5 submission.   See Pl.'s Trial Ex. 11-12.

borders, the 2012 Plan moved over 180,000 people in and out of the districts surrounding the Third Congressional District to achieve an overall population increase of only 63,976 people. Trial Tr. 87.  Tellingly, the populations moved out of the Third Congressional District were predominantly white, while the populations moved into the District were predominantly African-American.  Id. at 81-82.  Moreover, the predominantly white populations moved out of the Third Congressional District totaled nearly 59,000 residents—-a number very close to the total required increase of 63,976 people.  See Pl.'s Trial Ex. 27, at 15, tbl. 6; see also Trial Tr. 87.

While "[t]he Constitution does not mandate regularity of district shape," Bush, 517 U.S. at 962, Plaintiffs' circumstantial evidence of the Third Congressional District's irregularities and inconsistencies with respect to the traditional districting criteria described above, coupled with clear statements of legislative intent, supports our conclusion that, in this case, "traditional districting criteria [were] subordinated to race."  Id.

### 3. Predominance of Race over Politics

Defendants, as well as the dissent, rely heavily on isolated statements in the legislative record, made by opponents of Delegate Janis's bill, suggesting that incumbency protection and partisan politics motivated the 2011-12 redistricting

efforts.   See, e.g., Pl.'s Trial Ex. 43, at 48-49 (opponent of Delegate Janis's plan stating that Janis "admitted today that one of the criteria that he used in development of the plan was incumbent protection," and deeming the redistricting effort "one for incumbency protection first, last, alpha, and omega"); id. at 27 (opponent of the 2012 Plan suggesting that Delegate Janis used incumbency protection as a permissive redistricting criteria).   The Supreme Court has made it clear, however, that the views of legislative opponents carry little legal weight in characterizing legislation.   See, e.g., Shell Oil Co. v. Iowa Dep't of Revenue, 488 U.S. 19, 29 (1998) ("The fears and doubts of the opposition are no authoritative guide to the construction of legislation."); see also N.L.R.B. v. Fruit & Vegetable Packers, 377 U.S. 58, 66 (1964)("[W]e have often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents.   In their zeal to defeat a bill, they understandably tend to overstate its reach."); Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394-95 (1951) ("It is the sponsors that we look to when the meaning of the statutory words is in doubt.").   The rationale for this authority is patent: a bill's opponents have every incentive to place a competing label on a statute they find objectionable.

Defendants and the dissent are inarguably correct that partisan political considerations, as well as a desire to protect incumbents, played a role in drawing district lines.  It would be remarkable if they did not.  However, in a "mixed motive suit"--in which a state's conceded goal of "produc[ing] majority-minority districts" is accompanied by "other goals, particularly incumbency protection"--race can be a predominant factor in the drawing of a district without the districting revisions being "purely race-based."[18]  Bush, 517 U.S. at 959.  Indeed, the Supreme Court has observed that "partisan politicking" may often play a role in a state's redistricting process, but the fact "[t]hat the legislature addressed these interests [need] not in any way refute the fact that race was the legislature's predominant consideration."  Shaw II, 517 U.S. at 907.

The dissent's attempts to analogize this case to Cromartie II are unavailing.  Cromartie II involved a challenged district in which "racial identification correlate[d] highly with political affiliation," 532 U.S. at 258, and the plaintiffs were ultimately unable to show that "the legislature could have

---

[18]  We do not, as the dissent implies, suggest that a different legal test applies to a "mixed-motive suit."  We simply observe that, when racial considerations predominated in the redistricting process, the mere coexistence of race-neutral redistricting factors does not cure the defect.

achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles" because the challenged redistricting plan furthered the race-neutral political goal of incumbency protection to the same extent as it increased the proportion of minorities within the district, id.

While it may be true, as the dissent observes, that Democratic votes in the Third Congressional District, and presumably many similarly-situated districts, "can generally be predicted simply by taking the BVAP of a VTD and adding about 21 percentage points,"[19] post at 26, the evidence of political justification for the redistricting at issue in Cromartie II is quite different than that presented in this case. In Cromartie II, there was overwhelming evidence in the record "articulat[ing] a legitimate political explanation for [the state's] districting decision," 532 U.S. at 242, including unequivocal trial testimony by state legislators. While

---

[19] Aside from the clear distinctions between Plaintiffs' case here and Cromartie II, the dissent's contention that the legislature used BVAP as a predictor for Democratic votes is precisely the sort of race-based consideration the Supreme Court has confirmed triggers strict scrutiny. See Bush, 517 U.S. at 968 ("[T]o the extent that race is used as a proxy for political characteristics, a racial stereotype requiring strict scrutiny is in operation."); Shaw I, 509 U.S. at 653 ("[W]e unanimously reaffirmed that racial bloc voting and minority-group political cohesion never can be assumed, but specifically must be proved . . . .").

Defendants have offered post-hoc political justifications for the 2012 Plan in their briefs, neither the legislative history as a whole, nor the circumstantial evidence, support that view to the extent they suggest.

For example, Defendants point to a rather ambiguous statement by Delegate Janis that one goal of the 2012 Plan was to "respect . . . the will of the Virginia electorate." (Post-Trial Br. Int.-Def.'s and Def.'s at 11-12, ECF No. 106 (citing Pl's. Trial Ex. 43, at 19)). Taken in context, however, it is clear that this goal was "permissive" and subordinate to the mandatory criteria of compliance with the VRA and satisfaction of the one-person-one-vote rule. See Pl's. Trial Ex. 43, at 18-19. In support of the argument that political concerns trumped racial ones, the dissent points to Delegate Janis's remarks that incumbent legislators confirmed their satisfaction with the lines of their respective congressional districts. See id. at 5-6. It is undisputed, however, that the incumbents were not shown the entire 2012 Plan when they were solicited for their input, but were instead shown only the proposed changes to the lines of their individual districts. See Int.-Def.'s Trial Ex. 9, at 9. Delegate Janis testified that he had not asked any congressional representatives "if any of them supported the [redistricting] plan in its totality," or "[spoken] with anyone who plan[ned] to run against those incumbents" regarding the

redistricting plan.  Id. at 13-14.  Delegate Janis stated: "I haven't looked at the partisan performance.  It was not one of the factors that I considered in the drawing of the district."  Id. at 14.

Finally, the nature of the population swaps and shifts used to create the Third Congressional District suggests that less was done to further the goal of incumbency protection than to increase the proportion of minorities within the district.  "[A]mong the pool of available VTDs that could have been placed within the Third Congressional District that were highly Democratic performing," those with a higher BVAP were placed within the Third Congressional District, and those VTDs that were largely white and Democratic were left out, and instead shifted into the Second Congressional District.[20]  Trial Tr. 89.

The record before us presents a picture similar to that in Shaw II, in which the Supreme Court found the evidence sufficient to trigger strict scrutiny:

---

[20] Defendants' expert, Mr. Morgan, contends that the majority-white populations excluded from the Third Congressional District during redistricting were predominantly Republican.  Int.-Def.'s Trial Ex. 13, at 13-14.  The evidence at trial, however, revealed that Mr. Morgan's analysis was based upon several pieces of mistaken data, a critical error.  See Trial Tr. 359:1-14, 361:10-365:10 (indicating that Mr. Morgan had miscoded several VTDs as to whether they were part of the Third Congressional District); see also id. at 404:17-25 (Mr. Morgan's coding mistakes were significant to the outcome of his analysis).

> First, the District Court had evidence of the
> district's shape and demographics.  The court observed
> the obvious fact that the district's shape is highly
> irregular and geographically non-compact by any
> objective standard that can be conceived.  In fact,
> the serpentine district has been dubbed the least
> geographically compact district in the Nation.
>
> The District Court also had direct evidence of the
> legislature's objective.  The State's submission for
> preclearance expressly acknowledged that [the]
> overriding purpose was to comply with the dictates of
> [the DOJ] and to create two congressional districts
> with effective black voting majorities.

Shaw II, 517 U.S. at 905–06 (internal quotation marks omitted).

As we noted earlier, we do not find the dissent's attempts to

distinguish Shaw II from the case at hand persuasive.  As an

initial matter, it is irrelevant that the challenged district in

Shaw II was not only the least compact in the state, as is the

Third Congressional District, but also the least compact

district in the nation.  Irregularities in shape need not be so

extreme as to make the district an outlier nationwide; courts

simply consider a "highly irregular and geographically non-

compact" shape evidence of the predominance of race.  Id. at

905–06.  As the least compact and most bizarrely shaped district

in the 2012 Plan, the Third Congressional District displays such

characteristics.  And again, we see no reason why it should make

a difference whether Defendants' "explicit and repeated

admissions," post at 42, of the predominance of race were made

in the course of hearings on the House of Delegates floor, as

here, or in the State's Section 5 preclearance submission, as in
Shaw II.  These specific and repeated references, when taken
together with the circumstantial evidence of record, compel our
conclusion that race was the legislature's paramount concern.

### B.  Strict Scrutiny Analysis

The fact that race predominated when the legislature
devised Virginia's Third Congressional District in 2012,
however, does not automatically render the district
constitutionally infirm.  Rather, if race predominates, strict
scrutiny applies, but the districting plan can still pass
constitutional muster if narrowly tailored to serve a compelling
governmental interest.  See Abrams v. Johnson, 521 U.S. 74, 91
(1997); see also Miller, 515 U.S. at 920.  While such scrutiny
is not necessarily "strict in theory, but fatal in fact,"
Johnson v. California, 543 U.S. 499, 514 (2005) (quoting Adarand
Constructors, Inc. v. Pena, 515 U.S. 200, 237 (1995)), the state
must establish the "most exact connection between justification
and classification."  Parents Involved in Cmty. Sch. v. Seattle
Sch. Dist. No. 1, 551 U.S. 701, 720 (2007) (quoting Gratz v.
Bollinger, 539 U.S. 244, 270 (2003)).

And because, as we address below, compliance with the VRA
is a compelling state interest, the redistricting plan would not
fail under the Equal Protection analysis if it had been narrowly
tailored to that interest—-if it had not gone "beyond what was

reasonably necessary to avoid retrogression." Bush, 517 U.S. at 984. While the Third Congressional District was drawn in pursuit of the compelling state interest of compliance with Section 5, Defendants have failed to show that the 2012 Plan was narrowly tailored to further that interest.

### 1. Compelling Interest

The fact that Shelby County effectively relieved Virginia of its Section 5 obligations in 2013 does not answer the question of whether Section 5 compliance in 2012 was a compelling state interest. The appropriate inquiry is whether the legislature's reliance on racial considerations was, at the time of the redistricting decision, justified by a compelling state interest, not whether it can now be justified in hindsight. See Ala. Legislative Black Caucus v. Alabama, 989 F. Supp. 2d 1227, 1307 (M.D. Ala. 2013) (three-judge court) ("We evaluate the plans in the light of the legal standard that governed the Legislature when it acted, not based on a later decision of the Supreme Court that exempted [the state] from future coverage under section 5 of the [VRA].").

Although the Supreme Court has yet to decide whether VRA compliance is a compelling state interest, it has assumed as much for the purposes of subsequent analyses. See, e.g., Shaw II, 517 U.S. at 914 ("We assume, arguendo, for the purpose of resolving this suit, that compliance with § 2 [of the Voting

Rights Act] could be a compelling interest"); <u>Bush</u>, 517 U.S. at 977 ("[W]e assume without deciding that compliance with the results test [of the VRA] . . . can be a compelling state interest[.]").   Particularly because the parties do not dispute that compliance with Section 5 was a compelling interest pre-<u>Shelby County</u>,[21] we likewise do not.

### 2. Narrow Tailoring

We now consider whether the 2012 Plan was "narrowly tailored to achieve that compelling interest."   <u>Shaw II</u>, 517 U.S. at 908.   The Supreme Court has repeatedly struck down redistricting plans that did more than was necessary to avoid "a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." <u>Bush</u>, 517 U.S. at 983 (quoting <u>Miller</u>, 515 U.S. at 926); <u>see also Shaw</u>

---

[21]   Plaintiffs make limited arguments that Section 5 compliance is no longer a compelling state interest.  Plaintiffs first contend that <u>Shelby County</u> applies retroactively (<u>See</u> Pl.'s Trial Br. at 21-23, ECF No. 86), relying on <u>Citizens United v. Fed. Election Comm'n</u>, 558 U.S. 310 (2010), which held only that the Supreme Court's decision that a particular interest does not qualify as a compelling state interest may have retroactive effect.   The Supreme Court decided no such thing in <u>Shelby County</u>, so this assertion misses the mark. Plaintiffs also argue that compliance with Section 5 cannot be a compelling interest when the legislature conducted no analysis to determine whether an increase in the Third Congressional District's BVAP was necessary, but this point is relevant only to the narrow tailoring prong of the strict scrutiny analysis. (<u>See</u> Pl.'s Trial Br. at 23-24, ECF No. 86; Pl.'s Post-Trial Br. at 30-31, ECF No. 105).

II, 517 U.S. at 910-18 (concluding that districts were not narrowly tailored to comply with the VRA).

Indeed, "the [VRA] and our case law make clear that a reapportionment plan that satisfies Section 5 still may be enjoined as unconstitutional." Shaw I, 509 U.S. at 654. Section 5 does not "give covered jurisdictions carte blanche to engage in racial gerrymandering in the name of nonretrogression," and a reapportionment plan is not narrowly tailored to the goal of Section 5 compliance "if the State went beyond what was reasonably necessary to avoid retrogression." Shaw I, 509 U.S. at 655; see also Miller, 515 U.S. at 921 ("[C]ompliance with federal antidiscrimination laws cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws.").

Courts have cited several specific examples of characteristics of a redistricting plan that would suggest that the plan did more than was "reasonably necessary" to avoid retrogression. These include significantly increasing the total number of African-American voters in a historically "safe" majority-minority district, see Bush, 517 U.S. at 983; using a BVAP threshold for majority-minority districts, see Smith, 946 F. Supp. at 1210; and generally failing to take specific steps to narrowly tailor a district, such as by conducting a racial

bloc voting analysis before making redistricting changes, <u>see</u> <u>Moon</u>, 952 F. Supp. at 1150. As we explain below, all of these factors are present here.

### a. BVAP Increase in a Safe Majority-Minority District

Although the Third Congressional District has been a safe majority-minority district for 20 years, the 2012 Plan increased the total number of its African-American voting age residents by 44,711.[22] Pl.'s Trial Ex. 27, at 11, 14; Trial Tr. 52:18-54:5. This change also increased the district's BVAP from 53.1% to 56.3%. Pl.'s Trial Ex. 27, at 14.

Congressman Bobby Scott, a Democrat supported by the majority of African-American voters in the Third Congressional District, has represented the District since 1991. Pl.'s Trial Ex. 21, at 33; Trial Tr. 52:18-21. In the six elections between 2002 to 2012, Congressman Scott ran unopposed in three; he ran opposed in the general elections in 2010 and 2012, but was reelected each time. Pl.'s Trial Ex. 27, at 11; Trial Tr. 53:7-22. In 2010, Congressman Scott won 70% of the vote, while in 2012--under the redistricting plan at issue here--he won by an even larger margin, receiving 81.3% of the vote. <u>Id.</u>

---

[22] African-American voters accounted for over 90% of the voting age residents added to the Third Congressional District. Pl.'s Trial Ex. 27, at 14.

In this respect, the legislature's decision to increase the BVAP of the Third Congressional District is similar to the redistricting plan invalidated by the Supreme Court in Bush. See 517 U.S. at 983.  In Bush, a plurality of the Supreme Court held that increasing the BVAP from 35.1% to 50.9% was not narrowly tailored because the state's interest in avoiding retrogression in a district where African-American voters had successfully elected their representatives of choice for two decades did not justify "substantial augmentation" of the BVAP. Id.  Such an augmentation could not be narrowly tailored to the goal of complying with Section 5 because there was "no basis for concluding that the increase to a 50.9% African-American population . . . was necessary to ensure nonretrogression." Id. "Nonretrogression is not a license for the State to do whatever it deems necessary to ensure continued electoral success; it merely mandates that the minority's opportunity to elect representatives of its choice not be diminished, directly or indirectly, by the State's actions." Id.  While the BVAP increase here is smaller than that in Bush, the principle is the same.  Defendants show no basis for concluding that an augmentation of the Third Congressional District's BVAP to 56.3% was narrowly tailored when the district had been a safe majority-minority district for two decades.

### b. BVAP Threshold

At trial, Defendants' expert, Mr. Morgan, confirmed that the legislature adopted a floor of 55% BVAP for the Third Congressional District throughout the 2011-12 redistricting cycle.  See Int.-Def.'s Trial Ex. 13, at 26-27.  This BVAP threshold was viewed as a proxy for the racial composition needed for a majority-minority district to achieve DOJ preclearance.  See id. at 26.  Thus, the legislature altered the Third Congressional District's boundaries in order to meet or exceed that threshold.  See id. at 26-27 (noting that legislators "viewed the 55% black VAP . . . as appropriate to obtain Section 5 preclearance, even if it meant raising the Black VAP above the levels in the benchmark plan").

Because "[n]arrow tailoring [in the districting context] demands . . . that the district chosen entails the least race-conscious measure needed to remedy a violation," Prejean v. Foster, 227 F.3d 504, 518 (5th Cir. 2000), similar ad hoc uses of racial thresholds have been held to defeat narrow tailoring by other three-judge courts.  For example, one court invalidated a plan implementing a 55% threshold as arbitrary without supporting evidence.  See Smith, 946 F. Supp. at 1210 (holding that narrow tailoring requires legislatures to consider the fact that a 55% BVAP will not be needed to elect a candidate of choice in districts where most minority citizens register and

vote, and cautioning against "insist[ing] that all majority-minority districts have at least 55% BVAP with no evidence as to registration or voter turnout"). The legislature's use of a BVAP threshold, as opposed to a more sophisticated analysis of racial voting patterns, suggests that voting patterns in the Third Congressional District were not "considered individually." Id.[23] Considering the foregoing factors, we conclude that the 2012 Plan was not narrowly tailored to achieve compliance with Section 5, and therefore fails strict scrutiny.

## III. REMEDY

Having found that the 2012 Plan violates the Equal Protection Clause, we must now address the appropriate remedy. Plaintiffs seek to have us enjoin the use of the current congressional plan for the upcoming 2014 election, and to have the court draw an interim plan. Our consideration of this issue is guided by the Supreme Court's decision in Reynolds v. Sims, 377 U.S. 533 (1964). In Reynolds, the Court stated:

> [O]nce a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to [ensure] that no further elections are conducted under the invalid plan. However, under certain circumstances, such as

---

[23] We pause to clarify that, while the legislature did not conduct a racial bloc voting analysis in enacting the 2012 Plan, we do not find that one is always necessary to support a narrow tailoring argument.

> where an impending election is imminent and a State's
> election machinery is already in progress, equitable
> considerations might justify a court in withholding
> the granting of immediately effective relief in a
> legislative apportionment case, even though the
> existing apportionment scheme was found invalid.

377 U.S. at 585. We must also be conscious of the powerful concerns for comity involved in interfering with the state's legislative responsibilities. As the Supreme Court has repeatedly recognized, "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." Wise v. Lipscomb, 437 U.S. 535, 539-40 (1978). As such, it is "appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise . . . its own plan." Id.

It should also be noted that courts have repeatedly allowed elections to proceed under unconstitutional apportionment plans when elections are imminent, or necessity so requires. See, e.g., Upham v. Seamon, 456 U.S. 37, 44 (1982) ("[W]e have authorized District Courts to order or to permit elections to be held pursuant to apportionment plans that do not in all respects measure up to the legal requirements, even constitutional requirements."); Kilgarlin v. Hill, 386 U.S. 120, 121 (1967) (affirming the district court's decision allowing state

legislative elections to proceed even though districting plan was "constitutionally infirm in certain respects").

With these considerations in mind, we determine that general principles of equity dictate that Virginia's 2014 elections should proceed as scheduled under the challenged districting plans.  This case presents precisely the "unusual" case referred to by the <u>Reynolds</u> Court, where competing interests weigh heavily against Plaintiffs' equal protection rights.  Delaying the elections or attempting to configure an interim districting plan would unduly disturb Virginia's election process.  The general election is certainly imminent, roughly two months away.  Virginia's primary elections were held as scheduled in June, candidates have spent significant time and money campaigning, and voters have begun to familiarize themselves with the candidates.  Delaying the elections would cause significant and undue confusion.  Moreover, Plaintiffs are largely responsible for the proximity of our decision to the November 2014 elections.  Although the 2012 Plan was enacted in January 2012, Plaintiffs delayed bringing this action until October 2013, nineteen months later.[24]  (<u>See</u> Compl. [signature page], ECF No. 1).

---

[24]  Plaintiffs have offered the intervening decision in <u>Shelby County</u> as an excuse for their delay.  (<u>See</u> Pl.'s Br. Available Remedies 2, ECF No. 30 (stating that Plaintiffs (Continued)

If we enjoined the general election, we could not limit the intrusion to the unconstitutional Third Congressional District. Any interim remedy would have to apply to all of Virginia's electoral districts because we could not predict how repairing the Third Congressional District would alter the boundary lines of neighboring districts.  On the other hand, we recognize that individuals in the Third Congressional District whose constitutional rights have been injured by improper racial gerrymandering have suffered significant harm.  Those citizens "are entitled to vote as soon as possible for their representatives under a constitutional apportionment plan." Cosner v. Dalton, 522 F. Supp. 350, 364 (E.D. Va. 1981). Therefore, we will require that new districts be drawn during Virginia's next legislative session to remedy the unconstitutional districts.  In accordance with well-established precedent that a state should have the first opportunity to create a constitutional redistricting plan, e.g., Wise, 437 U.S.

---

brought their challenge "in the wake of the Supreme Court's recent ruling in Shelby County"); Pl.'s Opp'n Def.'s Mot. Summ. J. 21-22, ECF No. 42 (arguing that courts are capable of undertaking mid-decennial redistricting when an intervening decision of the Supreme Court, such as Shelby County, establishes that a current plan is no longer valid)).  Shelby County, however, dealt with Section 4 of the VRA, not Section 5, and therefore provides no support for their position.

at 539-40, we allow the legislature until April 1, 2015, to enact a remedial districting plan.

## IV.  CONCLUSION

Because Plaintiffs have shown that race predominated in Virginia's 2012 Plan, and because Defendants have failed to establish that this race-based redistricting satisfies strict scrutiny, we find that the 2012 Plan is unconstitutional, and will require the Commonwealth to act within the next legislative session to draw a new congressional district plan.

It is so ORDERED.


_____/s/_____        _____/s/_____
Allyson K. Duncan                         Liam O'Grady



Richmond, Virginia
Date:  October 7, 2014

PAYNE, Senior District Judge, Dissenting,

I respect very much the views of the record expressed by my good colleagues in the majority, but I am unable to join them because I understand the record quite differently.   Based on that understanding and for the reasons set forth below, I respectfully dissent.

## I.

The majority and I do not differ on the fundamental legal principles that apply here.   I think that we all recognize that "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions." Miller v. Johnson, 515 U.S. 900, 915 (1995). Accordingly, "[t]he courts . . . must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." Id. at 915-16. Moreover, the redistricting enactments of a legislature are entitled to a presumption of good faith, and the judiciary must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." Id. at 916; see also Easley v. Cromartie, 532 U.S. 234, 257 (2001).   I understand Miller and Easley to mean that courts must presume that a state legislature has not used race as the predominating factor in making its redistricting decisions because to do so would not be redistricting in good faith.

It is up to the Plaintiffs to dislodge that presumption by proving that the legislature subordinated traditional race-neutral redistricting principles to racial considerations and that race was the predominant factor in the redistricting decision at issue. Id. This is a "demanding" burden that cannot be satisfied by a mere showing that the legislature was conscious of the racial effects of redistricting or considered race as one factor among several; what is required is proof that the racial considerations were "dominant and controlling." Easley, 532 U.S. at 257. If the Plaintiffs meet their burden, then the challenged district will be subject to strict scrutiny, but "strict scrutiny does not apply merely because redistricting is performed with consciousness of race." Bush v. Vera, 517 U.S. 952, 958 (1996).[25]

As I understand the record, the redistricting decision here was driven by a desire to protect incumbents and by the application of traditional redistricting precepts even though race was considered because the legislature had to be certain that the plan complied with federal law, including the Voting

---

[25] The majority comments that this case is a "mixed motive suit" involving both race-based and race-neutral redistricting factors. At the most basic level, and for the reasons explained below, I agree with that characterization as a general proposition. However, I do not find any basis in precedent to conclude that applying the "mixed motive suit" label changes anything in the basic analysis. The applicable test remains whether race predominated in the decision-making process.

Rights Act of 1965[26] ("VRA") and, in particular, the non-retrogression provision of Section 5 of the VRA.  But, wholly apart from that conclusion, I do not believe that the Plaintiffs' have carried their demanding burden to prove that the predominant factor in creating Congressional District 3 ("C.D.3").

## II.

The Plaintiffs, like the majority, base their conclusions on the predominance issue on:  (1) what they consider to be an admission by the Defendants; (2) the views of the Plaintiffs' expert witness, Dr. Michael P. McDonald; and (3) direct evidence consisting principally of statements made by the Delegate Bill Janis, the sponsor of the redistricting language, a legislative resolution, and the existence of a perceived racial quota.  My understanding of the record on these topics are set forth below.

## A.    The Perceived Admission

The majority states that, "in light of the evidence, and as the Defendants have acknowledged, we conclude that compliance with Section 5 of the Voting Rights Act ("Section 5"), and accordingly, race, 'was the [legislature's] predominant purpose . . . underlying [the Third Congressional District's] racial composition in 2012."  That, I respectfully submit, is not

---

[26] 42 U.S.C. §§ 1973–1973bb-1.

correct in substance and, even if it were, it is not an admission by the State.

The quoted text is taken from the brief of the Intervenor-Defendants in support of their motion for summary judgment. The full text is: "[s]ince it is conceded that compliance with Section 5 was the General Assembly's predominant purpose or compelling interest underlying District 3's racial composition in 2012, the predominant factor motivating that decision could not have been an improper consideration of race." Intervenor-Defendants Virginia Representatives' Memorandum in Support of Motion for Summary Judgment (Docket No. 39, p. 15).

It seems to me that the substantive import of the sentence is to make the argument that "the predominant factor motivating that [the redistricting] decision could not have been an improper consideration of race." Id. The sentence relied on by the Plaintiffs, and cited by the majority, is the last sentence in a paragraph that is, I respectfully submit, making the point that compliance with the non-retrogression provision of Section 5 of the VRA, which necessarily includes consideration of race where, as here, a majority-minority district is involved, does not make race the predominant consideration in the redistricting decision. That interpretation is supported by the fact that the heading of the section of the brief in which the sentence at issue appears is: "**Plaintiffs Cannot Satisfy Their Burden To**

**Prove That The General Assembly Adopted The Enacted Plan With Discriminatory Purpose.”**  <u>Id.</u> at 11.  It would be strange, indeed, for the party making that argument to include in it a concession that race was the predominant purpose.  For the foregoing reasons, I do not read the substance of the sentence at issue to be a concession at all.

More importantly, even if the cited text from the Intervenor-Defendants' summary judgment brief is considered to be a concession that race was the predominant purpose, it is certainly not binding upon, or useable against, the State defendants because they did not make any such statement in their briefs, or, to my knowledge, elsewhere.  Hence, whatever may be said as to the perceived admission, it is not probative of the motivations that attended the Commonwealth of Virginia's redistricting decisions.

**B.  Dr. Michael P. McDonald: Generally**

To prove that race was a predominant factor in the redistricting decision, the Plaintiffs relied principally upon their expert witness, Dr. Michael P. McDonald.  In Section II.G below, I will address the details of McDonald's testimony and his report on which the Plaintiffs and the majority rely, but there is a more basic point about McDonald's credibility that I think needs to be addressed first and separately.

In this case, McDonald took the view that race was the predominant factor in the redistricting of C.D.3 but, in March 2013, before McDonald had been retained as an expert in this case, he was a co-author of a scholarly article published in the University of Richmond Law Review in which he made the case rather clearly that the animating consideration in the 2012 redistricting was the protection of incumbents.  Micah Altman and Michael P. McDonald, A Half-Century of Virginia Redistricting Battles: Shifting From Rural Malapportionment to Voting Rights to Public Participation, 47 U. Rich. L. Rev. 771 (2013).

That article begins with the statement that:

> In the 2012 general election, Virginia Republican candidates for the United States House of Representatives won a combined 70,736 more votes than Democratic candidates out of the 3.7 million votes cast for the major party candidates, yet won eight of the state's eleven House seats.  Thus, is the power of gerrymandering.

Id. at 772.  The paragraph then continues to outline the various factors often considered in the redistricting process and, after reciting those factors, the article observed that "these administrative goals [traditional redistricting principles][27] are

---

[27]  At trial, McDonald confirmed that this term "administrative goals" meant "traditional redistricting principles."  Trial Tr. 132.

nominally    devoid    of    political    considerations, <u>but such</u> <u>considerations are at the forefront</u> for those who conduct redistricting." <u>Id.</u>

Later, the article explained that:

> While the General Assembly was able to reach
> a bipartisan compromise to redistrict the
> two [General Assembly] chambers controlled
> by different political parties, it was
> unable to reach agreement on a congressional
> plan. The sticking point was whether to
> protect all incumbents, giving the
> Republicans an 8-3 edge among the state's
> eleven districts, or to restore the African-
> American population to the Fourth
> Congressional District that had been shifted
> to the Third Congressional District during
> the last redistricting, yielding a
> Democratic-leaning Fourth Congressional
> District with 45% African-American voting-
> age population and reducing the Republicans'
> edge to 7-4. After the November 2011
> elections, when Republicans gained a working
> majority in the Senate, the General Assembly
> passed the congressional plan that protected
> all incumbents including the eight
> Republicans.

<u>Id.</u> at 795-96.

McDonald was asked at trial about that statement in his article:

> Q.  So the fight was about whether or not they
> were going to endanger Republican incumbent
> Forbes in District 4 by shifting BVAP from
> District 3 in a way that would turn it into
> a Democratic-leaning district, correct?
>
> A.  Yes.

> Q.   And it was because of that desire to protect
>      the incumbent and maintain a Republican 8-3
>      advantage that the Republicans in the
>      General Assembly opposed it, right?
>
> A.   Right.

Trial Tr. 143-44.[28]

In his article, McDonald also said that:

> In the legislature, two competing plans
> emerged: one from Republicans, who favored a
> 8-3 partisan division of the state that
> protected all incumbents and one by the
> Democrats, which a 7-4 partisan division.
> The partisan contention involved the Fourth
> Congressional District represented by
> Republican incumbent Randy Forbes.
> Democrats wished to fashion this district
> into a roughly 45% African-American
> district – sometimes called a 'minority-
> influenced' district – that would likely
> elect a Democrat while Republicans wish to
> preserve the districts' Republican
> character.

Intervenor-Defendants Ex. 55, pp. 19-20; see Trial Tr. 150-52.

McDonald was questioned at trial about those statements from his article:

---

[28] At trial McDonald sought to mitigate the effect of his answer by saying that there were footnotes in his article indicating that he simply was characterizing what was in the popular press at the time.  Trial Tr. 144-45.  McDonald was shown the articles which did not support his effort to ameliorate his testimony that he was merely quoting the press. McDonald Trial Tr., pp. 146-147.  And, a reading of McDonald's article as a whole utterly refutes his effort to make such a point.

Q.   The Republicans did not want to change District 3 by transferring BVAP[29] into District 4 for political reasons; correct?

A.   Mostly, yes.

\* \* \*

Q.   Both politics and incumbency protection are nonracial reasons; correct?

A.   Yes.  They can be yes.

Q.   And you have no reason to think they weren't here.

A.   No, I do not.

Trial Tr. 151-52.

On cross-examination, McDonald was asked:

Q.   When you were looking at it as a disinterested academic, you determined that it was a political gerrymander by the General Assembly, correct?

A.   Yes, we evaluated the partisan performance of the districts and had determined that the intent was to create an 8-3 Republican majority.

Id. at 129.

He was then asked this question:

Q.   So they purposely enhanced Republican voting power or preserved it at eight for political purposes, correct?

A.   Yes.

Id. at 130.

---

[29] The term "BVAP" is an acronym for Black Voting Age Population.

McDonald also questioned about a number of statements in the article respecting the basis for the adoption of the redistricting plan here at issue and about competing plans discussed in the article and then was asked whether "the basis for your conclusion [in the article] that the 8-3 [eight Republicans and three Democrats] was the result of conscious decision-making by the legislature because these other plans with similar characteristics had only produced a 6-5 Republican advantage?" to which McDonald answered: "we were using these comparisons to draw this conclusion, yes." Trial Tr. 136-37.[30]

Certainly, if McDonald's careful study, as reported in his article, had shown that race was the predominant factor in the redistricting he would have said so. Instead, he said that incumbent protection drove the process and the results. And, his article devoted sixty pages (and 27,228 words) demonstrating that point and analyzing how other plans could have achieved a different political line up.

Having previously taken the view in a scholarly publication that the 2012 redistricting was driven by the desire to protect

_____

[30] At trial, McDonald appended to several answers the phrase "but with a caveat." When asked what that caveat was, he explained that it was the rare instance "when candidates can win in districts that are of the other political persuasion." Trial Tr. 124. However, McDonald acknowledged later that neither he nor, to his knowledge, anyone else had done any analysis on the basis of that caveat. Id.

incumbents, it lies not in the mouth of McDonald now to say that race, not protection of incumbents, was the predominant reason for the 2012 redistricting.  I simply cannot countenance, as a finder-of-fact, such a 180 degree reversal on a key issue.  I conclude that McDonald's views, in whole and in its constituent parts, are not entitled to any credibility.

## C.  Statements Made By Delegate Janis

Delegate William Janis was the author of the redistricting plan at issue here.  The Plaintiffs, and the majority, rely heavily on certain statements made by Janis in the floor debates over the plan to support their view that race was the predominant factor in the redistricting of C.D.3.  I do not understand the statements made by Janis when considered as a whole, to support, much less prove, such a conclusion.

To understand what Janis had to say about the redistricting plan that he formulated, it is important to view what he said in context and to consider the statements as part of a cohesive whole.  Of course, it is not possible here to recite all of the statements that Janis made in the floor debates.  Thus, I will focus on the ones that seem to be most comprehensive.  Unfortunately, that exercise will take some space but, it is, I think, an important one.  I do not repeat here the passages already cited by the majority, but I have taken them into

account in my assessment of what Janis meant in all the statements that he made considered as a whole.

When the bill was first presented in April 2011, Janis outlined the several criteria on which he had based the bill in which the plan was set out.[31] He began:

> First, and most importantly, the districts that were drawn to 3rd Congressional District conform [sic] to the mandates of the United States Constitution and the Constitution of Virginia, and specifically to comply with the one-person-one-vote rule, which occurs in both these Constitutional documents.

Pl's. 43, p. 3. Janis went on to explain that meeting those objectives was a significant challenge because of the "dramatic and non-uniform shifts in population in the Commonwealth over the past three years." Id.

Janis next explained that:

> [t]he second criteria [sic] that's applied in House Bill 5004 is that the districts were drawn to conform with all mandates of federal law, and, most notably, the Voting Rights Act. The Voting Rights Act mandates that there be no retrogression in minority voter influence in the 3rd Congressional District, and House Bill 5004 accomplishes that.

Id. Then, Janis recited that:

---

[31] As the majority notes, the bill ultimately was enacted in 2012 without any significant change.

> [t]hird, the districts were drawn to respect to the greatest degree possible the will of the Virginia electorate as it was expressed in the November 2010 elections. And these districts are based on the core of the existing congressional districts with the minimal amount of change or disruption to the current boundary lines, consistent with the need to expand or contract the territory of each district to reflect the results of the 2010 census and to ensure that each district had the right 727,365 benchmark.

Id. at 4. According to Janis:

> House Bill 5004 respects the will of the electorate by not cutting out currently elected congressmen from their current districts nor drawing current congressmen into districts together. And it attempts to do this while still making sure that we comply with the constitutional mandate and the federal law mandates.

Id. Janis' explanation continued with the observation that:

> We also attempt to keep together jurisdictions and localities, counties, cities, and towns. We try either to keep them intact or, in some cases, reunite counties, cities, or towns that were splintered in previous redistricting plans.
>
> * * *
>
> Whenever possible, the plan also seeks to preserve existing local communities of interest, and, in some cases, to reunite such communities that may have been fractured in the course of previous reapportionment plans, most notably, Reston in northern Virginia.

Id. at 5.   Then Janis pointed out that the plan was based in part on the views of Virginia's Congressional representatives respecting the configuration of their districts, stating:

> The district boundary lines were drawn based in part on specific and detailed recommendations that were provided by each of the 11 current members of the United States Congress in the Virginia delegation.
>
> * * *
>
> I have personally spoken with each member of the Virginia congressional delegation, both Republican and Democrat, and they have each confirmed for me and assured me that the lines for their congressional district as they appear in this legislation conform to the recommendations that they provided.

Id. at 5-6.   To summarize, Janis stated:

> That's why we drew the lines this way was to, [sic] to the greatest degree possible, conform with the United States Constitution and federal law and pursuant to the significant population shifts over the last ten years, to respect the core of the existing congressional district boundaries with the least amount of disruption in the continuity of representation on the part of the constituents of these districts.

Id. at 6.

After making his presentation, Janis received questions from Delegate Ward Armstrong, who was the House of Delegates Minority Leader and the principal spokesperson for the Democrats in the House of Delegates when it was considering the Congressional redistricting legislation.   In one of those

questions, Armstrong asked Janis to explain what criteria were used to arrive at the redistricting plan other than the VRA and the one-person-one-vote criteria.   To that, Janis responded as follows:

> The first criteria [sic] that we applied was, it had to comply with all mandates of the United States Constitution and the Constitution of Virginia, more especially it must comply with the one-person-one-vote rule as interpreted by appropriate case law . . . .

Id. at 18.

> Second, that it was drawn to conform with all mandates of federal law, and most notably the Voting Rights Act and most specifically, that it follow a zero-variance rule, which is the 727,365 rule, and also that there be no retrogression in the minority voter influence in the 3rd Congressional District.
>
> Those are the mandatory criteria that are not permissive, that there is no discretion in the application of those.
>
> Then, consistent with those criteria and the 2010 census data that mandated significant shifts in population between the various congressional districts, the third criteria that we tried to apply was, to the greatest degree possible, we tried to respect the will of the Virginia electorate as it was expressed in the November 2010 congressional elections.
>
> And what that meant was we based the territory of each of the districts on the core of the existing congressional districts.   We attempted -- I attempted to not disrupt those lines, to the minimum degree possible, consistent with the need to

either expand or contract the territory of these districts.

We respected the will of the electorate by not placing -- one of the criteria was not placing two congressmen in a district together.  And one of the criteria was that we would not take the district lines and draw a congressman out of his existing district.

The last criteria that we applied that was permissive was, to the greatest degree possible, consistent with the constitutional mandates, the federal law mandates, and the population shifts, we attempted to the greatest degree wherever possible not to split counties, cities, and towns, local jurisdictions, and to reunite wherever possible jurisdictions such as Allegheny County, Brunswick County, Caroline County, and the City of Covington.

And then we also tried not to split local communities of interest based on the recommendations we received from the current members of the congressional delegation.

Id. at 19-20.

Armstrong then queried why "it was of any significance whatsoever to contact incumbent members of the U.S. Congress and to gather their opinion on where the lines should be drawn." Id. at 26.  To that, Janis responded:

I didn't believe that it was the -- that the purpose of this legislation should be to overturn the will of the electorate as it was expressed in 2010.

And you've got members of the current congressional delegation that have served for one year, and you've got members of the delegation that have served for 20 years,

> and everything in between.  And when looking
> for input as to how to best preserve local
> communities of interest--local jurisdictions
> and localities are easy to see because
> they're on a map, but local communities of
> interest are not readily self-evident on a
> map - that it was relevant and it was
> reasonable to seek input and recommendations
> from those current congressmen because not
> only do they know the local communities of
> interest, but the local communities of
> interest know them and have elected them to
> public office.

Id.

In response to that explanation, Armstrong asked:  "would the gentleman then admit that incumbency protection was one of the permissive criteria that he utilized in the development of HB 5004?" Id. at 27.  Janis responded:

> Well, I would say that, as one member of the
> congressional delegation said, incumbency
> protection is how this has been described in
> every single newspaper report and every
> account in every newspaper was that this is
> an incumbency protection program.
>
> * * *
>
> And it was -- I just didn't think that it
> was the place of the House of Delegates to
> thwart the will of the electorate as it was
> expressed last year by disrupting the
> current congressional boundaries.  And what
> we tried to do was maintain the core of what
> those boundaries were under the existing
> lines.

Id. at 27-28.

Another delegate questioned Janis respecting what he meant by his references to "the will of the electorate based on the 2010 elections." <u>Id.</u> at 40.  Janis responded:

> I would say to the gentleman that the voters went to the polls in November of 2010 and they elected 11 Congressmen, Republican and Democrat.  Some of them they elected for the first time, some of them they elected for the fifth or sixth time.
>
> And these members of the congressional delegation, that one of the criteria that I applied here that is permissive in nature was that we were not going to deliberately -- this plan was not going to deliberately lump existing congressmen together and not cut existing congressmen out of their current congressional districts and that this plan was going to try to respect, to the greatest degree possible, consistent with the constitutional mandates and the federal law mandates, most especially the Voting Rights Act, with the core -- it would respect the core of the existing congressional districts.
>
> And that one of the permissive criteria that was applied was that this plan was not going to seek to deliberately re-engineer the map of Virginia in a way that was incompatible with the results of last year's election.

<u>Id.</u> at 40-41.

When considered in context and as a whole, I think that Janis's statements (including those cited by the majority) show that the predominant factor in the redistricting here at issue was protection of incumbents.  Those statements also show that traditional redistricting factors played an important role as

well. And, they show that, albeit necessarily considered in the process, race was not the predominant factor in the drawing of C.D.3 or otherwise in the redistricting.

With that view of the record, I cannot conclude that the Plaintiffs have met their demanding burden of proof to show that race was the predominant factor.

If, as the majority acknowledges, there were two animating factors - incumbency protection and race - then, when assessing legislative motivation, it is necessary to determine how race was considered in order to decide whether it was the predominate factor. Here, the record establishes that race was a factor only because federal law required it to be considered. In other words, that is a mandatory, and permissible use of race. But, that does not prove that, of two acknowledged factors, race was the predominant one.

## D.   Janis's Statements About The VRA And Non-Retrogression

The Plaintiffs, and the majority, take the view that Janis's specific reference to the non-retrogression requirement of the VRA and his subsequent reiterations of that requirement's importance in response to questioning in floor debates, see id. at 10, 14, and 25, prove that race was the predominant factor. I believe that, taken in context, however, those comments prove a more general purpose to avoid violations of federal constitutional law, state constitutional law, and federal

statutory law, rather than illustrating the use of race as the predominant redistricting factor.

It is a truism that "The Supremacy Clause obliges the States to comply with all constitutional exercises of Congress' power." Bush v. Vera, 517 U.S. at 991-92; see also U.S. Const., Art. VI, cl. 2. The Supremacy Clause also binds the United States to the terms of the United States Constitution. U. S. Const., Art. VI, cl. 2.  Notably, Janis's first stated goal included compliance with the United States Constitution, which is mandated by the Supremacy Clause. Id. His second stated goal, of which non-retrogression was an element, was also mandated by the Supremacy Clause.

In any redistricting, compliance with federal statutory and constitutional law is an absolute necessity. For a jurisdiction covered by Section 5 of the VRA, compliance with Section 5 is mandatory – a fact that applies with equal force whether or not a legislator openly acknowledges it. To construe a legislator's (or the legislature's) acknowledgement of the role of the Supremacy Clause as a de facto trigger for strict scrutiny of majority-minority jurisdictions is to place the legislatures and their legislators in a "trap[] between the competing hazards of liability." Bush v. Vera, 517 U.S. at 992 (O'Connor, J., concurring).

The majority opinion's description of this valid principle, and very real problem, as a "red herring" is based on its misapprehension of what the sentence actually says.  Thus, the majority says that "[t]he dissent argues that by subjecting a redistricting plan to strict scrutiny when it separates voters according to race as a means to comply with Section 5 trap[s] [legislatures] between competing hazards of [VRA and Constitutional] liability."  That, of course, is not what the dissent actually says.  The subject sentence actually says that "[t]o construe a legislator's (or the legislature's) acknowledgement of the role of the Supremacy Clause as a defacto trigger for strict scrutiny" places them in the trap identified in Bush.  Thus, the sentence makes the point is that it is not right to animate strict scrutiny because a legislator, or the legislature, acknowledges the role of the Supremacy Clause in redistricting.  That is a far different matter than subjecting a redistricting plan to strict scrutiny because it separates voters according to race.

To be sure, the Supremacy Clause and the application of Section 5 provide the potential for traditional redistricting criteria to be subordinated to race. But I read the Supreme Court's precedent as demanding actual conflict between traditional redistricting criteria and race that leads to the subordination of the former, rather than a merely hypothetical

conflict that _per_ _force_ results in the conclusion that the traditional criteria have been subordinated to race. _Cf_. _Miller_, 515 U.S. at 928-29 ("Application of the Court's standard does not throw into doubt the vast majority of the Nation's 435 congressional districts, where presumably the States have drawn the boundaries in accordance with their customary districting principles. That is so even though race may well have been considered in the redistricting process.") And, on the facts before us, where the Enacted Plan improves upon the Benchmark Plan in certain traditional criteria, _see_ Pl's Exh. 43, at 5, and all Congressional incumbents have personally indicated their satisfaction that the Enacted Plan conforms with their political interests, _see_ _id._ at 5-6, and both experts in this case agree that the General Assembly had political reasons to make the changed embodied in the Enacted Plan regardless of the race of the affected voters, _see_ Trial Tr. at 128-29 (McDonald), 266 (Morgan), I cannot conclude that Janis's statements about the VRA and non-retrogression show, or even tend to prove, that the traditional criteria were actually subordinated to race in the creation of the C.D.3.

**E.    The Senate Resolution**

Like the Plaintiffs, the majority points to a Virginia Senate Resolution as evidence that race was given priority over all other redistricting considerations.  The resolution provides

that "population equality among districts and compliance with federal and state constitutional requirements and the Voting Rights Act of 1965 <u>shall be given priority in the event of conflict</u> among the [previously enumerated redistricting] criteria." Pl's Ex. 5, p. 2, ¶ VI (emphasis added).

As explained above, it is both necessary, and unremarkable, that a state legislature would recognize its obligations under, and the effect of, the Supremacy Clause. And, I do not see how the recognition of that obligation could support, or tend to prove, a finding that race was the predominant reason for the Enacted Plan. More importantly for today's case, the resolution establishes a priority in the event of a conflict, and I can find nothing in the record to suggest that there was a conflict between, or among, the criteria outlined in the resolution. Nor does it appear from the record that the legislature considered that there was conflict. Hence, there never arose a need to resort to the priority clause of the resolution.

**F.   The Perceived Racial Quota**

Next, the Plaintiffs have argued, and the majority has found, that the General Assembly imposed a 55 percent Black Voting Age Population ("BVAP") quota for the C.D.3. The support for this view is a patchwork quilt of statements made by Morgan and Virginia's Section 5 pre-clearance submission to the Department of Justice. <u>See</u> Pl's Post-Trial Br. at 7-9. However,

71

in the final analysis, I do not think that the statements by Morgan or the Section 5 submission carry the weight ascribed to them.

The Section 5 submission merely states, as a factual matter, that the proportion of African-Americans in the total and voting age population in C.D.3 had been increased to over 55 percent. <u>See</u> Pl's Exh. 6, at 2. That, to me, is an objective description of a legislative outcome, rather than a declaration of subjective legislative intent or any evidence of a predetermined quota.

Morgan's expert report stated that "the General Assembly enacted . . . a House of Delegates redistricting plan [a plan for seats in the General Assembly] with a 55% Black VAP as the floor for black-majority districts subject to Justice Department preclearance under Section 5." Int. Def's Exh. 13, at 26. Again, this statement pertains to a different redistricting plan [the state House of Delegates plan], and gives no indication of whether the "floor" was a predetermined quota or an after-the-fact description of the districts that were contained in the enacted House of Delegates plan. Morgan went on to write that "the General Assembly had ample reason[32] to believe that

_____

[32] That was so, said Morgan, because the General Assembly previously had "enacted, with strong support of bipartisan and black legislators, a House of Delegates redistricting plan with (Continued)

legislators of both parties . . . viewed the 55% VAP for the House of Delegates districts as appropriate to obtain Section 5 preclearance," and that "[t]he General Assembly acted in accordance with that view for the congressional districts." Id. at 26-27. While these statements suggest that, in Morgan's view, the General Assembly looked favorably upon a plan with a BVAP greater than 55 percent, they do not go so far as to show that the legislature imposed a predetermined quota of 55 percent BVAP that predominated over every other redistricting criterion in effecting the Congressional redistricting here at issue.

Janis's public statements, on the other hand, suggest that the true starting point for the changes to C.D.3 was the recommendations provided by Virginian Congressmen before any assessment of the effect of those changes on the District's BVAP. Compare Pl's Exh. 13, at 11 (discussing input from Congressmen Scott and Forbes on the boundaries between C.D.3 and C.D. 4) with Int. Def's Exh. 10 (discussing analysis of previously proposed changes to verify that they did not lead to retrogression). Rather than indicating that race was the predominant factor or the subject of a hard quota, this sequence

---

a 55% BVAP as the floor for black-majority districts, subject to Justice Department preclearance under Section 5, including districts within the geography covered by Congressional District 3." Id.

of legislative drafting suggests only that Janis was conscious of the possible effects on racial demographics and potential for Section 5 preclearance. And "strict scrutiny does not apply merely because redistricting is performed with consciousness of race." <u>Bush v. Vera</u>, 517 U.S. at 958.

Significantly, prominent opponents of the Enacted Plan opposed it because it provided incumbent protection, not because it was the product of adopting a racial quota. Senator Locke, the sponsor of a rival redistricting plan, stated on the floor of the Virginia Senate that, "I stand in opposition to this legislation, which clearly is designed to protect incumbents." Va. S. Sess. Tr., (Jan. 20, 2012), Pl's Exh. 47, at 15. Senator Locke later reiterated her belief that "this plan is not about the citizens of the [C]ommonwealth but about protecting individuals who currently hold the office." <u>Id.</u> at 16. Delegate Armstrong, the minority leader in the Virginia House of Delegates, stated unequivocally, "The exercise is one for incumbency protection first, last, alpha, and omega." Va. HB 5004, 1st Spec. Sess. Tr. (Apr. 12, 2011), Pl's Exh. 43, at 48-49.

Delegate Morrissey compared the requests for redistricting input from incumbents to asking a professional football team where it would like the ball to be placed before a crucial play. <u>Id.</u> at 44-45. In Morrissey's view, "We're not here to protect

[incumbent] Congressman Connelly [sic] or Congressman Herd [sic]. We're here to do the people's business and to protect their interest." Id. at 45. Because the redistricting bill protected incumbents, he was opposed to it.

Notwithstanding the fact that these opponents of the Enacted Plan had every reason to characterize the Enacted Plan in the harshest terms possible (i.e., as race driven or as the product of a racial quota), they did not do so. The record proves that was because they saw the plan as driven by the goal of incumbency protection rather than as racial gerrymandering.

I am aware of the decisions that give little, to no, weight to statements made by the opponents of legislation. See Shell Oil Co. v. Iowa Dep't of Revenue, 488 U.S. 19,29 (1998); N.L.R.B. v. Fruit & Vegetable Packers, 377 U.S. 58, 66 (1964); Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394-395 (1951). That authority exists because opponents are thought often to be motivated to make the worst possible case against the piece of legislation under debate and thus their views are of little effect in interpreting the legislation. Those authorities do not apply here to bar consideration of the opponent's views because we are not involved here in the interpretation of a law. Rather, we are seeking to determine the motivation for enacting the law. And, I think, we can assume that the opponents would have condemned the Enacted Plan

as race driven had they thought that to be the case because it is far worse to be race driven than to have been animated by incumbency protection.  So when the opponents labelled the Enacted Plan as an incumbency protection plan, we can take their views into account.

In that regard, it is important to recall that the most salient difference between the Enacted Plan and Senator Locke's alternative redistricting plan was not the proportion of African-Americans in C.D.3, but whether one of the districts then held by a Republican incumbent would be transformed into a Democrat-leaning district.  As the Plaintiff's own expert, McDonald, wrote last year:

> The sticking point was whether to protect all incumbents, giving the Republicans an 8-3 edge among the state's eleven districts, or to restore the African-American population to the Fourth Congressional District that had been shifted to the Third Congressional District during the last redistricting, yielding a Democratic-leaning Fourth Congressional District with 45% African American voting-age population and reducing the Republicans' edge to 7-4. After the November 2011 elections, when Republicans gained a working majority, in the Senate, the General Assembly passed the congressional plan that protected all incumbents including the eight Republicans.

McDonald, supra, at 796-97. This assessment, offered in a scholarly publication a year after the Enacted Plan was signed into law, severely damages the credibility of McDonald's

subsequent testimony that "race trumped politics" in the drawing of the Enacted C.D.3. See Trial Tr. 88. Perhaps more importantly, however, McDonald's article demonstrates that even redistricting experts writing with the benefit of hindsight believed that the choice of redistricting plans was driven by issues of incumbency protection and partisan balance. Given that observation, there is ample reason to conclude that Janis and other legislators were animated in their redistricting decisions by incumbency protection and partisan balance.

For those reasons, I do not consider that the Plaintiffs proved their racial quota argument.

## G.  McDonald's Opinions: Circumstantial Evidence

In their presentation of the circumstantial evidence thought to support proof of a racial gerrymander, the Plaintiffs have relied on McDonald's opinion and report.[33] And, as I understand it, the majority relies heavily on the exhibits prepared by McDonald and his testimony about them when assessing the Plaintiffs' circumstantial evidence thought to show that race was the predominant factor in drawing C.D.3.

---

[33] McDonald's report and its exhibits (like that of the Defendants' expert, John Morgan) were admitted into evidence by agreement, notwithstanding that expert reports are hearsay and hence not admissible usually.

In reaching his conclusion that the race was the predominant factor in the creation of the Enacted Plan and the drawing of C.D.3, McDonald analyzed the racial composition of populations that moved in and out of C.D.3, the compactness of the district, the overall shape of the district (including the use of water to bypass racial communities while maintaining technical contiguity), and the number of precinct and locality boundaries that were "split" by the Enacted Plan. See Trial Tr. 72. I will address each of these factors in turn.

But, before doing so, I reiterate that, for the reasons set out in Section II.B, I would give no credence to any part of McDonald's testimony or report. However, because the Plaintiffs' case, like the majority opinion, depends on McDonald's views on these topics, I think it is wise to address them, wholly apart from my view of his credibility. Thus, I turn now to the elements of what the majority calls "Circumstantial Evidence of the Third Districts Shape and Characteristics." In so doing, I discuss, as has the majority, each point individually but assess them as a whole.

## 1. Population Swaps – Racial Composition

The Enacted Plan incorporated a number of population swaps between C.D.3 and the surrounding Congressional districts. McDonald testified that the effect of these various swaps was to remove areas with a comparatively low BVAP from C.D.3 and add

areas with a comparatively higher BVAP into C.D.3. Trial Tr. 82-87; Pl's Exh. 27, at 15, Table 6.   Even if we assume that point to be accurate, it does little to prove that race was the predominant factor in the redistricting because, "[i]n a case . . . where majority-minority districts . . . are at issue and where racial identification correlates highly with political affiliation," Easley, 532 U.S. at 258, a simple analysis demonstrating that blacks are disproportionately likely to be moved into a particular legislative district is insufficient to prove a claim of racial gerrymandering.   As Morgan explained, the Enacted Plan treats District 3 the same way as the majority-white districts by preserving its essential core and making relatively minimal changes to benefit incumbents in District three and adjacent districts.   Trial Tr. 256.

Neither party disputes that racial identification correlates highly with political affiliation in C.D.3 and surrounding areas.   And, the record shows that the Democrat vote share of local voting tabulation districts (VTDs) can generally be predicted simply by taking the BVAP of a VTD and adding about 21 percentage points. See Pl's Exh. 57, Table 2 (reflecting the analysis of the Plaintiff's expert and showing that most VTDs have a Democrat vote share 20-22 points higher than their BVAP); Int. Def's Corrected Exh. 50, Table 1 (reflecting the analysis

of the Defendants' expert and showing the same correlation between BVAP and Democrat vote performance).

The majority finds fault with this analysis because it is, in their view, "precisely the sort of race-biased consideration the Supreme Court has confirmed triggers strict scrutiny." (citing Bush v. Vera, 517 U.S. at 968; and Shaw I, 509 U.S. at 653). However, the analysis of racial correlation and political affiliation here is based on facts in the record: the Plaintiffs' own expert, the Defendants' expert, and the results of the most recent presidential election. Hence, this case does not present the racial stereotyping that Bush and Shaw I rightly prohibit. And that fact-based correlation between race and political affiliation has significance. That is because the proven correlation requires that "the party attacking the legislatively drawn boundaries must show at the least that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles." Easley, 532 U.S. at 258.

It is not, I think, disputed by anyone that, at least, one of the legitimate political objectives articulated in the Virginia legislature was incumbent protection, which directly implicated the partisan performance of the various Congressional Districts. McDonald purportedly tested these "political

considerations" to determine whether they could explain the changes to C.D.3, and concluded that "race trumped politics." See Trial Tr. 87-88.  But McDonald's test is simply too crude to support such a conclusion, as McDonald's own follow-up analysis demonstrates.

McDonald initially created a set of VTDs drawn from every locality that was partially or completely contained within the Benchmark C.D.3. See Trial Tr. 88. To that set, he added the VTDs from every locality adjacent to the Benchmark C.D.3. Id. McDonald isolated those VTDs where Democrats averaged 55 percent of the vote or more, and then compared the "highly Democrat VTDs" that were placed within the Enacted C.D.3 with those that were placed in other districts. Id. at 88-89. McDonald found that the highly Democrat VTDs placed within C.D.3. possessed a higher BVAP than their counterpart VTDs outside C.D.3. Id. at 89; Pl's Exh. 28, at 8 (finding an average BVAP of 59.5% for highly Democrat VTDs within the Enacted C.D.3 and an average BVAP of 43.5% for highly Democrat VTDs outside the Enacted C.D.3). From this finding, McDonald inferred that race predominated over politics in the selection of VTDs for inclusion in the Enacted C.D.3.

McDonald's analysis suffers from two major deficiencies. First, he made no distinction between VTDs that were already within the pre-existing boundaries of C.D.3 and VTDs that were

outside the boundaries of C.D.3. McDonald's analysis assumes that, but for partisan performance, a VTD in the inner core of the old C.D.3 is no more likely to be included in the new C.D.3 than a VTD thirty miles outside the old C.D.3. This assumption can be valid only if the redistricting legislature gave no value to the goals of preserving district cores and protecting the pre-existing communities of interest formed within those cores. However, the record makes it clear that the legislature, in fact, did assign substantial value to those goals. And, the record shows that, of the 189 highly Democrat VTDs assigned to the Enacted C.D.3, 159 were also included in the Benchmark C.D.3. Those 159 VTDs had an average BVAP of 60%. On this record, and considering the voting performance data from past presidential elections, it should not come as a surprise that a pre-existing majority-minority Congressional district would have a higher average BVAP in its highly Democrat VTDs than the surrounding localities, and evidence to that effect does not demonstrate that the changes to the Benchmark C.D.3, a pre-existing majority-minority district, were predominately motivated by race.

The second problem with McDonald's analysis and testimony is that, although the highly Democrat VTDs within C.D.3 had a higher average BVAP, they were also on average more highly Democrat. Plaintiffs' own Exhibit 57 shows that, while the

highly Democrat VTDs within C.D.3 had a BVAP 16 percentage points greater, they also performed 15.5 percentage points better for Democrat candidates. Thus, placing those VTDs within C.D.3 and keeping them out of the surrounding Congressional districts would serve the purpose of protecting incumbents (the Democrat incumbent in C.D.3, the Republican incumbents in C.D.1, C.D.4, C.D.7, and especially C.D.2) to a greater degree than would be possible if the lower BVAP, less highly Democrat VTDs were also placed within C.D.3.

When their own evidence shows that the selection of highly Democrat VTDs does as much to further the race-neutral political goal of incumbency protection as it does to increase the proportion of minorities within the district, the Plaintiffs cannot be said to have carried their burden to show that race predominated over politics, and certainly not through McDonald's VTD analysis.[34]  As in <u>Backus v. South Carolina</u>,

---

[34]  The Plaintiffs have placed great importance on five highly Democrat VTDs that were removed from the Benchmark C.D.3. <u>See</u> Trial Tr. 411-14; Pl's Post-Trial Reply, at 7-9 & n.4. These VTDs, however, were substantially less Democrat (19.2 percentage points) than the highly Democratic VTDs added to Benchmark C.D.3, and in fact close to the 55% cutoff selected by the Plaintiffs as the definition of a highly Democrat VTD. See Pl's Exh. 57, Table 2. The Plaintiffs argue that, because the discrepancy in the BVAPs of the added and removed districts (35.9 percentage points) is greater than the discrepancy in the Democrat performance, those five VTDs prove that race predominated over politics.

(Continued)

another case in which McDonald's similar testimony was found wanting, this analysis "focuse[s] too much on changes that increased the BVAP in certain [VTDs] and not enough on how traditional race-neutral principles were subordinated to race in making those changes." 857 F. Supp. 2d 553 (D.S.C. 2012) (three-judge court), summ. aff'd, 133 S.Ct. 156 (2012).

**2. Compactness**

McDonald also based his opinion on the predominance of race in part on his analysis of C.D.3's compactness. Based on a visual inspection of the district's map and three different

---

I can find no basis in precedent for this argument, and as a matter of logic it is a thin reed. There is no dispute that the five VTDs in question are less highly Democrat than their counterparts that were added to the Benchmark C.D.3. There is also no dispute that they have substantially lower BVAPs. Both the Defendants' alleged goals of incumbency protection and the race factor that Plaintiffs allege would have been substantially furthered by these redistricting choices. When both goals are substantially served by a particular redistricting decision, that decision offers no insight into which goal predominated in the decision-making process. The implication of the Plaintiff's argument is that the Defendants should have compromised their ability to achieve their political goals in order to avoid an even larger racial impact. But that is not the test set forth in Easley, and so the five VTDs highlighted by the Plaintiffs do not prove their claim. In fact, the Supreme Court rejected a similar precinct-based argument in Easley itself. See 532 U.S. at 255. ("First, appellees suggest, without identifying any specific swap, that the legislature could have brought within District 12 several reliably Democratic, primarily white, precincts in Forsyth County. None of these precincts, however, is more reliably Democratic than the precincts immediately adjacent and within District 12.")

statistical measures of compactness (The "Reock" test, the "Polsby-Popper" test, and the "Schwartzberg" test), McDonald testified that C.D.3 "is the least compact district of any district in the Commonwealth of Virginia." Trial Tr. 73. While that assertion seems to be accurate as far as it goes, it does not speak directly to the question whether the district's lack of compactness is constitutionally suspect.

In any given set of electoral districts, one or more must be the least compact. In all three tests used by McDonald, C.D.3 is the least compact district by the slimmest of margins. See Pl's Exh. 27, at 7. On the Reock test, where lower scores are less compact, the scores of Virginia's Congressional Districts range from 0.19 to 0.37, and C.D.3 scores only 0.01 worse than the second-least compact district. Id. On the Polsby-Popper Test, where lower scores are less compact, the scores range from 0.08 to 0.26, and C.D.3 scores only 0.01 worse than the second-least compact district. Id. On the Schwartzberg test, where higher scores are less compact, the scores range from 1.76 to 3.07, and C.D.3 scores only 0.01 worse than the second-least compact district. Id.

But, as McDonald conceded during his testimony, even a difference of 0.03 on the Reock test, 0.03 on the Polsby-Popper test, and 1.03 on the Schwartzberg test does not hold comparative significance under any professional standard. See

Trial Tr. 217 (testifying about differences in compactness between Enacted C.D.3 and Plaintiff's alternative plan); Pl's Exh. 29, at 7 (quantifying those differences in compactness scores). Therefore, by McDonald's own logic, C.D.3 is not significantly less compact than some of the other Congressional districts in the Commonwealth of Virginia.   Thus, McDonald's compactness contention does not advance the theory that race was the predominant factor in the creation of C.D.3.   And, certainly it does not prove the point.

### 3. VTD And Locality Splits

McDonald also examined the number of VTDs and localities that were "split" by the boundaries of the Enacted C.D.3. He testified that C.D.3 split more VTDs and localities than any other Congressional District in Virginia. Trial Tr. 76-80. <u>See also</u> Pl's Exh. 27, at 8-11 (McDonald's expert report). Thereupon, McDonald concluded that C.D.3's position as the leading source of split localities and VTDs indicated that race was the predominant factor in the redistricting of C.D.3.

But, as with his testimony about compactness, McDonald's logic is too sweeping. Unless a state manages to avoid splitting any localities and VTDs (an almost impossible task when combined with the need to achieve perfect population equality between districts), one or more districts will inevitably participate in more splits than other districts.   McDonald has not offered any

cognizable principle or professional standard that distinguishes between a reasonable distribution of splits between districts and a true outlier indicative of racial gerrymandering. His theorem fails for that reason alone.

Moreover, C.D.3 now splits fewer localities and VTDs than the version of C.D.3 that was struck down in 1997. See Pl's Exh. 27, at 8-11 (quoting statistics cited by Moon v. Meadows, 952 F.Supp. 1141, 1148 (E.D. Va. 1997)). Similarly, the Enacted Plan splits fewer localities and VTDs statewide than the redistricting plan struck down in 1997. Id. The Enacted Plan also splits fewer localities than the Benchmark Plan that was previously in place. Trial Tr. 321. Tellingly, McDonald previously wrote in his article that the Enacted Plan "scored highly" in his regard for its ability to limit the number of split political boundaries. See McDonald, supra, at 819-20.[35] On this record, I conclude that the number of VTD and locality splits are not probative of the theory that the splits were racially motivated.

---

[35] This is yet another illustration of the facile and malleable quality of McDonald's opinions. When opining before being retained in this case, McDonald's view on the "splits" issue was far different than the one he posits in this case.

### 4.    Contiguity

McDonald conceded that C.D.3 was contiguous, but found fault with the fact that the district was not completely contiguous by land or bridge connections. Trial Tr. 74-76. Specifically, McDonald concluded that C.D.3's use of water connections across the James River to bypass white communities located between Newport News and Hampton showed that traditional redistricting principles had been subordinated to race. Id. at 75-76.   However, McDonald made no attempt to analyze the political and partisan impact of excluding those white communities, and therefore did not make the necessary showing under Easley to demonstrate that these bypasses were created for racial rather than political reasons.

Furthermore, McDonald conceded upon cross-examination that water contiguity without a bridge is permissible in Virginia. Trial Tr. 221. The Virginia Senate Redistricting Criteria adopted in 2011 explicitly stated that, "Contiguity by water is sufficient." Pl's Exh. 5, at 1. And, the Supreme Court of Virginia has held that contiguity by water does not necessarily violate the Constitution of Virginia, reasoning that contiguity by land "is not necessary for exercising the right to vote, does not impact otherwise intact communities of interest, and, in today's world of mass media and technology, is not necessary for communication among the residents of the district or between

such residents and their elected representative." <u>Wilkins v. West</u>, 571 S.E.2d 100, 109, 264 Va. 447, 463 (Va. 2002). Under these circumstances, the Plaintiffs have not shown that contiguity by water is a violation of traditional redistricting principles in Virginia, let alone that the perceived impermissible form of contiguity was driven by race rather than politics.

### 5.   Population Swaps - Volume

The Plaintiffs have also made an issue of the fact that, although the Benchmark C.D.3 was underpopulated by roughly 63,976 people, the population swaps used to bring the Enacted C.D.3 to par with the other Virginia Congressional Districts involved roughly 180,000 people. <u>See</u> Trial Tr. 80-81, 87. The majority too finds this to be evidence in support of a finding that race was the predominant factor in this redistricting.

However, to a large degree, this discrepancy is explained by the changes in Virginia's population over time and the need to minimize split localities. C.D.3 was not the only underpopulated district that needed to be augmented after the 2010 census. Congressional Districts 2, 5, 6, 8, and 9 were also underpopulated. Trial Tr. 248. District 2, which is adjacent to District 3 and located on the far eastern edge of the Commonwealth, was underpopulated by more than 81,000 people. <u>Id.</u> The goal of the population swaps involving C.D.3 was not

merely to augment that District's population, but to work in concert with other population swaps to achieve the near-perfect population parity that would satisfy the Constitutional mandate of one-man-one-vote.

The need to achieve population parity between districts was complicated by a simultaneous desire to limit locality splits. The Enacted Plan managed to add precisely 63,976 people to C.D.3 while reducing the number of split localities. See Trial Tr. 321 As a matter of logic, it is extremely unlikely that any combination of "whole" localities in the vicinity of Benchmark C.D.3 could have been added to the District to augment the population by exactly 63,976 people, and the Plaintiffs have made no effort to demonstrate the feasibility of that scenario. In order to hit its population target for C.D.3, the Virginia legislature had to either split additional localities or trade complete localities back and forth between districts to achieve the desired net transfer of population. The evidence shows that the Virginia legislature took the latter route, which allowed it to achieve its population target and actually reduce the number of split localities, albeit at the expense of involving more people in the population swaps between districts.

Finally, to the extent that any population swaps cannot be explained by the two factors above, there is nothing about their existence that by themselves indicate that the swaps were

racially motivated.  That determination must be made on the basis of other evidence, and the other evidence is insufficient to that end.

### 6.  The Shape Of C.D.3

The shape of a district, if it is bizarre, can be considered as tending to show that race was the predominant factor in drawing the district lines.  See Shaw v. Hunt (Shaw II), 517 U.S. 899, 905-906 (1996); Karcher v. Daggett, 462 U.S. 725, 762 (1983); Miller, 519 U.S. at 914 ; Bush v. Vera, 517 U.S. at 980-81.  The Plaintiffs and the majority take the view that C.D.3 is configured so as to fall within the reach of those decisions.

With respect, when I examined the map that shows all of the Virginia districts (Int. Def's. Ex. 02), I could not conclude that C.D.3 fits the mold of the decisions in which the shape of the district was given such probative effect.  C.D.3 is somewhat irregular in shape, but that is true of many of Virginia's nine districts, especially C.D.'s 1, 2, 4 and 7, none of which are accused of being drawn on the basis of race.  Moreover, the shape of proposed C.D.3 in the Plaintiffs' Alternative Map is hardly any less irregular than the current shape of C.D.3 or in the Enacted Plan.  Thus, on this record, I conclude that the shape of C.D.3 does not tend to prove that race was the predominant factor in drawing the district.

## H.    The Credibility of John Morgan

The majority questions why I credit the testimony of the Defendants' expert, John Morgan, on a number of points.  That question arises because, says the majority, Morgan has no advanced degree, his undergraduate degree was in history, he has never taken a course on statistics, he did not talk to or work with members of the Virginia legislature and he miscoded some VTD's in his analysis.  The majority's query is a fair one and deserves an answer.  So too does the record in this case.

To begin, the Plaintiffs accepted Morgan as an expert in demography and redistricting.    Trial Tr., p. 241.    Second, Morgan has been accepted as an expert in other federal court redistricting cases.  Third, his resume shows extensive work in shaping statewide and congressional redistricting plans in nineteen states since 1991.    Fourth, he has served as a consultant to redistricting boards or commissions in five states.  Fifth, from 1991 to date (excluding a three year tour as Executive Director of GOPAC) he has been employed with Applied Research Associates, a consulting firm specializing in political and demographic analysis and its application to elections and redistricting.    Morgan started as a research analyst, became Vice-President in 1999 and has served as the firm's President since 2007.  Intervenor-Defendant's Ex. 1.

Sixth, Morgan's undisputed trial testimony shows that he has received formal training in the intricacies of redistricting from the National College of State Legislators, from Republican organizations, and from a vendor of software used in redistricting analysis. Trial Tr., p. 243-244. Seventh, Morgan has trained others in how to draw redistricting plans, and in the process has trained state legislators who are involved in the redistricting process as well as the National College of State Legislators. Trial Tr., p. 244. Eighth, although Morgan did not assist or advise in the development of the redistricting plan at issue here, he did work directly with the Virginia's General Assembly and its counsel in drawing the statewide redistricting plan in 2011. Ninth, I found him to be knowledgeable about all aspects of redistricting and the demographics related thereto and I found his analysis to make sense and to square with the other evidence in the case. Finally, I adjudged Morgan to be entirely truthful.

I recognize that Morgan made some mistakes in his original assignment of data about VTD's. Those mistakes occurred in the run up to trial when the parties were exchanging data. And, Morgan having candidly acknowledged them, and taken another look at his views in perspective of the correct data, explained that they did not affect his bottom line conclusions even if McDonald's views of the misassigned VTD's were accepted as true.

Trial Tr., pp. 391-92.  And, in my view, the cross-examination of McDonald in the Plaintiffs' rebuttal case confirmed what Morgan said.  Trial Tr., pp. 424-31.  In assessing his credibility, I considered the mistake that Morgan made on the misassignment of data, but, because it was an understandable, and honest, mistake of the kind that often happens in the press of litigation, I did not conclude that it undercuts his credibility as a whole and certainly not in the areas cited in this opinion.[36]

## I.   Plaintiffs' Failure To Produce An Adequate Alternative Plan

As part of their effort to show that "the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles," Easley, 532 U.S. at 258, the Plaintiffs proffered an alternative redistricting plan ("Alternative Plan").  The Plaintiffs have not presented any other suggestions for how the legislature could have achieved its stated objectives. Therefore, the Plaintiffs cannot succeed on the merits of their claim unless the Alternative Plan substantially achieves the

---

[36] With all his background, training, and experience in demographics and redistricting, I just do not think Morgan's credibility suffers because he did not have an advanced degree, his undergraduate degree was in history, and he has not taken a course in statistics.  I have set out above my views on the mistake cited by the majority and have noted his familiarity with Virginia's statewide redistricting.

same political objectives that the legislature achieved through the Enacted Plan and the Enacted C.D.3.

Morgan explained that, under the Benchmark Plan, Congressional District 2 "was a toss-up district," and that the legislature would have had reason to protect the Republican incumbent who had recently been elected in that district. Trial Tr. 258.  McDonald agreed that District 2 was a toss-up district over the past ten years and under the Enacted Plan.  Trial Tr. 119.  Morgan went on to testify that the Plaintiff's Alternative Plan would increase the Democratic vote share in Congressional District 2 from roughly 50 percent to about 55 percent, right at the threshold of what McDonald considered to be a "highly Democrat" area. Trial Tr. 304-05. Not only would this represent the largest political shift in any of the districts redrawn under the Plaintiff's Alternative, but it would be a significant political shift against an incumbent.

McDonald did not dispute Morgan's analysis.  In fact, McDonald admitted that the Alternative Plan does not protect all political incumbents:

> Q:   So the alternative plan subordinates traditional districting principles to race, but unlike the enacted plan, does not further the General Assembly's political goals of having an 8 [Republican]/3 [Democrat] incumbency protection plan; correct?

> A:   Yes.

Q:   Yes, it does not?

A:   Yeah. That's why I'm trying to think how to
     formulate the answer.

Q:   And you have no basis for disagreeing with
     the notion then that the alternative plan
     moves an overwhelmingly Democratic group
     into District 2 and moves and evenly divided
     group out of District 2, do you?

A:   No, I do not.

                    * * * *

Q:   And you don't have any basis for disagreeing
     with the fact that that move converts
     District 2 from a 50 percent toss-up
     district to a heavily Democratic 55 percent
     noncompetitive district, do you?

A:   No, I do not.

Q:   And if all of that were true, then this
     would be not only – this would be directly
     undermining the General Assembly's goals of
     incumbency protection and maximizing
     Republican congressional representation;
     correct?

A:   If those were the goals of the General
     Assembly, yes.

Trial Tr. 180:10-18; 184:10-24. At no point have the Plaintiffs

even attempted to explain how an Alternative Map that threatens

to unseat a Republican incumbent and create a 7-4 partisan split

in Virginia's Congressional Delegation serves the political

objectives of the Republican-controlled General Assembly.

    If race truly predominated over politics in the creation of

the Enacted Plan and C.D.3, then the Plaintiffs should have been

able to produce an alternative plan that remedied the alleged racial gerrymandering without disturbing the political viability of incumbents or the partisan balance in Virginia's Congressional Delegation. Instead, the Plaintiff's Alternative Plan would have a significant effect on both the racial demographics and the political environments of Congressional Districts 2 and 3.   The Alternative Plan itself, I think, actually provides strong and persuasive evidence that protection of incumbents, not race, was the predominant factor in the redistricting reflected in the Enacted Plan.   Apart from that, the Alternate Plan also fails to show that "the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional redistricting principles.  Easley, 532 U.S. at 258.

The majority acknowledges "that parties attacking redistricting boundaries must show 'that the legislature could have achieved its legitimate political objectives in alternate ways that are comparably consistent with traditional redistricting principles.'" (citing Cromartie II, 532 U.S. at 258).  Then, it says that the attacking party is not confined in its form of proof to submitting an alternative plan.  I do not quarrel with that statement as a general proposition, but it is difficult to envision what other form of proof could effectively establish that element of a plaintiffs' racial gerrymandering

claim where, as here, the Plaintiffs' expert acknowledges, and the evidence shows, that protection of incumbents was, at least, an important goal of the redistricting.

However, that is of no moment here because the Plaintiffs, in fact, offered in evidence the Alternative Plan in an effort to meet their burden to show "that the legislature could have achieved its legitimate political objectives in alternate ways that are consistent with traditional redistricting principles." Having done so, they cannot be excused from the probative consequences of their own evidence merely because other forms of proof conceptually might have been available.

The majority is correct that the Alternative Plan provides a slight improvement in splits and that its splits affect fewer people, but that is accomplished at the expense of protecting incumbents.  When all is said, I submit that the Alternative Plan shows that this case is about politics, not race, for it seeks to accomplish here a more favorable result for Democrats than does the Enacted Plan that was created through the legislative process.

## J.   Any Analogy To <u>Shaw v. Hunt</u> Is Inapt

It is suggested that this case is analogous to <u>Shaw II</u>, in which the Supreme Court applied strict scrutiny to North Carolina's creation of two majority-minority districts. I find this analogy inapt for several reasons.

First, North Carolina's District 12 was not merely the least compact district in the state, but "[had] been dubbed the least geographically compact district in the nation."  Shaw II, 517 U.S. at 906. An earlier Supreme Court opinion had described the district in almost surrealist terms:

> Northbound and southbound drivers on I-85 sometimes find themselves in separate districts in one county, only to "trade" districts when they enter the next county. Of the 10 counties through which District 12 passes, 5 are cut into 3 different districts; even towns are divided. At one point the district remains contiguous only because it intersects at a single point with two other districts before crossing over them. One state legislator has remarked that "'[i]f you drove down the interstate with both car doors open, you'd kill most of the people in the district.'"

Shaw v. Reno (Shaw I), 509 U.S. 630, 636 (1993) (internal citations omitted).  While C.D.3 could hardly be described as comely, there is no evidence that its irregularities are an outlier of the sort at issue in Shaw II.

Second, the record in Shaw II included explicit and repeated admissions that race was the predominant factor in the redistricting plan. North Carolina's preclearance submission had "expressly acknowledged that [the redistricting plan's] overriding purpose was to comply with the dictates of the Attorney General's December 18, 1991 letter and [thereby] to create two congressional districts with effective black voting

majorities." Shaw II, 517 U.S. at 906 (quoting from district court record). Perhaps more importantly, in Shaw II, the defendants formally conceded to the district court "that the state legislature deliberately created the two districts in a way to assure black-voter majorities." Id. (quoting Shaw v. Barr, 808 F. Supp. 461, 470 (E.D.N.C. 1992)). There is no such concession in this case,[37] and no explicit admission of predominant racial purpose was made in Virginia's Section 5 preclearance submission.

Third, in Shaw II the above indicators of racial predominance were "confirmed" by the testimony of "the redistricting plan's principal draftsman, who testified that creating two majority-black districts was the 'principal reason' for Districts 1 and 12." Id. (quoting from district court record). In this case, the principal draftsman, Delegate Janis, did not testify, so the Court and the parties must determine Delegate Janis's intent from what he said during the redistricting process. And, as explained in Section II.C, Janis's statements in the floor debates do not, in my view, show that race predominated here. Furthermore, because the Enacted

---

[37] As explained previously, I conclude that no such concession was made here; and, even if what the Intervenor-Defendants said is construed as an admission, it is not binding on, or useable against, the State defendants.

Plan maintains rather than creates a majority-minority district, the race-neutral factors of incumbent protection and core preservation deserve much more weight in the analysis here, than would the comments made in Shaw II.  In the end, however, it is far from clear that the Shaw II Court would have found that race was the predominant factor in the absence of strong corroborating evidence in the Shaw II draftsman's comments. And, as explained above, I do not believe that this record presents corroborative evidence that race predominated over politics (and particularly political incumbency protection).

### III.

With respect for the views of my good colleagues in the majority, I think that the record in this case, considered as a whole, shows that the Virginia General Assembly set out to redraw district lines to protect incumbents and, in so doing, it also sought to respect traditional redistricting principles. The legislature was also fully aware of its obligation to comply with federal law and thus, of necessity, it considered race in trying to assure that compliance.  But, at all times and in all the decisions it made, the predominant factor in the General Assembly's redistricting decisions was the protection of incumbents, not race.

For the reasons outlined above, I would find that race was not the predominant factor in the drawing of C.D.3. And, for the

same reasons, I cannot conclude that the Plaintiffs have met their burden to prove that race was the predominant factor in this redistricting.   Therefore, I would enter judgment in favor of the Defendants and dismiss the action with prejudice.[38]

It is so ORDERED.


_____/s/_____
Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date:  October 7, 2014

---

[38] I share the views on remedy in Section III of the majority opinion.