IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND  DIVISION

DAWN CURRY PAGE, et al,    )
                           )
              Plaintiffs,  )
                           )
        v.                 )
                           )
VIRGINIA STATE BOARD OF    )
ELECTIONS, et al.,         )     Civil Action No. 3:13-cv-678-REP-LO-AKD
                           )
              Defendants,  )

## PLAINTIFFS' OPENING BRIEF REGARDING *ALABAMA LEGISLATIVE BLACK CAUCUS V. ALABAMA*

In 2014, following trial, this Court determined that Virginia's reliance upon a numerical threshold of minority population to approximate compliance with Section 5 of the Voting Rights Act ("VRA") demonstrated both that race predominated the redistricting process and that the state's only majority-minority congressional district was not narrowly tailored to satisfy the VRA.  Six months later, in *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015), the Supreme Court confirmed that reliance upon mechanical racial percentages strongly suggests that race was the predominant consideration in drawing district lines and grossly misconstrues the requirements of Section 5.  The Supreme Court's *Alabama* decision thus bolsters the foundation of the Majority Opinion, including its ultimate conclusion that Virginia's Third Congressional District is an unconstitutional racial gerrymander.  Indeed, this Court's reasoning previewed what the Supreme Court in *Alabama* held was the appropriate analysis.

The Supreme Court has now remanded this case for further consideration in light of *Alabama*.  This narrow remand order does not invite reconsideration of all legal and factual issues discussed in the Memorandum Opinion.  It does not call for reopening the record or revisiting this Court's findings of fact.[1]  It simply asks whether any of the legal holdings in *Alabama* disturb this Court's conclusion that CD 3 is a racial gerrymander.  And the answer is just as simple: no.

Further consideration of this case in light of the *Alabama* opinion makes clear that, with respect to both its analysis and conclusions, this Court got it right.  Accordingly, Plaintiffs respectfully request that the Court fully reinstate and reaffirm its Memorandum Opinion and Judgment.

## I.     PROCEDURAL BACKGROUND

On October 7, 2014, this Court issued its Memorandum Opinion striking down Virginia's Third Congressional District ("CD 3") as an unconstitutional racial gerrymander.  ECF No. 109 ("Mem. Op.").  Consistent with the well-established standard for racial gerrymandering claims, the Court first determined that race was the predominant factor motivating the drawing of CD 3.  *Id.* at 13.  This finding had strong support in the factual record.  Indeed, there was direct evidence that considerations of race predominated—including Defendants' concessions to that effect, the General Assembly's use of a racial threshold, and the sole map drawer's unequivocal statements

---

[1] *Compare* Summary Disposition, *Cantor v. Personhuballah*, http://www.supremecourt.gov/orders/courtorders/033015zor_5iek.pdf (remanding "for further consideration in light of *Alabama Legislative Black Caucus v. Alabama*, 575 U. S. __ (2015)"), *with Alabama*, 135 S. Ct. at 1264-65 (remanding the cases "to allow appellants to reargue their racial gerrymandering claims" and inviting all parties to "introduce such further evidence as the District Court shall reasonably find appropriate").  Indeed, during the parties' April 1, 2015, conference with the Court, all parties agreed that this case can and should be resolved by legal briefing.

prioritizing race over all other considerations.  What the map drawer and Defendants conceded

outright was also echoed in the circumstantial evidence, including the district's contorted shape

and locality splits that followed racial lines.  *Id.* at 16-37.  The Court next determined that CD 3

failed to pass strict scrutiny because it was not narrowly tailored.  Specifically, the Court pointed

to the General Assembly's adherence to a numerical racial threshold and its failure to conduct

any analysis of racial voting patterns whatsoever to determine that the General Assembly did

more than was "reasonably necessary" to avoid retrogression.  *Id.* at 40.  In light of its conclusion

that CD 3 violated the Fourteenth Amendment to the U.S. Constitution, the Court allowed the

General Assembly until April 1, 2015, to enact a remedial districting plan.  *Id.* at 48.

Three weeks later, Intervenor-Defendants, eight Republican politicians who, at the time

of their intervention, were members of Virginia's congressional delegation,[2] filed a Notice of

Appeal to the United States Supreme Court.  ECF No. 115.  Defendants, officers of the Virginia

State Board of Elections, did not seek review of this Court's decision.

On January 27, 2015, in light of the Supreme Court's failure to act on their appeal,

Intervenor-Defendants moved to postpone the remedial deadline until September 1, 2015, noting

that a postponement would "allow the General Assembly, the Court, and the parties to act in

accordance with any additional guidance the Supreme Court offers in *Alabama* or any order in

this case."  ECF No. 125-1 at 3.  This Court subsequently modified its injunction to allow the

General Assembly additional time to prepare a new redistricting plan upon issuance of a decision

from the Supreme Court or further order of this Court.  ECF No. 137.

---

[2] Intervenor-Defendants Eric Cantor and Frank Wolf no longer represent Virginia in the United
States House of Representatives.

On March 25, 2015, the Supreme Court issued its opinion in *Alabama*, vacating and remanding the district court decision in that case which had dismissed the *Alabama* plaintiffs' racial gerrymandering claims.  *See* ECF No. 140-1 ("Slip Op.").  Five days later, the Supreme Court vacated this Court's judgment and remanded the case "for further consideration in light of [*Alabama*]."  *See* ECF No. 141.  After conducting a telephone conference with the parties, this Court subsequently ordered additional briefing "regarding the effect, if any, of the Supreme Court decision in [*Alabama*]."  ECF No. 144.

## II.    ARGUMENT

The Supreme Court's decision in *Alabama* is entirely consistent with the Majority Opinion's analysis in this case, and provides no basis for disturbing any of this Court's factual findings or legal conclusions.  In fact, the *Alabama* ruling specifically reinforces this Court's conclusion that the General Assembly's adherence to a racial threshold, adopted without an analysis of racial voting patterns or any basis whatsoever in evidence, not only helps establish that race was the predominant purpose behind CD 3, but also negates any argument that the district could satisfy strict scrutiny.

The Supreme Court in *Alabama* held that the district court "applied incorrect legal standards" in evaluating the plaintiffs' racial gerrymandering claims, Slip Op. at 2, outlining four specific errors: (1) the district court erroneously applied the racial gerrymandering analysis to the redistricting plan as a whole rather than to individual districts; (2) the district court erred in finding that the Alabama Democratic Conference lacked standing; (3) the district court did not properly calculate the "predominance" of race; and (4) the district court misunderstood the requirements of Section 5 of the VRA in applying its strict scrutiny analysis.  The first two of these holdings are inapplicable to the present case; there is no question the parties and the Court

properly considered Plaintiffs' challenge to a specific district, and no one has challenged

Plaintiffs' standing to bring the case.  The latter two holdings, meanwhile, only bolster the

Majority Opinion's analysis and confirm that this Court properly applied both the

"predominance" and the narrow tailoring inquiries in the context of Section 5.  In short, *Alabama*

validates this Court's conclusions with respect to both parts of the racial gerrymandering

analysis.

A.     *Alabama* **Does Not Disturb This Court's Finding that Race Predominated in Drawing CD 3**

Upon evaluating a host of direct and circumstantial evidence, the Majority Opinion found

that "Plaintiffs have shown race predominated" in drawing CD 3.  Mem. Op. at 13.  The

Supreme Court's recent holding in *Alabama* regarding the "predominance" inquiry is largely

inapplicable here, as it addresses the population equality requirement, an issue that was not

disputed in this case.  The Supreme Court's subsequent analysis of the relevant factors,

moreover, only confirms this Court's reasoning and ultimate conclusion that race was the

predominant factor behind CD 3.

The Supreme Court held that the  *Alabama* District Court "did not properly calculate

'predominance'" because it "placed in the balance, among other nonracial factors, legislative

efforts to create districts of approximately equal population."  Slip Op. at 15.  In other words, the

district court's analysis in *Alabama* improperly concluded that achieving population equality

"predominated" over all other considerations, including race.  *See id.* at 15-16.  The Supreme

Court explained that population equality "is a background rule against which redistricting takes

place," not a factor to be weighed against race or other "traditional" districting principles in

determining whether racial gerrymandering plaintiffs have met their burden.  *Id.* at 17.

The Supreme Court's holding in this regard has no impact on the Majority Opinion here. Although this Court recognized that population equality and VRA compliance were the General Assembly's top two priorities in drawing congressional districts, *see* Mem. Op. at 8, 18, it never weighed the two criteria against one another in determining whether race "predominated" the districting decision.  Just as the Supreme Court indicated that the district court's "predominance" conclusion "might well have been different" "once the legislature's 'equal population' objectives are put to the side," Slip Op. at 17; *see also id.* at 2 (noting that Alabama prioritized two goals: "[f]irst" achieving population equality, and "[s]econd" "ensur[ing] compliance with federal law, and, in particular, the Voting Rights Act of 1965"), this Court properly put aside the General Assembly's goal of population equality to determine that, in fact, "compliance with Section 5 of the VRA . . . , and accordingly, race, was the legislature's predominant purpose . . . underlying the Third Congressional District's racial composition in 2012," Mem. Op. at 4 (internal quotation marks, alterations, and citation omitted).  Because, unlike the *Alabama* District Court, this Court did not offset population equality against race in determining whether Plaintiffs had met their burden, nothing in the *Alabama* ruling suggests a need for this Court to revisit its conclusion that race was the predominant factor.

Alongside its definitive holding, the Supreme Court also listed the appropriate "traditional race-neutral districting principles" courts generally balance in determining whether race predominated, Slip Op. at 16, all of which this Court properly considered in making its determination.  Indeed, in suggesting that "there is strong, perhaps overwhelming, evidence that race did predominate as a factor when the [Alabama] legislature drew the boundaries of Senate District 26," *id.* at 17, the Supreme Court emphasized many of the same factors that led to this

Court's determination that race predominated when the Virginia legislature drew the boundaries of CD 3.

First and foremost, the Supreme Court noted that "[t]he legislators in charge of creating the redistricting plan believed . . . that a primary redistricting goal was to maintain existing racial percentages in each majority-minority district, insofar as feasible." Slip Op. at 17. Similarly, here, the Majority Opinion found that "the legislature considered a 55% BVAP floor for the 2012 congressional redistricting appropriate to obtain Section 5 preclearance" and adopted that racial threshold when drawing CD 3. Mem. Op. at 19 (internal quotation marks and citation omitted). That both states "adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria . . . provides evidence that race motivated the drawing of particular lines." Slip Op. at 10.

In *Alabama*, the Supreme Court highlighted the "considerable evidence that this goal had a direct and significant impact on the drawing of at least some of [the district's] boundaries." *Id.* at 17. Just as the vast majority of the population added to Alabama's Senate District 26 were African-American, *id.*, the populations moved into Virginia's CD 3 were predominantly African-American, Mem. Op. at 30; *see also id.* at 41 n.22 ("African-American voters accounted for over 90% of the voting age residents added to the Third Congressional District."). Just as Alabama "split seven precincts between the majority-black District 26 and the majority-white District 25, with the population in those districts clearly divided on racial lines," Slip Op. at 18, Virginia's CD 3 splits more counties, cities, and Voting Tabulation Districts than any of the state's other congressional districts, including "technical splits" that were "used strategically" to "bring predominantly African-American communities into the district," Mem. Op. at 26-27. And while the Alabama District Court "conceded that race 'was a factor in the drawing of District 26,' and

that the legislature 'preserved' 'the percentage of the population that was black,'" Slip Op. at 18

(quoting *Ala. Legislative Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1306 (M.D. Ala.

2013)), here Intervenor-Defendants both "'concede[d] that compliance with Section 5 was [the

legislature's] predominant purpose or compelling interest underlying District 3's racial

composition in 2012,'" Mem. Op. at 18 (quoting Int.-Defs.' Mem. Supp. Mot. Summ. J. 15, ECF

No. 39), and affirmatively embraced the General Assembly's use of a racial threshold in drawing

the district, *id.* at 19.

In short, the Supreme Court's and the Majority Opinion's analyses of race as the

predominant purpose are in lockstep with one another.  Not only does the precise holding of

*Alabama* regarding the role of population equality in evaluating racial gerrymandering claims

have no effect on the Court's analysis here, *Alabama*'s indication that race might have been "the

predominant boundary-drawing consideration," Slip Op. at 18, is based on precisely the same

type of evidence the Majority Opinion relied upon to make its ultimate determination.

Accordingly, the Majority Opinion's conclusion that "race predominated when the legislature

devised Virginia's Third Congressional District in 2012," Mem. Op. at 37, is only bolstered by

the *Alabama* ruling and should be reaffirmed.

**B.    *Alabama* Reinforces This Court's Holding that CD 3 Fails Strict Scrutiny**

*Alabama*'s holding regarding the narrow tailoring inquiry, meanwhile, unequivocally

rejects the approach taken by the Virginia General Assembly in its attempt to comply with

Section 5 and endorses this Court's emphasis on the substantive retrogression standard over fixed

numerical percentages.

The Supreme Court in *Alabama* held that the district court's alternative holding that the

districts at issue were "'narrowly tailored to comply with Section 5,'"  Slip Op. at 19 (quoting

*Ala. Legislative Black Caucus*, 989 F. Supp. 2d at 1311), "rests upon a misperception of the law," *id*.  The Court clarified: "*Section 5 does not require a covered jurisdiction to maintain a particular numerical minority percentage*.  It requires the jurisdiction to maintain a minority's ability to elect a preferred candidate of choice." *Id.* (emphasis added).  It further cited with approval the Department of Justice Guidelines stating that preclearance determinations "'require[] a functional analysis of the electoral behavior within the particular jurisdiction or election district.'" *Id.* at 20 (quoting Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 76 Fed. Reg. 7470, 7471 (Feb. 9, 2011)).  The Supreme Court faulted both the district court and the Alabama legislature for "rel[ying] heavily upon a mechanically numerical view as to what counts as forbidden retrogression." *Id.* at 21.

The Supreme Court further established that the narrow tailoring requirement requires the legislature to have a "strong basis in evidence in support of the (race-based) choice that it has made." *Id.* at 22 (internal quotation marks and citation omitted).  Although the Court credited the district court for "enunciat[ing] a narrow tailoring standard close to the one we have just mentioned" by stating the requirement is met "'when the race-based action taken was *reasonably necessary*' to achieve a compelling interest," *id.* (quoting *Ala. Legislative Black Caucus*, 989 F. Supp. 2d at 1307), it concluded that the district court and the legislature simply "asked the wrong question with respect to narrow tailoring," *id.* at 23.

> They asked: "How can we maintain present minority percentages in majority-minority districts?" But given §5's language, its purpose, the Justice Department Guidelines, and the relevant precedent, they should have asked: "To what extent must we preserve existing minority percentages in order to maintain the minority's present ability to elect the candidate of its choice?"

*Id.*.  Accordingly, the Supreme Court rejected the district court's conclusion with respect to strict scrutiny.  *Id.*

      The Majority Opinion's narrow tailoring analysis squares directly with the Supreme Court's *Alabama* ruling.  This Court *did* what the *Alabama* District Court *did not*:  It rejected the state's use of a BVAP threshold "as a proxy for the racial composition needed for a majority-minority district to achieve DOJ preclearance."  Mem. Op. at 43.  Far from "mechanically rely[ing] upon numerical percentages, Slip Op. at 21, this Court properly analyzed the extent to which CD 3's predominant use of race was necessary in order to maintain the minority group's opportunity to elect its representatives of choice.  *See* Mem. Op. at 42 (finding "no basis" for concluding that the legislature's augmentation of CD 3's BVAP was narrowly tailored "when the district had been a safe majority-minority district for two decades").  Most importantly, the Court noted that the General Assembly had performed no analysis whatsoever of racial voting patterns to even attempt to determine how to maintain the minority's ability to elect its candidates of choice.  *See id.* at 10 ("[T]he 2012 Plan was not informed by a racial bloc voting or other, similar type of analysis."); *id.* at 19 ("[T]he use of a 55% BVAP floor in this instance was not informed by an analysis of voter patterns."); *id.* at 44 ("The legislature's use of a BVAP threshold, as opposed to a more sophisticated analysis of racial voting patterns, suggests that voting patterns in the Third Congressional District were not considered individually.") (internal quotation marks and citation omitted).  Thus, consistent with the Supreme Court's emphasis on minority ability to elect rather than predetermined minority percentages, this Court properly concluded that "the 2012 Plan was not narrowly tailored to achieve compliance with Section 5, and therefore fails strict scrutiny."  *Id.*

Intervenor-Defendants, for their part, "d[id] not contend otherwise." Mem. Op. at 4 n.6 ("Defendants make only limited narrow tailoring arguments, but do not assert that any kind of racial voting analysis informed their decisions."). In fact, in direct contradiction to the Supreme Court's admonition that Section 5 "does not require maintaining the same population percentages in majority-minority districts as in the prior plan," Slip Op. at 20, Intervenor-Defendants specifically argued that the General Assembly was right to conclude that "Section 5 prohibited *any* reduction in District 3's BVAP," ECF No. 106 at 31 (emphasis in original), and cited the very same portion of the *Alabama* District Court opinion that the Supreme Court subsequently reversed as an utter "misperception of the law," Slip Op. at 19. *See* ECF No. 85 at 27 (citing *Ala. Leg. Black Caucus v. State of Ala.*, No. 2:12-cv-691, at 162–72 (N.D. Ala. Dec. 20, 2013) (concluding that Section 5 "required the Legislature to . . . not substantially reduce the relative percentages of black voters in those [majority-black] districts")).[3] They conceded that "the General Assembly opted not to conduct a costly racial bloc voting analysis," and maintained that "the best course to achieving preclearance, absent such an analysis, is *to not reduce District 3's BVAP below the Benchmark level*." *Id.* (emphasis added) (internal quotation marks omitted). In other words, Intervenor-Defendants fully endorsed the General Assembly's method of complying with Section 5 by "ask[ing] the wrong question": "How can we maintain [the] present minority percentage[] in [the] majority-minority district[]?" Slip Op. at 23. This Court correctly rejected Intervenor-Defendants' narrow tailoring analysis. *See* Mem. Op. at 38 ("Defendants have failed

---

[3] Intervenor-Defendants' Post-Trial Brief, in which they argued that "The Supreme Court's Eventual Decision In The Alabama Case Is Unlikely To Affect This Case," ECF No. 106 at 37, relied on the fact that "the Alabama three-judge court rejected Plaintiffs' [narrow tailoring] argument," while noting that the *Alabama* District Court opinion was the only relevant authority in light of the parties' request that this Court "resolve this case before the Supreme Court's decision in the *Alabama* case," *id.* at 33.

to show that the 2012 Plan was narrowly tailored to further" the state's interest in "compliance with Section 5").

This Court, moreover, appropriately considered whether the state "'went beyond what was reasonably necessary to avoid retrogression.'" Mem. Op. at 40 (quoting *Shaw v. Reno*, 509 U.S. 630, 655 (1993)). As the Supreme Court noted, this narrow tailoring standard is "close" to the "strong basis in evidence" standard it specifically adopted in *Alabama*. Slip Op. at 22. For good reason: These two phrases have long been part and parcel of a single inquiry. *See Bush v. Vera*, 517 U.S. 952, 977 (1996) (evaluating whether the state has a "'strong basis in evidence'" for concluding that a district is "reasonably necessary to comply" with the VRA) (quoting *Shaw*, 509 U.S. at 656). In any event, any distinction between the two standards is entirely academic here, where it is undisputed that the legislature performed *no retrogression analysis whatsoever*. "The standards of §5 are complex; they often require evaluation of controverted claims about voting behavior; the evidence may be unclear[.]" Slip Op. at 22. The Virginia legislature chose to sidestep this complexity altogether by relying upon fixed percentages rather than an actual analysis of minority ability to elect. This Court properly found that Intervenor-Defendants had shown "no basis"—much less a "strong basis in evidence"—in support of the race-based drawing of CD 3. Mem. Op. at 42.

In short, much like Alabama, Virginia's "mechanical interpretation of §5 . . . raise[s] serious constitutional concerns." Slip Op. at 21. As confirmed by the *Alabama* ruling, this Court rightly rejected the mechanical interpretation adopted by the Virginia legislature and endorsed by Intervenor-Defendants. *Alabama* does not require reevaluation of this Court's decision; it confirms it. Accordingly, this Court's conclusion that CD 3 fails to pass strict scrutiny is not only undisturbed but inexorable.

### III.   CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court fully reinstate and reaffirm its Memorandum Opinion and Judgment.  In accordance with the Court's Order of February 23, 2015, ECF No. 138, Plaintiffs further request that, upon reinstatement of the Memorandum Opinion and Judgment, the Court allow the General Assembly no more than sixty (60) days, and in no event later than September 1, 2015, to enact a remedial districting plan.


Dated:  April 13, 2015                              Respectfully submitted,


                                                   By _____/s/_____
                                                      John K. Roche (VSB# 68594)
                                                      Marc Erik Elias (admitted *pro hac vice*)
                                                      John Devaney (admitted *pro hac vice*)
                                                      Perkins Coie LLP
                                                      700 13th St. N.W., Suite 600
                                                      Washington, D.C. 20005-3960
                                                      Phone:  (202) 434-1627
                                                      Fax:  (202) 654-9106
                                                      Email: JRoche@perkinscoie.com
                                                      Email: MElias@perkinscoie.com
                                                      Email: JDevaney@perkinscoie.com

                                                      Kevin J. Hamilton (admitted *pro hac vice*)
                                                      Perkins Coie LLP
                                                      1201 Third Avenue, Ste. 4900
                                                      Seattle, WA 98101-3099
                                                      Phone:  (206) 359-8000
                                                      Fax:  (206) 359-9000
                                                      Email: KHamilton@perkinscoie.com

                                                      *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of April, 2015, I caused the foregoing to be electronically filed with the Clerk of this Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Stuart A. Raphael
Mike Melis
Trevor S. Cox
Carly L. Rush
Office of the Attorney General
900 East Main Street
Richmond, Virginia  23219
(804) 786-2071
Fax:  (804) 786-1991
mmelis@oag.state.va.us

*Attorneys for Defendants James B. Alcorn, Matthew A. Gray, and Singleton B. McAllister in their official capacities*

Frederick W. Chockley , III
Baker & Hostetler LLP
1050 Connecticut Ave NW
Suite 1100
Washington, DC 20036
(202) 861-1500
fchockley@bakerlaw.com

Jennifer Marie Walrath
Baker & Hostetler LLP (DC)
1050 Connecticut Ave NW
Suite 1100
Washington, DC 20036
202-861-1702
Fax: 202-861-1783
jwalrath@bakerlaw.com

*Attorneys for Movants Robert B. Bell, Christopher Marston, and William Janis*

Jonathan Andrew Berry
Jones Day
51 Louisiana Ave NW
Washington, DC 20001
202-879-3939
Fax: 202-626-1700
jberry@jonesday.com

John Matthew Gore
Jones Day
51 Louisiana Ave NW
Washington, DC 20001
(202) 879-3930
Fax: (202) 626-1700
jmgore@jonesday.com

Michael Anthony Carvin
Jones Day
51 Louisiana Ave NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com

*Attorneys for Intervenor-Defendant Virginia Representatives*

Cullen Dennis Seltzer
Sands Anderson PC
1111 E Main Street
24th Floor
P O Box 1998
Richmond, VA 23218-1998
804-648-1636
Fax: 804-783-7291
cseltzer@sandsanderson.com

*Attorneys for Interested Parties Clerk of the Virginia Senate, Clerk of the Virginia House, and Division of Legislative Services*

Respectfully submitted,

By _____/s/_____
    John K. Roche (VA Bar No. 68594)
    Perkins Coie LLP
    700 13th St., N.W., Suite 600
    Washington, D.C. 20005-3960
    Phone:  (202) 434-1627
    Fax:  (202) 654-9106
    JRoche@perkinscoie.com

    *Attorneys for Plaintiffs*