IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

GLORIA PERSONHUBALLAH, et al.,

    Plaintiffs,

v.                                        Civil Action No. 3:13cv678

JAMES B. ALCORN, et al.,

    Defendants.


**MEMORANDUM OPINION**

Before DIAZ, Circuit Judge, O'GRADY, District Judge, and PAYNE, Senior District Judge.

DIAZ, Circuit Judge:

This court twice has found Virginia's Third Congressional District to be an unconstitutional racial gerrymander, in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. See Page v. Va. State Bd. of Elections (Page II), No. 3:13cv678, 2015 WL 3604029 (E.D. Va. June 5, 2015); Page v. Va. State Bd. of Elections (Page I), 58 F. Supp. 3d 533 (E.D. Va. 2014), vacated sub nom. Cantor v. Personhuballah, 135 S. Ct. 1699 (2015). We subsequently ordered the Virginia General Assembly to devise a redistricting plan to remedy the constitutional violation by September 1, 2015. The General Assembly convened but failed to act. As a result, and after considering input from the parties,

we appointed Dr. Bernard Grofman[1] as special master to assist and advise the court in drawing an appropriate remedial plan. We also directed all parties and interested nonparties to submit proposed plans.

On November 13, 2015, the Supreme Court noted that it would hear argument in Intervenor-Defendants'[2] appeal of the liability judgment, asking the parties to additionally address whether the Intervenors have standing to bring the appeal. See Wittman v. Personhuballah, No. 14-1504, 2015 WL 3867187 (U.S. Nov. 13, 2015). After reviewing all plans submitted by parties and nonparties, Dr. Grofman filed his report on November 16, 2015. Also on that day, the Intervenor-Defendants moved to suspend further proceedings and to modify our injunction pending Supreme Court review. We ordered the parties to continue with their responsive briefing to the special master's report, and on December 14, 2015, we held a hearing on both the merits of the

---

[1] Dr. Grofman is Professor of Political Science and Jack W. Peltason Endowed Chair of Democracy Studies at the University of California, Irvine, and former Director of the UCI Center for the Study of Democracy. He has participated in over twenty redistricting cases as an expert witness or special master, and has been cited in more than a dozen Supreme Court decisions.

[2] Intervenor-Defendants David Brat, Barbara Comstock, Robert Wittman, Bob Goodlatte, Randy Forbes, Morgan Griffith, Scott Rigell, and Robert Hurt (collectively, "the Intervenors") are the Republican Congressional representatives for the Commonwealth of Virginia.

special master's recommendations and whether to stay our implementation of a remedy pending the Supreme Court's review of the liability judgment.

We hold that the balance of equities favors our immediate imposition of a remedial redistricting plan. To that end, we find that one of the two plans proposed by Dr. Grofman, Congressional Plan Modification 16 ("Plan 16"), best remedies the constitutional violation that we described in Page II. Accordingly, we direct the Defendants to implement the redistricting plan attached to the court's order as Appendix A for the 2016 U.S. House of Representatives election cycle.

I.

A.

Plaintiffs Gloria Personhuballah and James Farkas[3] reside in Virginia's Third Congressional District. In Page I,[4] they sued the Defendants[5] in their official capacities, alleging that the

---

[3] Dawn Curry Page was also a named plaintiff at the time the suit was filed, but was later dismissed from the case.

[4] The facts and history of the litigation are described fully in Page II, 2015 WL 3604029, at *1-6. We set forth an abridged version here.

[5] Defendants James B. Alcorn, Clara Belle Wheeler, and Singleton B. McAllister, are chairman, vice-chairman, and secretary of the Virginia State Board of Elections, respectively.

3

Third District was racially gerrymandered in violation of the Fourteenth Amendment's Equal Protection Clause.  We held that because racial considerations predominated in the drawing of the district boundaries, strict scrutiny applied.  We found that the plan was not narrowly tailored to advance a compelling government interest, as required to survive strict scrutiny, because the General Assembly did not have any evidence indicating that a black voting-age population ("BVAP") of 55% was required in the Third District for the plan to comply with Section 5 of the Voting Rights Act.  The Intervenors appealed to the Supreme Court, and on March 30, 2015, the Court vacated the judgment and remanded the case for reconsideration in light of Alabama Legislative Black Caucus v. Alabama, 135 S. Ct. 1257 (2015).  Cantor v. Personhuballah, 135 S. Ct. 1699 (2015) (mem.).

We reconsidered the case in accord with the Court's mandate, again found the Third District unconstitutional, and ordered the Virginia General Assembly to implement a new districting plan by September 1, 2015.  When the General Assembly failed to act, we took up the task of drawing a remedial plan.  See White v. Weiser, 412 U.S. 783, 794-95 (1973) ("[J]udicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate

4

opportunity to do so." (quoting Reynolds v. Sims, 377 U.S. 533, 586 (1964))).

To that end, we directed the parties and any nonparties desiring to do so to submit proposed remedial plans.  The Plaintiffs submitted one plan and the Intervenors submitted two. In addition, nonparties OneVirginia2021; the Richmond First Club; Senator J. Chapman Petersen; Bull Elephant Media, LLC; the Virginia State Conference of NAACP Branches; Jacob Rapoport; and the Governor of Virginia each submitted a plan.  Dr. Grofman did not consider, nor do we, the plans submitted by OneVirginia2021 and Bull Elephant Media, as the former did not include a map and the latter did not include the shape file we had required for detailed analysis.  Dr. Grofman thus had eight maps to consider.

### B.

The 2016 congressional election cycle has just begun in Virginia.  Candidates were set to start seeking petitions of qualified voters on January 2, 2016, and the Defendants have explained that, while the Virginia Board of Elections will do its best to implement any judicial order, the risk of error increases the later the Board is given a new plan to implement. Although Defendants could not provide a precise date at which

implementation would be impossible, they say it would be critical to have a plan in place by late March.[6]

## II.

We first address the Intervenors' motion to suspend our proceedings pending Supreme Court review.

All parties agree that, because our extant injunction prevents Virginia from conducting another election under the redistricting plan enacted in 2012 (the "Enacted Plan") but does not provide an alternative plan, we must either modify that injunction to allow the 2016 election to proceed under the Enacted Plan, or enter a new plan.

The Intervenors argue that the Supreme Court's decision to set oral argument in Page II has stripped us of jurisdiction to enter a remedial plan, or alternatively, that the balance of equities favors "suspend[ing] any remedial efforts pending the Supreme Court's decision." Intervenor-Defs.' Mem. Supp. Mot. to Suspend 2, ECF No. 271. They cite Donovan v. Richland County Ass'n for Retarded Citizens, 454 U.S. 389 (1982) (per curiam), United States v. Locke, 471 U.S. 84 (1985), and United States v. Wells Fargo Bank, 485 U.S. 351 (1988), for the proposition that

---

[6] If the Board were to receive the plan that late, at minimum, the primary election would have to be pushed back.

our jurisdiction is stripped by the filing of a notice of direct appeal. But these cases support only the claim that we could not now alter our liability decision; they do not speak to our jurisdiction to enter a remedy.

In Donovan, the plaintiff sued for a declaratory judgment that the application of the Fair Labor Standards Act to the mental health facility it operated would be unconstitutional. The district court so held, and the Ninth Circuit issued a decision affirming the district court. 454 U.S. at 389. Then, after the appellants filed their notice of appeal, the Ninth Circuit sua sponte issued a new decision reversing the district court. Id. at 390 n.2. Here, in contrast, our entering a remedy would not in any way affect the liability decision now before the Supreme Court.

Similarly, in Locke and Wells Fargo, the Court noted that it could resolve statutory questions even though it was "the portion of the judgment declaring an Act of Congress unconstitutional that provides [the Court] with appellate jurisdiction" because "such an appeal brings the entire case before [the Court]." Wells Fargo, 485 U.S. at 354; accord Locke, 471 U.S. at 92. The Intervenors urge us to read this statement to mean that their appeal of the liability judgment also brings the remedial aspect of the case before the Supreme Court.

7

The clear meaning of the phrase "the entire case" in context, however, is that statutory claims are not stripped from the constitutional claims in a single liability case—that is, the entire _liability_ case is before the Supreme Court on appeal. The Court's use of the phrase thus says nothing about the effect the appeal of a liability decision has on the jurisdiction of the district court charged with crafting a remedy.  See Griggs v. Provident Consumer Disc. Co., 459 U.S. 56, 58 (1982) (per curiam) ("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." (emphasis added)).  Because the remedial phase of this case is not an "aspect[] of the case involved in the appeal," we retain jurisdiction over it.

Accordingly, we turn to the question of whether we should stay implementation of a remedy pending the Supreme Court's consideration of the Intervenors' appeal.  We consider four factors when determining whether to issue a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest

lies." Hilton v. Braunskill, 481 U.S. 770, 776 (1987); accord Long v. Robinson, 432 F.2d 977, 979 (4th Cir. 1970).

We address each factor in turn, keeping in mind that "[a] stay is considered 'extraordinary relief' for which the moving party bears a 'heavy burden,'" and "[t]here is no authority to suggest that this type of relief is any less extraordinary or the burden any less exacting in the redistricting context." Larios v. Cox, 305 F. Supp. 2d 1335, 1336 (N.D. Ga. 2004) (quoting Winston-Salem/Forsyth Cty. Bd. of Educ. v. Scott, 404 U.S. 1221, 1231 (Burger, Circuit Justice, 1971)).

## A.

The Intervenors have not made a strong showing that they are likely to succeed on the merits. First, we have twice found the Third Congressional District as presently drawn to be unconstitutional, including with the benefit of the Supreme Court's guidance in Alabama. There, the Court made clear that a districting plan fails strict scrutiny when a state legislature insists on maintaining "the same percentage of black voters" in a majority-minority district without evidence that that percentage of black voters is required to preserve their ability to elect a candidate of choice. Alabama, 135 S. Ct. at 1272. That is precisely what the General Assembly did here.

Second, our holding as to liability was driven by our finding that racial factors predominated in the drawing of the

District.   The Supreme Court will review that finding for clear
error; thus, even if the Court would have decided otherwise, it
can reverse only if "it is 'left with the definite and firm
conviction that a mistake has been committed.'"   Easley v.
Cromartie, 532 U.S. 234, 242 (2001) (quoting United States v.
U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).

Third, the standard for the Supreme Court to set a case for
oral argument in direct appeals is not a demanding one.
Because—unlike in the context of petitions for certiorari—the
Court must make a decision on the merits in direct appeals,
whether the Court schedules oral argument turns on whether the
proper resolution of the case is so clear from the
jurisdictional statement, opposing motion, and opinions below,
that further briefing and argument is unnecessary.   Compare
Shapiro et al., Supreme Court Practice 304 (10th ed. 2013) ("[In
the direct appeal context,] [w]ith respect to the merits, the
question is whether, after reading the condensed arguments
presented by counsel in the jurisdictional statement and the
opposing motion, as well as the opinions below, the Court can
reasonably conclude that there is so little doubt as to how the
case will be decided that oral argument and further briefing
would be a waste of time."), with id. at 240 ("[T]he recent
introduction of the word 'compelling' and the use of the
'importance' concept throughout Rule 10 indicate that the Court

utilizes highly selective standards of review [for granting petitions for certiorari]." ).

Thus the Court's decision to hear oral argument indicates only that there is some doubt as to how the case will be decided. This is not enough to meet the Intervenors' burden of showing that they are likely to succeed on the merits.

B.

Nor have the Intervenors shown a personal irreparable injury that outweighs any injury to the Plaintiffs and the public. While we accept that the Intervenors who live in districts affected by our chosen remedy will have more complicated campaigns if we do not stay this case and the Court ultimately reverses, they nonetheless have the benefit of knowing the two possible maps that will be in place at the time of the elections. In addition, under the remedial plan we adopt today, each incumbent remains in his or her current district and no two incumbents are paired in a single district. The Intervenors can gather petition signatures primarily in those areas within their district under either map, and can prepare a contingency plan if the Supreme Court rules in their favor.

We acknowledge that even with such a contingency plan, a return to the Enacted Plan will cause hardship to some of the Intervenors' campaigns. But we are more reluctant to grant a stay with the effect of "giv[ing] appellant the fruits of

victory whether or not the appeal has merit." Jimenez v. Barber, 252 F.2d 550, 553 (9th Cir. 1958). The Intervenors would have us modify our injunction to ensure the 2016 election proceeds under the Enacted Plan regardless of the outcome of the Supreme Court's review. Thus, even if the Court finds the Intervenors do not have standing to appeal or affirms our judgment on the merits, the Intervenors say that the 2016 election should proceed under the unconstitutional Enacted Plan, deferring implementation of our chosen remedy until the 2018 election. The effect would be to give the Intervenors the fruits of victory for another election cycle, even if they lose in the Supreme Court. This we decline to do.

C.

We also find that granting a stay will substantially injure the other parties interested in the proceeding. The Plaintiffs have twice obtained a judgment that their congressional district was racially gerrymandered. "Deprivation of a fundamental right, such as limiting the right to vote in a manner that violates the Equal Protection Clause, constitutes irreparable harm." Johnson v. Mortham, 926 F. Supp. 1540, 1543 (N.D. Fla. 1996) (citations omitted) (citing Elrod v. Burns, 427 U.S. 347, 373-74 (1976)). To force the Plaintiffs to vote again under the Enacted Plan even if the Supreme Court affirms our finding that the Plan is unconstitutional—and to do so in a presidential

12

election year, when voter turnout is highest, see Vera v. Bush, 933 F. Supp. 1341, 1348 (S.D. Tex. 1996)—constitutes irreparable harm to them, and to the other voters in the Third Congressional District.[7]

As for the Defendants, among the imperfect choices open to us, staying implementation of our remedy would do them the most harm. "With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree." Reynolds, 377 U.S. at 585. If the Court affirms our judgment, the Commonwealth would either have to postpone the primary and rush to redraw districts at a much higher risk of error, or be forced to hold another election under an unconstitutional plan. By adopting a remedy now, the Commonwealth faces the lesser evil of implementing new districts at a time when it remains a relatively manageable task; then, if the Court reverses, the

---

[7] Although the Plaintiffs did not file suit until 2013, we think the delay was a greater concern leading up to the 2014 election; now that over two years have passed, the original delay in filing does not weigh in favor of our allowing another election to proceed under an unconstitutional plan. See Page I, 58 F. Supp. 3d at 554 ("Plaintiffs are largely responsible for the proximity of our decision to the November 2014 elections.").

Commonwealth need only revert to districts that it has operated under for years—a much less daunting challenge.

### D.

Finally, we find that the public interest aligns with the Plaintiffs' and Defendants' interests, and thus militates against staying implementation of a remedy. As noted, the harms to the Plaintiffs would be harms to every voter in the Third Congressional District. In addition, the harms to the Commonwealth are public harms. The public has an interest in having congressional representatives elected in accordance with the Constitution. As the Supreme Court has noted, once a districting scheme has been found unconstitutional, "it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." Id.

Accordingly, we decline to stay the implementation of a remedy.


### III.

We turn to the remedy. A court tasked with drawing a redistricting plan faces an "unwelcome obligation," Perry v. Perez, 132 S. Ct. 934, 940 (2012) (per curiam) (quoting Connor v. Finch, 431 U.S. 407, 415 (1977)), as the conflicting interests that must be balanced are better suited to the

legislative process, see White, 412 U.S. at 794-95 ("From the beginning, we have recognized that 'reapportionment is primarily a matter for legislative consideration and determination.'" (quoting Reynolds, 377 U.S. at 586)). However, given the General Assembly's failure to draw a new plan, it falls to us to do so, within the bounds set by the Constitution and federal law.

A.

First and most fundamentally, Article I, Section 2 of the Constitution "requires congressional districts to achieve population equality 'as nearly as is practicable,'" and "[c]ourt-ordered districts are held to higher standards of population equality than legislative ones." Abrams v. Johnson, 521 U.S. 74, 98 (1997) (quoting Wesberry v. Sanders, 376 U.S. 1, 7-8 (1964)); see also Alabama, 135 S. Ct. at 1271 ("[T]he requirement that districts have approximately equal populations is a background rule against which redistricting takes place."). Thus, since no "significant state policy or unique features" require us to depart from equal population districts, Chapman v. Meier, 420 U.S. 1, 26 (1975), we consider it a requirement that our remedial plan have district populations within one person of 727,366. Dr. Grofman's Plan 16 satisfies this requirement.

B.

15

Second, we must remedy the Shaw v. Reno, 509 U.S. 630 (1993), violation that led to the invalidation of the Enacted Plan. In Page II, we found that the General Assembly's insistence on a 55% BVAP in the Third Congressional District predominated over traditional redistricting principles, and that a 55% BVAP requirement was not narrowly tailored to comply with Section 5 of the Voting Rights Act. Shaw requires that map-drawers either not subordinate "traditional districting principles" to racial considerations, id. at 642, or, if they do, the district lines must be "narrowly tailored to further a compelling governmental interest," id. at 643. Traditional districting principles in Virginia include the constitutional requirements of compactness and contiguity, Va. Const. art. II, § 6, "respect for political subdivisions," Page II, 2015 WL 3604029, at *10 (quoting Shaw, 509 U.S. at 647), and "consideration of communities of interest," id. at *3.[8]

---

[8] The Intervenors emphasize the importance of preserving district cores. In Page II, however, we were not convinced that this was a factor driving the General Assembly's adoption of the Enacted Plan. 2015 WL 3605029, at *12. In addition, by choosing a plan that changes the Enacted Plan only so far as necessary to remedy the constitutional violation, we have preserved district cores where possible. In any event, maintaining district cores is the type of political consideration that must give way to the need to remedy a Shaw violation.

The Third Congressional District "reflect[s] both an odd shape and a composition of a disparate chain of communities, predominantly African-American, loosely connected by the James River," id. at *11, connecting the Tidewater area to the east with Richmond to the west. Our Page II decision was particularly concerned with the Third District's contorted shape and use of non-physical contiguity.

In drawing Plan 16's Third District, Dr. Grofman chose the Tidewater region as its center. To achieve population equality in the District, he was guided by the neutral goals of compactness, contiguity, and avoiding unnecessary city or county splits, rather than any racial considerations. Those districts abutting[9] the Third District were then drawn to achieve equal population, following the same major considerations. The BVAP of the neutrally drawn Third District was 45.3%. Based on the record evidence, Dr. Grofman determined that a BVAP "somewhat above" 40% would preserve African-American voters' ability to elect the representative of their choice in the Third District. Report of the Special Master 37, ECF No. 272. There was thus no need for Dr. Grofman to alter Plan 16 to increase the BVAP of the Third District.

---

[9] The First, Second, Fourth, and Seventh Districts abut the Third District in the Enacted Plan.

Plan 16 also vastly improves the Third District's compactness score and meaningfully improves the Plan's average compactness scores across all the affected districts. The scores only confirm what a quick look at Plan 16 makes clear. See Page II, 2015 WL 3604029, at *10 (citing Karcher v. Daggett, 462 U.S. 725, 762 (1983) (Stevens, J., concurring)). In addition, Plan 16 relies on land contiguity; while water contiguity is permissible in Virginia, it can be abused. See id. at *11 ("Here, the record establishes that, in drawing the boundaries of the Third Congressional District, the legislature used water contiguity as a means to bypass white communities and connect predominantly African-American populations in areas such as Norfolk, Newport News, and Hampton."). And because racial considerations did not predominate in the drawing of Plan 16, the Plan is not subject to strict scrutiny.

In contrast, the plans offered by the Intervenors do little to cure the Shaw violation. The plans draw the Third District tortuously and much like the Enacted Plan, in ways that appear to be race-based, thus likely triggering strict scrutiny. Though the plans lower the BVAP in the Third District to just over 50%, this choice remains constitutionally suspect, as the record indicates that a significantly lower BVAP would be sufficient for minority voters to be able to elect a candidate

of choice.   The 50% BVAP thus cannot be said to be narrowly tailored to advance a compelling government interest.

Our limited approval in <u>Page II</u> of the Plaintiffs' Alternative Plan, which had the same BVAP, does not suggest otherwise.   We highlighted the Alternative Plan simply to disprove the claim that "the population swaps involving the Third Congressional District—and resulting locality splits—were necessary to achieve population parity in accordance with the constitutional mandate of the one-person-one-vote rule."   <u>Id.</u> at *12.   Critically, however, we did not then have the benefit of a racial bloc voting analysis; nor did the Plaintiffs have the guidance of our ruling when they drafted the plan.

C.

Third, our implementation of a remedial plan "should be guided by the legislative policies underlying the existing plan, to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act."   <u>Abrams</u>, 521 U.S. at 79. How closely we must hew to the legislative policies depends on the scope and effect of the constitutional violation.

In <u>Upham v. Seamon</u>, 456 U.S. 37 (1982) (per curiam), the Court found that the district court had exceeded the bounds of its authority when only two of twenty-seven districts were objectionable, yet the court redrew districts that were hundreds of miles away from those districts.   In <u>White v. Weiser</u>, the

Court reversed, finding that the district court had before it two plans that fully remedied the constitutional violation, and without explanation chose the plan that "ignored legislative districting policy." 412 U.S. at 796. In Abrams, like here, the enacted plan was invalid because of racial gerrymandering, and the "contorted shape of the district and the undue predominance of race in drawing its lines" made it "unlikely the district could be redrawn without changing most or all of Georgia's congressional districts." 521 U.S. at 77. The Court therefore approved the district court's remedial plan, which "ma[de] substantial changes to the existing plan consistent with Georgia's traditional districting principles, and considering race as a factor but not allowing it to predominate." Id. at 86.

Reading these cases together, we conclude that to best balance the need to remedy the Shaw violation with the deference otherwise due to the General Assembly's redistricting choices, our chosen remedial plan should not alter any districts outside of the Third District and those abutting it, but may make substantial changes to those districts. See id. Whereas the two misshapen districts in Abrams allowed the district court to change all eleven of Georgia's districts, here the one misshapen district only requires changes to five of Virginia's eleven congressional districts.

20

Plan 16 best achieves this balance, leaving untouched the districts that do not abut the Third,[10] while altering the Third and its abutting districts only as necessary to remedy the Shaw violation. In addition, Plan 16 leaves each incumbent in his or her original district, which minimizes the disruptive impact of the remedial plan. See id. at 84 (finding valid a district court's plan that considered but subordinated the factor of "[p]rotecting incumbents from contests with each other"). We find Plan 16 superior to the other plan drawn by Dr. Grofman, NAACP Plan 6, in this regard. While NAACP Plan 6 also remedies the Shaw violation while preserving equal population and limiting its changes to the Third District and those districts abutting it, it requires reallocating significantly more of the population in the affected districts.

The Intervenors argue that adopting a plan consistent with the General Assembly's policies requires maintaining an 8-3 Republican-Democratic split. That is not correct. Though Abrams found a district court's plan to be valid where the court considered, but subordinated, protecting incumbents from being paired in a single district, we have found no case holding that

---

[10] Six of the submitted plans fail in this regard, making changes to districts that do not abut the Third District. For that reason, we reject the plans submitted by the Plaintiffs, the Governor of Virginia, the NAACP, Senator Petersen, Mr. Rapoport, and Richmond First.

21

we must maintain a specific political advantage in drawing a new plan, and at some point political concerns must give way when there is a constitutional violation that needs to be remedied. See id. at 88 (allowing departure from legislative policy where "[n]o other plan demonstrated" the policy could be followed "while satisfying the constitutional requirement that race not predominate over traditional districting principles"). This is especially true given the Supreme Court's expressed concern over partisan gerrymandering. See, e.g., Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n, 135 S. Ct. 2652, 2658 (2015) ("'Partisan gerrymanders,' this Court has recognized, 'are incompatible with democratic principles.'" (quoting Vieth v. Jubelirer, 541 U.S. 267, 292 (2004) (plurality opinion) and id. at 316 (Kennedy, J., concurring in the judgment)) (brackets omitted)).

D.

Finally, our chosen plan should be guided by principles of federal law—in particular, the Voting Rights Act. See Abrams, 521 U.S. at 96 (explaining that "in fashioning the plan, the court should follow the appropriate Section 5 [of the Voting Rights Act] standards . . . at the very least as an equitable factor to take into account" (quoting McDaniel v. Sanchez, 452 U.S. 130, 149 (1981))); id. at 90 ("On its face, § 2 [of the Voting Rights Act] does not apply to a court-ordered remedial

22

redistricting plan, but we will assume courts should comply with the section when exercising their equitable powers to redistrict.").

Although the Court's decision in Shelby County v. Holder, 133 S. Ct. 2612 (2013), has called into doubt whether compliance with Section 5 is a compelling interest, our remedial plan need not meet strict scrutiny, as racial considerations did not predominate in Dr. Grofman's drawing of the map or in our adoption of it. In addition, the General Assembly intended to comply with Section 5 when it drafted the Enacted Plan. Thus, we think it is appropriate to consider compliance with Section 5 as an equitable factor in our remedial calculus. Cf. Shelby Cty., 133 S. Ct. at 2631 ("We issue no holding on § 5 itself, only on the coverage formula."). Similarly, though the Intervenors urge us not to consider the requirements of Section 2,[11] as no Section 2 claim was raised in Page II, we think it

---

[11] More specifically, the Intervenors say that Dr. Grofman's decision to consider "packing" and "fragmentation" of minority voters in drawing his remedial plans is inappropriate where the Plaintiffs have not alleged such a claim. This misunderstands the point. We found a constitutional violation in Page II because the plan was not narrowly tailored to advance a compelling interest, given the General Assembly's failure to show that a 55% BVAP was necessary to preserve minority voters' ability to elect a candidate of choice in the Third District. In short, by "packing" more African-American voters than required into the Third District, the Enacted Plan fragmented the African-American vote in the surrounding districts. Dr. (Continued)

appropriate to implement a plan that complies with federal policy disfavoring discrimination against minority voters.

Section 5 "requires the jurisdiction to maintain a minority's ability to elect a preferred candidate of choice." Alabama, 135 S. Ct. at 1272. Section 2 prohibits denying minority voters "an 'equal opportunity' to 'participate in the political process and to elect representatives of their choice'" where the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district" and is "politically cohesive," and where the majority "votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." Abrams, 521 U.S. at 91 (quoting 42 U.S.C. § 1973(b) and Thornburg v. Gingles, 478 U.S. 30, 50-51 (1986)).

Dr. Grofman's Plan 16 results in a BVAP of 45.3% in the Third District and 40.9% in the Fourth District. In contrast, the Enacted Plan has a BVAP of 56.3% in the Third District and 31.3% in the Fourth District. Dr. Grofman's thorough analysis of previous elections in the relevant areas of Virginia shows that the minority choice candidates would likely receive a significant majority vote—over 60% in each case—in the new Third

---

Grofman's remedial plans were drawn with our holding firmly in mind.

District with a 45.3% BVAP.    Thus Plan 16's Third District is consistent with Section 5's requirements, as articulated in Alabama.    See 135 S. Ct. at 1273 ("Section 5 does not require maintaining the same population percentages in majority-minority districts as in the prior plan.    Rather, Section 5 is satisfied if minority voters retain the ability to elect their preferred candidates.").

Additionally, Dr. Grofman's analysis indicates that minority voters' candidates of choice would also receive over 60% of the vote in a new Fourth District with a BVAP of 40.9%. This analysis indicates that a Section 2 challenge to the Fourth District would fail, as the ability to garner 60% of the vote with a significantly below-majority BVAP indicates that the majority does not "vote[] sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." Abrams, 521 U.S. at 91 (quoting Thornburg, 478 U.S. at 51); see id. at 90-91 (noting that plaintiffs bringing a Section 2 claim must show all three threshold conditions).    We therefore find that Plan 16 accords with the principles of Section 2.

In short, Plan 16 remedies the Shaw violation that we found in Page II by drawing districts based on neutral, traditional criteria.    Additionally, it remains consistent with the Enacted Plan to the extent possible while remedying the Shaw violation, and honors the principles underlying Sections 2 and 5 of the

Voting Rights Act.   It is thus the plan that best fulfills our remedial mandate.

   It is so ORDERED.


_____/s/_____        _____/s/_____
Albert Diaz                               Liam O'Grady



Richmond, Virginia
Date:  January 7, 2016

PAYNE, Senior District Judge, concurring in part and dissenting in part.

## I.

I agree that the Intervenors' appeal to the Supreme Court does not divest this Court of jurisdiction to enter a remedial plan. And, I agree with the rationale offered to support that decision.

## II.

For the reasons set forth in the dissent on the merits of this case, I remain of the view that the Plaintiffs have not proved that race predominated over traditional redistricting principles in the redistricting, including that for CD3. Page v. Virginia State Bd. Of Elections, 2015 WL 3604029, at *19-26 (E.D. Va. June 15, 2015). Therefore, I think that a remedial plan is neither required nor permitted.

That said, if the majority opinion on the merits is affirmed by the Supreme Court, I agree that the remedial plan adopted by the majority ("Congressional Modification 16") represents the most appropriate way to remedy the constitutional violation that the majority identified in its opinion on the merits. There is, however, one component of the majority's reasoning for rejecting the Intervenors' remedial plan as to which I take a somewhat different view. In particular, I refer to the argument made by the Intervenors that, to be consistent

27

with the General Assembly's articulated redistricting policies, the remedial plan must maintain the 8-3 Republican-Democrat split deliberately chosen by the General Assembly.

The majority concludes "[t]hat is not correct," and I agree. But, my agreement is not predicated on the decision in Arizona State Legislature v. Arizona Indep. Redistricting Comm'n, 135 S. Ct. 2652, 2658 (2015) which cites the plurality opinion and Justice Kennedy's concurrence in Vieth v. Jubelirer, 541 U.S. 267, 292 (2004). Rather, I read Arizona and Vieth to reflect the substantial, and unfortunate, uncertainty present in the Supreme Court's decisions respecting the legitimacy, if any, of gerrymandering for partisan political purposes.

I am of the view that, under current Supreme Court jurisprudence, "deviations from neutral redistricting principles on the basis of political affiliation or preference may not always be constitutionally permissible." Bethune-Hill v. Virginia State Bd. Of Elections, 2015 WL 6440332, at *32 n.21 (E.D. Va. Oct. 22, 2015) (citations omitted). Nonetheless, there is considerable uncertainty on the point because the Supreme Court remains quite fractured on the legitimacy of partisan political gerrymandering, including whether a claim complaining of such gerrymandering is even justiciable. G. Michael Parsons, CLEARING THE POLITICAL THICKET: Why Political Gerrymandering For Partisan Advantage Is Unconstitutional 16-27

(Dec. 15, 2015), http://ssrn.com/author=2449663 (hereafter "Parsons at p. ___").[12]   In my view, that article clearly demonstrates that the law on political gerrymandering is unsettled and why.   Unfortunately, as this case illustrates so very well, that uncertainty has led to the view among legislatures, lawyers, and even some courts that partisan political gerrymandering is constitutionally permissible in general when, as I understand it, the Supreme Court actually has approved such gerrymandering only in quite limited circumstances.

Neither in the merits phase in this case nor in <u>Bethune-Hill</u> did the Plaintiffs contend that gerrymandering for political purposes was unconstitutional.   Hence, there was no need to confront that issue in deciding the merits of either case.   Now, however, the Intervenors have said that, in fashioning a remedy, this Court is obligated to maintain the 8-3 partisan split in the Enacted Plan.   To decide that contention, the Court necessarily must confront whether to effect a political gerrymander.   In my view, a district court cannot do that for two reasons.

---

[12]   The author of this thorough, thoughtful, and comprehensive article is a former law clerk to the undersigned.

First, no district court, when confronted with the necessity of undertaking redistricting, has approached the task with the intent of conferring or maintaining a partisan political advantage. Beyond the limited context of "avoiding contests between incumbent[s]," Karcher v. Daggett, 462 U.S. 725, 740 (1983), courts have unanimously agreed that political considerations "have no place in a plan formulated by the courts." Wyche v. Madison Parish Police Jury, 769 F.2d 265, 268 (5th Cir. 1985). Indeed, in an effort to avoid political entanglements, courts have often treated incumbency protection even in this limited context as "distinctly subordinate" to constitutional and statutory imperatives as well as other, neutral redistricting criteria. Larios v. Cox, 314 F. Supp. 2d 1357, 1361 (N.D. Ga. 2004); see also Favors v. Cuomo, 2012 WL 98223, at *16-17 (E.D.N.Y. Mar. 19, 2012); Essex v. Kobach, 847 F. Supp. 2d 1069, 1093 (D. Kan. 2012); Johnson v. Miller, 922 F. Supp. 1556, 1565 (S.D. Ga. 1995), aff'd sub nom. Abrams v. Johnson, 521 U.S. 74 (1997); Good v. Austin, 800 F. Supp. 557, 563 (E & W.D. Mich. 1992).

Second, there is a strong argument that gerrymandering purely for the purpose of achieving or maintaining partisan advantage is unconstitutional because it is a denial of the equal protection of law guaranteed by the Fourteenth Amendment. Why that is so is thoroughly explained in CLEARING THE POLITICAL

THICKET.  Parsons, at pp. 45-46.  I could not do a better job in explaining the argument that gerrymandering for purely political reasons is unconstitutional.  Nor is it necessary to say more on the topic now.  Suffice it to say that, even if a legislature can redistrict for that purpose, a court, under Supreme Court jurisprudence, should not do so when the task of redistricting is thrust upon it.[13]

### III.

Contrary to the majority's view, I think that implementation of the remedial plan should be stayed pending resolution of the merits of the case by the Supreme Court.  The four factor test set forth in Long v. Robinson, 432 F.2d 977, 979 (4th Cir. 1970) (citing Virginia Petroleum Jobbers Assoc. v. Fed. Power Comm'n, 104 U.S. App. D.C. 106 (1958)) has, in my view, been satisfied.

---

[13] It is one thing to find, as I did on the merits of this case, and as did the majority in Bethune-Hill, that race was not the not predominant reason for the Enacted Plan.  That merely means that race was not shown to be the predominate reason for drawing the district; and, therefore, that the Plaintiffs did not prove the only theory of the case which they presented.  On the merits, the Plaintiffs did not assert the alternate theory that the Enacted Plan was an unconstitutional political gerrymander, and it would have been improper for the Court to have decided the case on a theory neither raised nor tried.  The same is true in Bethune-Hill.

**A.    Likelihood of Success**

For the reasons set forth in the dissent on the merits, and as further explicated in Bethune-Hill, I think that the Intervenors have a strong likelihood of success on the merits. But, wholly apart from that view, I think that, at the least, the Intervenors have a "substantial case on the merits," and that the other stay factors militate in favor of a stay. Hilton v. Braunskill, 481 U.S. 770, 777-78 (1987); Project Vote/Voting For America, Inc. v. Long, 275 F.R.D. 473, 474 (E.D. Va. 2011).

The linchpin of the majority opinion is its view about the effect of the use of a 55% BVAP threshold in the drawing of Enacted CD3. Page, 2015 WL 3604029, at *18. Since the majority opinion was issued in this case, this Court has issued another decision that rejects the dispositive role given to that factor by the majority in this case. Bethune-Hill, 2015 WL 6440332, at *14-15. The other key aspect of the majority opinion in this case is how to apply the principles recently announced in Alabama Legislative Black Caucus v. Alabama, 135 S. Ct. 1257 (2015). On that important point, the decision in Bethune-Hill is also at odds with the tack taken in the majority opinion in this case.

In sum, this Court has decided two dispositive, but related, redistricting issues in two quite different ways. Both

cases are presently pending in the Supreme Court. The two three-judge courts in this district to have decided these dispositive issues involve five judges of this Court.[14] Taken together, three judges agree with the majority's view on these key issues. Two judges take a quite different view. That, I respectfully submit, demonstrates a conflict on two critical issues among reasonable jurists. That, in turn, warrants a finding that there is a substantial basis on which to believe that the Intervenors have a significant likelihood of success. Hilton, 481 U.S. at 777-78.

When there are strong arguments on both sides of a case, and where, as here, reasonable jurists have differed, in view of the balance of the equities, a stay is warranted. Florida v. United States Dept. of Health and Human Servs., 780 F. Supp.2d 1307, 1317 (N.D. Fla. 2011); see also Scallon v. Scott Henry's Winery Corp., 2015 WL 5772107, at *2 (D. Ore. Sept. 30, 2015); McConnell v. Fed. Election Comm'n, 253 F. Supp. 2d 18, 19 (D.D.C. 2003).

---

[14]    Judge Duncan, sitting by designation, and Judge O'Grady in this case and Judge Keenan, sitting by designation in Bethune-Hill are of one view.  Judge Lee and the undersigned are of a different view in Bethune-Hill, and the undersigned dissented in this case.

### B.    Irreparable Injury

I think that there is little doubt that irreparable hardship will be visited on the Intervenors if the remedial plan is implemented before the Supreme Court decides the merits of the case.

To begin, once the remedial plan is implemented, the landscape for the 2016 election will change immediately and irreparably.  The change is so significant that, as the majority acknowledges, the electoral process will have to be conducted on two fronts.

In particular, the Intervenors will have to run in the districts as fixed by the Enacted Plan so that, if the case is reversed on the merits, they will be positioned to be elected in the district specified by the General Assembly.  And, they will have to run in the districts under the remedial plan so that, if the merits opinion is affirmed, they will be positioned to be elected.  And, of course, other candidates will have to proceed in the same fashion.

In other words, until after the Supreme Court decides the case, neither the Intervenors, nor their possible opponents, nor the electorate will know the composition of the districts that will be in effect in November 2016.  With all respect to the view expressed by my colleagues in the majority, I think the two-front process is irreparable injury to the Intervenors.  In

fact, the solution presented by the majority (to campaign in both the old and new districts), I think, makes considerable added expense to all candidates, both incumbents and challengers, a certainty. Additionally, it is quite likely that the incumbents (Intervenors) could face different challengers in each district (the old and the new). Moreover, because "[a]ll politics is local,"[15] it is also likely that the issues of importance to the constituents in the old and the new districts will be somewhat different. That would be especially true in the case of CD3,[16] CD2, and CD4, where the composition, geography and demography significantly change in the remedial plan.

The prospect of running parallel campaigns under such circumstances presents a realistic, serious, and immediate threat of confusion for candidates and constituents alike that is, I submit, irreparable harm to the Intervenors. That harm is compounded by the need to fund two different campaign organizations and advertising programs, depending on who the

---

[15] The phrase is commonly attributed to former Speaker of the House of Representatives, Thomas P. "Tip" O'Neill, but it actually was penned first in 1932 by Byron Price, Washington Bureau Chief for the Associated Press. http://www.barrypopik.com/index/new_york_city/entry/all_politics _is_local.

[16] Of course, Representative Scott is not an Intervenor, but given the significant changes in composition, demography and geography of CD3 under the remedial plan, even he could encounter problems.

opponent is and what the issues of most significance are. Given the expense of maintaining campaign organizations and of advertising, that burden is a heavy one. That burden could affect the results of the election by diverting scarce resources to a district that ultimately was not called for by the Supreme Court's decision. None of this burden need be visited upon the candidates or the electorate if we but await the Supreme Court's resolution of the merits.

In addressing irreparable injury, the majority has expressed the view that: "[t]he effect [of a stay] would be to give the Intervenors the fruits of victory for another election cycle, even if they lose in the Supreme Court." Supra at 12. With respect for that view, I do not think that, on the facts of this case, our decision on the request for a stay should be influenced by concern that the 2016 election might be conducted under the Enacted Plan if the majority decision is affirmed. On that score, we must be mindful that CD3 has existed in essentially its current form without complaint since 1999. Moreover, the Plaintiffs waited for 21 months after the Enacted Plan was adopted until they filed this action. On this record, I respectfully am unable, in assessing irreparable injury, to ascribe any import to the "unwarranted fruits of victory" concept.

## C.    Harm to Other Parties

I find that the possible harm to the other parties[17] does not justify the denial of a stay.  I recognize that, if the Court were to stay entry of a remedial plan, regardless of whether Plaintiffs were to prevail on the merits in the Supreme Court, time constraints imposed by the federal MOVE Act, 52 U.S.C. § 20302, arguably require that the 2016 congressional elections be run under the Enacted Plan.  However, the time constraints imposed on the Court and the Defendants are a direct result of Plaintiffs' choice to delay filing their Complaint until almost two years after the plan at issue was enacted.    Two  congressional  elections  have  already  been conducted under the Enacted Plan; at worst, Plaintiffs' relief (if they prevail on the merits) would be delayed for one more election cycle.  Given that Plaintiffs did not even file their complaint until long after the implementation of the Enacted Plan, I do not think that the additional delay represents harm to the Plaintiffs or the Defendants; and, whatever harm there may be does not, in my view, outweigh the harm to the Intervenors if the remedial plan is not stayed.

---

[17] The Defendants supported the Enacted Plan on the merits. However, with the change of parties in the offices of Governor and Attorney-General, they have changed sides.

Moreover, the potential injury to the Plaintiffs is further mitigated by the Court's power to postpone the general elections for the affected districts, should the majority's finding of liability be affirmed.  Normally, of course, federal law requires that congressional elections take place "on the Tuesday next after the 1st Monday in November, in every even numbered year[.]"  2 U.S.C. § 7.  However, Congress has provided for an exception to this general rule where extraordinary circumstances so require.  2 U.S.C. § 8.  Section 8 of Title 2 of the United States Code provides that "[t]he time for holding elections in any State, District, or Territory for a Representative or Delegate to fill a vacancy, whether such vacancy is caused by a failure to elect at the time prescribed by law, or by the death, resignation, or incapacity of a person elected, may be prescribed by the laws of the several States and Territories." 2 U.S.C. § 8.  The United States District Court for the District of Columbia, applying this section under similar factual circumstances, "construe[d] this section to mean that where exigent circumstances arising prior to or on the date established by Section 7 preclude holding an election on that date, a state may postpone the election until the earliest

practicable date."   Busbee v. Smith, 549 F. Supp. 494, 525 (1982), aff'd without opinion, 459 U.S. 1166 (1983).[18]

In Busbee, the court concluded that Georgia's reapportionment plan violated Section 5 of the Voting Rights Act, and therefore constituted "failure to elect at the time prescribed by law."[19]   Id. at 525.   Accordingly, the court entered an order setting an amended schedule for Georgia's congressional elections in two of the affected congressional districts, which delayed the general congressional elections in those districts until November 30, a total of 28 days.   Id.   The court recognized that imposing an altered schedule would "impose the burdens of a double election on employed voters [and the state]," but found that this burden was outweighed by Section 5's imperative that the electoral process proceed under a non-discriminatory plan.   Id.   The same is true here; should the Supreme Court agree with the Page II majority, this Court may

---

[18] Although Busbee interpreted a prior version of this statutory provision, the amendments made in 2005 left the relevant text unchanged, and therefore do not alter the analysis as it applies to this case.

[19] A footnote in a later Supreme Court case seems to contemplate a potentially narrower definition of this phrase, based on the legislative history of Section 8.   Foster v. Love, 522 U.S. 67, 71 n.3 (1997).   However, that case was decided in an entirely distinct factual context, and provides no elaboration on the meaning of that phrase beyond that brief footnote.

take steps to enforce its injunction prohibiting elections under an unconstitutional plan and ensure timely implementation of an appropriate remedy, including, if necessary, an amended schedule for the general elections in CDs 1, 2, 3, 4, and 7.

In sum, I can find no substantial injury to the Plaintiffs where, as here, the district at issue has remained essentially the same since 1999 and there was a lengthy delay between the redistricting and the institution of this action.[20]

On the record in this case, I think that the balance of the equities as between the parties calls for the exercise of our discretion to grant a stay so that the Supreme Court can decide the merits of this case before a remedial plan is implemented. It also is appropriate in assessing the injury to the Plaintiff and the balance of the equities to remain mindful of the animating force for this case. In particular, this case was spawned not by a citizen who felt that his or her constitutional

---

[20] That is especially so where, in the event of an affirmance by the Supreme Court, we can slightly alter the election date for CDs 1, 2, 3, 4 and 7, and have the election conducted under the remedial plan. At the merits stage, the Plaintiffs sought to explain the delay in filing suit by arguing that they could not have proceeded until after the Supreme Court decided Shelby County. That is not so because the prohibition against racial gerrymandering long predated the decision in Shelby County. In any event, we rejected the argument in the merits opinion. Page v. Virginia State Bd. Of Elections, 58 F. Supp. 3d 533, 554 n.24 (E.D. Va. 2014), vacated on other grounds sub nom. Cantor v. Personhuballah, 135 S. Ct. 1699 (2015).

rights had been violated.  Instead, this case was brought at the instance of the National Democratic Redistricting Trust.[21] Indeed, Plaintiffs' initial fee application in this case contains an entry showing that it was necessary to go out and drum up a client.  (ECF No. 112-4, at 6 (invoice entry for "email with [redacted] and local contacts regarding finding plaintiffs.").

I do not suggest that an impropriety has occurred, but I think those facts are pertinent in assessing how much weight to give the assertion that the Plaintiffs have been aggrieved so long that we should not enter a stay.  That is particularly so considering the fact that CD3 in essentially its current shape has remained unchallenged since 1999, and considering the 21 month delay between the redistricting and the filing of this action.

Clearly, if the majority opinion is affirmed, the Plaintiffs' rights will have been aggrieved and how the litigation vindicating those rights came to pass will be of no particular importance.  But where, as here, the Plaintiffs did not originate the idea of the suit and, where, as here, there is

---

[21] See Jenna Portnoy, Virginia Redistricting Lawsuits Could Cost Taxpayers Big Bucks, WASHINGTON POST (May 23, 2015), https://www.washingtonpost.com/local/virginia-politics/virginia-redistricting-lawsuits-could-cost-taxpayers-big-bucks/2015/05/23/0e3ca55e-ffd0-11e4-833c-a2de05b6b2a4_story.html.

41

a long delay between the alleged affront of the right and the filing of the suit, it is appropriate, in deciding whether to impose a brief stay to allow full consideration of important issues by the Supreme Court, and in assessing the injury that would result therefrom, to take real world conditions into account.   After all, the Enacted Plan, if it is found by the Supreme Court to be a lawful one, reflects the rights of hundreds of thousands of Virginians to elections conducted under a plan drawn by their elected representatives.   That, I respectfully submit, must be considered in balancing the equities.

D.   **The Public Interest**

I respectfully submit that the public interest will best be served by staying implementation of the remedial plan until after the Supreme Court decides the important, and quite unsettled, issues presented in this case.   As shown above, the two key issues in this case (the effect of using a 55% BVAP in redistricting CD3 and the proper application of the recent decision in Alabama) has been decided differently by two three-judge panels of this Court.   Five judges have split three to two on those issues on the merits.   And, one of the key positions of the Intervenors on the remedy issue (adherence to legislative partisan political objectives) is the subject of substantial uncertainty in the Supreme Court.   The public interest will, I

42

respectfully submit, be best served by awaiting word from the Supreme Court on these key issues, as to which two decisions of this Court manifest significant disagreement.

Furthermore, the practical consequences to the public of denying the stay are quite grave. Should the majority's finding of liability be reversed on appeal, the implementation of the remedial plan beforehand will mean that many thousands voters will have been moved out of their current districts for the third time in less than a decade if the state is permitted to revert to the Enacted Plan for 2018. This shuffling of voters will engender voter confusion, reduce voter participation, foster a disconnect between voters and their legislators, and create significant and avoidable administrative complexity and expense. With the 2016 election cycle quickly approaching, a stay pending appeal will mitigate the likelihood of public confusion during the electoral process for 2016 and potentially 2018 as well.

Finally, as explained above, there is, I think, a very real risk of voter confusion that will be caused if, as the majority posits, the Intervenors have to run campaigns in two districts. There is no need to repeat those points here, but, to me, they counsel the issuance of a stay to foreclose the confusion that could, and, in my view, likely will, skew the results of the election.

Furthermore, the public has an interest in orderly elections conducted in perspective of the guidance of the Supreme Court. In fact, we have held as much previously in this case. <u>Page v. Virginia State Bd. of Elections</u>, 2015 WL 763997 (E.D. Va. Feb. 23, 2015). Admittedly, we confronted a somewhat different landscape there, but we recognized the important principle that, where important relevant issues are pending before the Supreme Court, we ought to stay our hand to await the judgment of the Supreme Court. I think that principle fully applies here.

For the foregoing reasons, I would grant the Intervenors' motion to stay entry of a remedial plan until after the Supreme Court's resolution of the case on the merits.


_____/s/_____
Robert E. Payne


Richmond, Virginia
Date:  January 7, 2016


44